# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

RUSSEL DOVER, JONATHAN STONE,
CODY RANK, and SUZETTE PERRY, on
behalf of themselves and all others similarly
situated,

        Plaintiffs, -

       v.

BRITISH AIRWAYS, PLC (UK),

        Defendant.

Case No. 1:12-cv-05567-MKB-MDG

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BRITISH AIRWAYS PLC'S MOTION TO DISMISS

DLA Piper LLP (US)
Richard F. Hans
Keara M. Gordon
David V. Sack
richard.hans@dlapiper.com
keara.gordon@dlapiper.com
david.sack@dlapiper.com
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 335-4500

*Attorneys for Defendant British Airways PLC*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

I.      INTRODUCTION ............................................................................................... 1

II.     STATEMENT OF FACTS ................................................................................... 3

        A.      The Parties ................................................................................................ 3

        B.      The Ever-Growing Cost of Fuel to BA..................................................... 3

        C.      The Fuel Surcharge .................................................................................. 5

                1.      The Fuel Surcharge Is An Estimate of a Future, Unknown Amount........ 5

                2.      BA's Cost of Fuel May Not Equal Oil's Market Price on Date of Travel ................................................................................................. 7

        D.      British Airways Executive Club ................................................................ 8

        E.      DOT Oversight.......................................................................................... 9

        F.      The Plaintiffs............................................................................................ 10

                1.      Russell Dover.................................................................................. 10

                2.      Jonathan Stone ................................................................................ 10

                3.      Cody Rank ....................................................................................... 11

                4.      Suzette Perry ................................................................................... 11

III.    ARGUMENT........................................................................................................ 11

        A.      Motion to Dismiss Standard...................................................................... 12

        B.      The Contract Claim Fails To State a Claim and Should Be Dismissed.............. 13

                1.      The Contract is Enforceable and Not a Contract of Adhesion................. 13

                2.      The Contracts Expressly Contemplate the Imposition of a Fuel Surcharge And Thus the First Contract Claim Fails............................... 15

                3.      The Plaintiffs' Alternative Contract Claim Fails ..................................... 17

                        a.      The Website Statement is Not Part of the Contract.................... 18

                        b.      The Reference to "Reflect" the Price of "Worldwide Oil" Is Too Vague To Be Enforceable ................................................... 19

        C.      The Airline Deregulation Act Preempts Plaintiffs' Claim................................ 20

                1.      The ADA Expressly Preempts the Plaintiffs' Claim .............................. 21

                2.      The ADA Impliedly Preempts The Plaintiffs' Claim ............................. 24

IV.     CONCLUSION.................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A.I.B. Express, Inc. v. FedEx Corp.,*
    358 F. Supp. 2d 239 (S.D.N.Y. 2004)............................................................21, 23

*Ahing v. Lehman Bros., Inc.,*
    No. 94-cv-9027, 2000 WL 460443 (S.D.N.Y. Apr. 18, 2000) ................................13

*Am. Airlines, Inc. v. Wolens,*
    513 U.S. 219, 115 S. Ct. 817 (1995)...................................................21, 22, 23, 24

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009)........................................................................................12

*ATSI Commn's, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007)....................................................................................3

*Aviall, Inc. v. Ryder Sys., Inc.,*
    913 F. Supp. 826 (S.D.N.Y. 1996) ......................................................................13

*Bakalar v. Vavra,*
    619 F.3d 136 (2d Cir. 2010)................................................................................12

*Bekhor v. Bear, Stearns & Co., Inc.,*
    No. 96 Civ. 4156, 2004 WL 2389751 (S.D.N.Y. Oct. 25, 2004) ...........................16

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...........................................................................................12

*Best Brands Beverage, Inc. v. Falstaff Brewing Corp.,*
    842 F.2d 578 (2d Cir. 1987).................................................................................19

*Brookhaven Housing Coalition v. Solomon,*
    583 F.2d 584 (2d Cir. 1978)............................................................................19, 20

*Buck v. Am. Airlines, Inc.,*
    476 F.3d 29 (1st Cir. 2007)..............................................................................21, 22

*Capp Seville, Inc. v. Northwest Airlines, Inc. (In re Northwest Airlines Corp.),*
    383 B.R. 283 (Bankr. S.D.N.Y. 2008) .................................................................16

*Cipollone v. Liggett Group, Inc.,*
    505 U.S. 504 (1992)...........................................................................................21

*Cordts-Auth v. Crunk, LLC,*
    479 F. App'x 375 (2d Cir. 2012) ..........................................................................17

*Del Global Tech. Corp. v. Park,*
    No. 03-civ-8867, 2008 WL 5329963 (S.D.N.Y. Dec. 15, 2008)............................................16

*Delta Air Lines, Inc. v. Black,*
    116 S.W.3d 745 (Tex. 2003)..................................................................................................23

*Donkor v. British Airways Corp.,*
    62 F. Supp. 2d 963 (E.D.N.Y. 1999) ...................................................................................23

*Ellse v. Hill-Pickford*
    [2006] EWHC 3293 ......................................................................................................16, 17

*Euromepa, S.A. v. R. Esmerian, Inc.,*
    154 F.3d 24 (2d Cir.1998)......................................................................................................12

*Feldman v. United Parcel Service, Inc.,*
    No. 06-civ-2490, 2008 WL 800989 (S.D.N.Y. Mar. 24, 2008)..............................................24

*Fireman's Fund Ins. Co. v. Superior Court,*
    65 Cal. App. 4th 1205, 78 Cal. Rptr. 2d 418 (Cal. Ct. App. 1997) ........................................17

*FMC Tech., Inc. v. Edwards,*
    No. C05-946C, 2007 WL 1725098 (W.D. Wash. June 12, 2007), *aff'd*, 302 F. App'x
    577 (9th Cir. 2008)..................................................................................................................19

*Galbut v. Am. Airlines, Inc.,*
    27 F. Supp. 2d 146 (E.D.N.Y. 1997) ...................................................................................23

*Gambello v. Time Warner Commc'n, Inc.,*
    186 F. Supp. 2d 209 (E.D.N.Y. 2002) ...................................................................................19

*Goldman v. Metropolitan Life Ins. Co.,*
    5 N.Y.3d 561, 841 N.E.2d 742 (2005)....................................................................................17

*Grandis Family P'ship, Ltd. v. Hess Corp.,*
    588 F. Supp. 2d 1319 (S.D. Fla. 2008) ...........................................................................18, 19

*Greenfield v. Phillies Records, Inc.,*
    98 N.Y.2d 562, 750 N.Y.S.2d 565 (2002) .............................................................................15

*Hamilton v. Accu-Tek,*
    47 F. Supp. 2d 330 (E.D.N.Y. 1999) ...................................................................................12

*Hbouss v. Coca-Cola Enter. Inc.,*
    No. 05-cv-7965, 2006 WL 2285598 (S.D.N.Y. Aug. 9, 2006)................................................12

*Hearst Commc'ns, Inc. v. Seattle Times Co.,*
    154 Wash. 2d 493, 115 P.3d 262 (Wash. 2005) ...................................................................17

iii

*In re Jetblue Airways Corp. Privacy Litig.*,
  379 F. Supp. 2d 299 (E.D.N.Y. 2005) ...................................................................23

*In re Parmalat Sec. Litig.*,
  No. 04-9771, 2007 WL 541466 (S.D.N.Y. Feb. 22, 2007).......................................12

*Investors Compensation Scheme Ltd. v. West Bromwich Building Society*,
  [1997] UKHL 28 .......................................................................................................17

*Klos v. Lotnicze*,
  133 F.3d 164 (2d Cir. 1997)...............................................................................13, 14

*Ladas v. California State Auto. Ass'n*,
  19 Cal. App. 4th 761, 23 Cal. Rptr. 2d 810 (Cal. Ct. App. 1993) ...........................19

