## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RUSSELL DOVER, HENRY HORSEY, CODY RANK, and SUZETTE PERRY, on behalf of themselves and all others similarly situated,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　　-vs.-<br><br>BRITISH AIRWAYS, PLC (UK),<br><br>　　　　　　　　Defendant. | Case No. 1:12-cv-05567-MKB-MDG<br><br>AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

1169756.2

# INTRODUCTION

1.      Most major airlines invite their customers to join and to participate in their frequent flyer programs. Customers who join these programs ("Members") earn points ("Miles") from engaging in various activities, such as flying with the airline or using a particular credit card. While Miles may be used for any number of purposes, Members frequently redeem them for "free" airline tickets ("Reward Tickets").

2.      Reward Tickets are not literally free. Rather, under the terms of each frequent flier program's governing contract, Members often must pay certain taxes and fees associated with each Reward Ticket; essentially, these are "pass-through" costs charged by governments and quasi-governmental bodies such as airports. For example, United Airlines, Inc. ("United") charges its Members $2.50 for each flight that departs from a United States-based airport, which reflects what is known as the September 11 Security Fee (this is the only tax or fee charged to all of United's Members).[1]

3.      The frequent flier program offered by Defendant British Airways, PLC (UK) ("BA" or "British Airways") is known as the "Executive Club." All Members in the Executive Club who reside in the United States are subject to the terms of a uniform contract called the "Executive Club Terms and Conditions" (the "Contract"). This Contract provides that, in connection with Reward Travel, Members are responsible for paying various incidental fees, taxes, and charges that are levied on British Airways by "any person or relevant authority or body," which BA then passes on to its Members traveling on Reward Tickets.

4.      British Airways lists in the Contract several (non-exhaustive) examples of "taxes and charges" and "incidental fees or taxes" for which Members are liable: "airport departure

---

[1] Most United Members also must pay a relatively small service fee of between $25 and $75 if they obtain a Reward Ticket less than 21 days prior to departure, and a similar fee if they choose not to book their Reward Ticket through United's website.

1169756.2

tax[es]"; "airport charges"; "customs fines"; "customer user fees"; "immigration fees"; "agricultural inspection fees"; "security and insurance surcharge[s]"; and "fuel surcharges."

5. On information and belief, with one exception, all of the taxes, charges, and fees assessed by BA comply with the terms of the Contract: they are levied on British Airways by a "person or relevant authority or body," and BA then passes those on to its Members traveling on Reward Tickets.

6. The exception, however, is a very large one: British Airway's purported "fuel surcharges." These "fuel surcharges" sometimes exceed $500 per Reward Ticket. This is in stark contrast to the nominal amount of the charges allowed by the contract; as explained above, for example, the September 11 Security Fee is only $2.50 per departure.

7. There are at least two significant problems with the "fuel surcharges" that BA adds to all Reward Tickets. First, such charges are not levied on BA by any "person or relevant authority or body," but rather are charges that BA itself creates and imposes on its Members. In other words, they are not authorized by the Contract. Second, the "fuel surcharge" is not a charge based on the cost of fuel. While BA asserts on its website that this charge "reflect[s] the fluctuating price of worldwide oil," that assertion is false.

8. The Contract does not allow BA to charge Members *any* BA-imposed charge: it only allows BA to pass through "incidental fees or taxes charged by any person or relevant authority or body."

9. Even if the Contract could be interpreted to allow BA to impose a fuel surcharge (and it should not be), such a surcharge would only be appropriate if it — in BA's own words — "refelect[ed] the fluctuating price of worldwide oil." The hundreds of dollars of arbitrary (and previously undisclosed) BA profit surcharges imposed on Members who purchase Reward

Tickets do not "reflect the fluctuating price of worldwide oil." In essence, they are nothing other than additional fare dollars.

