# EXHIBIT C

```
1                      UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF NEW YORK
2

3    ---------------------------------------X
                                            :
4    RUSSEL DOVER, et al,                   :
                                            :  12-CV-5567 (RJD)
5               Plaintiffs,                 :
          v.                                :
6                                           :  July 10, 2014
     BRITISH AIRWAYS, PLC (UK),             :  Brooklyn, New York
7                                           :
                                            :
8               Defendant.                  :
                                            :
9    ---------------------------------------X

10
       TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE DISCOVERY CONFERENCE
11               BEFORE THE HONORABLE MARILYN D. GO
                  UNITED STATES MAGISTRATE JUDGE
12
     APPEARANCES:
13
     For the Plaintiffs:        DAVID STELLINGS, ESQ.
14                              DOUGLAS CUTHBERTSON, ESQ.
                                NICHOLAS DIAMAND, ESQ.
15                              Lieff, Cabraser, Heimann &
                                 Bernstein
16                              250 Hudson Street, 8th Floor
                                New York, New York 10013
17

18   For the Defendant:         COLLEEN CAREY, ESQ.
                                TIMOTHY BIRNBAUM, ESQ.
19                              EDWIN CORTES, ESQ.
                                DLA Piper LLP
20                              1251 Avenue Of The Americas
                                New York, New York 10020
21

22

23   Court Transcriber:         MARY GRECO
                                TypeWrite Word Processing Service
                                211 N. Milton Road
24                              Saratoga Springs, New York 12866

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

2

1   (Proceedings began at 1:03 p.m.)

2          THE COURT:  <u>Dover v. British Airways</u>, Docket Number

3   2012-CV-5567.  This is a telephone discovery conference.  I'd

4   like plaintiffs to state their names for the record.

5          MR. STELLINGS:  Good afternoon, Your Honor.  This is

6   David Stellings of Lieff, Cabraser, Heimann and Bernstein for

7   the plaintiff, and I have with me on the phone as well my

8   colleague Doug Cuthbertson and Nick Diamand.

9          THE COURT:  For the defendant?

10          MS. GORDON:  Good afternoon, Your Honor.  This is

11   Keara Gordon from DLA Piper.  And on the phone with me are my

12   colleagues Colleen Carey, Tim Birnbaum, and Edwin Cortes.

13          THE COURT:  Okay.  We have two motions and one that

14   I wanted to discuss with you today, I planned on discussing

15   with you today, and the plaintiff filed a motion for a

16   protective order I guess yesterday.  I'll address that first

17   because that's easy to handle and I don't need a response.

18          I'm denying it without prejudice because I think

19   it's premature.  Rule 45(f) contemplates the originating

20   jurisdiction to handle it upon a transfer order from the

21   compliance court.  So if you get me an order, I will be happy

22   to handle it.  Okay?

23          MR. STELLINGS:  Understood, Your Honor.

24          THE COURT:  Okay.  And then, you know, when you re-

25   file you'll just tell me the schedule that submissions will be

3

1    made.  You'll discuss that ahead of time with the defendant

2    and we'll address it.

3             MR. STELLINGS:  Okay.

4             THE COURT:  I don't know which motion we should

5    address first.  I guess since the defendants filed the motion

6    first, we'll discuss the defendant's motion to compel and that

7    deals with the inadvertent waiver.  Just setting aside your

8    arguments on the inadvertent waiver, I just want to find out

9    whether or not the defendants are contesting that the

10   materials would otherwise fall within the protection of Rule

11   26(b)(4)(D).

12            MS. GORDON:  Your Honor, I think we outlined that

13   besides inadvertent waiver we also believe that if the waiver

14   attached, it was waived when the plaintiff used this analysis

15   to form the basis of their complaint, used the analysis to

16   oppose the motion for summary judgment, relied on it in oral

17   argument.  We believe they selectively used it as a sword and

18   believe that they cannot now shield the portions of the

19   analysis that they choose to shield.  We have the right to see

20   the entire part of it and their choice to include it and base

21   their claims on this analysis effected a waiver.

22            THE COURT:  Well, I don't think the issue of waiver

23   was very extensively briefed in the papers.

24            MS. GORDON:  It was briefed as I believe the second

25   argument in the first letter and also briefed again in the

4

1    reply because they did not actually distinguish any of our

2    cases at that issue waiver, in particular, <u>Granite Partners v.</u>

3    <u>Bear Stearns</u>.

4              THE COURT:  Mr. Stellings?

5              MR. CUTHBERTSON:  Your Honor, this is Doug

6    Cuthbertson for the plaintiffs.  I'll speak to this issue.  I

7    mean, you know --

8              MS. CAREY:  Your Honor, actually it's not -- if I

9    may?  The defendants weren't done so if we can just finish our

10   answer before the plaintiff starts speaking?

11             I just wanted to add to what my colleague said with

12   regard to your request as to where this is in the briefing.

13   I'd just like to direct your attention to Pages 2 and 3 of our

14   brief.  And if you look, for example, at the last paragraph on

15   Page 2 it says, "Even assuming that the [indiscernible]

16   analysis is protected by the work product doctrine, which we

17   have an issue with, the plaintiff waived any purported

18   protection when they put it at issue in the complaint and

19   invoked it during oral argument on BA's motion to dismiss.

20             We then cite their two case, <u>John Doe Co. v. US</u> and

21   <u>Granite Partners</u>.  On Page 3 we then proceed to more

22   specifically discuss the <u>Granite Partners</u> case and then apply

23   that case to our situation and add a citation to <u>Verizon</u>

24   <u>Directory Corp.</u> as well.  So I just wanted to direct you to

25   that portion of the briefing.

5

1          MR. CUTHBERTSON:  Thank you, Keara.  This is Doug

2    Cuthbertson for the plaintiff.  May I go ahead?

3          THE COURT:  go ahead.

4          MR. CUTHBERTSON:  Okay.  We addressed <u>Granite</u>

5    <u>Partners</u> and a line of cases in our opposition to their motion

6    to compel.  We feel that <u>Granite Partners</u> and the entire

7    argument is based on an absence of case law.

8          Essentially, what British Airways is arguing is that

9    plaintiffs are using the R-squared analysis which our informal

10   non-testifying experts used and that we placed in our

11   complaint and that we're using it as a sword.  But the problem

12   with that argument is that we are not using the R-squared

13   analysis as a sword and we're not using it at all.  It forms

14   the basis of our claims and in Judge Dearie's order denying

15   British Airway's motion to dismiss he acknowledged it as one

16   of three factors that led to our complaint being plausible at

17   this stage.  But we don't intend to use the R-squared analysis

18   moving forward, and in fact, it wouldn't make any sense if we

19   did.  Any damages or liability theory will need to be based on

20   data that we are currently in the process of receiving from

21   British Airways.

22         So the idea that we're using it as a sword strikes

23   me as odd.  We're not using it in any way.  The cases that

24   they cite, including <u>Granite Partners</u>, are instances where a

25   party truly is using a particular document as a sword.  For

6

1    example, in Granite Partners, the party that's fighting the

2    disclosure also intended to use the privileged document to

3    impeach various witnesses.  So they're actually actively using

4    a document that was inadvertently disclosed.  And I think it

5    was a fair argument in that case that that was not fair for

6    the party that was resisting the disclosure because they were

7    getting to use the document and then withhold it.

