## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RUSSELL DOVER, HENRY HORSEY, CODY RANK, and SUZETTE PERRY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs<br><br>-vs.-<br><br>BRITISH AIRWAYS, PLC (UK),<br><br>Defendant. | Case No. 1:12-cv-05567 (RJD) (MDG)<br><br>Judge: Raymond J. Dearie<br><br>Magistrate Judge:  Marilyn D. Go |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

David S. Stellings
Nicholas Diamand
Jason L. Lichtman
Douglas I. Cuthbertson
**LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY  10013-1413
212.355.9500

Clive Zietman
Fiona Stewart
Daniel Loblowitz
**STEWARTS LAW, LLP**
5 New Street Square
London, UK EC4A 3BF
+44 (0)20.7822.8000

*Counsel for Plaintiffs*

*Additional Counsel Listed on Signature Page*

1274889.6

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION AND SUMMARY OF THE ARGUMENT ..........................1

II.    LEGAL STANDARD...................................................................................3

III.   THE PROPOSED CLASS ..........................................................................4

IV.   RELEVANT FACTS ..................................................................................4

      A.    BA used the YQ Charge as a "revenue enhancement charge" rather than a fuel surcharge. ..................................................................5

      B.    The parties have proposed competing definitions of the term "fuel surcharge":  BA will either be liable to all class members or to none...................................................................................................6

      C.    If BA is liable, it is undisputed that damages can be calculated on a formulaic, class-wide basis. .....................................................9

      D.    The proposed representative plaintiffs seek to hold British Airways liable to all proposed class members. .......................................9

V.    PLAINTIFFS HAVE ESTABLISHED THE SEVEN PREREQUISITES TO CLASS CERTIFICATION............................................................10

      A.    The class is ascertainable because the class is defined with reference to objective criteria, and there is a database that contains identifying information about all proposed class members. ..................11

      B.    Numerosity is satisfied because there are hundreds of thousands of proposed class members. ..................................................12

      C.    There is at least one issue common to all members of the class............12

      D.    The proposed class representatives' claims are typical. .........................13

      E.    The proposed class representatives and their counsel will adequately represent the class. ................................................15

      F.    Common issues predominate over individual ones. ...............................16

      G.    A class action is superior to other methods of adjudication. .................18

CONCLUSION...................................................................................................19

CERTIFICATE OF SERVICE ...........................................................................20

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Amchem Prods. v. Windsor,*
   521 U.S. 591 (1997)..................................................................................................15

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
   133 S. Ct. 1184 (2013)..............................................................................................2, 3

*Brecher v. Republic of Argentina,*
   No. 14-4385, __ F. 3d __, 2015 WL 5438797 (2d Cir. Sept. 16, 2015)............................3, 11

*Butler v. Sears, Roebuck & Co.,*
   727 F.3d 796 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1277 (2014)......................................16

*Carnegie v. Household Int'l, Inc.,*
   376 F.3d 656 (7th Cir. 2004) ....................................................................................18

*Denney v. Deutsche Bank AG,*
   443 F.3d 253 (2d Cir. 2006) ................................................................................15, 17

*Dupler v. Costco Wholesale Corp.,*
   249 F.R.D. 29 (E.D.N.Y. 2008)..................................................................................17

*Ellis v. Costco Wholesale Corp.,*
   657 F.3d 970 (9th Cir. 2011)................................................................................15, 16

*Harris v. comScore, Inc.,*
   292 F.R.D. 579 (N.D. Ill. 2013)..................................................................................10

*In re Delta/Airtran Baggage Fee Antitrust Litig.,*
   No. CIV.A. 1:09-MD-2089, 2015 WL 5258757 (N.D. Ga. Aug. 5, 2015) ............................11

*In re Nassau Cnty. Strip Search Cases,*
   461 F.3d 219 (2d Cir. 2006) ......................................................................................17

*In re Nigeria Charter Flights Contract Litig.,*
   233 F.R.D. 297 (E.D.N.Y. 2006)..........................................................................11, 12

*In re Scotts EZ Seed Litig.,*
   304 F.R.D. 397 (S.D.N.Y. 2015) ..........................................................................passim

*In re U.S. Foodservice Inc. Pricing Litig.,*
   729 F.3d 108 (2d Cir. 2013), *cert. denied,* 134 S. Ct. 1938 (2014)........................3, 10, 13, 16

*Kleiner v. The First National Bank of Atlanta,*
   97 F.R.D. 683 (N.D. Ga. 1983)..................................................................................10

*Marshall v. Deutsche Post DHL,*
   No. 13-CV-1471 RJD JO, 2015 WL 5560541 (E.D.N.Y. Sept. 21, 2015)......................12, 14

## TABLE OF AUTHORITIES
### (continued)

Page

*Midwestern Mach. v. Nw. Airlines, Inc.*,
   211 F.R.D. 562 (D. Minn. 2001) ...................................................................11

*Ramcharan v. A.F.L. Quality, Inc.*,
   No. 1:12-CV-07551, 2014 WL 4388579 (D.N.J. Sept. 5, 2014)...........................12

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015) ........................................................................3, 10

*Rodman v. Safeway, Inc.*,
   No. 11-CV-03003-JST, 2014 WL 988992 (N.D. Cal. Mar. 10, 2014)...................10

*Salim Shahriar v. Smith & Wollensky Rest. Group, Inc.*,
   659 F.3d 234 (2d Cir. 2011) ...........................................................................13

*Steinberg v. Nationwide Mut. Ins. Co.*,
   224 F.R.D. 67 (E.D.N.Y. 2004)..............................................................2, 10, 19

*Sykes v. Mel S. Harris & Assocs. LLC*,
   780 F.3d 70 (2d Cir. 2015) .......................................................................passim