*Larned v. First Chicago Corp.*,
  636 N.E.2d 1004 (Ill. App. Ct. 1994) .....................................................................14

*Lozano v. United Cont'l Holdings, Inc.*,
  11 C 8258, 2012 WL 4094648 (N.D. Ill. Sept. 17, 2012).......................................19

*Lyn-Lea Travel Corp. v. Am. Airlines*,
  No. 3:96-cv-2068, 1999 WL 777716 (N.D. Tex. Sept. 29, 1999) ...........................24

*McMullen v. Delta Air Lines, Inc.*,
  No. 08-1523, 2008 WL 4449587 (N.D. Cal. Sept. 30, 2008)...................................22

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992)...........................................................................................21, 22

*Onoh v. Northwest Airlines, Inc.*,
  613 F.3d 596 (5th Cir. 2010) ...................................................................................23

*Oorah, Inc. v. Schick*,
  No. 09-CV-00353, 2012 WL 3233674 (E.D.N.Y. Aug. 6, 2012) ......................19, 20

*PaineWebber, Inc. v. Bybyk*,
  81 F.3d 1193 (2d Cir. 1996)......................................................................................18

*Polinovsky v. British Airways, Inc.*,
  No. 11 C 779, 2012 WL 1506052 (N.D. Ill. Mar. 30, 2012) ...................................23

*Portside Growth & Opportunity Fund v. Gigabeam Corp., Inc.*,
  557 F. Supp. 2d 427 (S.D.N.Y. 2008).......................................................................16

*Prince of Peace Enter., Inc. v. Top Quality Food Mkt., LLC*,
  760 F. Supp. 2d 384 (S.D.N.Y. 2011).......................................................................13

*Rothstein v. Am. Airlines, Inc.*,
    No. 09-c-2770, 2011 WL 2647961 (N.D. Ill. June 30, 2011)............................13, 14

*Serrano v. Cablevision Sys. Corp.*,
    863 F. Supp. 2d 157 (E.D.N.Y. 2012) ...........................................................18, 19

*Simon v. Cont'l Airlines, Inc.*,
    1:09 CV 631, 2010 WL 429932 (N.D. Ohio Feb. 4, 2010) *aff'd*, 439 F. App'x 542
    (6th Cir. 2011)............................................................................................15

*Smith v. Comair, Inc.*,
    134 F.3d 254 (4th Cir. 1998) .........................................................................23

*Spirit Airlines, Inc. v. DOT*,
    687 F.3d 403 (D.C. Cir. 2012)........................................................................24

*Statland v. Am. Airlines, Inc.*,
    998 F.2d 539 (7th Cir. 1993) .........................................................................22

*TSR Silicon Res., Inc. v. Broadway Com Corp.*,
    No. 06 Civ. 9419(NRB), 2007 WL 4457770 (S.D.N.Y. Dec. 14, 2007)..................13

*Volodarskiy v. Delta Air Lines, Inc.*,
    No. 11 C 782, 2012 WL 5342709 (N.D. Ill. Oct. 29, 2012) .................................23

*Waul v. American Airlines, Inc.*,
    2003 WL 22719273 (Cal. App. Ct. Nov. 17, 2003)............................................24

*Zaltz v. Wells Fargo Home Mortg.*,
    No. 08-civ-11225, 2010 WL 3026536 (S.D.N.Y. Aug. 2, 2010) ...........................15

## STATUTES

49 U.S.C. § 41712............................................................................................9, 24

49 U.S.C. § 41713..............................................................................................21

## OTHER AUTHORITIES

14 C.F.R. § 399.84...........................................................................................9, 24

14 CFR § 399.88..................................................................................................5

14 CFR § 221.100...............................................................................................10

Fed. R. Civ. P. 44.1.............................................................................................12

# I.    INTRODUCTION

During the putative class period, the cost of jet fuel to defendant British Airways PLC ("BA") more than doubled, from £1.6 billion as of March 2006, to £3.7 billion in 2012.  In 2012, those costs rose to more than 35 percent of BA's total expenses.  To defray a portion of these skyrocketing costs, BA imposes a fuel surcharge on its flights, including ones redeemed through its frequent flier program, the Executive Club.

Each plaintiff chose to join BA's Executive Club, which is free to join and permits members to earn "Avios" not only by flying on BA but also by staying at partner hotels, renting cars, using partner credit cards, or redeeming American Express points.  When the plaintiffs joined the Executive Club, they signed a contract that explicitly informed them that BA intended to impose a fuel surcharge, and by accepting, agreed to that term.  When the plaintiffs chose to redeem Avios to book a flight, the BA website unambiguously set forth the various charges, including the fuel surcharge, imposed.  The plaintiffs then, of course, could choose whether to book that flight or otherwise redeem their Avios.  The plaintiffs booked their flights on the terms presented.

Now, with full notice that BA reserved the right to, and would, impose a fuel surcharge, and nevertheless proceeding, the plaintiffs feign shock that one was imposed, object to its imposition, claim that BA could not contractually impose it, and argue that the contract was one of adhesion. The explicit language of the contract eviscerates that claim, and it must be dismissed.

In the alternative, the plaintiffs argue that, in the event that BA could impose a fuel surcharge (which, of course, it could), the contract required BA to set the fuel surcharge in some particular manner (exactly how is not articulated), and BA supposedly deviated from this

(unknown and unstated) mechanism. In so doing, the plaintiffs essentially offer a consumer protection claim using breach of contract language.

This alternative claim, that the fuel surcharge must but does not precisely track some undefined relationship to the cost of fuel on a particular day is meritless. The contract does not require (or promise) that BA follow any particular methodology for setting the fuel surcharge and does not require BA to adjust the surcharge with every rise and fall in a volatile oil market. Without such particularity, the term that the plaintiffs advocate be read into the contract is void for vagueness. Moreover, what the plaintiffs seek – an exact, statistical correlation between the market price of fuel on the date of travel that precisely matches the exact amount of fuel expended on their flight – is both impracticable and impermissible. BA applies the fuel surcharge on the date one books a flight, not the later travel date, and when imposed, the exact cost of fuel on the future travel date is unknowable. The amount of fuel that actually will be expended on that particular flight is also unknowable, varying with among other things, the type of aircraft flown, the number of actual passengers on board, the weight of cargo, weather, and trip delays. And, because BA purchases fuel via forward contracts and hedges those positions, the cost of fuel to BA may deviate from the specific market price of fuel on any given day. But, BA assesses its fuel costs and sets its fuel surcharge accordingly: The surcharge has fallen at times and at times remained flat, even in the face of rapidly rising fuel prices.

Finally, the fuel surcharge is an integral component of the overall pricing of a ticket, and as a result, any complaint brought under state or other contract law is expressly preempted by the Airline Deregulation Act (the "ADA"). If the plaintiffs seek to impose a specific regimen for the determination of the fuel surcharge, then such claim is impliedly preempted as issues relating to

the application and disclosure of fuel surcharges falls exclusively within the oversight and governance of the U.S. Department of Transportation.

The complaint must be dismissed as a matter of law.

## II.   STATEMENT OF FACTS

### A.   The Parties

BA is a member of International Consolidated Airlines Group, S.A. ("IAG") and the UK's largest international airline. Its principal place of business is in London, with a presence at Heathrow, Gatwick, and London City airports. (Ex. 2, at 2.)[1] Through its joint business agreement, code share, and franchise partners, BA flies more than 34 million passengers annually to more than 400 destinations worldwide. (*Id.*, at 2, 79).

The four named plaintiffs in this action – Russell Dover, Jonathan Stone, Cody Rank, and Suzette Perry – allege they are BA Executive Club members who booked reward flights for international travel with BA. (Compl. ¶ 11).