10. As detailed below, British Airway's "fuel surcharge" is actually a "Revenue Enhancement Charge." While a fuel surcharge would theoretically protect an airline against unusually high and unstable fuel prices, BA did not tie its fuel surcharges to fuel prices. Instead, British Airways used the fuel surcharge as an opportunity to charge its Executive Club Members hundreds of dollars for each "free" Reward Ticket, to increase its own revenue regardless of whether fuel prices were high or low.

11. Plaintiffs Russell Dover, Henry Horsey, Cody Rank, and Suzette Perry are Executive Club Members who redeemed Miles for Reward Tickets and paid BA's "fuel surcharge." They allege that BA breached its Contract with each of them, and with hundreds of thousands of similarly situated Executive Club Members, when it charged exorbitant, arbitrary "fuel surcharges" to Members who redeemed Miles for Reward Tickets.

## ALLEGATIONS CONTAINED WITHIN THIS COMPLAINT

12. Allegations concerning each Plaintiff are based on personal knowledge. All other allegations are based on investigation by Plaintiffs' counsel.

## WHY PLAINTIFFS HAVE FILED THIS LAWSUIT

13. Plaintiffs are residents of the United States who became Executive Club Members so that they could earn Miles and purchase Reward Tickets. None of the Plaintiffs expected to be charged hundreds of dollars in "fuel surcharges" in order to obtain a Reward Ticket, and the Contract does not permit BA to impose such charges.

14. Plaintiffs bring this suit not solely out of the desire to protect their individual contractual rights, but also to protect the contractual rights of every Executive Club Member who was forced to pay BA's "fuel surcharge" in connection with the purchase of a Reward Ticket.

-3-

**I.     PARTIES**

    **A.     Plaintiffs**

        **1.     Russell Dover**

15.     Plaintiff Russell Dover resides in Campbell, CA. He has been a Member of the British Airways Executive Club since approximately March 1996.

16.     For the first three years of his membership, Mr. Dover resided in the United Kingdom. There, he flew one to two intra-European flights each week and two to three flights between London Heathrow Airport ("LHR") and San Francisco International Airport ("SFO") every year. Over this time period, he accumulated half a million Miles and became one of BA's most frequent fliers (this is known as achieving an airline's highest "status").

17.     In July 1999, Mr. Dover moved from the United Kingdom to the United States. He continued to fly between SFO and LHR on BA, and he has taken approximately half a dozen intra-Europe flights with BA every year from 1999 to the present.

18.     Mr. Dover currently has a balance of more than 160,000 Miles in his account.

19.     On April 26, 2012, Mr. Dover booked two first class, round-trip tickets from SFO to LHR. He redeemed 150,000 Miles, but also paid a total of $1167.09 in taxes, fees, and surcharges. The "fuel surcharge" accounted for $854. He describes himself has having been "horrified" to realize that BA charged more for this "free" ticket than it charged for the "normal" purchase of two economy class tickets for the same route.

20.     The flight departs on December 25, 2012 and returns on January 2, 2013; his ticket number is 125-2489147367.

        **2.     Henry Horsey**

21.     Plaintiff Henry Horsey resides in Washington, D.C. He became a Member on May 4, 2011.

22. On January 10, 2013, Mr. Horsey booked two first class tickets for a trip to Mumbai, India.

23. The first flight departed Washington, D.C. on December 17, 2013 to London, where Mr. Horsey boarded a second flight for Mumbai on December 18, 2013. Mr. Horsey returned from Mumbai to Washington, D.C., via London, on December 31, 2013.

24. Mr. Horsey redeemed 270,000 Miles for his tickets. He also paid $3,014.12 in taxes, fees, and charges that included a fuel surcharge. The amount of the fuel surcharge is unspecified on his tickets. On information and belief, the majority of the $3,014.12 consisted of the "fuel surcharges."