8              We would agree that if we were doing that here, it

9    would be impermissible.  We're simply not.  So --

10             THE COURT:  Okay.  I just want to --

11             MR. CUTHBERTSON:  -- we don't understand.

12             THE COURT:  I'm sorry for interrupting.  I just want

13   to clarify --

14             MR. CUTHBERTSON:  No, please do.

15             THE COURT:  I mean I agree that the line of cases on

16   at issue waiver regarding use of specific documents may not be

17   directly applicable in this case, but you know, there's a

18   broader concept of at issue waiver and I want to clarify.  Are

19   you telling me that you're abandoning the R-square analysis?

20             MR. CUTHBERTSON:  It's not that we're abandoning the

21   R-squared analysis.  I mean I think the R-squared analysis a

22   valid analysis.  I mean it's a statistical regression that was

23   used based upon publically available data.  And what we used

24   it to do is to show that there's a disjunct between the fuel

25   surcharge that British Airways levied on our plaintiff and the

7

1 price of fuel. But any analysis moving forward, and I think

2 that British Airways mistakenly said summary judgment before,

3 but I assume what they meant was motion to dismiss. Whatever

4 is done on a summary judgment, whatever would be done on class

5 certification, whatever would be done in terms of our experts,

6 we would move on necessarily to a different analysis.

7          So Your Honor, when you ask if we're abandoning it,

8 we're not abandoning it in the sense that we don't believe the

9 analysis is valid, but we're simply not using it moving

10 forward because it wouldn't make any sense to do so. We have

11 to use the data that will come from British Airways as a basis

12 for surviving summary judgment, as a basis for any sort of

13 damages calculation. And it wouldn't make sense for us to use

14 public data as opposed to the data that comes from British

15 Airways to do that.

16          THE COURT: Okay. Well, I mean I can appreciate the

17 fact but in the context of a motion to dismiss the plaintiffs

18 have far less data and the pleading -- the complaint is

19 prepared without much data other than what's publically

20 available. So but I just want to confirm with the plaintiffs

21 whether or not you will in fact be using R-squared analysis in

22 the future. And perhaps if you are, then in the course of

23 expert discovery everything we're discussing today may be

24 rendered moot I would think.

25          MR. CUTHBERTSON: That makes sense, Your Honor. I

8

1    can confirm that the answer to your question is no, we will

2    not be.  For summary judgment and all stages we will be using

3    the data that is coming forward.  We may use an R-squared

4    analysis generally, but that's just a term.  We may use the

5    sort of the method, but we wouldn't use the data that we

6    received which was on publically available information.  We'll

7    be using various analyses but it will be on completely

8    different information.  So what appeared in the complaint, the

9    spreadsheet that is at issue here today on British Airways'

10   motion, no, we won't need to use that moving forward.

11            THE COURT:  Okay.  Well, the second component, a

12   second aspect of the defendant's motion deals with just

13   standard inadvertent waiver analysis.  It's not often that a

14   court confronts a situation where the inadvertent disclosure

15   occurs twice.  And I don't quite understand your explanation

16   for the production of the documents and why there was a

17   failure to exercise -- I don't know if you exercised diligence

18   in the second production of documents.

19            MR. CUTHBERTSON:  Let me address that as well, Your

20   Honor.  And I think it's fair to admit and to say generally

21   that if British Airways has a stronger argument here it would

22   be with the inadvertent disclosure, although I still think it

23   clearly favors plaintiff.  British Airways is correct.  There

24   were two unfortunately inadvertent disclosures and, you know,

25   we have to apologize for that.  It was careless.  However,

9

1   carelessness is not the standard under the law.

2         Some background here, when we began producing

3   documents in March of this year, what I'll call the first

4   inadvertent disclosure, we produced the spreadsheet and quite

5   frankly, in terms of the reason behind it, this spreadsheet,

6   we didn't see that we had produced the version that had what

7   are three items. The protected, or at least the portions of

8   the spreadsheet that plaintiffs claim are protected,

9   constitute a column to the far right, some data on the very

10   back page, and the name of our information consulting experts

11   on the front page. And we simply didn't see that that data

12   was included when we produced it. And upon production, one

13   day later we immediately noticed our error when we were

14   looking at the spreadsheet and saw that in addition to the

15   publically available data and the cells are informal

16   consulting expert's analysis itself which in our eyes at least

17   was buried to the right and on the back page had been

18   produced. And we contacted British Airways. British Airways

19   agreed to destroy the copy that they had per Paragraph 11 of

20   the protective order, and we went about our ways.

21         At the same time, we were reproducing every single

22   document that we had already produced to British Airways

23   including the spreadsheet to conform with the metadata

24   requirements that British Airways had asked for. These

25   documents came from individual plaintiffs that had produced

10

1  the PDF, but we went back and we reproduced the documents that

2  all of the metadata was available to British Airways.  And we

3  have a vendor that helped us perform that task.  The vendor

4  went back, we made sure all the metadata was there.  And in

5  early May we reproduced all of our documents.  And the

6  explanation as for the second inadvertent disclosure is that

7  we didn't realize that the protected versions of the

8  spreadsheet sat in that pool of data and though it was

9  reproduced on that along with everything.  So all of the non-

10 protected information, as well as the protected information on

11 these two spreadsheets.

12        That's the explanation as to why this inadvertent

13 disclosure occurred a second time.  We were required to

14 reproduce everything.  I admit it was careless not to take

15 steps to ensure that the protected version of the spreadsheet

16 wasn't produced again, but there is a method to the madness so

17 to say.  That's why it occurred.

18        And under the standards in this district, we believe

19 that that disclosure was inadvertent and that proper cautions

20 were reasonable if not perfect.

21        I think that if you look at the different factors

22 that go into it, the sort of reasonableness of plaintiff's

23 precautions are probably our weakest argument, but I still

24 think that under the case law it was certainly reasonable.

25 There is an explanation, as I just described.

1    In addition, we did not know about this disclosure

2  until after the very first deposition of plaintiff Cody Rank.

3  And we notified British Airways within five business days,

4  actually within four business days as required under the

5  protective order.  That's the second factor under Judge

6  Sweet's 1985 decision in <u>Lois Sportswear</u> which Your Honor

7  cites in her MNA decision.

8    In addition, the scope of the production was

9  incredibly small but we're talking about two varied portions

10 of two spreadsheets here.

11    And fourth, most importantly, plaintiffs believe

12 that British Airways suffers absolutely no prejudice here

13 whatsoever.  They were able to ask the plaintiff about the

14 non-protected version of the spreadsheet for at least three of

15 them.  The plaintiffs don't know anything about these

16 spreadsheets.

17    As I described earlier, plaintiffs don't intend to

18 use the spreadsheet moving forward and frankly, are not

19 certain why British Airways wants to ask about it.

20    They also suffer no prejudice because this

21 publically available information can be easily reverse

22 engineered.  I mean British Airways, they're in possession of

23 all this data.  This is plaintiff's attempt pre-filing, pre-

24 receipt of discovery to sort of map out the disjuncts between

25 what we were seeing anecdotally between the high fuel

12

1  surcharges and the price of fuel.  That we think is the most

2  important factor here.  No matter what, there's no consequence

3  here for British Airways.  They'll argue that we're using it

4  as a sword, and they have in their papers.  And they're free

5  to ask, as far as we're concerned, about the versions of the

6  spreadsheet that don't contain any work product.  But we are

7  required to protect the versions that constitute the analysis

8  of our informal experts.

9          And importantly, in addition to the analysis is the

10 identity itself of our informal expert.  That is clearly

11 protected under the case law.  And our informal experts came

12 forward on a confidential basis not intending to be testifying

13 experts.  They're involved in the industry and only one has

14 come forward in that manner.

15         For all those reasons, we believe that the

16 inadvertent disclosure was reasonable and that we haven't

17 waived anything there.