*Toure v. Cent. Parking Sys.*,
   No. 05-5237, 2007 U.S. Dist. LEXIS 74056 (S.D.N.Y. Sept. 28, 2007) ...............15

*UFCW Local 1776 v. Eli Lilly & Co.*,
   620 F.3d 121 (2d Cir. 2010) ...........................................................................16

*Vincent v. Money Store*,
   304 F.R.D. 446 (S.D.N.Y. 2015) .....................................................................17

*Vu v. Diversified Collection Servs., Inc.*,
   293 F.R.D. 343 (E.D.N.Y. 2013).......................................................................12

*Wal-Mart Stores* v. *Dukes*,
   131 S. Ct. 2541 (2011).....................................................................................13

*Whitton v. Deffenbaugh Disposal, Inc.*,
   No. 12-2247, 2015 WL 751817 (D. Kan. Feb. 23, 2015)..............................passim

*Williams v. Mohawk Indus., Inc.*,
   568 F.3d 1350 (11th Cir. 2009) .......................................................................18

*Wolph v. Acer America Corp.*,
   No. C09-01314, 2012 WL 993531 (N.D. Cal. Mar. 23, 2012)...........................12

*Yarger v. ING Bank, fsb*,
   285 F.R.D. 308 (D. Del. 2012) ........................................................................12

**Rules**

Fed. R. Civ. P. 23(a)(1)................................................................................3, 12

**TABLE OF AUTHORITIES**
**(continued)**

                                                                                            **Page**

Fed. R. Civ. P. 23(a)(2)....................................................................................3, 12

Fed. R. Civ. P. 23(a)(3)....................................................................................3, 13

Fed. R. Civ. P. 23(a)(4)....................................................................................3, 15

Fed. R. Civ. P. 23(b)(3)...............................................................................3, 16, 18

-iv-

I.      **INTRODUCTION AND SUMMARY OF THE ARGUMENT**

Most major airlines invite their customers to join frequent flyer programs.  Customers who join these programs ("Members") earn points from engaging in various activities, such as flying with the airline or using a particular credit card.  Members frequently redeem these points for "free" airline tickets ("Redemption Tickets").

Plaintiffs are Members of Defendant's frequent flier program.  As part of their membership, each of them entered into a standard, form contract with British Airways, Plc ("BA").  That contract gave British Airways the right to assess a "fuel surcharge" on Redemption Tickets.  Consistent with the common understanding of the term, BA announced that its "fuel surcharge" was "a charge based on the fluctuating price of worldwide oil."[1]

When Plaintiffs redeemed their points, BA imposed a huge charge—sometimes more than $500 per ticket—and told them that it was a "fuel surcharge."  Plaintiffs allege that BA did not use the "fuel surcharge" to protect itself from fluctuations in the volatile fuel market.  The evidence has confirmed this:  BA used the "fuel surcharge" as a revenue maximization tool.

                                    *       *       *

British Airways all but admits that its "fuel surcharge" did not fluctuate with its fuel costs.  BA says that for any given year during the class period, it used "fuel surcharges" to attempt to capture the difference in cost between BA's total fuel bill in 2003 and its total fuel bill in the year in question.  For example, assume British Airways paid $1 billion for fuel in 2003, $2.3 billion in 2010, and $2.5 billion in 2011.  BA's 2011 "fuel surcharge" would reflect not the $200 million change in costs since 2010 (much less monthly or quarterly fluctuation in the price of fuel), but BA's entire $1.5 billion fuel cost change since 2003.  This resulted in the assessment of

---

[1] Ex. B (RFA Resp.) at 6 (admitting that for the vast majority of the proposed class period BA's website stated that the "fuel surcharge" reflected the "fluctuating price of worldwide oil." ).

a wildly improper "fuel surcharge" that did not track fluctuations in BA's cost of fuel *and sometimes exceeded 100% of BA's total fuel costs* on certain routes.

Why did BA charge its customers based on its total fuel costs in 2003? When Plaintiffs asked BA's CEO that very question, he admitted that there was no logic to it at all and stated: "Why not 1992? Why not 1962?"[2]

To be sure, British Airways' contract could have defined a "fuel surcharge" as a charge linked to BA's total cost of fuel in 2003, but BA chose not to do this. Rather, BA took precisely the opposite tack and hid its actions: it even went so far as to designate the 2003 baseline a "trade secret" (in this case). That secrecy indicates that BA believes that it may calculate the "fuel surcharge" however it wants. Not so. Plaintiffs will prove to the jury that BA's "fuel surcharge" wasn't a fuel surcharge at all, and that a fuel surcharge is a charge that changes as the cost of fuel changes.

Because this is a motion for class certification, however, what matters for present purposes is not how this Court or a jury ultimately will interpret the meaning of the term "fuel surcharge." What matters instead is whether all class members' breach of contract claims will rise or fall in unison. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013). The answer to that question is yes: either the contract permitted all of BA's "fuel surcharges," or it permitted none of them (because they were not fuel surcharges). Indeed, because this case arises "from interpretations of a form contract," it "present[s] the classic case for treatment as a class action." *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 411 (S.D.N.Y. 2015) (Briccetti, J.) (quoting *Steinberg v. Nationwide Mut. Ins. Co.,* 224 F.R.D. 67, 74 (E.D.N.Y. 2004)).

---

[2] Ex. P (3/13/15 Williams Dep.) at 35:21.

Plaintiffs respectfully ask the Court to certify this straightforward breach of contract claim.  *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 124 (2d Cir. 2013) (affirming class certification where, as here, each proposed class member was subject to the same material contractual terms), *cert. denied,* 134 S. Ct. 1938 (2014); *Whitton v. Deffenbaugh Disposal, Inc.*, No. 12-2247, 2015 WL 751817, at *6-8 (D. Kan. Feb. 23, 2015) (finding class certification proper for a breach of contract claim alleging that a "fuel surcharge" was not truly a fuel surcharge).