### B.   The Ever-Growing Cost of Fuel to BA

The cost of jet fuel to BA has risen nearly continuously since 2003 and the percentage of fuel costs to total expenses has risen as well.[2]

- During fiscal year 2005 alone, the price of fuel rose 44.4 percent, which resulted in an increased cost of fuel to BA of 22.5 percent (for a total of £1,128,000 billion in fuel and oil costs). (Ex. 3, at 2-3, 6).[3]

---

[1]     Capitalized terms herein are defined as in the Complaint (Ex. 1). All documents referenced herein are attached to the Declaration of Keara M. Gordon, filed contemporaneously herewith and referred to as "Ex. _."

[2]     The Court may properly consider documents integral to or incorporated into the complaint, documents of which plaintiffs had knowledge, public documents filed with the Securities and Exchange Commission, or facts of which the Court may take judicial notice. *See ATSI Commn's, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). BA's annual reports, investor day presentations and transcripts are publicly available and the Court may take judicial notice of them. Given their voluminous nature, BA is attaching only the relevant excerpts of those documents, but it will make the entirety of the documents available to the Court upon request.

[3]     By March 2005, fuel prices were at "record highs"; the cost of fuel was up 75 percent from early December 2003, which resulted in a "heavy hit to the bottom line". (Ex. 4; Ex. 5, at 19-21). Fuel was "the major cost issue" for BA at that time. (*Id.* at 21).

- In fiscal year 2006, fuel costs continued to soar; brent crude reached a then all-time high of $72 a barrel in May 2005. (Ex. 6, at 3).

- Fuel prices were up 38 percent in March 2006 over the prior fiscal year. (Ex. 6, at 3, 23). The resulting cost to BA for fuel and oil rose 44.7 percent, to £1.6 billion at March 31, 2006. (*Id.* at 10). BA reported that fuel prices "continue to stalk the industry and there is no sign this will change". (*Id.* at 3). At that time, BA anticipated an additional significant cost for 2006/2007. (Ex. 7, at 137).

- In 2007, fuel continued to be a "major cost" – BA's second largest cost, and it rose 22.1 percent to £1.931 billion. (Ex. 8, at 2; Ex. 9; Ex. 10, at 45).

- Fuel prices continued to increase; by March 2008, fuel costs rose to £2.055 billion, a 28.4 percent increase from 2006. (Ex. 11, at 13, 14; Ex. 6, at 10; Ex. 12, at 36).

- In March 2008, BA anticipated that the following year's fuel bill would be up an additional £1 billion to a whopping £3 billion. (Ex. 11, at 5, 11).

- Record oil prices continued in fiscal year 2009. (Ex. 13, at 9). "The year saw unprecedented volatility in oil prices, climbing at one point to $146 a barrel and falling to as low as $37 a barrel." (*Id.* at 14). At $146 a barrel, fuel costs were at "unprecedented levels." (*Id.* at 19; Ex. 14). BA remained concerned about the "prospect of renewed volatility." (Ex. 13, at 19, Ex. 15, at 59).

- By the end of 2009, fuel costs had risen another staggering 44.5 percent to £2.969 billion. (Ex. 13, at 15). In 2010, jet fuel costs recovered, but they rose again by more than 33 percent in 2011. (Ex. 16, at 5).

- As BA noted in its 2011 Annual Report, "[i]t has been a difficult few years for the aviation industry; 2011 was no exception with significant increases in fuel prices against a backdrop of a sluggish global economic recovery." (Ex. 6, at 2).

- In 2012, fuel costs again increased, this time by 14.4 percent, to more than £3.7 billion. (Ex. 2, at 6).

In sum, with limited exceptions, the cost of jet fuel has risen significantly and nearly continuously throughout the putative class period. (Ex. 17; *see also* Ex. 18).

## C.     The Fuel Surcharge

As a result, BA began to impose a fuel surcharge. (Ex. 3, at 4). BA was not unique or an outlier – many airlines began to impose a fuel surcharge in this same period. (*See* Ex. 19, at 17).

Fuel surcharges are not limited to airlines – they are imposed by a number of transportation-related industries.

## 1. **The Fuel Surcharge Is An Estimate of a Future, Unknown Amount.**

BA does not assign a unique fuel surcharge to an individual flight, but rather assesses globally fuel costs as well as market forces, and sets the surcharge based on sector, length of flight and class of ticket purchased. BA applies the surcharge on the date that one purchases a ticket, not as of the date of travel. (Ex. 19, at 17-19). It is not commercially practicable for BA (or any airline) to assign a fuel surcharge that will exactly match the actual per passenger cost of fuel on a specific flight on which a specific passenger may travel months in advance.

- Like the plaintiffs, many travelers purchase their travel a month, three months, or eight months in advance (or more). (Compl. ¶¶ 19-20, 23, 26, 29). At the time that BA issues a ticket, the price of refined jet fuel on the date of travel is unknowable, and cannot be predicted with any certainty.[4]

- The price BA pays for jet fuel on a particular traveler's plane will be affected by its hedging positions, the purchase of forward fuel contracts, and the impact of the currency exchange rate between dollars and pounds. (*See, infra,* Section I(C)(2); Ex. 19, at 15-17).

- At the time of booking, BA does not know other future variables that necessarily will affect the amount of fuel expended on that flight, such as: weather; seat density; type and age of the aircraft; the size of the aircraft; the percentage of the plane that will be filled (versus vacant); excess baggage; the existence (or lack of) headwinds; taxi times; or long waits circling to land. (*See, e.g.,* Ex. 19, at 8-12 (factors affecting fuel efficiency)).

- BA, with its partners, files over 750 flights per day to 70 countries on 240 planes, and in the last 12 months, transported more than 34 million passengers, which common sense dictates administratively would make a particularized fuel surcharge calculation impossible. (Ex. 20).

- BA does not change its fuel surcharge daily; rather, it changes the fuel surcharge periodically based upon a variety of factors including significant swings in the price

---

[4] BA assumes the risk of an increase in fuel costs and surcharge between the time of purchase and travel, and the customer has certainty in pricing. Imagine the contrary situation where, on the date of travel, a customer is told that he or she owes another $100 to cover the cost of fuel because of precipitous price spikes. In any event, BA is prohibited from retroactively truing up the actual or additional cost of fuel used. *See* 14 CFR § 399.88.

of jet fuel that are not perceived to be short-term; as a result, the fuel surcharge is not going to move every time that the price of oil moves.  (*See* Ex. 19, at 17).

- As explained to investors in March 2008, fuel surcharges did not then recapture the entirety of fuel costs or even the entirety of any increase of fuel prices since the beginning of their precipitous rise in 2003; instead, at the time, BA recouped only approximately 60-70 percent of the increase in fuel prices since 2003.  (Ex. 12, at 47).

Nevertheless, the correlation of fuel surcharge to the volatile price of jet fuel over the relevant period is demonstrable.



(*See* Ex. 31).

BA has on several occasions, during the putative class period, reduced the fuel surcharge, to reflect and follow a fall in jet fuel prices.  For example, on December 18, 2008, following a precipitous drop in the weighted spot price of jet fuel from a high of $1,993 per gallon in early November 2008 to $1,315 per gallon by mid-December, British Airways *reduced* its fuel surcharge on short-haul flight segments 22 percent, from $68 to $53, and 31.25 percent for long-haul flights, from $96 to $66.  (Ex. 31).  BA also lowered its fuel surcharge on long haul flights during 2007.  (Ex. 10, at 47).

From December 18, 2008 until December 13, 2010, a period of two years, and almost from the moment that BA reduced its fuel surcharge, the spot price of jet fuel began a nearly continuous and steep rise, increasing 78.45 percent, from $1,355 per gallon to $2,418 per gallon. (Ex. 31). During this period, BA did not raise its fuel surcharge. When BA finally did increase the surcharge, on December 14, 2010, it only did so modestly, raising its short-haul fuel surcharge an increase of only 18.87 percent, and its long-haul surcharge an increase of only 15.15 percent. (Ex. 21).