### 3. Cody Rank

25. Plaintiff Cody Rank resides in Seattle, WA. He joined the Executive Club on or about January 2010.

26. On May 17, 2012, Mr. Rank booked reservations for a trip to Amsterdam. He exchanged his Miles for two Economy tickets to fly from Seattle to LHR, and then from London Gatwick Airport to Amsterdam, departing Seattle on June 18, 2012. He also used his Miles to book a return flight from Berlin to Seattle via LHR; that flight departed on July 4, 2012. The ticket numbers were 125-2489740183-84 and 125-2489740185-86.

27. Mr. Rank redeemed 98,000 Miles and paid $1436.78 in fees for the two tickets. The amount of the fuel surcharge is unspecified on his tickets. On information and belief, the majority of the $1436.78 consisted of the "fuel surcharge."

### 4. Suzette Perry

28. Plaintiff Suzette Perry resides in Salinas, CA. She became a Member on or about October 2011.

29. On June 6, 2012, Ms. Perry booked five coach class tickets for a trip to London. The flights departed Los Angeles for London on September 18, 2012. They returned from London to San Francisco on October 3, 2012.

30. Ms. Perry redeemed 272,500 Miles for her tickets. She also paid $3,292.60 in surcharges.

### B. Defendant

31. BA's North American headquarters is in Jackson Heights, New York. As of January 2008, BA employed approximately 1700 people throughout the United States; approximately 18% of those employees were based in Jackson Heights, New York.

32. JFK and Newark International Airport ("EWR") have the largest volume of BA passenger traffic in the United States. JFK is located within the Eastern District of New York, and EWR is located approximately 15 miles from 225 Cadman Plaza East, Brooklyn, NY 11201.

33. BA, a subsidiary of the International Consolidated Airlines Group S.A. ("IAG"), is incorporated under the law of England and Wales. Its principal place of business and corporate headquarters is in Harmondsworth, West Drayton, United Kingdom.

## II. JURISDICTION AND VENUE

34. The court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2)(A) and 28 U.S.C. § 1332(d)(2)(C) because the amount in controversy exceeds $5,000,000 and the defendant is a citizen of a foreign country, while at least one Plaintiff is a citizen of a State.

35. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because British Airways North American headquarters is located within the Eastern District of New York and BA is subject to personal jurisdiction in New York.

### III. BA'S UNIFORM BREACH OF CONTRACT

36. The Contract at issue in this litigation, which governs all United States-based Executive Club Members, is available on BA's website. *See* http://goo.gl/HZzqf (last visited on October 23, 2012).[2]

37. On information and belief, the Contract was drafted by BA or is agents. It is a contract of adhesion.

38. On information and belief, if any changes to the Contract have been made over the last six years, those changes did not alter the material terms at issue in this litigation — i.e., no change (if any) disclosed that the purported "fuel surcharge" was actually a Revenue Enhancement Charge that was not based on fuel costs, and no change disclosed that the "fuel surcharge" was created and imposed by BA itself on its Members, to increase BA's revenue.

39. Under the Contract, "English law" applies to any Member's claim for breach of contract, regardless of a particular Member's state of residence. Contract at § 30.1. The Contract specifically contemplates litigation outside of England, however, because it contains a non-exclusive jurisdiction clause indicating that England is only one of the permissible places in which a Member may bring a lawsuit for breach of contract. *See id.*

40. The Contract explains that Members who wish to redeem Miles for Reward Tickets are liable for certain pass-through "taxes and other charges associated with Reward travel." *Id.* at § 13.14. In particular, the Contract provides:

> Other than in relation to special promotions and subject to the applicable Conditions of Use of such promotions, Members will be liable for all taxes and other charges associated with Reward travel on British Airways or a Service Partner airline, including without limitation, airport departure tax, customs fines, immigration fees, airport charges, customer user fees, fuel surcharges, agricultural

---

[2] The original link is http://www.britishairways.com/travel/ec-terms-and-conditions/public/en_us?source=MNVEXC1executive_club_terms_and_conditions&link=main_nav. All links in this complaint have been "shortened" with "Google's URL Shortener."

>inspection fees, security and insurance surcharge or other incidental fees or taxes charged by any person or relevant authority or body.