18         THE COURT:  Okay.  Well, I'm just a little confused

19 about the extent of the protected material because the

20 defendant says that the materials that you claim are

21 privileged constitute roughly 25 percent of the production,

22 and you're saying two spreadsheets.

23         MR. CUTHBERTSON:  That's exactly right.  So there

24 are three spreadsheets at issue, just to break it down.

25         THE COURT:  Okay --

1          MR. CUTHBERTSON:  There's a spreadsheet that has --

2   sure.

3          THE COURT:  So three types of spreadsheets and then

4   they constitute 25 percent of the production.  Is that what

5   you're telling me?

6          MR. CUTHBERTSON:  No, that is not correct.  And to

7   be honest, I'll let British Airways speak for itself, but I

8   don't believe that British Airways is claiming that the two

9   versions of the spreadsheets that have work protected portions

10  constitute 25 percent of our production.

11         THE COURT:  Well, they say that R-squared analysis

12  constitutes 34 pages or roughly 25 percent of the production.

13  So --

14         MS. GORDON:  Your Honor --

15         THE COURT:  -- are we talking -- yes, and I'll let -

16  - yes, I think you're correct, Mr. Stellings, we should let

17  British Airways speak to this because I just want to know what

18  we're really talking about here that defendant claims was

19  subject to the motion here.

20         MS. GORDON:  Sure, Your Honor.  So as Doug mentioned

21  earlier, the first inadvertently produced version of the

22  spreadsheet was on March 4th.  That document was 34 pages of I

23  believe a 137 production which was 25 percent of that

24  production.  Then Doug referenced that two additional versions

25  of the spreadsheet were produced on May 2nd as part of the

14

1   reproduction.  So those were two documents out of the total 52

2   document production.  So it was a very small production, 52

3   documents.  Two of them happened to be again this spreadsheet.

4   And we mentioned earlier -- Doug said that, you know, this was

5   a reproduction.  We have difficulty understanding how that's

6   possible because it contained two versions of the spreadsheet

7   when only one was in the first one and those two versions of

8   this Excel analysis are different from one another.  So we

9   can't really follow how it's just supposedly an accident that

10  it was reproduced.  It appears to have been a version that was

11  never produced before.

12          In addition, along the same line, it indicates that

13  there was absolutely no quality check that was performed

14  before that May 2nd production went out, otherwise someone

15  would have noticed that.

16          As we explained in our papers, if you look at

17  Exhibit 19 and Defendant's Exhibit 51, you clearly notice one

18  has a title, one doesn't.  One has obvious columns that don't

19  appear on the other.  The entire last page is radically

20  different.  So to say that someone could not notice,

21  especially during the deposition of named plaintiff of Cody

22  Rank when there's, you know, extensive questioning that they

23  could not tell that this was the privileged version of the

24  document that they had already produced once by mistake, it

25  strains our belief that this was appropriate measures.  And

1   they could have taken other steps to protect the privilege.

2   If they had any concern that the document was privileged, they

3   could have stopped and asked for a break and analyze the

4   document.  They permitted it to be put in as an exhibit.  They

5   permitted 10, 15 minutes of questioning on it specifically

6   asking questions about the last page of the analysis, about

7   the columns that had been added and there was no objection.

8          So you know, we think this goes way beyond careless

9   to produce this document three separate times and to allow a

10  witness to be deposed extensively on it.  And we do think it

11  is unfair because if defendant, or excuse me, if the

12  plaintiffs say they're going to use a similar R-squared

13  analysis in the future, we do think we have the right to see

14  the original one and compare it.

15         And finally, we cannot reconstruct it because as we

16  indicated in our papers, we can't tell what their expert did.

17  We do not know what the independent variable was.  And as you

18  can see from the chart, there were many different rows of jet

19  fuel prices, many different rows of fuel surcharge prices.

20  You need two independent variables to do this regression

21  analysis and we do not have any of the assumptions or back

22  calculations to figure out exactly how their expert came to

23  this conclusion so we can't reverse engineer it.

24         And the only other thing I want to mention is Doug

25  keeps saying that, you know, it's important for them to keep

16

1   the identity of their expert.  The spreadsheets that are at

2   issue here, the two that they inadvertently produced on May

3   2nd, neither one contains the name of the expert as far as I'm

4   aware of, so that concern doesn't seem to be present here.

5          And again, in general, all of these analyses that

6   form the basis of their complaint, they're admissions.  We

7   have the right to test them regardless of whether they're

8   going to choose to abandon them going forward.  We have the

9   right to see what the basis was for this analysis and test

10  them and use them as admissions.

11         So for example, Magistrate Go, if you look at the

12  purportedly privileged spreadsheet that's attached as Exhibit

13  F to our motion, you will see that there is a column that says

14  BA Fuel Surcharge Average, and then there's a last column that

15  says Example of Fuel Surcharges in Line with Fuel Prices.  In

16  many, many instances on this chart those two numbers are the

17  same.  Now, that suggests to us that the plaintiff's expert

18  did an analysis and for those periods of time where the

19  numbers are the same, they agree that the fuel surcharges were

20  in line with fuel prices.  That is absolutely an admission

21  that we are entitled to probe and to use at summary judgment.

22  And if the plaintiffs don't like this analysis, they can't

23  just pretend that they never relied on it, jettison it and get

24  a new one.

25         If they come up with a different analysis that says

17

1  you know what, those numbers are now different, we're entitled

2  to probe their expert as to how and why and we are entitled to

3  use these admissions against them.

4       MR. CUTHBERTSON:  This is Doug Cuthbertson for the

5  plaintiffs.

6       I profoundly disagree here.  You are entitled, and

7  British Airways is entitled and will undoubtedly at summary

8  judgment and at Daubert and all of the stages that go before

9  us to test our testifying experts on their analyses based upon

10 the data that comes from British Airways.  But I do not see

11 the relevance or the ability to get an admission on data that

12 is publically available data that does not come from British

13 Airways that was simply used as a basis for the plausibility

14 of our complaint and just one of the many examples that we

15 used to show why British Airways' high fuel surcharges do not

16 correlate with the cost of fuel.  You can --

17      THE COURT:  Okay.  I understand the argument.  It

18 would strike me as incongruous that British Airway was the

19 party arguing most vehemently about the R-squared analysis at

20 the oral argument and in its papers and complaining that the

21 analysis was quite primitive, which I'm sure it was under the

22 circumstances.  It would be incongruous for British Airway to

23 then revert back to whatever the plaintiff may have worked

24 with early on this case and tried to bring the expert analysis

25 back to the original analysis used by the plaintiff.

18

1          Now, I just one question of the defendant.  If we

2    didn't have the second production on May 2nd, or 2nd and 3rd,

3    would you agree that there wouldn't be any problem with the

4    first inadvertent disclosure setting aside your dispute over

5    whether or not it ought to have been protected in the first

6    place?

7          MS. GORDON:  Separate and apart from the fact that

8    we do not believe -- we believe it was waived otherwise, we do

9    not believe the first inadvertent waiver that there was

10   anything wrong with it.  It happened the day after.  They

11   immediately notified us.  We were okay with that which is why

12   we destroyed it in compliance with the protective order.