## II.   LEGAL STANDARD

When plaintiffs seek class certification for money damages, they must affirmatively prove seven prerequisites to class certification:

(1) Ascertainability.  It must be administratively feasible for the court to determine whether a particular individual is a member of the proposed class.  *Brecher v. Republic of Argentina*, No. 14-4385, __ F. 3d __, 2015 WL 5438797, at *2 (2d Cir. Sept. 16, 2015).

(2) Numerosity.  Class certification is only appropriate if it is not practical to join all potential claimants in one litigation.  Fed. R. Civ. P. 23(a)(1).

(3) Commonality.  At least one legal or factual question must be common to every member of the class.  Fed. R. Civ. P. 23(a)(2);

(4) Typicality.  The named plaintiffs must have the same type of claim as other class members.  Fed. R. Civ. P. 23(a)(3).

(5) Adequacy.  The named plaintiffs and their counsel must represent the interests of absent class members.  Fed. R. Civ. P. 23(a)(4).

(6) Predominance.  Legal and factual issues that can be resolved on a classwide basis must be more important than those that could only be resolved on an individual basis.  Fed. R. Civ. P. 23(b)(3).

(7) Superiority.  A class action must be superior to many individual lawsuits.  Fed. R. Civ. P. 23(b)(3).

*See, e.g., Amgen*, 133 S. Ct. at 1191 (articulating the standards for class certification); *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015).

III.     **THE PROPOSED CLASS**

Plaintiffs respectfully move to certify a class of:

All members of the British Airways Executive Club who redeemed frequent flier miles for an award ticket from November 9, 2006 through April 17, 2013 and who paid a BA-imposed "fuel surcharge," so long as that member provided British Airways with a valid United States address at the time of booking. This class excludes: (1) members who redeemed frequent flier miles exclusively using what British Airways termed its "Cash + Avios" option; (2) any judge to whom this case is assigned, along with his or her staff; (3) British Airways officers, directors, employees, as well as outside counsel in this litigation, and; (4) immediate family of any individual excluded by 2 or 3.

IV.     **RELEVANT FACTS**

British Airways entered into a form contract with every one of the proposed class members. *See generally* Ex. A (Contract) at BA00003946; *see also* Ex. B (BA RFA) at 1 (admitting that the relevant contractual language applied throughout the class time period). In particular, the contract stated that BA reserved the right to impose a "fuel surcharge." *Id.* at ¶ 13.14 (Members will be liable for all taxes and other charges associated with Reward travel on British Airways or a Service Partner airline, including without limitation . . . fuel surcharges . . . .). The contract is governed by English law. *Id.* at ¶ 30.1 ("[T]hese Terms and Conditions shall be governed by and construed in accordance with English law."); *cf.* Ex. C (7/15/15 Sutcliffe Rep.) (articulating the governing principles of English law).

Plaintiffs' sole claim in this case is straightforward: BA's "fuel surcharge" was not actually a fuel surcharge at all. Instead, the "fuel surcharge" was a charge that helped BA maximize its revenues. *See* Ex. D (5/4/15 Kokonis Rep.) ¶¶ 9, 19, 52. Indeed, one of BA's own experts admitted that the "fuel surcharge" was simply a component of BA's overall ticket price.

Ex. E (9/4/15 Kasper Rep.) ¶ 51.[3]  In part for this reason, Plaintiffs refer to the "fuel surcharge" by the technical name that BA used internally, the YQ Charge.[4]

### A.    BA used the YQ Charge as a "revenue enhancement charge" rather than a fuel surcharge.

The evidence shows that the YQ Charge was designed primarily to maximize BA's revenues.  For example, on some flights, the YQ Charge could exceed the difference between BA's cost of fuel in BA's purported 2003 "base year" and BA's cost of fuel at the time of ticket purchase.  *See* Ex. F (7/27/15 Kokonis Rep.) ¶¶ 45-46.  Indeed, the YQ Charge significantly exceeded BA's *total* cost of fuel for at least one of BA's routes.  *Id.*  In other words, instead of protecting BA from fluctuations in its cost of fuel, the "fuel surcharge" *sometimes paid for more than 100% of BA's fuel costs*.

The YQ Charge, moreover, was not always changed for reasons that related to fuel costs (or prices).  Ex. D (5/4/15 Kokonis Rep.) ¶¶ 18-19; *see also id*. Appx. D (analyzing testimony in which BA executives discussed the YQ Charge without referencing fuel).  Among other things, British Airways would raise the YQ Charge when the competitive environment allowed it to do so, whether or not BA's fuel costs were rising.  *See id.*

And because the YQ Charge was set simply to maximize revenue (rather than to capture fluctuations in fuel prices), it could vary based on the point of sale.  Ex. D (5/4/15 Kokonis Rep.) ¶ 22; Ex. F (7/27/15 Kokonis Rep.) ¶¶ 33-39.  For example, customers in New York purchasing roundtrip tickets between London and New York paid 30% more for the YQ Charge than

---

[3] The Court may recall that one of the early disputes in this litigation revolved around the question of whether a "fuel surcharge" is a charge that relates to fuel prices, fuel costs, or either. Because this issue is not relevant to class certification or either party's theory of liability, Plaintiffs refer only to costs in this brief, but do so to mean "cost or price."