### 2. BA's Cost of Fuel May Not Equal Oil's Market Price on Date of Travel.

For a variety of reasons, the cost of fuel to BA on a given day may not be the same as the market price of oil on that day. For example, BA purchases refined jet fuel, not crude oil, and does so (in part) pursuant to forward contracts as jet fuel. (Ex. 22, at 59; Ex. 3, at 59; Ex. 13, at 119-120). Forward contracts are "over the counter" agreements between two parties whereby one purchases fuel from the other at a fixed price at a future date. (*See* Ex. 19, at 15-16). And, BA employs a hedging strategy in an attempt to temper the relationship between the daily, more volatile market price for jet fuel and BA's cost of fuel.[5] Moreover, BA pays for fuel in dollars, but accounts in pounds sterling, and thus its cost of fuel is affected by currency exchange rates. (Ex. 15, at 60). Set forth within Exhibit 12 is a chart that demonstrates the relationship between the market price of crude oil, and the actual cost to BA, after factoring in its hedging position. (Ex. 12; *see also* Ex. 14; Ex. 15, at 60).

---

[5]     *See, e.g.,* Ex. 22, at 6 (explaining that the price of fuel rose by 9.9 percent but the cost to BA rose 9.5 percent due in part to hedging); Ex. 3, at 6 (price of fuel rose 44.4 percent but the cost to BA rose 22.5 percent due in part to hedging), 10 (discussing hedging strategy); Ex. 6, at 41, 86, 88 (fuel price strategy and hedging); Ex. 8, at 30-31; Ex. 9; Ex. 12 at 48-52 ("jet prices are high and volatile" . . . "with consequent impact on operating profit"); Ex. 13; Ex. 15, at 59.

**D.** **British Airways Executive Club**

The "Executive Club" is BA's frequent-flier program. It is free to join. One need not fly on BA to earn points, called "Avios"; rather, members can earn points while staying at a number of hotel chains, such as Marriott, Starwood, Hyatt, Mandarin Oriental, Hilton, and many others, by renting a car with Avis, or simply using a credit card linked to the Executive Club. Members can then apply their Avios on reward flights, hotel stays, or car rentals. (*See* Ex. 23, About the Executive Club http://goo.gl/5T4Qj).)

Travelers who wish to join the Executive Club must first agree to the "Executive Club Terms and Conditions" (the "Contract"). (Compl. ¶ 3). The Contract is on BA's website. (Ex. 24, Executive Club Terms & Conditions http://goo.gl/J4Weq). Anyone who joins the Executive Club must agree to its terms before joining. (*Id.*)

The Contract specifically provides that BA may impose a fuel surcharge:

> 13.14. Other than in relation to special promotions and subject to the applicable Conditions of Use of such promotions, **Members will be liable for all taxes and other charges associated with Reward travel on British Airways or a Service Partner airline, including without limitation,** airport departure tax, customs fines, immigration fees, airport charges, customer user fees, **fuel surcharges,** agricultural inspection fees, security and insurance surcharge or other incidental fees or taxes charged by any person or relevant authority or body.

(*Id.* (emphasis added)).

The Contract provides that "Rewards for travel on British Airways flights are subject to the General Conditions of Carriage for Passengers and Baggage" ("Conditions of Carriage"), which provide BA authority to charge its customers a fuel surcharge on all flights. (Ex. 24, Contract § 13.1.). The Conditions of Carriage, which are also available on the website, provide that, "When you buy a ticket to travel on a flight we operate, you enter into a contract of carriage with us. The contract is governed by: the conditions in your ticket or itinerary and receipt; any tariffs which apply; Conditions of Carriage; our regulations." (Ex. 25, Conditions of Carriage).

8

The Conditions of Carriage explicitly provide BA authority to charge fuel surcharges on all flights. "We may charge any surcharge to the fare for your ticket which applies under our tariff on the date you pay for your ticket, for example a fuel or insurance surcharge." (Ex. 25, Conditions of Carriage § 4a5).[6]

Contrary to the plaintiffs' allegations, the website does not promise free flights. (Compl. ¶ 1-2). Rather, it explicitly states that, "The taxes, fees and charges will always need to be paid with money." (Ex. 26, About Reward Flights http://goo.gl/CCGcg). Attached as Exhibit 26 are screenshots that demonstrate that BA clearly discloses the charges that will be imposed. The website also discloses that, "The taxes, fees and carrier charges vary according to travel date, carrier and route flown . . . ." (*Id.*). When an Executive Club member seeks to redeem Avios in exchange for a flight using BA's website, the website explicitly states that fuel surcharges will be assessed and this is stated *before* the members book the desired flight.[7] Each member (and thus each plaintiff) then has the choice to redeem Avios and book the flight or purchase a ticket with another airline. It is the member's choice.

E.    **DOT Oversight**

Trade practices, including the advertising and disclosure of air fares, charges, and other prices, are closely regulated by the Department of Transportation ("DOT"), and the DOT may investigate and discipline carriers in respect of their practices. *See* 49 U.S.C. § 41712; 14 C.F.R. 399.84; *see also* Ex. 27). As it is required to do pursuant to governing law and DOT regulations, BA files an International Passenger Rules and Fares Tariff (the "Tariff"). BA updates its tariff from time to time to reflect changes in, among other things, fuel surcharges. (Ex. 28). The Tariff

---

[6]    There is no contractual document which requires a specific or definable correlation between the cost of jet fuel and any specified fuel surcharge.

[7]    BA is not the only airline to impose fuel surcharges on redemption flights for frequent flyer customers. Delta, for example, states on its website that it imposes "Taxes & Carrier Imposed Fees", including YR, which is a reference to fuel surcharge, of up to $650.00 each way.

is publicly available. *See* 14 CFR 221.100. Rule 41, found under the Tariff's General Rules, details insurance and fuel surcharges for various long-haul and short-haul sectors for BA flights.

## F.     The Plaintiffs

### 1.     Russell Dover

Russell Dover has been an Executive Club member since 1996. (Compl. ¶ 15). He alleges that he booked two first-class, round-trip tickets from San Francisco International Airport to London Heathrow International Airport ("LHR"), a flight covering 5,350 miles. (*Id.* ¶¶ 19-20; *See* http://goo.gl/H8B8V).[8] Dover booked his flights on April 26, 2012, eight months in advance of the scheduled departure. (*Id.*). He alleges that he paid $854 total in fuel surcharges. (*Id.*). Every "round-trip" ticket is actually a set of two tickets, and Dover alleges that he purchased two round-trip tickets, so the actual fuel surcharge applied across four trips covering 21,400 miles, equates to $213.50 of fuel surcharge per ticket, or about 25 cents per mile.

### 2.     Jonathan Stone

Jonathan Stone alleges that he has been an Executive Club member for more than twelve years. (Compl. ¶ 21). Stone alleges that he booked two round-trip tickets on January 21, 2012, for a flight from John F. Kennedy International Airport to LHR, a trip of 3,440 miles. (*Id.* ¶ 23; *See* http://goo.gl/H8B8V). Stone bought his ticket six months in advance of his travel date. (Compl. ¶ 23). Stone does not specify what amount he allegedly paid in fuel surcharges. Rather, he lumps the alleged fuel surcharge into $750 of "taxes, fees and surcharges," vaguely alleging that the fuel surcharge accounted for an unstated "vast majority" of this set of fees. (*Id.*). The total surcharges, applied across four tickets covering 13,760 miles, equate to $187.50 per ticket, or about 18 cents per mile.

---

[8]     All cites to mileage are from http://goo.gl/H8B8V (last viewed March 20, 2013).