*Id*.

41. The Contract thus indicates that BA will charge Reward Ticket holders only what are commonly known as pass-through costs: "incidental fees or taxes charged by any person or relevant authority or body," ("Pass-Through Charges") such as the "airport departure tax, customs fines, immigration fees, airport charges, customer user fees, fuel surcharges, agricultural inspection fees, [or] security and insurance surcharge." *Id*.

42. No United States or United Kingdom-based governmental or quasi-governmental authority or body charges BA for "fuel surcharges;" BA creates those charges itself as a method to increase revenue. Similarly, on information and belief, no other jurisdiction into which BA flies imposes such a charge on BA. Thus, while BA would be entitled to pass on the cost of any fuel surcharge that it was forced to pay to its Reward Ticket holders, no such surcharge exists.

43. According to travel website "Kayak.com," three United States-based airlines fly directly between New York and LHR: American Airlines, Inc. ("American"), Delta Air Lines, Inc. ("Delta"), and United Air Lines, Inc. ("United"). The only other United States-based airline to fly to LHR is US Airways, Inc., which offers flights from Philadelphia to LHR.

44. On information and belief, no United States-based airline imposes a fuel surcharge on frequent flier passengers.

45. When a Member exchanges Miles for a Reward Ticket, the BA website informs him or her that the fuel surcharge "reflect[s] the fluctuating price of worldwide oil." Thus, even according to British Airways itself, if the Contract somehow allowed BA to impose upon its Members a separate charge for high fuel costs (it does not), that charge would have to "reflect

-8-

the fluctuating price of worldwide oil." BA's "fuel surcharges" are not meaningfully related to the fluctuating price of worldwide oil.

### A. BA Admitted to its Investors that its "Fuel Surcharges" Are Not Related to the Price of Fuel.

46. In 2011, BA's largest single operating cost was fuel.

47. Much of BA's 2011 annual report was devoted to discussion concerning fuel. In that report, BA explained that the risk of changes to fuel prices is "partially hedged through the purchase of oil derivatives in forward markets."

48. Nowhere in its annual report does BA mention its ability to levy fuel surcharges on commercial passengers as a hedge against changes in oil prices. Instead, when describing the risk of changing fuel prices in its annual report, BA explained to investors:

> [BA] is exposed to fuel price risk. [BA's] fuel price risk management strategy aims to provide the airline with protection against sudden and significant increases in oil prices while ensuring that the airline is not competitively disadvantaged in the event of a substantial fall in the price of fuel. The current . . . strategy, as approved by the Board, is to hedge between 70 per cent and 100 per cent of fuel consumption for the next quarter; an average of 45 per cent between quarters two and five; and 10 per cent between quarters six and eight, with the flexibility to operate within +/- 10 per cent of the policy.

49. The above constitutes an admission that BA's "fuel surcharge" is unrelated to the price of worldwide oil because if BA actually imposed a surcharge based on the shifting price of worldwide oil, this surcharge would have been disclosed to investors as an additional type of hedge against fuel price risk.[3]

---

[3] While Reward Ticket Holders represent only a fairly small portion of BA fliers, on information and belief BA levies the exact same purported fuel surcharge on all customers. In other words, every ticket sold by British Airways contains this charge.

-9-

### B. BA's "Fuel Surcharge" is Not Based On the Fluctuating Price of Worldwide Oil.

50. There has been little correlation between BA's "fuel surcharges" and the cost of fuel during the period May 2007 through May 2012.

51. Statisticians refer to the strength of a relationship between the changes in two variables as "r-squared."

52. R-squared is a number from 0 to 1, in which 0 represents no relationship at all between the two variables (i.e., a change in the independent variable does not predict anything about the change in the dependent variable) and 1 represents a perfect relationship (i.e., change in the independent variable predicts the precise change of the dependent variable).