13         THE COURT:  Okay.  And so --

14         MS. GORDON:  And we also just want to make sure

15   we're clear.  Our arguments on motion to dismiss related to

16   the R-squared analysis were simply that there was no

17   allegation.  Like the allegations were just here's the final

18   result.  They just gave like a number .15 to .4.  There was

19   nothing in the complaint that explained how that analysis was

20   conducted and that was our concern.  And to say now that we

21   still don't have the ability to see how that analysis was

22   created and to test that seems extremely unfair to us and

23   seems exactly what courts do not allow.  It was the basis of

24   them surviving the motion to dismiss.  Judge Dearie called it

25   the most important allegation here.  And so to say that they

19

1   can use it, not describe it very well, describe it as like one

2   line or two lines and to say like this is .15 or whatever came

3   out, and then prevent us from actually seeing how they

4   performed that calculation now that they've survived the

5   motion to dismiss seems extremely unfair and prejudicial to

6   BA.

7           THE COURT:  I think the question of prejudice is

8   different and I'm not going to bother Judge Dearie about it.

9   But most of the submissions on the motion to dismiss centered

10  on the issue of preemption.  As Judge Dearie related even in

11  his decision, I mean it speaks for itself even though he might

12  have considered an important factor the statistical analysis

13  described by the plaintiff.  There are other factors and

14  ultimately he felt that what was alleged was sufficient to

15  survive a motion to dismiss.  I'm not going to read any more

16  into that.

17          I'm going to reserve decision.  We'll issue a

18  decision on this so that people will have the benefit of a

19  written order.

20          But I do want to clarify with respect to the May 2nd

21  production, we're only talking about two spreadsheets?

22          MR. CUTHBERTSON:  Your Honor, this is Doug

23  Cuthbertson for the plaintiff.  That's correct.  And I would

24  like two clarifications on the spreadsheets.  We're talking

25  about small, what I believe to be small portions of two

20

1  spreadsheets, and I'd like to correct an error from British

2  Airways that was made shortly ago, although I believe a true

3  inadvertent error on their part.  The identify of our informal

4  testifying expert is contained in the documents that were

5  inadvertently produced.

6          THE COURT:  On one of the two.

7          MR. CUTHBERTSON:  That's correct.

8          THE COURT:  Okay.  All right.  Now we'll move on to

9  plaintiff's motion.  Before we address the plaintiff's motion,

10 I'm wondering if we could just sidetrack for a minute because

11 this seems to be a good time to discuss trying to narrow

12 discovery a little bit and be a little more efficient in how

13 you proceed in discovery.  And I'm wondering given the long

14 class period, the large number of separate routes and

15 variables at issue over this time period whether it may make

16 sense to think about working out a sampling as you did with

17 respect to your sampling expert earlier this year.

18         MR. STELLINGS:  Your Honor, this is David Stellings

19 for the plaintiff.

20         THE COURT:  And this is to narrow discovery and

21 hopefully for the benefit of the defendant narrowing the scope

22 of production necessary.  But I do want to make sure that the

23 plaintiffs are not prejudiced in their efforts to conduct

24 discovery.  But I would think at this point there might be

25 enough information produced that you'll have a pretty good

1   handle on what you might need and the parties might be able to

2   agree to certain, you know, temporal limits, geographical

3   limit, or the discovery to proceed going forward when we're

4   dealing with the specific items, discrete items of information

5   relating to the fuel surcharges.  Go ahead.

6          MR. STELLINGS:  Thank you, Your Honor.  This is

7   David Stellings again.  I think we're at a pretty good place

8   now.  As you know, several months ago, many months ago by this

9   point, we the plaintiffs proposed to British Airways that we

10   engage in electronic discovery expert named H5.  It's one of

11   the prominent or preeminent experts in this field in the

12   country.  And one of the purposes, one of the primary purposes

13   of engaging H5 was to try to cabin the scope of discovery and

14   try to the best of our ability to limit the number of

15   documents for which British Airways would have to search and

16   then collect and then review, then produce to the plaintiffs

17   for our review.

18          We went through a many month process of negotiating

19   with British Airways and talking on both sides separately to

20   H5 to figure out what the proper search terms were.  That

21   process also included, as you referenced, a sampling process

22   which involved British Airways producing a relatively small

23   number of documents compared to the entire universe so that H5

24   could go through it and figure out what the proper search

25   terms were.  And then after that sample process we again

22

1    negotiated the search term list and I think we are in

2    agreement with British Airways on the search term list and

3    British Airways is now in the process of collecting and

4    reviewing those documents and they will start to produce those

5    documents to us I believe early next month on a rolling basis

6    and that they will complete their production in I think it's

7    early October.  That was the subject of Your Honor's -- the

8    order that you entered a few weeks ago.

9            So it's hard at this point before we have any of

10   those documents to comment or suggest any changes to the

11   process.  So far the process seems to be working well.  And of

12   course we're happy in the future, we're always happy to have

13   fewer documents to review ourselves.  on the other hand, like

14   you said, it's important to balance the necessity of access to

15   evidence that we need to carry our burden to prove the claim

16   in our case.

17           THE COURT:  Well, I guess what I'm suggesting is

18   whether or not the parties can come to an agreement that if

19   you pick certain routes or whatever other criteria you want

20   for a particular time period or various time periods, you

21   know, and I'll use as an example the request for fare change

22   documents, the request reflected in number 15.  You wanted

23   information on the frequency of fare changes.  Let's not get

24   into the merits of the motion to compel here, but I mean could

25   you agree on like a certain month, three different months, or

23

1  a narrow time period, a certain route for production that

2  might be responsive to this request and agree that whatever

3  the request is narrowed to would be a representative sampling

4  of how fares were changed?  But it would be important for you

5  to just be consistent in whatever universe of documents you

6  would narrow yourselves to.  Do you understand what I'm

7  saying?

8         MR. STELLINGS:  I do.  I think that the answer is we

9  would be willing to consider creating sort of exemplar months

10  and routes with respect to that type of request.  I think in

11  the request itself we actually did specify only a small

12  handful of routes and then we ask one general question about

13  the total number of times they changed fares because the

14  purpose obviously of our request is to get that information

15  out there that it's easy for them to make the fare changes.

16  But we're happy to specify, you know, a relatively small

17  number of routes.  And it sounds like what you're suggesting

18  is instead of asking for the specified, you know, five routes

19  that we already have in there, instead of using that during

20  the entire cross period that we could choose, you know, four

21  months a year or whatever the number is to slightly reduce it.

22         The thing is, Your Honor, though I mean I would

23  question this only on one respect which is that British

24  Airways has not even asserted an undue burden argument in

25  connection with that request.  And so it's not clear to me

24

1   that it would be any easier for BA to give us information like

2   that about four months as opposed to 12 months.  And I think

3   where we're going to go with that anyway, and I'm not trying

4   to preview the argument, but I think where we're probably

5   going with that anyway is that we're going to be getting

6   deposition testimony from BA on that as opposed to documents

7   that they're saying the documents don't exist in response to

8   that request.

9           THE COURT:  Okay.  I think we're talking --

10          MS. GORDON:  Your Honor --

11          THE COURT:  -- about different requests, but I would

12  think that both sides would have to agree that whatever

13  narrowing of the time frame or routes you agree to, I mean

14  both sides would have to agree that they are representative of

15  the entire class period.  Go ahead.

16          MS. GORDON:  Your Honor?  Oh, I'm sorry, I didn't

17  mean to interrupt.  I thought you were done.

18          THE COURT:  Yes.  I was just saying go ahead to you.

19          MS. GORDON:  Thank you, Your Honor.  I wanted to be

20  clear about a couple of things.  One is the only reason that

21  British Airways has said there is no undue burden with regard

22  to the two specific requests we're talking about, request

23  number 15 and 16, is because documents that are specific to

24  that request as framed do not exist.  I'll clarify that those

25  requests do not ask for five routes, they ask for documents

1   sufficient to identify the number of times each day you change

2   the fare for each route.