[4] The term "YQ" was created by the International Air Transport Association; it was the code BA used for the "fuel surcharge."

customers who purchased the same roundtrip tickets on the same day in London, even if the New Yorker and the Londoner flew on the exact same flights.  In other words, customers who on the same day purchased the same ticket, for the same flights, would each pay a *different* YQ Charge (even though they "consumed" the exact same amount of fuel).  Obviously, that disparity has nothing to do with fluctuations in BA's cost of fuel.  *See* Ex. D (5/4/15 Kokonis Rep.) ¶ 22.[5]

At bottom, the YQ Charge was not primarily used to recover fuel costs: it was simply part of BA's "broad revenue maximization scheme."  Ex. F (7/27/15 Kokonis Rep.) ¶ 4; *cf.*, *e.g.*, *Id.* ¶ 2; Ex. D (5/4/15 Kokonis Rep.) ¶¶ 20-21 (noting that the YQ Charge was sometimes non-refundable, even though a consumer who does not fly uses no fuel).

**B.    The parties have proposed competing definitions of the term "fuel surcharge":  BA will either be liable to all class members or to none.**

As this Court predicted more than two years ago, this trial "will be a battle of the experts." Ex. G (9/20/13 Hr'g Tr.) at 4:3-4.  To that end, Plaintiffs support their claim that the YQ Charge was not a fuel surcharge with testimony from Dr. Jonathan Arnold, former Chief Economist at the New York State Office of the Attorney General and an economics professor at numerous schools, including the University of Chicago (in both the Booth School of Business and the Department of Economics).  *See* Ex. H (5/4/15 Arnold Rep.) ¶ 2 & Appx. 1. Dr. Arnold has concluded that the YQ Charge does not reflect the price or cost of fuel, but rather was simply an element of the total price BA charged it customers.  *See id.* ¶ 9.

---

[5]  Similarly, BA's YQ Charge was $300 more for a customer who purchased a ticket in Miami for travel to and from London than it was for a customer who purchased a ticket in London for travel to and from Miami on the same flights.  *See* Ex. D (5/4/15 Kokonis Rep.) ¶ 22.  When a customer asked BA's non-executive chairman, Martin Broughton, about the great disparity in the YQ Charge based solely on point of purchase, Mr. Broughton initially responded that competition was the "most important' factor in setting the YQ Charge.  *See id.* ¶¶ 20-23. Interestingly, BA's CEO incorrectly testified that competition was *not* a factor in setting the YQ Charge.  *See id.* ¶ 25.

1.   **If a "fuel surcharge" is a charge based on changes in the price or cost of fuel, BA will be liable to all class members.**

As explained above, Plaintiffs contend that the contractual term "fuel surcharge" means that BA will include its regular fuel costs (BA's single largest operating cost) in its fares, but that BA will impose an extra charge on top of the fare for recent changes in the cost of fuel.  In other words, Plaintiffs contend that a "fuel surcharge" is exactly what BA publicly said that it was, a charge that reflects the "fluctuating price of worldwide oil."  Ex. B (RFA Resp.) at 6 (admitting that BA's website made this statement for the majority of the class period).  This definition is consistent with the dictionary definition of the term "surcharge" quoted by one of BA's experts, which explains that a "surcharge" is "an amount of money that must be paid in addition to the regular price."  Ex. I (8/28/15 Sherman Rep.) ¶ 28; *cf.* Ex. J (7/15/15 Arnold Rep.) ¶ 27 (noting that BA's experts cited an academic paper that proposed this same definition).

Dr. Arnold, moreover, directly addresses BA's contention that a fuel surcharge is a charge that attempts to recover a particular year's fuel costs compared to 2003.  He explains that to be reasonably based on the cost of fuel from an economic perspective, the YQ Charge must be based on relatively recent changes in the cost of fuel:

> [I]t is not reasonable to assess a fuel surcharge based on a benchmark that is several years old.  To see why this is so, consider that most of the changes in fuel prices that had occurred (or were to occur) between 2003 and 2008 were already known in 2007. Thus, using 2003 prices as a benchmark instead of some more recent price will inappropriately ignore a great deal of information known to BA.

*Id*. ¶ 45; *see also, e.g.*, ¶ 44 ("BA's own executives have acknowledged the arbitrary nature of this reference period.  BA's CEO, Mr. Keith Williams, when asked why the baseline for fuel prices was 2004, responded "Why not 1992? Why not 1962?").  *See* Ex. P (3/13/15 Williams Dep.) at 35:21.

## 2.     If "fuel surcharge" means a charge linked to the price of fuel at a single undisclosed time in the distant past that incorporates a number of competitive factors, BA will not be liable to any class member.

British Airways does not accept Plaintiffs' proposed definition of a "fuel surcharge." Instead, BA argues that a "fuel surcharge" is a charge that takes into account a number of competitive factors along with the cost of fuel at a single undisclosed time in the past (2003). *See, e.g.*, Ex. I (8/25/15 Sherman Rep.) ¶¶ 25, 31, 39-40, 43, 57, 63, 70, 71-83. In particular, BA executives have stated in their deposition testimony that the YQ Charge took into account the competitive environment and attempted to recover the cost of fuel in a given year relative to 2003. *See, e.g.*, Ex. Q (2/26/15 Foran Dep.) at 22:4-23:2; Ex. P (3/13/15 Williams Dep.) at 28:3-13. The "fact" that the YQ Charge was an effort to recover BA's total cost of fuel (relative to 2003) was never disclosed to the public, and BA still considers it a highly confidential trade secret. *See, e.g.*, Ex. R (Lichtman Decl.) ¶ 8 ("BA designated every reference to the 2003 baseline as confidential information under the Protective Order.").[6]

Whether a "fuel surcharge" can be set to attempt to recover all of BA's fuel costs relative to a secret, arbitrarily chosen year in the distant past is of dispositive relevance. BA will not be liable to any class member if the jury finds that BA met its contractual obligations when it charged them a "fuel surcharge" that BA claims was set to allow it to recover as much of its annual fuel costs as possible compared to its fuel costs in 2003. *See* Ex. H (5/4/15 Arnold Rep.)