### 3.  Cody Rank

Cody Rank alleges that he has been an Executive Club member since January 2010. (Compl. ¶ 25).  Rank alleges that on May 27, 2012, he booked two economy tickets for separate, two-legged flights:  first, a June 18, 2012 departing flight from Seattle to LHR, a distance of 4,780 miles, and then from London Gatwick Airport to Amsterdam (another 225 miles); and, second, a July 4, 2012 return flight from Berlin to LHR (597 miles), and LHR to Seattle (4,780 miles).  (*Id.* ¶ 26; *See* http://goo.gl/H8B8V).  Rank alleges total fees and charges paid on his tickets, but does not specify what amounts he allegedly paid in fuel surcharges, offering only that "[o]n information and belief, the majority of the $1,436.78 consisted of the 'fuel surcharge'." (Compl. ¶ 27).  The total surcharges applied across these four flights and 10,382 miles, equates to less than $359.16 per ticket, or about 14 cents per mile.

### 4.  Suzette Perry

Suzette Perry alleges that she became an Executive Club member in October 2011. (Compl. ¶ 28).  Perry alleges to have booked five, round-trip "coach class" tickets for a "trip to London," departing from Los Angeles to London on September 18, 2012, and returning from London to San Francisco on October 3, 2012.  (*Id.* ¶ 29).  Perry booked her travel more than three months in advance.  (*Id.*).  Perry alleges to have paid $3,292.60 in what is described only as "surcharges" for the ten legs of travel that these round-trip tickets represent.  (*Id.* ¶ 30).  Perry does not allege, however, whether this amount is exclusively or even substantially fuel surcharges.  The total surcharges applied to these ten flights amounts to $329.26 for each of the nearly 11-hour, 5,350-5,440 mile legs, or about 6 cents per mile.  (*See* http://goo.gl/H8B8V).

## III.  ARGUMENT

The plaintiffs have failed to plead adequately breach of contract claims.  The Contract: (1) is not one of adhesion and its terms should be enforced; (2) explicitly permits the application

of a fuel surcharge as determined by BA; (3) does not dictate any particular methodology for calculating the surcharge, nor may one be implied, and (4) does not (and cannot) require that the surcharge reflect the actual cost of fuel for that passenger on that future flight. The plaintiffs' claims are really thinly veiled consumer protection and unfair trade practices claims, striking directly at BA's pricing, and thus are expressly and impliedly preempted by the ADA.

## A.   <u>Motion to Dismiss Standard</u>

Under Rule 12(b)(6), a complaint must be dismissed if it does not plead sufficient facts to state a claim for relief that is "plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotations omitted). "[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Id.* at 1940 (citing *Twombly*, at 555).[9]

---

[9]      The Executive Club Contract provides that it is governed by English law. (Ex. 29, Contract ¶ 30.1). As a result, the analysis herein incorporates the attached English law opinion, which applies English law. The Federal Rules provide that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1; *see Hbouss v. Coca-Cola Enter. Inc.*, No. 05-cv-7965, 2006 WL 2285598, at *4 (S.D.N.Y. Aug. 9, 2006) (making foreign law determinations pursuant to Rule 44.1 on motion to dismiss); *Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24, 28 n.2 (2d Cir.1998) (affidavits submitted by the parties may be considered); *In re Parmalat Sec. Litig.*, No. 04-9771, 2007 WL 541466 (S.D.N.Y. Feb. 22, 2007) (accepting declaration of Italian law from Milan-based partner of defendant's counsel, Clifford Chance). As such, BA has attached to the Gordon Declaration the English Law Opinion of Paul Stone, an admitted Solicitor and partner in DLA Piper's Leeds, U.K. office.

The tickets purchased, however, are separate contracts between BA and the passengers, and do not contain a choice of law provision. Because the Court's jurisdiction in this case is predicated on diversity of citizenship, New York's choice-of-law rules apply. *See Bakalar v. Vavra*, 619 F.3d 136, 139 (2d Cir. 2010); *Hamilton v. Accu-Tek*, 47 F. Supp. 2d 330, 335 (E.D.N.Y. 1999) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S. Ct. 1020 (1941)). In the absence of a choice-of-law clause, "the interpretation and the validity of contracts are determined by the law of the place where the contract is made, while all matters connected with its performance are regulated by the law of the place where the contract, by its terms, is to be performed." *Prince of Peace Enter., Inc. v. Top Quality Food Mkt., LLC*, 760 F. Supp. 2d 384, 396-97 (S.D.N.Y. 2011); *TSR Silicon Res., Inc. v. Broadway Com Corp.*, No. 06 Civ. 9419(NRB), 2007 WL 4457770, at *3 (S.D.N.Y. Dec. 14, 2007) (quoting *Auten v. Auten*, 308 N.Y. 155, 160, 124 N.E.2d 99, 101 (1954)). As the issues here appear to range from interpretation to performance, the laws of the several relevant states, including New York, must be considered.

**B.**     **The Contract Claim Fails To State a Claim and Should Be Dismissed.**

**1.**     **The Contract is Enforceable and Not a Contract of Adhesion.**

The allegation that the Contract is an adhesion contract may be quickly rejected.   The Contract, and the contract formed when one buys a frequent flier ticket, are not contracts of adhesion.   "New York contract law presumes that a written agreement is valid and that it accurately reflects the intention of the parties, and imposes a heavy burden on the party seeking to disprove those presumptions." *Aviall, Inc. v. Ryder Sys., Inc.*, 913 F. Supp. 826, 831 (S.D.N.Y. 1996).   The plaintiffs must show "the contract is the product of procedural unfairness *and* suffers from" substantive defects, such as inflicting unfairness or including terms that are "unduly oppressive, unconscionable, or contrary to public policy." *Id.* (emphasis added); *accord Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) (adhesion "may not be invoked to trump the clear language of the agreement unless there is a disturbing showing of unfairness, undue oppression, or unconscionability"); *Ahing v. Lehman Bros., Inc.*, No. 94-cv-9027, 2000 WL 460443, at *7 (S.D.N.Y. Apr. 18, 2000) (contract enforced because plaintiff did not make necessary disturbing showing of unfairness, undue oppression or unconscionability) (citing *Arakawa v. Japan Network Group*, 56 F. Supp. 2d 349 (S.D.N.Y. 1999)).

Courts repeatedly hold that frequent flier program contracts are not unconscionable adhesion contracts. *See, e.g., Rothstein v. Am. Airlines, Inc.*, No. 09-c-2770, 2011 WL 2647961, at *4 (N.D. Ill. June 30, 2011) (fraudulent-use clause allowing airline to terminate lifetime pass in frequent flyer contract was not unconscionable; term was "not grossly one-sided or oppressive to [plaintiff]"); *Larned v. First Chicago Corp.*, 636 N.E.2d 1004 (Ill. App. Ct. 1994) (frequent flier miles credit card contract was not adhesion contract); *see also Klos*, 133 F.3d at 168-69.

In *Klos*, for example, the plaintiffs asserted that the requirement that they purchase a round-trip ticket (rather than a one-way ticket) was part of an adhesion contract.   133 F.3d at

13

168-169. The Court held it was not because travelers had full notice before buying their tickets that the airline required a round-trip purchase, the tickets were not procured by fraud or deceit, and there were several transportation alternatives, including other airline options. *Id.* Thus, the round trip policy was not "so oppressive or unconscionable as to reach the threshold of an unenforceable contract of adhesion." *Id.* at 169. Similarly, in *Larned*, the Court found that an airline's affiliated credit card agreement was not an adhesion contract because the plaintiff was not forced to choose, but instead freely chose, this particular credit card, and other companies offered similar benefits. As a result, the plaintiff "did not lack meaningful choice" when he freely chose to enter into the contract. 636 N.E.2d at 1006.