53. For example, Standard & Poor's maintains a list of 500 of the top United States-based companies, known as the "S&P 500." Many companies, including The Vanguard Group, Inc. ("Vanguard") offer investors products that attempt to perfectly mirror the movement, whether up or down, of the S&P 500. In Vanguard's case, this fund is known as "VFINX." The S&P 500 (the independent variable) and VFINX (the dependent variable) have an r-squared of approximately 1, which means that movement in the S&P 500 almost perfectly predicts movement in the VFINX. *See* http://goo.gl/lJ6O6.[4]

54. Put another way, r-squared indicates the percentage of the change in a dependent variable that can be "explained" by the change in an independent variable. An r-squared of .8 would indicate that 80% of the change in the dependent variable could be explained by changes in a given independent variable, and an r-squared of .4 would indicate that 40% of the change in a dependent variable could be explained by the changes in a given independent variable. In the

---

[4] The original link is http://money.usnews.com/funds/mutual-funds/large-blend/vanguard-500-index-fund/vfinx.

above example, the r-squared of approximately 1 indicates that knowing the change in the S&P 500 can explain approximately 100% of the change in VFINX.

55. A comparison of the fluctuating cost of fuel to the "fuel surcharges" that BA imposed between 2007 and 2012 (on flights from the east coast to London as well as from the west coast to London) reveal that the r-squared values ranged between approximately .15 and .4. In other words, BA's "fuel surcharges" bore little relationship to — and were not based upon — changes in the price of fuel.

## IV. CLASS ALLEGATIONS

### A. Proposed Class Definition.

56. Plaintiffs propose a class consisting of:

> All residents of the United States who are members of the British Airways Executive Club, who purchased a Reward Ticket with frequent flier miles from November 9, 2006 to the present (the "Proposed Class"), and who paid a purported "fuel surcharge" when making the purchase.

### B. The Class is so Numerous that Individual Joinder is Impractical.

57. According to its 2011 annual report, BA "is the UK's largest international scheduled airline and one of the world's leading global premium airlines."

58. On information and belief, there are at least hundreds of thousands of Executive Club Members within the United States. On information and belief, no fewer than tens of thousands of those Members have redeemed Miles for Reward Tickets and paid the "fuel surcharges" during the relevant time period.

### C. The Answers to Questions Common to the Proposed Class will Drive the Resolution of this Litigation, and Common Questions Predominate over Individual Questions.

59. The answer to two questions will determine BA's liability to all (or nearly all) Class Members.

60. Plaintiffs contend that the Contract does not permit BA to impose any charge that is not an "incidental fee[] or tax[] charged by any person or relevant authority or body." Whether or not the Contract permits such a charge is a legal question that is common to all Class Members, the answer to which would drive resolution of the litigation. If a judge and/or jury were to agree with Plaintiffs, BA would be liable to all Class Members for imposition of its "fuel surcharge."

61. Plaintiffs also contend that the "fuel surcharge" is not a "fuel surcharge" at all, because it is unrelated to the fluctuating price of worldwide oil; and that even if BA were contractually permitted to impose its own fuel surcharge, such a charge would only be proper if it were based on BA's actual fuel costs. The issue of whether the "fuel surcharges" are based on BA's fuel costs presents a question of fact that is common to all Class Members, the answer to which would drive resolution of the litigation. Should a judge and/or jury agree with Plaintiffs on this issue, BA would be liable to all Class Members for imposition of the "fuel surcharges."

62. Put more broadly, this litigation focuses entirely on whether BA's conduct was in breach of the Contract, as interpreted under the law of a single jurisdiction. Should a judge and/or jury find BA liable for breach of the Contract, it is a ministerial task to determine damages for Plaintiffs and Class Members because, on information and belief, BA maintains electronic records of the "fuel surcharges" it assessed against each and every Plaintiff and Class Member.

**D.  Plaintiffs' Claims are Typical of the Claims of all Class Members.**

63. Plaintiffs, like all Class Members, are Executive Club Members.

64. Plaintiffs' relationship with BA, like the relationship between all Class Members and BA, is governed by the terms of the Contract.