3           THE COURT:  Yes, I realize that.

4           MS. GORDON:  And as you know, Your Honor, British

5   Airways with its partners flies to over 400 locations

6   worldwide.  But the 30(b)(6) notice that Mr. Stellings

7   referenced isn't before you today.  We haven't even had a

8   chance to respond to it.  But I can tell you quite clearly we

9   will object to it.  That document request, Your Honor, asked

10  for a deponent to talk about the number of times each day

11  during the class period that BA changed its fares on all

12  routes worldwide.  This is six-year class period.  There are

13  365 days in a year.  We're talking about somebody to discuss

14  the fares that were at issue for 400 different routes --

15          THE COURT:  Ms. Gordon --

16          MS. GORDON:  -- for 2,190 days.

17          THE COURT:  Ms. Gordon?

18          MS. GORDON:  Yes?

19          THE COURT:  Ms. Gordon, I realize Mr. Stellings was

20  only talking about document request number 19.  And all I'm

21  asking is whether or not the parties might be able to talk

22  about a narrower scope of discovery but that you would have to

23  agree that whatever you narrow the discovery to, those time

24  periods would be representative of the -- that the data

25  produced or whatever information is produced could be used in

26

1   a way so that the plaintiffs could argue that it would be

2   representative of whatever occurred during the class period

3   and --

4           MR. STELLINGS:  Well, from the -- I'm sorry.

5           THE COURT:  And you know, so I think -- I mean I can

6   appreciate what you're saying, Ms. Gordon, and I'm really just

7   trying to help you out and I just want to know if the

8   defendant would be willing to agree to some sort of

9   stipulation in an effort to narrow the scope of discovery

10  here.

11          MS. GORDON:  Well, I didn't mean to give you the

12  impression, Your Honor, that I wasn't appreciative of your

13  offer.  We have said from the beginning that we would like to

14  narrow the time period at issue.  We said that from the

15  beginning we'd like to narrow the routes at issue.  We though

16  that the appropriate routes and time period would be limited

17  to the named plaintiff.  There's no class certified, and we've

18  had that discussion.

19          We're absolutely willing to consider any way in

20  which we're going to save this so that it is less burdensome

21  for everybody.  I did not mean to suggest otherwise.

22          THE COURT:  Okay.

23          MR. STELLINGS:  And Your Honor, from the plaintiff's

24  perspective, we're willing to talk to BA about getting

25  information about every route that they flew during the class

27

1    period for 15, for example. We can figure out a handful of

2    routes or a couple of handfuls of routes and use that as sort

3    of a -- extrapolate from that to the entire universe.

4            Again, I mean the focus of these requests, it's

5    fairly narrow. It's just, you know, to get at the point that

6    we want to make that we just want to be able to argue to the

7    court that it was not hard for BA to change its fuel

8    surcharges. That's it. I mean that's the point of these

9    requests.

10           THE COURT: Well, I --

11           MR. STELLINGS: And again, I'm not -- sorry.

12           THE COURT: I'm sorry.

13           MR. STELLINGS: I'm not sure how this fits in with

14   BA's statement that it doesn't have documents because I think

15   where we are --

16           THE COURT: Well, let's set aside --

17           MR. STELLINGS: -- compromises will be -- yeah.

18           THE COURT: Let's set aside the individual requests

19   at issue in your motion, Mr. Stellings.

20           MR. STELLINGS: Sure.

21           THE COURT: But as I said, I think this is a good

22   time to try to set a template for all discovery and maybe with

23   respect to some discrete requests you might even just narrow

24   it down some more. But I gather you do have more information

25   and you might be able to, you know, to think how you're going

1  to proceed and perhaps, you know -- I think it sounds as if

2  you've been able to agree on, at least with respect to H5, on

3  the documents that you are going to narrow the analysis to and

4  you might be able to do that on a going forward basis on most,

5  if not all, of discovery.

6          So I would suggest that the proposal comes from the

7  plaintiff as to how you would narrow discovery and we'll just

8  go on to talk about the requests at issue now I mean unless

9  somebody has something else to add to this, this conceptual

10 discussion narrowing discovery generally going forward.

11         MS. GORDON:  Well, Your Honor --

12         THE COURT:  And I don't want to limit the parties

13 because you may come up with specific discovery requests or

14 depositions where you may want to go beyond whatever confines

15 you've agreed to, but I'm sure you'll be able to draft some

16 sort of stipulation that would cover that situation too.

17         MR. STELLINGS:  Your Honor, speaking for the

18 plaintiffs again, we're always looking for ways to make this

19 litigation run as efficiently as possible and that includes

20 not seeking discovery broader than we absolutely need.  And so

21 I will commit to you that we will continue to talk with BA's

22 lawyers about ways to keep discovery efficient.

23         At this point it's sort of an odd moment in the

24 litigation where we're waiting for BA to start producing what

25 we expect to be a large volume of documents and information to

29

1   us.  And so I think maybe we'll be in a better position to

2   have that discussion in a couple of months after we've had a

3   chance to start seeing the documents in advance of many

4   depositions I think that will occur in the fall and the winter

5   this year and next year,

6           THE COURT:  Okay.  I heard somebody for the

7   defendant speaking up.

8           MS. GORDON:  Yes, Your Honor.  I was just going to

9   say that we are happy to entertain any proposal from the

10  plaintiff to narrow the scope of discovery as you had

11  suggested.  I think it's a great suggestion.  [Indiscernible]

12  here as well something that we could propose to the plaintiff

13  and try to work collectively to get something in front of Your

14  Honor.

15          THE COURT:  Okay.  But you'll have to just think

16  about some sort of agreement that will cover the case till the

17  end of the case, you know, from whenever you enter into the

18  agreement to the end of the case and leave yourself just a

19  little room for some tweaking as the situation may arise.

20          MS. GORDON:  If we can think of ways to streamline

21  this and make the resolution quicker, we will let you know.

22          THE COURT:  Okay.  So now we'll go to the

23  plaintiff's motion to compel.  And the first issue raised by

24  the plaintiff deals with documents regarding the fare changes

25  every day and that's reflected in request 15 and 16?

30

1          MR. STELLINGS:  That's right, Your Honor.

2          THE COURT:  Okay.  I think it's of marginal

3  relevance and it's officially, as the defendants argue, a

4  fairly obvious point that the fare may change a lot of times

5  every day.  That's correct?

6          MR. STELLINGS:  Yeah.  You know, Your Honor, I have

7  to say the point, like I mentioned earlier, the point of these

8  two requests is not to make the defendants do a lot of work to

9  gather together all of this data.  What we're really trying to

10 get here is proof that BA did in fact have the capability and

11 did in fact change its fares frequently each day.  And that's

12 directly relevant to our case because as Your Honor knows the

13 heart of this case is the question of whether the fuel

14 surcharge was actually a surcharge to protect BA from change

15 in the cost of fuel or whether that fuel surcharge was

16 [indiscernible] for BA.  And one of the things that BA has

17 said is that it was not commercially practicable for the

18 airline to assign a fuel surcharge that exactly matched the

19 fuel cost.  And I think that BA will argue as the case

20 progresses that it's our burden, plaintiff's burden, to

21 propose to the court what the fuel surcharge should have been,

22 what the formula should have been.  And part of that involves

23 our knowing whether it was possible for BA to change the fuel

24 surcharge more frequently than it did which was not very

25 frequently compared to how often fuel costs change.  And so

1   all of this was to say that if BA were willing to admit

2   formally that it changed its fares very frequently and that it

3   could have done so with the fuel surcharge based on its

4   technical ability much more frequently than it did, I think we

5   will be happy with that.