---

[6] All of BA's executives other than its CEO claimed that the YQ Charge was based on the cost of fuel in 2003 (whereas he stated that it was based on the cost of fuel in 2004). BA's experts have split this difference and said that it is based on the cost of fuel in 2003-2004. *See* Ex. I (8/25/15 Sherman Rep.) ¶¶ 73-81. In any event, neither BA nor its experts attempt to justify basing the YQ Charge on 2003-2004. Instead, BA makes the circular argument that it was justified in using 2003-2004 as an undisclosed baseline because it used 2003-2004 as an undisclosed baseline. *See, e.g.*, Ex. H (5/4/15 Arnold Rep.) ¶ 44 (quoting BA's CEO on this point).

¶ 53 ("As a matter of economics, either all of the YQ Charges were fuel surcharges or none of them were.").

     **C.**     **If BA is liable, it is undisputed that damages can be calculated on a formulaic, class-wide basis.**

Plaintiffs and BA appear to agree on at least one thing: if there are damages, they can be calculated on a class-wide basis. *See* Ex. J (7/15/15 Arnold Rep.) ¶¶ 34-37. Dr. Arnold has proposed a formulaic method for calculating damages, and BA's experts do not propose an alternative damages calculation, nor do they argue that Dr. Arnold's calculations are not appropriate for use on a class-wide basis separately from their argument that there are no damages at all. As Dr. Arnold explained:

> [T]he amount by which each class member was damaged is either the total amount of the illegitimate charge or the difference between the actual YQ Charge and a legitimate fuel surcharge. As I demonstrated in my initial report, such a "but-for" fuel surcharge can be constructed without reference to customer-specific information. Mr. Sherman and Mr. Kasper appear to agree with me on this point, as neither argues that customer-specific information is relevant to an appropriate fuel surcharge.

*Id*. ¶ 37.

     **D.**     **The proposed representative plaintiffs seek to hold British Airways liable to all proposed class members.**

Four proposed representative plaintiffs have stepped forward—at the expense of significant time and effort—to hold BA accountable for its conduct, seek compensation for those who have been harmed, and to deter BA's future misconduct. *See, e.g.*, Ex. K (Dover Decl.) ¶ 5(a) ("I do not seek relief solely for myself, nor do I seek any type of relief that is different from the relief that I seek on behalf of all other proposed class members."); Ex. L (Horsey Decl.) ¶ 5(a) (same); Ex. M (Rank Decl.) ¶ 5(a) (same); Ex. N (Perry Decl.) ¶ 5(a) (same).

Each representative plaintiff has taken his or her duties seriously and devoted significant time and attention to this case: producing documents, repeatedly traveling cross-country for

multiple depositions, and reviewing numerous pleadings.  *See* Ex. K (Dover Decl.) ¶ 6; Ex. L (Horsey Decl.) ¶ 6; Ex. M (Rank Decl.) ¶ 6; Ex. N (Perry Decl.) ¶ 6.  None has any interest that is antagonistic other class members.  *See* Ex. K (Dover Decl.) ¶ 5(c) ("I know of no reason that I would gain financially while other class members would lose financially, nor do I know of any reason that I would lose financially while other class members would gain."); Ex. L (Horsey Decl.) ¶ 5(c) (same); Ex. M (Rank Decl.) ¶ 5(c) (same); Ex. N (Perry Decl.) ¶ 5(c) (same).

Perhaps most importantly, each has testified that he or she "will at all times consider the interest of other class members to be just as important as my own interests, and I will never seek to benefit myself at the expense of other class members."  Ex. K (Dover Decl.) ¶ 5(b); Ex. L (Horsey Decl.) ¶ 5(b); Ex. M (Rank Decl.) ¶ 5(b); Ex. N (Perry Decl.) ¶ 5(b).

## V.  PLAINTIFFS HAVE ESTABLISHED THE SEVEN PREREQUISITES TO CLASS CERTIFICATION.

Plaintiffs respectfully submit that class certification in this case is not a close question. Indeed, it is well established that litigation involving the "interpretation of a form contract . . . present[s] the classic case for treatment as a class action."  *Scotts EZ Seed*, 304 F.R.D. at 411 (quoting *Steinberg*, 224 F.R.D. at 74).  This proposition has been affirmed many dozens of times. *See, e.g.*, *Rodman v. Safeway, Inc.*, No. 11-CV-03003-JST, 2014 WL 988992, at *7 (N.D. Cal. Mar. 10, 2014) ("[I]nterpretation of a form contract . . . present[s] the classic case for treatment as a class action."); *Harris v. comScore, Inc.*, 292 F.R.D. 579, 585 (N.D. Ill. 2013) (same); *Kleiner v. The First National Bank of Atlanta*, 97 F.R.D. 683, 692 (N.D. Ga. 1983) (same).

The Second Circuit, moreover, recently affirmed class certification where, as here, the plaintiffs moved to certify a breach of contract claim when each proposed class member was subject to the same material contractual provision.  *U.S. Foodservice Pricing Litig.*, 729 F.3d at 124; *see also Roach*, 778 F.3d at 405 (reaffirming same).  And another district court recently

explained that class certification was proper when plaintiffs alleged that they had been charged a "fuel surcharge" that was not genuinely a fuel surcharge.  *Whitton*, 2015 WL 751817, at *6-8; *cf. In re Delta/Airtran Baggage Fee Antitrust Litig.*, No. CIV.A. 1:09-MD-2089, 2015 WL 5258757, at *8 (N.D. Ga. Aug. 5, 2015) (certifying antitrust claims against airlines notwithstanding the airline defendants' argument that the airline industry involves "an elaborate pricing system that results in a range of prices" (quoting *Midwestern Mach. v. Nw. Airlines, Inc.*, 211 F.R.D. 562, 571–72 (D. Minn. 2001)).  The same result is appropriate in this case.  *Cf. In re Nigeria Charter Flights Contract Litig.*, 233 F.R.D. 297, 299 (E.D.N.Y. 2006) (Dearie, J.) (granting class certification for breach of contract claim brought against an airline).