So too here. BA put the plaintiffs on notice – through explicit language in the Contract, in the Conditions of Carriage, and on the website – that BA would impose a fuel surcharge, and the actual surcharge was disclosed prior to purchase. BA did not "spring this term on an unwitting and unsophisticated customer, or bury it in fine print." *Rothstein*, 2011 WL 2647961, at *4. And indeed, there is no allegation that BA engaged in deceptive practices to induce members to join the Executive Club. The plaintiffs freely chose to enter into the Contract (which costs nothing), and to redeem their Avios for flights, in lieu of redeeming their Avios for other rewards such as hotel stays. As a result, there is no adhesion contract.[10]

---

[10]    English law does not recognize the concept of adhesion contracts. The Unfair Terms in Consumer Contracts Regulations 1999 ("UTCCR") regulates certain aspects of the interpretation and enforcement of "pre-formulated standard form contracts" between a business ("seller or supplier") and a private consumer. (Ex. 29, English Law Op. ¶ 4.5) ("English Law Op."). The UTCCR, however, is not applicable where the challenge is to "the adequacy of the price or remuneration, as against the goods or services supplied in exchange." (*Id.* ¶ 4.15). Because the plaintiffs' claim is based on the fuel surcharge, which is part of the ticket cost, it is excluded from the scope of the UTCCR. Moreover, business travelers may not invoke the UTCCR as it does not apply to business travel, but only protects individuals who have acted in a purely private capacity. (*Id.* ¶ 4.11).

## 2. The Contracts Expressly Contemplate the Imposition of a Fuel Surcharge And Thus the First Contract Claim Fails.

The "best evidence of what parties to a written agreement intend is what they say in their writing. Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Phillies Records, Inc.*, 98 N.Y.2d 562, 750 N.Y.S.2d 565, 568 (2002) (quotation omitted). "The task of the court then is to enforce the plain meaning of an unambiguous agreement, rather to accept a construction that would render a purposeful provision of a contract meaningless." *Zaltz v. Wells Fargo Home Mortg.*, No. 08-civ-11225, 2010 WL 3026536 (S.D.N.Y., Aug. 2, 2010).

Here, as demonstrated above, both the Contract and the Conditions of Carriage expressly and unambiguously provide notice that BA may charge its passengers fuel surcharges. *See supra*, at II(D). As such, the contracts expressly and unambiguously anticipate payment of the very fees challenged. *Simon v. Cont'l Airlines, Inc.*, 1:09 CV 631, 2010 WL 429932, at *6 7 (N.D. Ohio Feb. 4, 2010) *aff'd*, 439 F. App'x 542 (6th Cir. 2011) (breach of contract claim failed; frequent-flier program contract expressly permitted challenged fees).

Ignoring this fact, the plaintiffs claim that the Contract allows only "pass-through" charges; they posit that BA may not impose a fuel surcharge unless it is charged by a "person," "body," or "governmental . . . body" other than BA. (Compl. ¶¶ 2, 40-42). They are wrong. The Contract does not require that surcharges be imposed *only* if charged by entities other than BA. To read it otherwise requires the reader to ignore the disjunctive term "or". Section 13.14 provides in pertinent part:

> Members will be liable for all taxes and other charges associated with Reward travel on British Airways . . . including without limitation . . . fuel surcharges, agricultural inspection fees, security and insurance surcharge or other incidental fees or taxes charged by any person or relevant authority or body.

The term "or" is a disjunctive, not conjunctive, term and does not modify the entire sentence to provide that only fees charged by persons ***other than*** BA are permitted. The term fuel surcharge precedes the "or" and so stands on its own and is not modified by that which follows the "or". *See Del Global Tech. Corp. v. Park*, No. 03-civ-8867, 2008 WL 5329963, at *4 (S.D.N.Y. Dec. 15, 2008) (plaintiff's interpretation of contract "does not account for the use of the disjunctive 'or'"); *Portside Growth & Opportunity Fund v. Gigabeam Corp., Inc.*, 557 F. Supp. 2d 427, 431 (S.D.N.Y. 2008) ("'or' is a disjunctive particle used to express an alternative or to give a choice of one among two or more things") (quoting Black's Law Dictionary 1990 (6th ed. 1990)). So too under English law: the word "or" is to be read "prima facie, and in the absence of some restraining context . . . as disjunctive, and . . . meaning what it says." *Ellse v. Hill-Pickford* [2006] EWHC 3293 (Ch); Ex. 29, English Law Op., ¶ 5.5.5 (citing *Green v Premier Glynrhonwy Slate Co Ltd* [1928] 1KB 561)). In any event, BA is a "person" who may charge the fuel surcharge, as explicitly contemplated by the Contract and the Conditions of Carriage. *See* Section 61(b) of the Law of Property Act 1925 ("Person" includes a corporation).

Moreover, Section 13.14 establishes that the stated charges are "without limitation." (Ex. 24, Contract § 13.14). This phrase is a standard drafting term appearing before a list intended to make clear that any examples that follow are illustrative, not exclusive. *See Capp Seville, Inc. v. Northwest Airlines, Inc. (In re Northwest Airlines Corp.)*, 383 B.R. 283, 294 (Bankr. S.D.N.Y. 2008); *Bekhor v. Bear, Stearns & Co., Inc.*, No. 96 Civ. 4156, 2004 WL 2389751 (S.D.N.Y., Oct. 25, 2004); *see also* Ex. 29, English Law Op. ¶ 5.5.4.)

The phrase "fuel surcharge" does not, implicitly or explicitly, impose the limitation the plaintiffs urge. Rather, as used here, the term accords with common usage and dictionary definitions. Merriam-Webster defines it simply as "an additional tax, cost, or impost [or] an

extra fare." (www.Merriam-Webster.com; *see also*, English Law Op. ¶ 5.3). Merriam-Webster even offers the following example: "The airline has added a $20 fuel surcharge on all international flights." (*See* http://goo.gl/tcn4). The Law Dictionary defines "Fuel Surcharge" as an "[a]dditional fee for travel used to cover increases in fuel cost for the type of transportation used." (*See* www.thelawdictionary.org/fuel-surcharge).

The plaintiffs may not ignore the Contract's plain language and predicate a claim on interpretations unsupported by that language. *See, e.g.*, *Investors Compensation Scheme Ltd v. West Bromwich Building Society*, [1997] UKHL 28; *Ellse v Hill-Pickford* [2006] EWHC 3293 (Ch) (enforcing contract as written); *Cordts-Auth v. Crunk, LLC*, 479 F. App'x 375, 378 (2d Cir. 2012) (affirming dismissal of breach of contract claim that rested upon a "fatal misunderstanding of the contract terms").[11] For these reasons, the plaintiffs' claim must be dismissed.

### 3.    The Plaintiffs' Alternative Contract Claim Fails.

The plaintiffs next claim that, in the event that BA could impose a fuel surcharge (which it may), the statement on BA's website that it "applies a fuel surcharge on all flights to reflect the fluctuating price of worldwide oil" mandates some structure controlling the precise manner in which BA calculates and adjusts its fuel surcharges. (Compl. ¶¶ 7, 9, 45, 55, 61.) This statement, not found in the Contract, does not support the plaintiffs' claim because (1) it is not incorporated in the Contract, and (2) even if it were (which it is not), the phrase is too vague to impose contractually any specific, articulable methodology.

---

[11]     *See Goldman v. Metropolitan Life Ins. Co.*, 5 N.Y.3d 561, 571, 841 N.E.2d 742, 746 (2005) (affirming dismissal of breach of contract claim); *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wash. 2d 493, 512, 115 P.3d 262, 271 (Wash. 2005) (affirming dismissal of a breach of contract claim interpreting "the plain terms of the agreement"); *Fireman's Fund Ins. Co. v. Superior Court*, 65 Cal. App. 4th 1205, 1212, 78 Cal. Rptr. 2d 418, 422 (Cal. Ct. App. 1997) (dismissing claim where contract was not ambiguous).