65. Plaintiffs, like all Class Members, redeemed Miles for Reward Tickets.

-12-

66. Plaintiffs, like all Class Members, paid a "fuel surcharge" when purchasing their Reward Tickets.

67. If BA is liable to Plaintiffs for the claim enumerated in this Complaint, it also is liable to all Class Members for that claim.

### E. **Plaintiffs and their Counsel Will Adequately Represent the Proposed Class.**

68. Plaintiffs will put the interests of the Class Members on equal footing with their own interests, and Plaintiffs bring this lawsuit out of a desire to help all Class Members, not merely out of a desire to recover their own damages.

69. Plaintiffs' counsel are highly experienced class action litigators who are well-prepared to represent the interests of the Class Members.

### F. **A Class Action is Superior to Individual Actions.**

70. BA is a sophisticated party with substantial resources.

71. Each individual Proposed Class Member's damages are relatively small. On information and belief, relatively few Proposed Class Members will have more than $2000 in damages.

72. Prosecution of this litigation is likely to be expensive. For example, Plaintiffs' counsel anticipate that to fully analyze BA's "fuel surcharge" and fuel cost data, expert analysis alone will cost at least tens of thousands of dollars.

73. Given the high cost of litigation, relatively low individual damages, and the fact that an individual litigating against BA would have to hire an expert to perform an analysis regarding BA fuel costs and "fuel surcharges" that would be similar to the analysis required to prove the claims of an entire Class, it would not make economic sense for any (or almost any) Class Member to pursue this litigation as an individual action.

## V. CLAIM FOR RELIEF

### BREACH OF CONTRACT

74. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

75. The Contract does not permit BA to impose any charge that is not an "incidental fee[] or tax[] charged by any person or relevant authority or body."

    a. Neither the United States or the United Kingdom imposes a fuel surcharge on commercial airlines or on commercial airline passengers.

    b. No jurisdiction to which BA flies imposes a fuel surcharge on commercial airlines or on commercial airline passengers.

    c. Accordingly, BA breached the Contract by charging Executive Club Members a fuel surcharge.

    d. BA's breach injured Plaintiffs and the Class because Plaintiffs and the Class paid BA's self-imposed fuel surcharge when BA was not authorized to do so.

76. In the alternative, even if the Contract permitted BA to impose its own fuel surcharge, BA would not be entitled to impose any fuel surcharge except for one that is based on BA's actual fuel costs.

    a. BA's fuel surcharge during the relevant period was not based on its fuel costs.

    b. Accordingly, BA breached the Contract by charging Executive Club Members a "fuel surcharge" that was not based on BA's fuel costs.

    c. BA's breach injured Plaintiffs and the Class because Plaintiffs and the Class paid a surcharge that was greater than one based on BA's actual fuel costs.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that the Court enter judgment against BA, awarding the following relief:

(A) Compensatory damages;

(B) Prejudgment and post-judgment interest on such monetary relief;

(C) All other relief to which Plaintiffs may be entitled that the Court deems proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  January 9, 2015                    Respectfully submitted,

By: _____
     Jason L. Lichtman

Jason L. Lichtman (jlichtman@lchb.com)
David S. Stellings (dstellings@lchb.com)
Nicholas Diamand (ndiamand@lchb.com)
Douglas I. Cuthbertson (dcuthbertson@lchb.com)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:     212.355.9500

Clive Zietman (czietman@stewartslaw.com)
Fiona Stewart (fstewart@stewartslaw.com)
Daniel Loblowitz (dloblowitz@stewartslaw.com)
**Stewarts Law, LLP**
5 New Street Square
London, UK  EC4A 3BF
Telephone:     +44 (0)20.7822.8000

Mark Schlachet (mschlachet@gmail.com)
3515 Severn Road
Cleveland, Ohio 44118
(216) 896-0714

*Attorneys for Plaintiffs*

1169756.2