6          MS. GORDON:  Your Honor ---

7          MR. STELLINGS:  Or with a deposition, you know, in

8   which we obtain that similar kind of testimony.

9          MS. GORDON:  I'm sorry, Mr. Stellings, I didn't mean

10  to interrupt you before.

11         THE COURT:  Okay.  Ms. Gordon --

12         MR. STELLINGS:  That's okay.

13         THE COURT:  -- go ahead.

14         MS. GORDON:  Okay.  So Magistrate Go, a couple of

15  things in response to that.

16         Number one is we made no representation at all as to

17  how frequently BA changes the fare.  That is the separate and

18  distinct analysis from how frequently BA changes the fuel

19  surcharge.  The fare is something totally different and it is

20  arrived upon using different analyses, using different

21  criteria and as I understand it, basically an algorithm.  It's

22  not like BA goes into some computer system every day or every

23  hour or every minute and changes its fares.  It does it

24  through algorithms that I don't purport right now to

25  understand that deal with yield and a whole bunch of things,

1   totally different than what Mr. Stellings just said which is

2   BA in its motion to dismiss explained that it's not

3   practicable or commercially possible for BA's fuel surcharge

4   to exactly match the cost of its fuel on a particular flight.

5   Two totally different things.  Remember some of --

6           THE COURT:  Ms. Gordon, I'm sure you'll be very

7   persuasive when you make that argument to the jury or in

8   summary judgment.  I am just trying to get past this

9   additional discovery as painlessly as possible for BA.

10          MS. GORDON:  I understand, Your Honor, but --

11          THE COURT:  At least as to this request.  I mean I

12  like inflicting pain sometimes, but I think as to request

13  number 15 it shouldn't -- based on what you've said, I would

14  hope that you'd be able to reach some sort of agreement to

15  just provide some sort of statement that the plaintiff can

16  use.  They may not be permitted to use it at trial, but be

17  that as it may, some sort of statement that would satisfy them

18  or some sort of data on representative days to show the number

19  of changes each day for that particular day.

20          MS. GORDON:  Here's my problem, Magistrate Go.  My

21  problem is request number 15 asks for documents sufficient to

22  identify the number of times each day BA changed the fare for

23  each routed slip.  There are no such documents.

24          THE COURT:  No, no, no, no --

25          MS. GORDON:  And we've told the plaintiffs three

1  times those documents don't exist.  So when the documents

2  don't exist to a request and we told them that, I'm happy to

3  have suggestions as to how else we can proceed because I can't

4  produced documents that don't exist.

5       THE COURT:  Ms. Gordon, I'm sure the plaintiffs

6  would love to have a smoking with these beautiful daily

7  printouts from BA but I can appreciate what you're saying, but

8  I think that Mr. Stellings can certainly speak for himself

9  that they're asking for data that would be sufficient to show

10 the rate changes, so I would think documents that show the

11 rate changes on a particular day would be what he'd be looking

12 for.  Is that correct, Mr. Stellings?

13      MR. STELLINGS:  That's absolutely right, Your Honor.

14 And like I mentioned earlier, if they didn't want to go to the

15 trouble of collecting all that data, we could probably reach

16 some kind of agreement either for them to just present someone

17 for deposition so that we can get testimony about frequency.

18 You know, there are definitely more efficient ways to go about

19 getting this information.

20      THE COURT:  Well, I would think this is perhaps a

21 good request for the parties to work on beginning to narrow

22 future discovery and perhaps you can try to think about how to

23 narrow that to particular days and particular routes.  And

24 then that could coincide with any future depositions that will

25 be scheduled on fare changes.  Obviously, this is not a

34

1  finding that what the plaintiffs intend to introduce would be

2  at all admissible at trial but I'm not going to deprive the

3  plaintiffs of discovery on this issue.

4       MR. STELLINGS:  Thank you, Your Honor.  And I commit

5  that we will talk to BA about narrowing this.

6       THE COURT:  Okay.  And then the methodology would --

7  I'm not sure there would be documents.  I guess well there

8  might be in terms of algorithms for the fare changes, but I

9  think that ought to be tied to whatever dates and routes that

10 you narrow request number 15 to.

11      MR. STELLINGS:  Right.  That's fair, Your Honor.

12 And just to be clear so that Ms. Gordon -- I think she already

13 understands this, but we're not looking for -- we don't want

14 the algorithm for why they changed the fare from a particular

15 number to a particular number.  We're really just at the

16 frequency of the fare changes.

17      THE COURT:  Okay.

18      MS. GORDON:  Well, Your Honor, to answer your

19 question, there is no document that identifies the methodology

20 to change the fare, and we had had a conversation with the

21 plaintiff with regard to the burden that would be required.

22 As I understand it, and Mr. Stellings can correct me if I'm

23 wrong, the plaintiffs are still holding to their prior

24 agreement that the only search term that will be implicated if

25 Your Honor finds that this area is relevant are the two to

35

1  which we've agreed with regard to fare distributions.  Mr.

2  Stellings, you are maintaining that position, correct?

3          MR. STELLINGS:  We are not -- we are -- yes, we are

4  maintaining the same search terms that we agreed to with BA

5  and H5.  So like the court, what Judge Go just said, we can

6  first talk about narrowing routes and then I think we will be

7  okay, Keara, with just the deposition of someone who's

8  knowledgeable to confirm that BA has the ability and in fact

9  did change its fares frequently during the class period.

10          MS. GORDON:  Well, I think, Your Honor, respectfully

11  we would ask that we have an opportunity to be heard on the

12  30(b)(6) motion, the 30(b)(6) request that they have made.

13  That is not ripe and isn't in front of Your Honor today.  We

14  will be filing objections to that both with regard to the

15  timing and with regard to the scope.

16          We would ask that we reconvene and have a subsequent

17  conversation with Your Honor about that deposition.

18          THE COURT:  I'm not --

19          MS. GORDON:  Now, the subsequent conversation that

20  we have may be a lot less difficult than the one today if we

21  can reach some sort of agreement as to the narrowing of the

22  scope.  Hopefully, we can do that, but if not, I just would

23  like to reserve the opportunity to come back to you on that.

24          THE COURT:  I haven't told you I didn't want to hear

25  it.  And in any event, I have no choice as to whether or not I

 1  want to hear it.

 2          MR. STELLINGS:  And Your Honor, but from our

 3  perspective, you know, this is the reason that we raised this

 4  relevance issue with you today even though BA says that it

 5  doesn't have responsive documents is because we knew, and

 6  Keara confirmed just now, that BA would assert the exact same

 7  relevance objection because the issue that we need to depose a

 8  witness on is identical to the issue in the request for

 9  production and we didn't think it made any sense efficiency

10  wise to brief the relevance issue, have a hearing on a

11  relevance issue before Your Honor today, and then re-brief the

12  same exact issue in a couple of weeks and have another hearing

13  on the same exact issue.  So that's why we think that the way

14  to go is, you know, they have committed to narrowing the

15  routes that we're talking about and the timing that we're

16  talking about.  And you know, I think that we should be able

17  to come to an agreement with BA that would obviate a need for

18  additional briefing and Your Honor to spend additional time

19  presiding over a hearing on issues that you've already heard

20  today.

21          THE COURT:  Yes.  I --

22          MS. GORDON:  But Your Honor, it's not the same

23  issue.  It's not the same issue at all.