### A.    The class is ascertainable because the class is defined with reference to objective criteria, and there is a database that contains identifying information about all proposed class members.

Rule 23 contains "an implied requirement of ascertainability."  *Brecher*, 2015 WL 5438797, at *2.  In particular, a "class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case."  *Id.* (internal quotation marks and citation omitted).  It is not, however, necessary for Plaintiffs to actually identify proposed class members.  *Id.* n. 2 (internal quotations omitted) (citation omitted).

Ascertainability should not be meaningfully contested in this case.  That is so because BA has a database known as the "ICW database" that contains the identity of all 168,259 proposed class members.  *See* Ex. O (4/9/15 Cemlyn-Jones Dep.) at 245:19-23 ("[The ICW database] contain[s] all the address records for any Executive Club member that made a booking during the class period that had a U.S. address that was active at the time of booking"); *see also* Ex. H (5/4/15 Arnold Rep.) ¶¶ 55-60 (using the ICW database to calculate damages formulaically for all proposed class members); *cf.* Ex. R (Lichtman Decl.) ¶ 9 ("Plaintiffs did not

attach the database because it is voluminous, however, Plaintiffs will produce this database if the Court requests it.").  Put simply, ascertainability is not in doubt when the defendant has a database that contains the actual identity of most class members.  *Vu v. Diversified Collection Servs., Inc.*, 293 F.R.D. 343, 355 (E.D.N.Y. 2013) (Garaufis, J.) ("[T]hrough searches of its database guided by Plaintiff's various class definitions, Defendant has been able to produce estimates of the class sizes, thereby demonstrating . . . ascertainability.").[7]

**B.** **Numerosity is satisfied because there are hundreds of thousands of proposed class members.**

Plaintiffs must also demonstrate that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Plaintiffs have established numerosity because the proposed class includes 168,259 members.  *See* Ex. O (4/9/15 Cemlyn-Jones Dep.) at 245:19-23 ("[A]ll the address records for any Executive Club member that made a booking during the class period . . . .").  Indeed, numerosity is presumed when a class contains more than 40 members.  *See, e.g.*, *Marshall v. Deutsche Post DHL*, No. 13-CV-1471 RJD JO, 2015 WL 5560541, at *3 (E.D.N.Y. Sept. 21, 2015) (Dearie, J.); *In re Nigeria Charter Flights Contract Litig.*, 233 F.R.D. at 302.

**C.** **There is at least one issue common to all members of the class.**

Plaintiffs also must demonstrate that there is a question of fact or law common to the class.  Fed. R. Civ. P. 23(a)(2).  In particular, Plaintiffs must show that there is at least one

---

[7] *See also, e.g.*, *Ramcharan v. A.F.L. Quality, Inc.*, No. 1:12-CV-07551, 2014 WL 4388579, at *4 (D.N.J. Sept. 5, 2014) (explaining that a class was ascertainable when it could be identified through a payroll database, even when that database was not provided to the Court); *Yarger v. ING Bank, fsb*, 285 F.R.D. 308, 318 (D. Del. 2012) (explaining that when a company has a database of proposed class members, the class is ascertainable); *Wolph v. Acer America Corp.*, No. C09-01314, 2012 WL 993531, at *2 (N.D. Cal. Mar. 23, 2012) ("[T]he identity and contact information for a significant portion of these individuals [can] be obtained from the warranty registration information and through [defendant's] customer service databases.").

common question such that "a classwide proceeding [can] generate common *answers* apt to drive the resolution of the litigation."  *Wal-Mart Stores* v. *Dukes*, 131 S. Ct. 2541, 2551 (2011) (emphasis in original) (citation omitted); *see also id.* ("[E]ven a single common question will do.").

Commonality is readily met in cases where, as here, plaintiffs allege breach of a materially identical contract.  *See, e.g.*, *U.S. Foodservice Pricing Litig.*, 729 F.3d at 124.  This case, like other "claims arising from interpretations of a form contract," *Scotts EZ Seed*, 304 F.R.D. at 411, turns on the resolution of a single, indisputably common issue:  the meaning of the contractual term "fuel surcharge."  Either a "fuel surcharge" is an extra charge in addition to the normal price of fuel to take into account recent changes in fuel prices (and BA has breached its contract with *all* proposed class members), or a "fuel surcharge" is simply a charge that attempts to recover as much of BA's annual fuel costs relative to 2003 as possible (and BA breached its contract with none of the class members).  *See, e.g.*, Ex. H (5/14/15 Arnold Rep.) ¶ 53 ("As a matter of economics, either all of the YQ Charges were fuel surcharges or none of them were.").

Plaintiffs thus respectfully submit that that there is at least one issue common to the class that will drive the resolution of this litigation.  *Whitton*, 2015 WL 751817, at *6-8 (finding class certification proper for breach of contract claim alleging that a "fuel surcharge" was not truly a fuel surcharge); *see also, e.g.*, *Scotts EZ Seed*, 304 F.R.D. at 411 (explaining that cases involving a form contract "present the classic case for treatment as a class action").

       D.       **The proposed class representatives' claims are typical.**

Plaintiffs must also show that the representative plaintiffs' claims are typical.  *See* Fed. R. Civ. P. 23(a)(3).  The Second Circuit has explained that typicality is satisfied "when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  *Salim Shahriar v. Smith & Wollensky Rest.*

*Group, Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) (citation and internal quotation marks omitted).  In other words, the named plaintiffs should bring claims "for the same type of injury under the same legal theory as the rest of the class."  *Marshall*, 2015 WL 5560541, at \*3.