### a.      The Website Statement is Not Part of the Contract.

Parties to a contract are not bound by the terms of any document outside that contract unless it is clearly identified or incorporated in the agreement. *See, e.g., PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (documents "must be so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt.") (citation and emphasis omitted). To incorporate a document outside the four corners of the Contract, "the document [must] be referenced beyond all reasonable doubt." *Serrano v. Cablevision Sys. Corp.*, 863 F. Supp. 2d 157, 165 (E.D.N.Y. 2012); *Grandis Family P'ship, Ltd. v. Hess Corp.*, 588 F. Supp. 2d 1319, 1326 (S.D. Fla. 2008) (citing *Bybyk*, 81 F.3d at 1201) (same). In *Grandis,* APT brought a contract claim, and the defendant, Hess, moved to compel arbitration by invoking a clause on its website. *Id.* at 1322. The contract was silent on arbitration, but Hess cited the terms and conditions in the purchase orders sent to APT, which in turn stated that the "terms and conditions . . . located at [Hess' website] are incorporated by reference in this purchase order." *Id.* Notwithstanding this reference, the Court held that the arbitration clause was not binding because the contract did not "beyond all reasonable doubt" identify and incorporate the purchase orders. *Id.* at 1328, 1335-36.

Here, the Contract and Conditions of Carriage do not incorporate by reference the phrase to which plaintiffs point on BA.com, much less identify and incorporate it beyond all reasonable doubt. Instead, the Conditions of Carriage mention "BA.com" only twice, and then only in the limited contexts of company contact information and check-in deadlines. The Contract defines BA.com as meaning only "the Executive Club pages, as amended from time to time, available on the British Airways website at internet address www.ba.com," which does not include the referenced statement. (Ex. 24, Contract § 2 ("Definitions")). Without explicit reference and incorporation, the phrase cannot be deemed part of the Contract itself. *See Serrano*, 863 F. Supp.

2d at 165; *Grandis*, 588 F. Supp. 2d at 1326; *Lozano v. United Cont'l Holdings, Inc.*, 11 C 8258, 2012 WL 4094648, at *5 (N.D. Ill. Sept. 17, 2012) (provision on airline website not incorporated into the Contract of Carriage where the latter explicitly mentions and incorporates Montreal Convention Treaty but does not have similar explicit incorporation language for website provision).

### b.     The Reference to "Reflect" the Price of "Worldwide Oil" Is Too Vague To Be Enforceable.

Even were it incorporated into the Contract (which it is not), the reference to the price of worldwide oil on the website is too vague to be enforceable. An enforceable agreement must be sufficiently "definite and explicit so that the parties' intention may be ascertained to a reasonable degree of certainty." *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 587 (2d Cir. 1987) (quotation omitted). "If essential terms of an agreement are omitted or are phrased in too indefinite a manner, no legally enforceable contract will result." *Brookhaven Housing Coalition v. Solomon*, 583 F.2d 584, 593 (2d Cir. 1978))

The plaintiffs seek to impose a definiteness to the terms "reflect" and "worldwide oil" that is not warranted. *See Gambello v. Time Warner Commc'n, Inc.*, 186 F. Supp. 2d 209, 226 (E.D.N.Y. 2002) (agreement too vague and uncertain to be enforceable); *FMC Tech., Inc. v. Edwards*, No. C05-946C, 2007 WL 1725098 (W.D. Wash. June 12, 2007), *aff'd*, 302 F. App'x 577 (9th Cir. 2008) ("[T]o introduce to a contract a vague term that was not originally part of the instrument runs contrary to the purpose of interpreting a contract."); *Ladas v. California State Auto. Ass'n*, 19 Cal. App. 4th 761, 770, 23 Cal. Rptr. 2d 810, 814 (Cal. Ct. App. 1993) (contract unenforceable where alleged promise was too vague and indefinite); *Oorah, Inc. v. Schick*, No. 09-CV-00353, 2012 WL 3233674 (E.D.N.Y. Aug. 6, 2012). In *Oorah,* for example, the Court found that a note created during an arbitration between a school and Oorah was unenforceable

because its stated commitment not to "write or transmit in any forum charges" was overly vague. *Id.* at *3-4. It did not reflect "a meeting of the minds as to the material terms of any obligation, and the Court [could not] discern any commitments clearly enough to enforce them." *Id.* (citing *Brookhaven Housing*, 583 F.2d at 593).

Here, no "essential terms" are contained in the sentence on which the plaintiffs rely. There is no evidence – certainly none is pled – that BA and the plaintiffs had a meeting of the minds about any methodology that was required before BA could charge or calculate fuel surcharges, or the precise relationship between surcharges and the worldwide price of oil or jet fuel.

Undeterred, the plaintiffs speculate that BA's fuel surcharge is not at all related to the price of fuel, relying exclusively on (1) a reference in BA's annual report to hedging, and (2) their own statistical regression analysis. (Compl. ¶¶ 46-55). Neither is sufficient. BA hedges its fuel purchases, a fact long since disclosed, and does so, as do many other airlines, to protect itself against the risk of purchasing fuel through forward contracts. (Ex. 17, at 15-16). Hedging is not, however, the exclusive manner in which BA seeks to protect itself from fluctuating oil prices. (*See* Ex. 19, at 15-22). The plaintiffs' regression analysis proves nothing, as it is based upon a false predicate. As demonstrated in Section II(C), the relationship between the fuel surcharge and the fluctuating price of refined jet fuel is real, but will not exactly correlate to the market price of fuel.

## C. The Airline Deregulation Act Preempts Plaintiffs' Claim.

Article VI, Clause 2 of the United States Constitution, the Supremacy Clause, provides that federal law "shall be the supreme Law of the Land; and the Judges in every state shall be bound thereby, any Thing in the Constitution or Laws of any State notwithstanding." The Supremacy Clause vests in Congress the power to supersede not only State statutory and

regulatory authority, but state common law as well. *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992). Where Congress has demonstrated a clear and manifest intent to preempt state law, it is expressly preempted. Implied preemption occurs when federal law and regulation so thoroughly occupies the field as reasonably to infer that Congress left no room for the States to supplement it. *Id.* The plaintiffs' claims here are expressly and impliedly preempted.

### 1. The ADA Expressly Preempts the Plaintiffs' Claim.

Preemption of state law over airline pricing issues was an integral part of the ADA. 49 U.S.C. § 41713. The ADA expressly provides in pertinent part that "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law *related to* a price, route, or service of an air carrier." *Id.* (emphasis added); *see Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378-79 (1992). In *Morales*, the Supreme Court confirmed the ADA's sweeping preemptive scope and the expansive reach of the provision's "related to" language, finding apparent the "breadth" of its "pre-emptive reach." 504 U.S. at 383-84 (quotation omitted); *see also Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 34 (1st Cir. 2007); *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 227, 115 S. Ct. 817, 823 (1995) (confirming *Morales's* interpretation); *A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 247 n.52 (S.D.N.Y. 2004) (citing *Morales* as "defining the 'relating to' language in the ADA preemption clause as "having a connection with or reference to airline 'rates, routes, or services'") (quotation omitted).

The ADA preempts state laws of general applicability, including consumer protection and contract laws, if the application of such laws relate in any way to airline prices, routes, or services. *Morales*, 540 U.S. at 383-84; *see also McMullen v. Delta Air Lines, Inc.*, No. 08-1523, 2008 WL 4449587, at *3 (N.D. Cal. Sept. 30, 2008) (preempting contract claim; it "undoubtedly is related to price" and alleges no "self-imposed undertaking"); *Statland v. Am. Airlines, Inc.*, 998 F.2d 539, 542 (7th Cir. 1993) (preempting a contract challenge to policy of withholding 10

percent of federal tax on cancelled tickets as related to price). In *Morales*, the Court struck down an attempt by several states to apply consumer protection laws to stop allegedly deceptive airline fare advertising that ran afoul of certain advertising guidelines composed by the National Association of Attorneys General. 540 U.S. at 379-89.