24          THE COURT:  Wait, wait, wait.  Ms. Gordon?

25          MS. GORDON:  Yes.

1            THE COURT:  15 is different from 16 which is the

2  methodology.  And my view is you also read that request too

3  narrowly in terms of identifying the methodology.  I don't

4  think that the plaintiffs are expecting to find these nice

5  documents saying this is how we determine fare and this is how

6  you should look into it, and here are the programs that we

7  use.  But there may be some information that's available on

8  the components of the computer system.  I mean something to

9  assist in the determination of how fares are adjusted.  And

10  you know, this has been an underlying source of dispute

11  through all the discovery conferences we've had.  I can

12  appreciate BA not wanting to be tied to any set of factors in

13  its determination of rates, but there may be documents on the

14  mechanics of the determination of the fares.  And so I don't

15  think it's fair for BA, and you are under an obligation to

16  construe discovery requests broadly, I don't think it's fair

17  to construe that request to mean that there will be a document

18  that says this is the methodology on how you should change

19  fare for each route.  Of course it doesn't exist.  So --

20             MS. GORDON:  Well, Your Honor, just to clarify, I

21  mean if we were talking about the methodology with regard to

22  setting fuel surcharge, we would have no problem with that.

23  If the plaintiffs wanted to ask about the methodology for fuel

24  surcharge, how often the fuel surcharge is changed, that we

25  completely agree is absolutely relevant.  But we're talking

38

1   about fares.  We're talking about pricing which is separate

2   and distinct from the fuel surcharge.  Remember, none of the

3   named plaintiffs paid a fare, not a single one of them.

4   There's no fare assessed on reward tickets.  The only thing

5   that's at issue in this case is fuel surcharge.  And if we're

6   talking about the fare and if the fare and the reasonableness

7   and the price is at issue, then this whole case is preempted

8   under that ADS.  So this case isn't about fare.  They're only

9   going to say well if you could change your fare more often,

10   you could change your fuel surcharge more often.  But there's

11   nothing, Your Honor, in the contract that requires us to

12   change the fuel surcharge every day.  There's nothing in the

13   contract that constrains our discretion to set the fuel

14   surcharge according to the factors and in the mechanism in the

15   timing that we see fit.  And Mr. Stellings said before that

16   we're going to ask them what they thought the fair fuel

17   surcharge should have been.  No, no.  There is absolutely

18   nothing in the contract that gives the plaintiff the

19   discretion to set the fuel surcharge.  That discretion is

20   reserved to British Airways.  And what we do with our fares

21   and how often we change them has absolutely no bearing on the

22   fuel surcharge.

23          MR. STELLINGS:  Your Honor, I think we're getting a

24   little bit off topic here.  I think that Judge Dearie squarely

25   addressed BA's arguments in its motion to dismiss as a motion

39

1  to dismiss including a reconsideration motion in which BA made

2  the argument passionately like Ms. Gordon has here that BA was

3  allowed to exercise virtually unlimited discretion setting its

4  fuel surcharges.  And I think Your Honor is exactly right

5  about what we're looking for here, that we're asking for

6  documents sufficient to show something.  We're not asking for

7  the perfect document, although that would be nice, that

8  explained everything in a neat little doc.  But anyway, I

9  guess that's all I have to say on this issue.

10        THE COURT:  Let me just ask you to narrow it and

11  you'll come back to me, Ms. Gordon, because if the plaintiffs

12  can't narrow the issue sufficiently, you'll be having problems

13  with the 30(b)(6) deposition and we'll revisit that request

14  number 16.

15        Now, the next area deals with the fair ratio, the

16  ratio between the field surcharge and the fare.  I assume

17  again that the plaintiff might be able to try to narrow the --

18  well, you've narrowed it to the particular flights and perhaps

19  that's --

20        MR. STELLINGS:  Right.

21        THE COURT:  -- a time share -- I mean a period.

22        MR. STELLINGS:  I think we could do that, Your

23  Honor.  We can figure out, you know, sort of sample

24  representative months instead of the entire class period.

25        THE COURT:  Okay.  I mean I think it arguably could

40

1   lead to admissible evidence.  It may not be.  I'm going to

2   permit it but I'll direct the plaintiff to narrow the request

3   as we've discussed.  Now --

4           MR. STELLINGS:  Thank you, Your Honor.

5           MS. GORDON:  Your Honor, may I clarify something?

6   You know, our response on this was relevance.  We don't see

7   how the ratio of fare to fuel surcharge is relevant to this

8   case.  There's nothing in the contract as we know that

9   requires BA to set any particular fare.  There's nothing in

10  the contract that requires BA to maintain any specific ratio

11  between the fuel surcharge and the fare.  There's nothing in

12  the contract that limits our discretion in that regard at all.

13  I understand Mr. Stellings' response is well we got past the

14  motion to dismiss, but that doesn't mean the contract doesn't

15  matter.  It's still a breach of contract case and at bottom,

16  everything has to be tied to the contract.  If there is no

17  contractual obligation on BA to do or not do something, then

18  BA doing or not doing that is not a breach of contract.  There

19  is absolutely nothing in the contract that says the fuel

20  surcharge has to equate to in any particular manner the fare.

21          And I've read the plaintiff's papers.  I don't see

22  anything that they've tied to the contract, a contractual

23  obligation that BA has.

24          So I guess I'd like a clarification whether this is

25  a ruling by the court that the fares of BA and the ratio of

41

1  the fares to fuel surcharge are deemed to be relevant to this

2  case.

3        THE COURT:  It's relevant for discovery purposes.

4  And I'm not going to predict in advance what the data will

5  show.  And it ultimately may be meaningless.  However, I can

6  see how it would be unfair to deprive the plaintiff of

7  information regarding the fares which I would assume is

8  affected by fuel prices and it may or may not be affected in

9  the same manner as the determination of the fuel surcharges

10  imposed on the plaintiffs.  I don't know.  But I think it

11  ought to be provided.

12        MS. GORDON:  Thank you, Your Honor.

13        THE COURT:  Now, 13.  It strikes me from the little

14  tidbit that's offered by the plaintiff in the motion, or I

15  should say that little portion of the deposition transcript

16  that there is certainly some relevance between the payments

17  made to Partner Airlines and the fuel surcharge imposed.

18  There may be other factors.  I'm a little concerned over the

19  broadness of the request and certainly it may be difficult to

20  -- I don't know if there are actual documents regarding the

21  fuel surcharge.  I mean BA is the only party that would know

22  that in this conversation.

23        MR. STELLINGS:  And Your Honor, you're right.  I

24  mean we are in a similar position to the court which is that

25  all that we know about this issue we learned from the

42

1  deposition of BA where BA told us for the first time that they

2  share this fuel surcharge revenue.  And so all we want here

3  again are the documents sufficient to provide the information

4  that we're looking for but it's hard for us to ask anything

5  more narrow without having more information than we currently

6  have.

7          MS. GORDON:  Your Honor, at a minimum we would ask

8  that this request be confined to revenue regarding reward

9  travel.  As you know, reward travel is the only thing that is

10  at issue in this case and reward travel with that limitation

11  would decrease the burden on British Airways and also limit it

12  to the amount that actually potentially would possibly be

13  relevant here.

14          THE COURT:  Wouldn't it be --

15          MS. GORDON:  We, as you -- uh-huh?

16          THE COURT:  Excuse me.

17          MS. GORDON:  I'm sorry.

18          THE COURT:  Wouldn't it necessarily be limited to

19  the reward travel because the fuel surcharge is only imposed

20  on reward travelers?