Typicality, like the other prerequisites to class certification, is not a close call here.  The proposed representative plaintiffs do not merely make arguments that are *similar* to the legal arguments of other class members (which is all that Rule 23 requires), the representative plaintiffs make the *same* legal arguments as other class members:

> [BA's experts] use common, albeit flawed, arguments to suggest that class members' claims should fail.  I have used analysis common to all class members to explain why their claims should succeed.  In other words, *no expert for either party has suggested that the Court or jury apply any methodology under which it is possible that some class members' claims could prevail, while other class members' claims would not.*

Ex. J (7/15/15 Arnold Rep.) ¶ 36 (emphasis added); *accord, e.g., Scotts EZ Seed*, 304 F.R.D. at 411; *Whitton*, 2015 WL 751817, at \*6-8.[8]  Put another way, typicality is met for the same reason that commonality is met:  BA either breached its contract with all proposed class members, or it breached its contract with none of them.  *See, e.g.*, Ex. H (5/14/15 Arnold Rep.) ¶ 53 ("As a matter of economics, either all of the YQ Charges were fuel surcharges or none of them were."); *cf. Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 80 (2d Cir. 2015) (explaining that in some cases the "commonality and typicality requirements of Rule 23(a) tend to merge").

---

[8] *See also* Ex. K (Dover Decl.) ¶ 5(a) ("I do not seek relief solely for myself, nor do I seek any type of relief that is different from the relief that I seek on behalf of all other proposed class members.  Among other things, I understand my claim to be based on the same events as the events on which every other proposed class members' claim is based, and I understand my legal arguments in this litigation to be the same as the legal arguments of other proposed class members."); Ex. L (Horsey Decl.) ¶ 5(a) (same); Ex. M (Rank Decl.) ¶ 5(a) (same); Ex. N (Perry Decl.) ¶ 5(a) (same).

E.     **The proposed class representatives and their counsel will adequately represent the class.**

Plaintiffs must "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4); *see also Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997).  The adequacy determination requires determining:  (1) "whether the named plaintiffs and their counsel have any conflicts of interest with other class members;" and (2) whether "the named plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the class[.]"  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (citation and internal quotation marks omitted); *see also Sykes*, 780 F.3d at 80.

The proposed class representatives and their counsel have met Rule 23's "adequacy" prong.  *See Sykes*, 780 F.3d at 80; *Ellis*, 657 F.3d at 985.  First, there is no conflict between the proposed representative plaintiffs and other class members:

> [T]here is no economic sense in which the named Class representatives' claims are antagonistic to the claims of any other Class member. Among other things, the named class representatives would not recover damages unless the other Class members also recovered damages, and no class member would be worse off if the Plaintiffs should prevail.

Ex. H (5/14/15 Arnold Rep.) ¶ 53.[9]

Second, there can be no serious doubt that the proposed named plaintiffs and their counsel will "vigorously pursue the claims of the class."  *Toure v. Cent. Parking Sys.*, No. 05-5237, 2007 U.S. Dist. LEXIS 74056 at *18-19 (S.D.N.Y. Sept. 28, 2007) (quoting *Denney v. Deutsche Bank AG,* 443 F.3d 253, 268 (2d Cir. 2006)); *see also Sykes*, 780 F.3d at 80.  Each of

---

[9] *See also* Ex. K (Dover Decl.) ¶ 5(c) ("I am aware of no interest of mine in this litigation that is antagonistic to the interest of other class members.  Among other things, I know of no reason that I would gain financially while other class members would lose financially, nor do I know of any reason that I would lose financially while other class members would gain."); Ex. L (Horsey Decl.) ¶ 5(c) (same); Ex. M (Rank Decl.) ¶ 5(c) (same); Ex. N (Perry Decl.) ¶ 5(c) (same); Ex. R (Lichtman Decl.) ¶ 7 (certifying that proposed class counsel is aware of no conflicts between themselves and the class).

the proposed class representatives has testified that they "have participated actively in the case

and will continue to do so" and "will at all times consider the interest of other class members to

be just as important as [their] own interests, and [ ] never seek to benefit [themselves] at the

expense of other class members."  Ex. K (Dover Decl.) ¶ 5; Ex. L (Horsey Decl.) ¶ 5; Ex. M

(Rank Decl.) ¶ 5; Ex. N (Perry Decl.) ¶ 5; *cf.* Ex. R (Lichtman Decl.) ¶¶ 2-6 (discussing proposed

class counsel's qualifications and commitment to the class).

Adequacy should not be disputed.  *See Sykes*, 780 F.3d at 80; *Ellis*, 657 F.3d at 985.

### F.   Common issues predominate over individual ones.

Common questions of law or fact predominate "if resolution of some of the legal or

factual questions that qualify each class member's case as a genuine controversy can be achieved

through generalized proof, and if these particular issues are more substantial than the issues

subject only to individualized proof."  *U.S. Foodservice Pricing Litig.*, 729 F.3d at 118; *UFCW*

*Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010); *see also* Fed. R. Civ. P. 23(b)(3).

While this is a "more demanding" inquiry than commonality, "Rule 23(b)(3) does *not* require a

plaintiff seeking class certification to prove that each elemen[t] of [her] claim [is] susceptible to

classwide proof.'"  *Sykes*, 780 F.3d at 81 (citation and quotation marks omitted) (emphasis in

original).  Indeed, "[a]n issue 'central to the validity of each one of the claims' in a class action,

if it can be resolved 'in one stroke,' can justify class treatment."  *Butler v. Sears, Roebuck & Co.*,

727 F.3d 796, 801 (7th Cir. 2013) (Posner, J.), *cert. denied*, 134 S. Ct. 1277 (2014).

In this case, common issues predominate over individual ones.  Plaintiffs' claims do not

turn on *any* individual issues:

> [E]very proposed Class member's claim requires the finder of fact to answer a
> single question—whether BA's YQ Charges were, in fact, fuel surcharges. As a
> matter of economics, either all of the YQ Charges were fuel surcharges or none of
> them were. . . . should the finder of fact determine that BA's YQ Charges were
> not fuel surcharges, every member of the proposed class will have suffered an

> economic injury through the same mechanism: he or she will have paid money to BA (by way of a YQ Charge) to which BA was not legally entitled. While the actual money damages will vary by class member, the damages themselves occurred through the same mechanism.