As in *Morales*, the Complaint here strikes directly at the prices and services BA provides. Objecting to that portion of the overall price that constitutes fuel surcharge, the plaintiffs assert first that it may not be charged, and then, if it may, argue it is too high or not otherwise properly calculated. A claim could not be more closely related to the "price" of airfare or better fit within the scope of the ADA's preemption. To allow such a claim necessarily would have broad, binding effect on BA, its determination of fuel surcharges, and its pricing going forward and therefore must be preempted. *See Morales*, 540 U.S. at 390-91 (the challenged guidelines would impose obligations that "would have a significant impact upon . . . the fares they charge."); *see also Buck*, 476 F.3d at 35 (state remedies preempted).

*Wolens'* narrow exception to preemption is inapplicable here. There, the Supreme Court held that breach of contract claims arising out of American Airlines' retroactive changes to the terms and conditions of its frequent flier program – specifically, the value assigned to the application of certain mileage credits – was not preempted because the ADA did not preempt contract claims "seeking recovery solely for the airline's breach of its own, self-imposed undertakings." *Wolens*, 513 U.S. at 232. Here, however, the plaintiffs' claims are intended to challenge BA's pricing and not, as in *Wolens*, some promised award or exchange under the Executive Club Contract. And, unlike *Wolens*, the plaintiffs attack a surcharge that BA applies to flights generally regardless of whether booked by BA Executive Club member redemptions. As such, it is not an issue limited to Executive Club membership or the Contract.

As one court held, the ADA may not preempt routine breach-of-contract claims *"as long as there is no enlargement or enhancement based on state laws or policies external to the agreement."* *A.I.B. Express*, 358 F. Supp. 2d at 253 (emphasis added) (citing *Wolens*, 513 U.S. at 228). Where a claim enlarges the parties' bargain based on policies external to the agreement, the claim is preempted because "such an enlargement would interfere with the ADA's purpose of deregulating air carriers." *Id.* (preempting claims enlarging defendant's contractual obligations based on policies external to agreement and relating to prices); *see also Delta Air Lines, Inc. v. Black*, 116 S.W.3d 745, 755 (Tex. 2003) (same).[12]

The plaintiffs will cite decisions from this Court adopting *Wolens'* breach of contract exception without limitation, none of which involved pricing. *Cf., In re Jetblue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 317 (E.D.N.Y. 2005).[13] In *JetBlue*, for example, the plaintiffs alleged that the airline breached its stated privacy policy in transferring personal information to a data mining company. 379 F. Supp. 2d at 304-05. The Court allowed the plaintiffs' claim to continue, but recognized that some breach of contract claims may be preempted – the "critical distinction between principles of contract law that fall within and without the *Wolens* exception is whether they seek to effectuate the intent of the parties rather than the State's public policies." 379 F. Supp. 2d at 317 (quotation omitted). So it is here, the

---

[12] A number of courts have held that resort to policies, regulation or guidance outside the four corners of the contract requires preemption. *Polinovsky v. British Airways, Inc.*, No. 11 C 779, 2012 WL 1506052 (N.D. Ill. Mar. 30, 2012) (*Wolens* exception inapplicable); *Volodarskiy v. Delta Air Lines, Inc.*, No. 11 C 782, 2012 WL 5342709 (N.D. Ill. Oct. 29, 2012) (same); *see also Smith v. Comair, Inc.*, 134 F.3d 254, 258 (4th Cir. 1998) (ADA preempted passenger's breach of contract claim arising from airline's refusal to permit him to board because airline invoked defenses provided by federal law, which meant that plaintiffs "contract claim can only be adjudicated by reference to law and policies external to the parties' bargain . . . ."); *Onoh v. Northwest Airlines, Inc.*, 613 F.3d 596 (5th Cir. 2010) (breach of contract claim preempted because it would need "to reach beyond the contract and interpret a variety of external laws that were not expressly incorporated in the contract").

[13] *Cf. Donkor v. British Airways Corp.*, 62 F. Supp. 2d 963, 965,971 (E.D.N.Y. 1999) (the plaintiff asserted tort and contract claims associated with being detained during a long layover in England); *Galbut v. Am. Airlines, Inc.*, 27 F. Supp. 2d 146, 147-48,151 (E.D.N.Y. 1997) (plaintiff alleged that the airline wrongfully refused to grant an upgrade where the airline believed his "upgrade stickers" were stolen).

23

plaintiffs seek to curtail fuel surcharges and impose their own amorphous principles of fairness, not to effectuate what the parties intended.

Distilled to its essence, the Complaint is a consumer protection claim masquerading as a breach of contract. The plaintiffs claim that they were misled and that the fuel surcharges were unfair or too high. At the pre-motion conference, the plaintiffs' counsel admitted that it is the use of the phrase "fuel surcharge" that is at issue; had BA chosen to call it something other than a fuel surcharge, perhaps a "profit surcharge," "we would not have a claim." (Ex. 30, at 13). If the claim is that they were so deceived, this is not a breach of contract claim, but an unfair trade practices complaint. And if so, then it is for the DOT to handle *exclusively* and this action is necessarily preempted. *See Wolens*, 513 U.S. at 227-28.[14]

## 2. The ADA Impliedly Preempts The Plaintiffs' Claim.

Under the ADA, the DOT retained full and unfettered authority "to prohibit unfair or deceptive trade practice[s] . . . in air transportation or the sale of air transportation." 49 U.S.C. § 41712. The DOT has issued pervasive regulations and guidance to the airlines, occupying the field of airline pricing and disclosure. For example, the DOT promulgated 14 C.F.R. § 399.84, "Price advertising and opt-out provisions," to further Congress' goal of preventing deception of and unfairness to consumers. *See Spirit Airlines, Inc. v. DOT*, 687 F.3d 403, 414-15 (D.C. Cir. 2012) ("The rule aims to prevent consumer confusion about the total price they have to pay . . . ."). Where the regulator occupies the field, any attempt to impose a different standard is and must be impliedly preempted. *See Lyn-Lea Travel Corp. v. Am. Airlines*, No. 3:96-cv-2068,

---

[14] *See, e.g., Feldman v. United Parcel Service, Inc.*, No. 06-civ-2490, 2008 WL 800989, at *17 (S.D.N.Y. Mar. 24, 2008) (preempting breach-of-fiduciary-duty claim that plaintiff "frames . . . as a state-law breach-of-contract claim"); *see also Waul v. American Airlines, Inc.*, 2003 WL 22719273, at *3-4 (Cal. App. Ct. Nov. 17, 2003) ("However the breach may be characterized, the source of the asserted obligation is not a commitment that AA has made to its frequent flyer customers but plaintiffs conception of what fairness requires and what the law should insist upon. Thus, this claim is also preempted."). Although *Waul* may not be cited in California, the Court's rationale is persuasive.

1999 WL 777716 (N.D. Tex. Sept. 29, 1999) (ADA "expressly authorizes the DOT to investigate and act upon instances of unfair or deceptive conduct on the part of air carriers."). Here, the plaintiffs trespass upon the DOT's field of authority. However framed, claims predicated allegations of unfair or deceptive practices must be rejected as impliedly preempted by the ADA.

## IV.   CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Respectfully Submitted,
DLA Piper LLP (US)

By:

Richard F. Hans
Keara M. Gordon
David V. Sack
richard.hans@dlapiper.com
keara.gordon@dlapiper.com
david.sack@dlapiper.com
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 335-4500
*Attorneys for Defendant*
*British Airways PLC*