21          MS. GORDON:  Well, the fuel surcharge --

22          MR. STELLINGS:  No, Your Honor.

23          MS. GORDON:  -- to clarify, is a charge that is

24  imposed on all fliers, so whether you're redeeming your Avios

25  and paying a fuel surcharge or whether you're a revenue ticket

 1  just flying BA regularly, there is a fuel surcharge that is

 2  assessed on all passengers.  So the request as written would

 3  encompass revenue as well as reward travel.  If Mr. Stellings

 4  wants to agree right now on the phone that his request is

 5  limited to just reward travel, that would help us narrow this.

 6          MR. STELLINGS:  What Ms. Gordon just said, Your

 7  Honor, is exactly the reason why we're not able to agree to

 8  restrict it to just reward travel because we believe it's too

 9  early for us to know for sure at this point, but we believe

10  that BA said its fuel surcharges generally just apply not only

11  for reward travel, and therefore, the information about

12  revenue sharing for us to be able to meet our burden at

13  summary judgment or trial we would need information more broad

14  than just for reward travel because a lot of the decisions are

15  made not in the context of reward travel and a lot of the

16  revenue shared is not in the context of reward travel.

17          MS. GORDON:  Your Honor, that's not relevant.  It's

18  not relevant.  I'd like somebody to show me a point in the

19  contract that say that BA -- let me back up.  The contracts,

20  as you know, say that BA can impose a fuel surcharge.  So what

21  we're now hearing instead is a complete mutation of the

22  contract that instead says BA can impose a fuel surcharge but

23  only if it changes the fuel surcharge on some time schedule

24  that the plaintiffs are going to arrive on later in some

25  manner that corresponds somehow to the fluctuating price of

44

1    oil, and that simultaneously maintains some specific yet

2    unknown ratio to the fares and cannot in any way take into

3    account the business realities of the joint business

4    arrangement in which the company operates.

5           There's nothing in the contract, Your Honor, that

6    prohibits British Airways from entering into joint business

7    agreements.  That's the business model.  How we decide to do

8    that is so far afield from the industry issues here that we do

9    not in any way see the relevance.  And to the extent that we

10   wanted to try to narrow this as just reward travel, the

11   plaintiffs are refusing to do even that.

12          MR. STELLINGS:  We are not objecting to any of BA's

13   arrangements with its partner airlines.  That's not what this

14   case is about.  This case is about the fuel surcharges and BA

15   could not have made itself more crystal clear that it believes

16   that it has unlimited discretion to choose how and what number

17   the fuel surcharge should be set at.  We disagree.  I think

18   Judge Dearie disagreed.

19          But in any event, the purpose of this particular

20   request is just to get more information about how the money

21   that BA pays to other airlines from its fuel surcharges affect

22   the fuel surcharges.  And it goes directly to whether the fuel

23   surcharges are in fact reflective of the cost of fuel or

24   whether they reflect something broader than that including,

25   you know, BA having the opportunity and taking the opportunity

45

1   to make money from the fuel surcharges.  And so, you know, I

2   don't think we're getting anywhere by arguing this contract

3   point that the contract nowhere specifies that BA did not

4   contract with other parties or that they have to do field

5   surcharges in a certain way.  I mean that issue has failed.

6           THE COURT:  I mean the --

7           MS. GORDON:  No, no, that is --

8           THE COURT:  Excuse me.

9           MS. GORDON:  -- that is -- at the end of the day the

10  plaintiffs have to show that there is a contractual obligation

11  that has been breached.  Everything that we've heard is just

12  that their claim is not predicated on any contractual

13  obligation that exists anywhere.

14          THE COURT:  Ms. Gordon --

15          MS. GORDON:  Instead, they have --

16          THE COURT:  Ms. Gordon --

17          MS. GORDON:  -- gone into a good faith and fair

18  dealing claim that is clearly preempted by Ginsberg --

19          THE COURT:  Ms. Gordon --

20          MS. GORDON:  -- and --

21          THE COURT:  Ms. Gordon --

22          MS. GORDON:  Yes?

23          THE COURT:  -- I mean I understand your point and I

24  understand what you're going to argue under the contract, but

25  the point is whether or not BA used impermissible factors in

46

1   calculating the surcharge and --

2              MS. GORDON:  But Your Honor, where are the factors

3   in the contract that say what factors we can and cannot

4   consider?  Right?  There's no factors that define the

5   discretion.  And Judge Dearie did not reject our argument full

6   stop.  That was a motion to dismiss that he let go forward

7   based on a regression analysis that the plaintiffs ran away

8   from at the beginning of this call and that if you look at,

9   contradicts the allegations that they made in their complaint.

10  And when we deposed the named plaintiffs, none of them saw the

11  statement on the website about the fuel surcharge reflecting

12  the fluctuating price of oil.  The plaintiffs got past the

13  motion to dismiss by saying that it wasn't based on rates, and

14  now here they are asking for rate information.

15             This case is entirely out of control with regard to

16  discovery and they've mutated it into an entirely new cause of

17  action that if they had presented that one to Judge Dearie

18  would be preempted.

19             MR. STELLINGS:  That's wrong.  The cases about

20  whether the fuel surcharge is a term that BA itself chose to

21  use to describe a fee that it was imposing on the plaintiffs

22  and the class members actually is a fuel surcharge or whether

23  it's something else.  That's the contractual issue.  That's

24  what we made clear in our opposition to the motion to dismiss,

25  that's what Judge Dearie found in his order.  Obviously, it

47

1  was an order on a motion to dismiss, not on summary judgment

2  and not on trial.  We still have a long way to go before we

3  prove our claim.  But the purpose of this discovery is to help

4  us prove our fundamental contention that the fuel surcharge

5  was not in fact a surcharge based on BA's cost of fuel.

6          THE COURT:  Anyway, we've all repeated ourselves

7  many times this afternoon.

8          I'm not going to limit the discovery for the

9  production to fuel surcharges imposed on rewards fliers but I

10 will consider and I'll even more narrowly limit the discovery

11 as to the other all fare paying passengers.  I'll give you the

12 first crack, Mr. Stellings, at narrowing it even more than

13 what you've narrowed your request will be.  I will want it to

14 be narrower than request 19 and perhaps it's just a temporal

15 narrowing.  And this is without prejudice in the future to

16 come back and ask for more.  But I'll give you a sampling, a

17 limited sampling for you to see what are the factors used in

18 determining the fuel surcharges as to other fliers and you can

19 make --

20         MR. STELLINGS:  Okay.  Thank you.

21         THE COURT:  -- any argument you want but rather than

22 spending time on trying to determine what's an appropriate

23 narrowing I'll just tell you I expect it to be a fairly narrow

24 time frame and number of records.

25         MR. STELLINGS:  I understand, Your Honor, and we

48

1    will comply.

2              THE COURT:  Okay.  I think that's it.

3              MS. GORDON:  Thank you very much, Your Honor.

4              THE COURT:  If you think you need help drafting some

5    sort of stipulation that will deal with discovery in the

6    future and narrowing discovery in the future, just feel free

7    to call and we'll have a further discussion of the issue.

8              MS. GORDON:  Thank you, Your Honor.

9              MR. STELLINGS:  Okay.

10             THE COURT:  Okay.  Have a good day.

11             MR. STELLINGS:  Thank you.  Bye.

12             MS. GORDON:  Thank you.  Bye-bye.

13   (Proceedings concluded at 2:22 p.m.)

14                        *  *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

49

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5      _____

6                          Mary Greco

7  Dated:  July 13, 2014