Ex. H (5/14/15 Arnold Rep.) ¶ 53; *accord*, *e.g.*, *Scotts EZ Seed*, 304 F.R.D. at 411; *Whitton*, 2015 WL 751817, at *1.[10]  Put simply, "no expert for either party has suggested that the Court or jury apply any methodology under which it is possible that some class members' claims could prevail, while other class members' claims would not." Ex. J (7/15/15 Arnold Rep.) ¶ 36.[11]

BA may respond that while Plaintiffs will prove (or fail to prove) their claims with common evidence, BA intends to offer affirmative defenses that could vary based on the individual class member.  To that end, and while Plaintiffs at all times bear the burden of establishing the propriety of class certification, it is important to note that BA must do more than simply raise the possibility of individual affirmative defenses:  it must show that such defenses are "meritorious" and "likely to detract significant attention from the common issues in the litigation." *Vincent v. Money Store*, 304 F.R.D. 446, 462 (S.D.N.Y. 2015) (Koeltl, J.) (citing *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006); *see also Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 45 (E.D.N.Y. 2008) (Bianco, J.) (citing same); *cf. Sykes*, 780

---

[10] *See also* Ex. K (Dover Decl.) ¶ 5(a) ("I understand my claim to be based on the same events as the events on which every other proposed class members' claim is based, and I understand my legal arguments in this litigation to be the same as the legal arguments of other proposed class members."); Ex. L (Horsey Decl.) ¶ 5(a) (same); Ex. M (Rank Decl.) ¶ 5(a) (same); Ex. N (Perry Decl.) ¶ 5(a) (same).

[11] Depending on the way a jury calculated damages, it is possible that a tiny fraction of the proposed class (between 0.3% and 2.6%) would not have any damages.  *See* Ex. H (5/14/15 Arnold Rep.) ¶ 69 & Figure 14.  This would be true if the jury finds that BA would have imposed some kind of alternative "true" fuel surcharge and deducts the amount of that "true" fuel surcharge from Plaintiffs' damages; i.e., if the jury found that BA did not have to return all of the wrongfully collected money at issue in this case.  *See id.*  In other words, while BA did or did not breach its contract with *all* proposed class members, it is possible that some tiny fraction of the class might not ultimately recover damages from that breach.  It is well-established that this does not bar class certification.  *See, e.g.*, *Denney*, 443 F.3d at 264-65.

F.3d at 81("Individual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual questions will be present." (citations omitted).)

      **G.**     **A class action is superior to other methods of adjudication.**

Finally, Plaintiffs must show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In consumer lawsuits such as this one, because of the burdens of litigation and relatively small damages, superiority ordinarily is met any time common issues predominate over individual ones. *See, e.g.*, *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (Posner, J.) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30. But a class action has to be unwieldy indeed before it can be pronounced an inferior alternative—no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied—to no litigation at all." (emphasis in original)).

It does bear emphasis that class-wide resolution is superior to the hypothetical possibility of many individual suits. *See Sykes*, 780 F.3d at 81 (instructing trial courts to consider whether a class action would be more "manageable" than individual actions). The single trial Plaintiffs propose will be significantly less complicated than tens of thousands of hypothetical trials for breach of contract, in which the Court (and numerous juries) would be forced to decide the same legal and factual issues over and over and over again. *See, e.g.*, *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358 (11th Cir. 2009) ("If a district court determines that issues common to all class members predominate over individual issues, then a class action will likely be more manageable than and superior to individual actions."); *cf.*, *e.g.*, *Scotts EZ Seed*, 304 F.R.D. at 411 ("[I]nterpretation of a form contract . . . present[s] the classic case for treatment as a class action."

(quoting *Steinberg,* 224 F.R.D. at 74)).  Plaintiffs thus respectfully submit that they have

established superiority, along with the six other prerequisites to class certification.

## <u>CONCLUSION</u>

For the above reasons, Plaintiffs respectfully ask the Court to grant their motion for class

certification.

Dated:  October 1, 2015                    Respectfully submitted,


                                           */s/ David S. Stellings*
                                                David S. Stellings

                                           David S. Stellings (dstellings@lchb.com)
                                           Nicholas Diamand (ndiamand@lchb.com)
                                           Jason L. Lichtman (jlichtman@lchb.com)
                                           Douglas I. Cuthbertson (dcuthbertson@lchb.com)
                                           **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
                                           250 Hudson Street, 8th Floor
                                           New York, NY  10013-1413
                                           212.355.9500


                                           Clive Zietman (czietman@stewartslaw.com)
                                           Fiona Stewart (fstewart@stewartslaw.com)
                                           Daniel Loblowitz (dloblowitz@stewartslaw.com)
                                           **STEWARTS LAW, LLP**
                                           5 New Street Square
                                           London, UK EC4A 3BF
                                           Telephone: +44 (0)20.7822.8000

                                           Mark Schlachet (mschlachet@gmail.com)
                                           3515 Severn Road
                                           Cleveland, Ohio 44118
                                           (216) 896-0714

                                           *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 1, 2015, service of this document was accomplished via

e-mail and hand-delivery.


_____

Jason L. Lichtman