**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

RUSSEL DOVER, HENRY HORSEY, CODY
RANK, and SUZETTE PERRY, on behalf of
themselves and all others similarly situated,

           Plaintiffs,

           v.

BRITISH AIRWAYS, PLC (UK),

           Defendant.

Case No. 1:12-cv-05567-MKB-MDG

**BRITISH AIRWAYS PLC'S MEMORANDUM IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

DLA Piper LLP (US)
Richard F. Hans
Keara M. Gordon
Colleen M. Carey
richard.hans@dlapiper.com
keara.gordon@dlapiper.com
colleen.carey@dlapiper.com
1251 Avenue of the Americas
New York, New York  10020
Tel: (212) 335-4500

*Attorneys for Defendant*
*British Airways PLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................ 1

FACTS ................................................................................................................................. 3

    A.     British Airways' Executive Club ............................................................... 3

    B.     BA's Fuel Surcharge ................................................................................... 4

    C.     The Putative Class Representatives ........................................................... 5

          1.     Russell Dover ............................................................................... 5

          2.     Suzette Perry ................................................................................ 6

          3.     Cody Rank .................................................................................... 7

          4.     Henry Horsey ............................................................................... 7

ARGUMENT ....................................................................................................................... 9

I.      THE LEGAL STANDARD ....................................................................................... 9

II.     PLAINTIFFS CANNOT SATISFY THE REQUIREMENTS OF RULE 23(a) ............ 10

    A.     The Plaintiffs Fail to Establish Numerosity ......................................... 10

    B.     Commonality Is Lacking ............................................................................ 11

    C.     The Named Plaintiffs Are Not Adequate Class Representatives ........................ 15

III.    PLAINTIFFS CANNOT SATISFY THE STANDARDS FOR CERTIFICATION
       UNDER 23(b)(3) ....................................................................................... 18

    A.     Individual, Rather Than Common, Issues Will Predominate ............................. 18

          1.     Liability and Injury Cannot Be Proven on a Class-wide Basis ................ 18

          2.     The Plaintiffs' Damages Models Are Inconsistent with Their
              Theory of Liability ...................................................................... 22

          3.     Individualized Issues Regarding the Term "Fuel Surcharge"
              Destroy Predominance ................................................................. 23

          4.     Unique Defenses Preclude Predominance .............................................. 24

              a.     The Voluntary Payment Doctrine ............................................... 24

              b.     Statute of Limitations ................................................................. 27

              c.     Waiver ....................................................................................... 27

    B.     A Class Action Is Not Superior to Other Methods of Adjudication ................... 28

IV.    THE PROPOSED CLASS IS NOT ASCERTAINABLE ......................................... 29

CONCLUSION ................................................................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. Kansas City Life Ins. Co.,*
  192 F.R.D. 274 (W.D. Mo. 2000) ................................................................................19, 24

*Alix v. Wal-Mart Stores, Inc.*,
  16 Misc. 3d 844 (N.Y. Sup. Ct. Albany County 2007), *aff'd*, 57 A.D.3d 1044 (3rd
  Dep't 2008) .........................................................................................................................30

*Avritt v. Reliastar Life Ins. Co.*,
  615 F.3d 1023 (8th Cir. 2010) .............................................................................................24

*Bakalaw v. Vavra*,
  237 F.R.D. 59 (S.D.N.Y. 2006) ...........................................................................................29

*Biglio v. Coca-Cola Co.*,
  675 F.3d 163 (2d Cir. 2012)..................................................................................................25

*Brecher v. Rep. of Argentina*,
  2015 WL 5438797 (2d Cir. Sept. 16, 2015) ......................................................................9, 29

*Calabrese v. CSC Holdings, Inc.*,
  2009 WL 425879 (E.D.N.Y. Feb. 19, 2009).......................................................................28

*Chen-Oster v. Goldman, Sachs & Co.*,
  2015 WL 1566722 (S.D.N.Y. Mar. 10, 2015) .....................................................................22

*Cohen v. Laiti*,
  98 F.R.D. 581 (E.D.N.Y. 1983) ...........................................................................................17

*Cohn v. Mass Mut. Life. Co.*,
  189 F.R.D. 209 (D. Conn. 1999)...........................................................................................28

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013)...............................................................................................9, 22, 23

*Dunnigan v. Metro. Life Ins. Co.*,
  214 F.R.D. 125 (S.D.N.Y. 2003) .........................................................................................28

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974)...............................................................................................................28

*Enriquez v. Cherry Hill Mkt. Corp.*,
  2013 WL 5437038 (E.D.N.Y. Sept. 30, 2013) ....................................................................22

*Friedman-Katz v. Lindt & Sprungli (USA), Inc.*,
    270 F.R.D. 150 (S.D.N.Y. 2010) .............................................................16

*Grocery Haulers, Inc. v. C&S Wholesale Grocers, Inc.*,
    2013 WL 342693 (S.D.N.Y. Jan. 29, 2013) ...........................................13

*Gustafson v. BAC Home Loans Servicing, LP*,
    294 F.R.D. 529 (C.D. Cal. 2013) ............................................................25

*Hawkinson v. Conniff*,
    53 Wash. 2d 454 (1959).........................................................................25

*In re Currency Conversion Fee Antitrust Litig.*,
    230 F.R.D 303 (S.D.N.Y.2004). .............................................................18

*In re Int'l Air Trans. Surcharge Antitrust Litig.*,
    Case No. 06-md-01793-CRB (N.D. Cal. Feb. 15, 2008)...................27, 28

*In Re IPO Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006)...............................................................9, 30

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) ...............................................................22

*In re Vivendi Univ., S.A. Sec. Litig.*,
    2009 WL 855799 (S.D.N.Y. Mar. 31, 2009) .........................................30

*Jim Ball Pontiac-Buick-GMC, Inc. v. DHL Express (USA), Inc.*,
    2011 WL 815209 (W.D.N.Y. Mar. 2, 2011)...................................19, 30

*Johnson v. Nextel Comm'ns Inc.*,
    780 F.3d 128 (2d Cir. 2015)...........................................................18, 29

*Kline v. Wolf*,
    702 F.2d 400 (2d Cir. 1983)...................................................................16

*Lazard Freres & Co. v. Protective Life Ins. Co.*,
    108 F.3d 1531 (2d Cir. 1997).................................................................25

*Licci v. Lebanese Canadian Bank, SAL*,
    672 F.3d 155 (2d Cir. 2012)...................................................................25

*Masokowitz v. La Suisse, Societe D'Assurances Sur La Vie*,
    282 F.R.D. 54 (S.D.N.Y. 2012) .............................................................19

*McDaniel v. County of Schenectady*,
    2005 WL 1745566 (N.D.N.Y July 21, 2005) ........................................16

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010)................................................................9, 18, 24

*Norman v. Arcs Equities Corp.*,
    72 F.R.D. 502 (S.D.N.Y. 1976) ............................................................16

*Northwest, Inc. v. Ginsberg*,
    134 S. Ct. 1422 (2014)..........................................................................1

*O'Gara v. Countrywide Home Loans, Inc.*,
    282 F.R.D. 81 (D. Del. 2012) ..................................................19, 20, 27

*Pagan v. Abbott Labs., Inc.*,
    287 F.R.D. 139 (E.D.N.Y. 2012) ...................................................... passim

*Parino v. BidRack, Inc.*,
    838 F. Supp. 2d 900 (N.D. Cal. 2011) ..................................................25

*Rapp v. Green Tree Servicing*, LLC,
    302 F.R.D. 505 (D. Minn. 2014)......................................................19, 20

*Rocco v. Nam Tai Elecs., Inc.*,
    245 F.R.D. 131 (S.D.N.Y. 2007) ..........................................................16

*Savino v. Computer Credit, Inc.*,
    164 F.3d 81 (2d Cir. 1998)...............................................................16, 17

*Scaggs v. N.Y. State Dep't of Educ.*,
    2009 WL 890587 (E.D.N.Y. Mar. 31, 2009) ....................................10, 15

*Shaw v. Marriott Int'l, Inc.*,
    474 F. Supp. 2d 141 (D.D.C. 2007) ......................................................25

*Southwell v. Mortgage Investors Corp. of Ohio, Inc.*,
    2014 WL 3956699 (W.D. Wash. Aug. 12, 2014) ..................................11

*Spagnola v. Chubb Corp.*,
    264 F.R.D. 76 (S.D.N.Y. 2010) ...................................................... passim

*Spagnola v. Great Northern Ins. Co.*,
    531 F. Appx. 93 (2nd Cir. 2013)...........................................................19

*Spann v. AOL Time Warner, Inc.*,
    219 F.R.D. 307 (S.D.N.Y. 2003) ..........................................................28

*Spread Enterprises, Inc. v. First Data Merchant Servs. Corp.*,
    298 F.R.D. 54 (E.D.N.Y. 2014) ............................................................10

*St. Stephen's School v. PricewaterhouseCoopers Accountants N.V.*
  570 Fed. Appx. 37 (2d Cir. 2014) ...........................................................................30

*Vaccariello v. XM Satellite Radio, Inc.*,
  295 F.R.D. 62 (S.D.N.Y. 2013) .......................................................................22, 25

*Van West v. Midland Nat. Life. Ins. Co.*,
  199 F.R.D. 448 (D.R.I. 2001) ................................................................................30

*Vincent v. Money Store*,
  304 F.R.D. 446 (S.D.N.Y. 2015) ...........................................................................24

*Vu v. Diversified Collection Services, Inc.*,
  293 F.R.D. 343 (E.D.N.Y. 2013) ...........................................................................22

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ................................................................................... passim

*Whitton v. Defenbaugh Disposal, Inc.*,
  2014 WL 26023881 (D. Kan. June 11, 2014) ..................................................12, 13

*Whitton v. Defenbaugh Disposal, Inc.*,
  2015 WL 751817 (D. Kan. Feb. 23, 2015) .......................................................12, 13

## Other Authorities

Fed. R. Civ. P. 23 ......................................................................................... passim

## INTRODUCTION

The plaintiffs posit that, based upon little more than their say so, this Court should conclude that each distinct fuel surcharge paid by any of the more than 168,000 putative class members over the more than six year putative class period,[1] on any of 38,771 route combinations operated by British Airways Plc ("BA"), should be evaluated exactly the same – without any deviation – regardless of the amount of fuel surcharge assessed, how or why it was determined, or the benefit received.  The plaintiffs also lump together each of the 15 different global fuel surcharge changes that BA made during the putative class period, notwithstanding that, as explained in the attached declarations of Adam Daniels ("Daniels Decl.") and Jerry Foran ("Foran Decl."), the process and the methodology for evaluating the fuel surcharge level changed over time, the factors and weight attributed to each varied, and not all fuel surcharges were adjusted each time.  The plaintiffs' approach defies common sense, abhors the record, and is inconsistent with governing class action jurisprudence.

This is a contract case.  At this point, the plaintiffs have been forced to concede that the Executive Club Terms and Conditions ("EC Contract") unequivocally permits BA to charge a fuel surcharge.  Under English law, BA has the power to set the fuel surcharge, in its discretion. (Ex. 1, June 15, 2015 Rebuttal Report of Michael Crane ("Crane Rep.") ¶¶ 33-41.)[2]  Under English law, BA cannot be liable for a breach of that contract unless, among other things, it acted irrationally in exercising its discretion.  (*Id.*)  Because the plaintiffs' claim has morphed entirely into a good faith and fair dealing claim, it is pre-empted and should be dismissed.  *Northwest, Inc. v. Ginsberg*, 134 S. Ct. 1422 (2014).  If, however, the Court considers the claim, the Court

---

[1]      As established in Section III(A)(4), the operative statute of limitations is actually two years.

[2]      "Ex. __" refers to the exhibits attached to the Declaration of Keara M. Gordon ("Gordon Declaration") filed contemporaneously herewith.  Citation to "Pl. Br. __" refers to the Memorandum in Support of Plaintiffs' Motion for Class Certification.

will have to review, individually, each fuel surcharge decision and each resulting fuel surcharge change to determine whether BA breached its contractual obligations.  Only then, would it need to compare those fuel surcharges to the amount of fuel surcharges contractually permitted to determine if any putative class member was actually injured and, if so, in what amount.

It is clear, therefore, that BA's fuel surcharges do not rise or fall in unison:

- The plaintiffs argue that the fuel surcharge was improper because their industry expert supposedly found **one** route – out of 240 – in one year, on which he claims BA over recovered its fuel costs.  (Ex. 2, July 27, 2015 Corrected Reply Report of Robert Kokonis ("Kokonis Reply") ¶ 45.)  Even assuming that analysis is correct (which it is not), it would establish that **239** of the 240 routes (or **99.5%**) had **no over recovery**.  The purported existence of a **single** allegedly over recovered route, on which no named plaintiff flew, for one snapshot in time does not establish class wide liability, injury or damage for that one route, let alone all.  In any event, the plaintiffs have admitted that the fuel surcharge never recouped BA's fuel costs or its incremental fuel costs since the fuel surcharge was imposed.  (*See, e.g.*, Ex. 10, Nos. 113-14.)

- The plaintiffs claim that the ratio between the fuel surcharge and the fare on a particular flight is a determinant of whether the fuel surcharge is appropriate.  (Ex. 3, May 4, 2015 Expert Report of Jonathan I. Arnold, Ph.D. ("May Arnold Rep.") ¶¶ 37-39.)  The EC Contract does not contain such a limitation, and the putative class booked ████████ tickets, on ██████ route combinations, over a more than six year period, during which BA had millions of fares.  (*Id.* Figures 9-10.)  The named plaintiffs' ratios ranged from 4% to 15%, much lower than the markedly different results that the plaintiffs derived from focusing upon only low, inapplicable shoulder season fares.  (Ex. 4, August 28, 2015 Supplemental Rebuttal Report of Marc B. Sherman ("Sherman Rep.") ¶¶ 65-68; Ex. 3, May Arnold Rep. ¶ 39, Figures 9, 10.)  This metric – with its widely disparate results – does not establish class wide liability, injury or damage.

- The plaintiffs overlook entirely BA's Reward Flight Saver Program, which began in November 2011, and pursuant to which the putative class, U.S. Executive Club Members ("Members"), paid only £35 on certain short haul flights in Europe to cover all taxes, fees, and fuel surcharges (which were actually paid by another entity), rather than the otherwise applicable fuel surcharge amount. (Ex. 5, September 4, 2015 Supplemental Rebuttal Report of Daniel M. Kasper ("Kasper Rep.") ¶ 88; Daniels Dec. ¶ 11.)

- The plaintiffs claim that the fuel surcharge was inappropriate because it was non-refundable.  The fuel surcharge was **fully refundable** on every reward ticket purchased by anyone in the putative class, and was fully refundable on all tickets prior to December 2008 (Foran Decl. ¶ 16), so even if it were relevant, it does not establish class wide liability, injury or damage.

2

- The plaintiffs' spin on the term "fuel surcharge" turns on a statement on BA.com that the fuel surcharge reflected the "fluctuating" price of worldwide oil. If the term "fuel surcharge" is ambiguous, English law fixes the "factual matrix" at the time a Member enters into the EC Contract, which means that the statement cannot be considered in determining the meaning of the term "fuel surcharge" for any of the 125,099 putative class members who joined the Executive Club prior to July 2, 2009. (Ex. 1, Crane Rep. ¶ 44; Ex. 6, BA00169580; Ex. 7, Mar. 20, 2015 BA's R&O to Pls.' Second RFA, No. 4 at 6;  Sutcliffe 109:2-123:22; Crane 69:2-15; Decl. of Paul Shade ¶ 7.)[3]

- The plaintiffs manufacture a false distinction between a "cost recovery" and "revenue maximization" charge and claim that BA's fuel surcharge was not intended for "cost recovery," and therefore, is not a fuel surcharge. (Ex. 2, Kokonis Reply ¶¶ 2, 4.) This is absurd; from a revenue standpoint, there is no way to offset incurred fuel costs other than by generating revenue. (Kokonis 107:24-108:19, 124:21-125:5.) In any event, the plaintiffs' industry expert admitted that it was "possible" that BA used its fuel surcharge revenues "for fuel cost offset" (*id.* 108:15-19), but he had no idea "what percentage of those revenues British Airways applied against its fuel costs." (*Id.* 109:4-8.) And, he could not prove that BA's fuel surcharge revenue went to anything other than fuel cost recovery. (*Id.* 110:12-18.) As a result, it would be improper for this Court to assume that every dollar of fuel surcharge revenue collected during the 2,351 days in the putative class period went toward something other than fuel cost recovery.

- The plaintiffs claim that BA did not "always" change the fuel surcharge for reasons that related to fuel costs. (Pl. Br. 5.) But, BA's witnesses consistently testified that BA set its fuel surcharge to offset rising fuel costs, and the plaintiffs have failed to establish by a preponderance of the evidence that any particular fuel surcharge change (let alone all 15 global changes) was made for an improper reason. (Ex. 5, Kasper Rep. ¶ 95.)

Amazingly, despite these facts, the plaintiffs declare that if BA is liable, it "agrees" that damages can be calculated on a formulaic, class wide basis. (Pl. Br. 9.) BA has **never** agreed to this. Quite the contrary, the particularized inquires that must be undertaken in an attempt to prove breach and damages here foreclose class certification.

<u>FACTS</u>

A.     **British Airways' Executive Club.**

The "Executive Club" is BA's frequent-flyer program. It is free to join, and Members earn frequent flyer points ("Avios") in several ways, including traveling on BA, using a BA-

---

[3]     Deposition citations are in the following format: deponent name, page number, line number. Deposition transcripts referenced herein are provided in Appendix A to the Gordon Declaration.

branded credit card, buying wine, renting cars, or staying at participating hotel chains.  (Dover 103:17-19, 146:7-150:8; Ex. 10, No. 1 at 4; Ex. 24, BA00168963.) Travelers who join the Executive Club are subject to the EC Contract (Ex. 10, No. 29 at 12.)

BA told the plaintiffs, before they booked their flights, that BA would impose a fuel surcharge, and the plaintiffs agreed to pay it.  The EC Contract informed Members that they were "liable for all taxes and other charges associated with Reward travel . . . including without limitation . . . *fuel surcharges*."  (Ex. 8, EC Contract § 13.14.)  The EC Contract is subject to BA's General Conditions of Carriage for Passengers and Baggage ("CoC").  (Ex. 9, CoC.)  The CoC, which Members enter into when they redeem Avios for reward travel, makes plain that BA "may charge any surcharge to the fare for your ticket which applies under our tariff on the day you pay for your ticket, for example a fuel or insurance surcharge."  (*Id.*, CoC § 4a5.)

### B.      BA's Fuel Surcharge.

The EC Contract gives BA the discretion to set the fuel surcharge.  The Court has already held that the term "fuel surcharge" was unambiguous and that the "plain meaning of the term 'fuel surcharge' is a supplemental charge that is reasonably related to or based upon the cost or price of fuel" and "an added charge imposed by an airline in order to defray rising fuel costs." (Nov. 7, 2013 Mem. & Order (Dkt. No. 52) ("MTD Order") at 9.)  Under English law, since the EC Contract does not contain any express contractual limitation on BA's power to impose a fuel surcharge, "BA [was] under an implied duty to act honestly, in good faith and rationally having regard to the presumed purpose of a fuel surcharge."  (Ex. 1, Crane Rep. ¶ 1(iii)).  Rationality means "good faith," "that there should be some logical connection between the evidence and the ostensible reasons for the decision, and (which will usually amount to the same thing) an absence of arbitrariness, of capriciousness or of reasoning so outrageous in its defiance of logic as to be perverse."  (*Id.* ¶ 39 (quoting *Hayes v Willoughby* [2013] 1 WLR 935).)

The manner in which BA exercised its discretion to set, review, and adjust the fuel surcharge is set forth in the attached declarations of Jerry Foran and Adam Daniels.

### C.      The Putative Class Representatives.

#### 1.      Russell Dover

Mr. Dover  joined the Executive Club in March of 1996, years before BA imposed a fuel surcharge.  (Ex. 10, No. 2 at 4-5.)  Since then, he has traveled on BA dozens of times. (Amended Complaint (Dkt. No. 131) ("AC") ¶¶ 16-17; Dover 115:11-123:9, 127:145:23.)  Mr. Dover was a member of a prior settlement class, and, as such, has released claims that he purports to assert here.  (Dover 68:20-96:15, 221:14-23.)

Mr. Dover accumulates his Avios by, among other things, spending on his BA-branded credit cards.   (Dover 148:13-149:8, 150:15-25.)   He engages in a practice known as "manufactured spending"; his "hobby [is] acquiring loyalty points."   (*Id.* 239:10-247:20; 249:250:24; 258:24; 269:19-270:4; 483:13-489:2.)   To "manufacture[] spending," Mr. Dover purchased "vanilla reloads" with his BA Visa.  (*Id.* 246:11-254:16.)  Vanilla reloads allow him to earn points by storing money on cards instead of actually spending it.  (*Id.* 246:25-247:20.)  Mr. Dover "spent" hundreds of thousands of dollars in manufactured spending and boasted online about bringing his seven year old daughter with him to stores as his "beard" to avoid suspicion. (*Id.* 265:25-269:2; 257:3-258:5-24.)

Mr. Dover redeemed Avios on April 26, 2012 to book two first-class, roundtrip tickets from San Francisco to London, departing eight months later, on Christmas Day, and returning January 2, 2013.   (*Id.* 145:3-17; AC ¶ 19.)   When he did so, BA informed Mr. Dover of the associated fees and charges and he paid them without complaint.  (Dover 166:15-167:3; 167:20-

168:6, 172:10-23; Ex. 10 Nos. 35-36 at 14.)  The fuel surcharge equated to just over 8 cents per

mile, per person, to sit in BA's first class cabin.  (*See* ICW Data;[5] Ex. 11, BA00002624 at 78.)

 Mr. Dover later read a blog post about Lieff Cabraser Heimann & Berstein, LLP ("LC")

investigating BA's fuel surcharge, which is what prompted him to sue BA.  (Ex. 12, Def's Dep.

Ex. 38; Dover 183:8-184:15; 191:4-12.)

### 2. Suzette Perry

 Ms. Perry is a lawyer who acts as a judge.  (Perry 329:6-10, 335:12-333:22.)  She joined

the Executive Club on May 22, 2012 because she mistakenly thought that she could only redeem

points earned through American Express on BA.  (*Id.* 39:21-40:11, 41:24-43:7, Ex. 13, May 15,

2015 Perry's Second Am. R&O to RFA, No. 2 at 4-5.)  Ms. Perry redeemed 272,500 Avios,

obtained by transferring points from her American Express card, to book five tickets for a trip to

London four months later, paying approximately 4 cents per mile in fuel surcharge.  (*Id.* 74:4-15,

79:3-6; ICW Data; Ex. 14, Def's Dep. Ex. 61.)  Ms. Perry canceled the first leg of her flight, and

BA refunded her the associated Avios.  (Perry 74:23-75:19, 81:7-82:12.)

 Ms. Perry did not recall reading the EC Contract.  (*Id.* 124:6-19; Ex. 13, No. 27 at  11.)

She is also a seasoned litigant who has been involved in various suits, one of which resulted in a

judgment entered against her.   (*Id.* 30:12-32:17.)   Ms. Perry joined this lawsuit after

communicating with LC.  (*Id.* 221:19-222:16.)  She spoliated evidence in this case by mass

deleting thousands of e-mails after she brought suit.  (*Id.* 290:7-291:8, 294:23-295:12, 399:25-

15, 401:9-18.)  Despite this destruction of evidence, Ms. Perry falsely attests in her declaration in

support of the plaintiffs' class certification motion ("Declaration") that she "preserved all

---

[5] "ICW Data" refers to data from the Integrated Corporate Warehouse, which is a data warehouse BA uses to
store its information.  (Shade Decl. ¶ 3; BA00174616-174621, BA00174625 & BA00174626.)

potentially relevant documents (hard copy and electronic) in [her] custody, possession or control." (Pl. Br. Ex. K ¶ 7.)

### 3.      Cody Rank

Mr. Rank is a software engineer who moonlights as an activist and has taken part in protests, one of which led to his arrest in 2004 for vandalizing a traffic sign and disorderly conduct. (Rank 42:11-50:18; Ex. 15, Def's Dep. Ex. 5.) Mr. Rank pled guilty to the charges but could not recall doing so at his deposition. (Rank 42:21-43:2, 50:19-24, 51:24-52:6.)

Mr. Rank joined the Executive Club on October 14, 2009. (Ex. 16, May 15, 2015 Rank's Second Am. R&O to RFA, No. 2 at 4-5.) He earned 50,000 Avios just for signing up for a BA credit card and another 50,000 Avios by spending $2,000. (Rank 93:11-15; 95:15-24; Ex. 17, Def's Dep. Ex. 7.) Mr. Rank and his fiancée redeemed 98,000 of those 100,000 Avios to book a trip to Europe. (Rank 96:7-18, 102:21-103:15; AC ¶ 26.) He paid approximately 6 cents per mile in fuel surcharge. (ICW Data.) Mr. Rank never used his BA credit card again. (Rank 96:25-97:7.) To book his travel, Mr. Rank called BA and was told the fees and charges. (Rank 76:9-11; 76:25-77:9, 77:18-24.) He said he "would have to think about it," he discussed the cost with his fiancée and decided it was "worth it" to book the flights. (*Id.* 76:25-77:9; 79:17-81:15.)

Mr. Rank read a "blog post" that LC was looking for people who paid a BA fuel surcharge. (*Id.* 125:6-125:23.) He testified that he did not know whether he would have brought this suit if he had not seen the blog, and, when asked whose idea it was to sue, LC instructed Mr. Rank not to answer. (*Id.* 135:14-19.)

### 4.      Henry Horsey

Mr. Horsey joined the Executive Club in February 2011 to receive the bonus Avios associated with opening his BA Chase Card. (Horsey 49:9-19; Ex. 18, May 15, 2015 Horsey's

Second Am. R&O to BA's RFA, No. 2 at 4-5.)  Mr. Horsey has booked flights on BA at least three times.

First, on April 5, 2009, Mr. Horsey booked non-redemption travel on BA for himself and his then-girlfriend from Denver to London, which was scheduled to depart approximately seven months later.  (Horsey 55:7-55:21.)  He canceled the trip when he broke up with his girlfriend.  (*Id.* 58:10-18.)  He did not complain about the charges associated with his travel; he considered the fare details unimportant.  (*Id.* 56:18-20; 63:17-64:3.)

On January 1, 2013, Mr. Horsey redeemed 270,000 Avios, which he accumulated on his BA Chase Card, to book first-class tickets for two for a trip from Dulles to Mumbai (with a layover in London) departing December 17, 2013 and returning December 31, 2013.  (*Id.* 88:17-89:10, 97:12-17, 99:3-5.)  Prior to booking the travel, BA informed Mr. Horsey of the associated fees and charges, and he paid them without complaint.  (*Id.* 109:19-111:10; Ex. 18, Nos. 34-35.)  The fuel surcharge equated to just over 8 cents per mile, to sit in first class, and have access to BA's lounge, free massages and free ground transportation while on the lay over in London.  (*See* ICW Data; Ex. 19, BA-PLTF-001258; *see also* Ex. 11, BA00002624 at 78; Ex. 20 BA00169507; Ex. 21, BA00169531.)  After his flight, Mr. Horsey complained that the first-class cabin was "very, very antiquated."  (*Id.* 135:10-21, 140:7-41:22.)  He made no other complaint at that time.  In response, BA gave him and his wife 100,000 Avios, which Mr. Horsey considered to be "generous."  (*Id.* 142:8-144:12.)

Finally, on March 15, 2014, after reaching out to LC and joining this lawsuit, Mr. Horsey redeemed 240,000 Avios to book flights, again in first class, for two people from Dulles to Dubai (with a layover in London) departing on February 17, 2015.  (*Id.* 148:2-149:8.)

Mr. Horsey joined the lawsuit after reading an article about LC bringing this case. (*Id.* 124:11-125:11.) He admits he does not know whether the fuel surcharge was excessive; he is simply "ask[ing] the question." (*Id.* 179:16-24.)

## ARGUMENT

### I.   THE LEGAL STANDARD

A "class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). Plaintiffs "bear[] the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements ha[ve] been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010).

Rule 23 "does not set forth a mere pleading requirement"; rather, a plaintiff must satisfy with evidentiary proof the four prerequisites of Rule 23(a) – numerosity, commonality, typicality, and adequacy – and at least one provision of Rule 23(b). *Id.* at 1432. Rule 23 also contains "an implied requirement of ascertainability." *Brecher v. Republic of Argentina*, 2015 WL 5438797, at * 2 (2d Cir. Sept. 16, 2015).

Certification is proper only if "the trial court is satisfied, after a *rigorous analysis*, that the prerequisites of Rule 23[] have been satisfied." *Comcast*, 122 S. Ct. at 1432 (emphasis added) (internal quotations omitted). It "'may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.'" *Id.* The Court must receive "enough evidence, by affidavits, documents, or testimony" to establish that certification is appropriate. *In Re IPO Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006). The plaintiffs here have not met these demanding requirements.

## II.     PLAINTIFFS CANNOT SATISFY THE REQUIREMENTS OF RULE 23(a).

"Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011).  Here, the plaintiffs have not shown, by a preponderance of the evidence, that they satisfy Rule 23(a)'s threshold requirements of (A) numerosity, (B) commonality, and (C) adequacy of representation.  These defects, alone, are fatal to class certification.

### A.     The Plaintiffs Fail to Establish Numerosity.

The plaintiffs fail to establish, by a preponderance of the evidence, that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "[W]hile 'evidence of the exact size or identity of class members is not required,' a plaintiff cannot rely on 'pure speculation or bare allegations' in order to demonstrate numerosity."  *Spread Enter., Inc. v. First Data Merchant Servs. Corp.*, 298 F.R.D. 54, 67 (E.D.N.Y. 2014); *see also Scaggs v. N.Y. State Dep't of Educ.*, 2009 WL 890587, at *5 (E.D.N.Y. Mar. 31, 2009).  In *Scaggs*, for example, the plaintiffs alleged that a school operator violated statutory requirements by depriving them of their right to a free public education.  2009 WL 890587, at *2-3.  In an attempt to establish numerosity, the plaintiffs noted that the defendant had schools in various states.  The Court found that showing inadequate and denied certification: "The mere fact that there are, or were, presumably more than 40 students enrolled in schools managed by [the defendant] is not enough to establish numerosity where plaintiffs have failed to demonstrate that even a single one of them suffered the same alleged injuries as plaintiffs."  *Id.* at *4.

Here, the plaintiffs assert that their proposed class "includes 168,259 members" based on a database that contains records of "any" Member with a U.S. address that "made a [redemption]

booking[6] during the class period." (Pl. Br. 12.) Although the plaintiffs' experts reports span 423 pages, they do not establish that any of the four named plaintiffs paid a fuel surcharge that deviated from a contractually-permitted fuel surcharge by a specific amount, much less that any member of the putative class suffered the same alleged injuries. (Kokonis 100:16-24,105:5-22; Arnold 137:12-137:25, 214:21-215:14, 228:16-229:5.) It is pure speculation to assume that every Member that booked a flight during the putative class period paid a fuel surcharge that was above the contractually permitted amount. The mere act of booking and paying a fuel surcharge is insufficient to establish numerosity. *Southwell v. Mortg. Investors Corp. of Ohio, Inc.,* 2014 WL 3956699, at *3 (W.D. Wash. Aug. 12, 2014) (numerosity not proven); *Pagan v. Abbott Labs., Inc.*, 287 F.R.D. 139, 147 (E.D.N.Y. 2012) (denying certification).

### B. Commonality Is Lacking.

Commonality requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). It is not enough for a plaintiff to show that class members "suffered a violation of the same provision of law." *Dukes*, 131 S. Ct. at 2551. Rather, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Id.* (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 157 (1982)). In other words, "[w]hat really matters to class certification . . . is not the raising of common questions – even in droves – but, rather the capacity of a classwide proceeding to generate **common answers** apt to drive the resolution of the litigation." *Id.* (emphasis added).

---

[6]     The plaintiffs' proposed class definition encompasses tickets that fail to meet their own criteria, including: (1) tickets booked within the putative class period, but the fuel surcharge was not paid until afterwards; (2) tickets that were exchanged or refunded during the putative class period; (3) tickets where the fuel surcharge was paid prior to the putative class period, but later adjusted without any additional fuel surcharge payment; (4) segments that were not redemption travel; (5) upgrades; (6) "tickets that were either fully paid for by cash or were paid for with a combination of Avios and cash"; (7) redemptions made under BA's Reward Flight Saver program in which Members did not actually pay a fuel surcharge; and (8) redemptions made by Members who did not have a U.S. address at the time of booking. (*See* Ex. 4, Sherman Rep., Chart 11, at 57.) In each of these instances, the tickets and coupons do not even meet the plaintiffs' proposed class definition and should be excluded from any class.

Here, there are no common answers: the fuel surcharge assessed in November 2006 was different structurally and in amount from that assessed in April 2013; each of the 15 fuel surcharge changes involved different facts, considered different factors in different ways, was influenced by varying economic circumstances, and may have changed only long-haul or short-haul; the process changed over time; and the arguments to which the plaintiffs point in an attempt to claim that all fuel surcharges were not in fact true fuel surcharges are not uniform across route, or fare class, and are not necessarily applicable during the entire 2,153 day putative class period.  (Foran Decl. ¶¶ 6-45; Daniels Decl. ¶¶ 4-32.)  The plaintiffs do not, nor could they, establish that the entire class "suffered the same injury."  *Pagan*, 287 F.RD. at 148-49.

The plaintiffs cite to *Whitton v. Defenbaugh Disposal, Inc.*, 2015 WL 751817 (D. Kan. Feb. 23, 2015), which they describe as "finding class certification proper for breach of contract claim alleging that a 'fuel surcharge' was not truly a fuel surcharge."  (Pl. Br. 13.)  Not so.  The opinion is not the decision on class certification.  Presumably, the plaintiffs meant to cite *Whitton v. Defenbaugh Disposal, Inc.*, 2014 WL 26023881 (D. Kan. June 11, 2014).  That decision, however, makes clear the stark contrast between BA's fuel surcharge and the one in *Whitton*; there, the fuel surcharge methodology was "based on a table that tie[d] the amount of the fee to the average retail price of diesel fuel," and all putative class members were "charged the same fees, for the same reasons."  *Id.* at *2, 9.  Here, BA did not use a formula to determine the amount of the fuel surcharge, there was no one methodology, the process changed over time, and the class members all paid different fuel surcharges.  (Foran Decl. ¶¶ 6-45; Daniels Decl. ¶ 4-32.)

In attempting to frame a common issue, the plaintiffs offer two possible definitions of the term fuel surcharge: (1) either "an extra charge in addition to the normal price of fuel to take into

account recent changes in fuel prices" or (2) "a charge that attempts to recover as much of BA's annual fuel costs relative to 2003 as possible." (*Id.*)  In so doing, the plaintiffs:

- Ignore the fact that they previously argued for the first definition propounded by their English law expert (Ex. 22, May 4, 2015 English Law Expert Report of Andrew Sutcliffe, QC ("May Sutcliffe Rep.") ¶ 58), which the Court implicitly rejected when it ruled that the term "fuel surcharge" is unambiguous and that the "plain meaning of the term 'fuel surcharge' is a supplemental charge that is reasonably related to or based upon the cost or price of fuel" and "an added charge imposed by an airline in order to defray rising fuel costs." (MTD Order at 9.)  The law of the case doctrine applies this ruling to subsequent phases of this case.  *Grocery Haulers, Inc. v. C&S Wholesale Grocers, Inc.*, 2013 WL 342693, at *2 (S.D.N.Y. Jan. 29, 2013) ("unambiguous interpretations of the contract as a matter of law" were entitled to deference under the law of the case doctrine).

- Contradict their own prior statements acknowledging that the question posed by the Court was whether BA's fuel surcharge was reasonably related to or based upon the cost or price of fuel.  (Mem. in Supp. of Pls.' Mot. to Exclude All Testimony from Daniel M. Kasper and Certain Testimony from Marc B. Sherman at 2.)

- Ignore their own damages expert's testimony that he was applying the Court's fuel surcharge definition (not the definition the plaintiffs now proffer) and their industry expert's admission that there was no industry-wide definition of fuel surcharge; instead, it could "change from one carrier to the next," but should be designed to recover an element of fuel expenses, the level of which "would depend on the carrier."  (Arnold 15:14-19; Kokonis 160:22-107:23.)

- Wrongly assert that, under any definition, there will be the exact same answer uniformly applicable to all putative class members, regardless of when during the more than six year putative class period they bought their reward ticket, regardless of the length of their flight, or its timing, or the fuel surcharge paid, or the fuel price that day, or fuel trends, or BA's cost of fuel (net of hedging).

- Fail to identify the common proof that supposedly will drive common answers.

- Misstate the record and BA's position. BA never intended the fuel surcharge to recover all its fuel costs or even all of its incremental increase in fuel costs. (Foran Decl. ¶ 6; Daniels Decl. ¶ 4.)  Instead, BA set its fuel surcharge prospectively, in an attempt to recoup some percentage of its increasing fuel costs.  BA, of course, never came close to recovering its entire fuel bill, the incremental cost versus 2003, or even the incremental costs year over year.  (Ex. 4, Sherman Rep. ¶¶ 71-73, Charts 9-10.)

The plaintiffs' all or nothing approach – that all fuel surcharges were appropriate or none were – is simply wrong.  (Pl. Br. 13.)  BA undisputedly was entitled to charge a fuel surcharge.

(Ex. 22, May Sutcliffe Rep. ¶ 15; Ex. 23, July 15, 2015 Reply Report of Andrew Sutcliffe, QC ("July Sutcliffe Rep.") ¶ 6.a.)   To establish a breach, the plaintiffs must demonstrate, by a preponderance of the evidence, that BA abused its discretion by setting a fuel surcharge that was irrational and not reasonably related to the price or cost of fuel.  (Ex. 23, July Sutcliffe Rep. ¶¶ 23, 31, 32.)  If they could establish a breach, then damages under English law would be "the difference between the amount actually paid in fuel surcharge . . . and whatever amount would have been paid had BA not acted outside the terms of the contract but nevertheless applied the power to impose a fuel surcharge in its own commercial interests having regard to circumstances prevailing at the time."  (Ex. 1, Crane Rep. ¶ 90; Ex. 22, May Sutcliffe Rep. ¶ 36.)

The plaintiffs also claim that the fuel surcharge was not "always" changed to reflect BA's fuel costs – yet they do not analyze any, let alone all – of the 15 global fuel surcharge changes during the putative class period or demonstrate that any one (much less all) of them violated the EC Contract or was not reasonably related to the price or cost of fuel.  (Ex. 3, May Arnold Rep. ¶ 20, Figure 1.)  Instead, the plaintiffs point to certain aspects of BA's fuel surcharge at certain points during the putative class period to argue that it was not a fuel surcharge.  This tactic does not generate common answers to the question posed:

- Whether BA supposedly over recovered its fuel costs on **one route** out of **240** for one year (Pl. Br. 5), when BA sets its fuel surcharge on a global, rather than route-by-route, flight-by-flight basis, says nothing about the appropriateness of the fuel surcharge attendant to the other 239 routes.  (Foran Decl. ¶  9; Daniels Decl. ¶ 5.)

- Whether the fuel surcharge was non-refundable (Pl. Br. 6) is irrelevant to Members because redemption tickets were *always* refundable.  In any event, this change was made to non-redemption flights in late 2008, two years into the putative class period.  (Foran Decl. ¶  16.)

- The statement on BA.com regarding the "fluctuating price" of oil (Pl. Br. 1) did not appear until July 2009 – 32 months into the putative class period, and the named plaintiffs had no recollection of seeing it.  (Ex. 7, Mar. 20, 2015 BA's R&O to Pls.'

14

Second RFA, No. 4 at 6; Dover 207:6-14; Perry 171:16-22; Rank 172:22-173:4; Horsey 196:22-197:5; 53:23-54:7.)

- The point of sale variance (Pl. Br. 5) only reflected currency exchange rates until October 2008, and after that was consistent with industry custom and practice.  (Ex. 5, Kasper Rep. ¶¶ 63-67, 130; Foran Decl. ¶ 44; Daniels Decl. ¶ 7, 10.)

- To the extent that the plaintiffs' argument with BA's baseline is that it became less relevant over time, its appropriateness necessarily differs during the putative class period.

The absence of evidentiary proof that the entire class "suffered the same injury" also destroys commonality.  In *Pagan,* the plaintiffs alleged that the defendant misrepresented the safety of its infant formula that allegedly contained beetle parts.  287 F.R.D. at 148-9.  The Court ruled that commonality had not been met because it was "not enough" "merely" to show that the class bought the infant formula – they needed to demonstrate that the formula purchased "actually contained beetle parts" to establish injury.  Since only one percent of the product contained beetle parts, the Court concluded that "the majority of the putative class members received exactly what they paid to receive and, thus, cannot now claim injury."  *Id.* at 149.

The same conclusion is compelled here.  Even if the plaintiffs' analysis demonstrated that one route, out of 240, had some over recovery during one year, that does not, and cannot, establish liability on all ███ flights, on ███ route combinations, over a more than six year period.  *Scaggs*, 2009 WL 890587, at *5.

**C.     The Named Plaintiffs Are Not Adequate Class Representatives.**

The plaintiffs must show that they "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The adequacy requirement is intended "to ferret out potential conflicts between representatives and other class members," and courts "carefully scrutinize the adequacy of representation in all class actions."  *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 95 (S.D.N.Y. 2010).  Courts deny class certification where, as here, the named plaintiffs' testimony

and actions raise serious questions about their ability to serve as fiduciaries for the putative class. *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998).  The named plaintiffs are inadequate here because they: (1) flouted their discovery obligations, (2) contradicted the allegations of their complaint, and (3) lack credibility.

First, "[o]ne who will not comply wholeheartedly and fully with the discovery requirements of modern federal practice, is not to be regarded by this Court as one to whom the important fiduciary obligation of acting as a class representative should be entrusted." *Norman v. Arcs Equities Corp.*, 72 F.R.D. 502, 506 (S.D.N.Y. 1976) (denying certification); *see also Pagan*, 287 F.R.D. at 147 (denying certification where plaintiff may have spoliated evidence); *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 137 (S.D.N.Y. 2007) (denying class certification).  Named plaintiffs must comply with their "discovery obligations and failure to do so strongly intimates that the class representation is inadequate."  *McDaniel v. County of Schenectady*, 2005 WL 1745566, at *3 (N.D.N.Y July 21, 2005).[7]  Courts also "may consider the honesty and trustworthiness of the named plaintiff." *Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir. 1983) (affirming denial); *Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 157-161 (S.D.N.Y. 2010) (denying certification).

Here, Ms. Perry – a lawyer who acts as a judge – admitted at the very end of her deposition that she spoliated evidence by conducting a mass deletion of e-mails after she filed this lawsuit.  (Perry 290:7-291:8, 308:24-310:23.)  Almost a year after her purge, her counsel

---

[7]      The plaintiffs' alarming unfamiliarity with this case and unwillingness to learn about the underlying facts reinforces their inadequacy. *Koenig v. Benson*, 117 F.R.D. 330, 337 (E.D.N.Y. 1987).  As detailed in Exhibit 26, at their depositions, the named plaintiffs did not know what contract they were suing under, never read either the EC Contract or the CoC, did not review documents before filing, and did not know what damages they were seeking. Tellingly, during their depositions, the named plaintiffs stated "I don't know," "I don't remember, and "I don't recall," approximately **960 times**.  Despite their repeated displays of ignorance at their depositions, the named plaintiffs each submitted declarations in support of their motion for class certification attesting that their claim is based on "the same events as the events on which every other proposed class member's claims is based" and that their "legal arguments [are] the same as the legal arguments of other proposed class members."  (Pl. Br., Ex. K ¶ 5, Ex L ¶ 5, Ex. M. ¶ 5,  Ex.  N ¶ 5; *see also* Ex. 27 (chart comparing declarations to deposition testimony).)

notified BA that "two emails" "c[ould] not be produced in compliance with BA's specifications. Those emails are no longer available in their original format as Ms. Perry unfortunately deleted them." (Ex. 25,  Letter from Mr. Cuthbertson to Mr. Birnbaum, dated May 2, 2014.)  Counsel neglected to mention that Ms. Perry's actions went far beyond deleting "two e-mails."

At her deposition, Ms. Perry finally revealed that, in fact, she had conducted a "mass deletion" of "thousands" of e-mails after she began this litigation.  (Perry 290:7-291:4, 294:23-295:12 ("Q. You said that you deleted thousands of emails; is that correct?  A.    Yes.").)  Directly contradicting these facts, Ms. Perry attests in her Declaration that she supposedly "preserved all potentially relevant documents."  (Pl. Br., Ex. K ¶ 6.)  It is this destruction of evidence (coupled with the fact that Ms. Perry only produced three documents before her first deposition and 333 afterwards) that necessitated the two depositions Ms. Perry references in her declaration.  (Perry 387:8-389:25.)

As set forth in Exhibit 28, Messrs. Dover and Horsey also failed to comply with their discovery obligations.  (*See* Ex. 28.)  Mr. Dover initially produced only five documents, with another 13 the week before his deposition.  (Dover 357:13-16; Ex. 29, Def's Dep. Ex. 54.)  Even then, Mr. Dover's document production was woefully inadequate, which necessitated a second deposition.  (Ex. 28; Ex. 30; Ex. 31.)  Mr. Horsey's production was similarly deficient.  (Ex. 32.)

Second, as set forth in Exhibit 33, the plaintiffs provided testimony that contradicted the central allegations of the Complaint regarding, for example, BA's alleged contractual promises and the R-Squared Analysis.   (Ex. 33.)   This alone renders the plaintiffs inadequate representatives.  *See Savino*, 164 F.3d at 87 (affirming denial of certification); *Spagnola*, 264 F.R.D. at 95-97 (same); *Cohen v. Laiti*, 98 F.R.D. 581, 582-83 (E.D.N.Y. 1983) (same).

Finally, the named plaintiffs' testimony revealed independent credibility issues:

- Mr. Dover games the system by using vanilla reloads to cheat corporations – including BA – that offer loyalty points by earning points without actually spending money.  (As discussed previously at Section C(1), *supra*.)

- Mr. Rank provided counterfactual responses to interrogatories regarding his disorderly conduct conviction and, when confronted with his own criminal record, could not remember it.  (As discussed previously at Section C(3), *supra*.)

- Ms. Perry, a lawyer, provided testimony filled with inconsistencies, contradictions and inaccurate information.  (*See* Ex. 34 (chart of Ms. Perry's contradictory statements).)

- Each of the named plaintiffs' declarations submitted under oath in support of their class certification motion contains statements that contradict their sworn deposition testimony. Attached as Ex. 27 is a chart detailing these discrepancies.

## III.   PLAINTIFFS CANNOT SATISFY THE STANDARDS FOR CERTIFICATION UNDER 23(b)(3).

Even if the plaintiffs could satisfy the prerequisites of Rule 23(a) (which they cannot), class certification is still inappropriate because: (a) individual, rather than common, issues predominate and (b) a class action is not superior to other means of adjudication.

### A.      Individual, Rather Than Common, Issues Will Predominate.

Rule 23's predominance requirement is designed to ensure that "proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Myers*, 624 F.3d at 547 (citing *Amchen Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).   This requirement is "more demanding than Rule 23(a)."  *Johnson v. Nextel Comm'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015).  "[A] Court must consider the elements of each cause of action, and determine whether those elements can be satisfied by common, class-wide proof."  *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 310 (S.D.N.Y. 2004).  Here, they cannot.

### 1.      Liability and Injury Cannot Be Proven on a Class-wide Basis.

"[A] court must deny certification where individual issues of fact abound."  *Spagnola*, 264 F.R.D. at 98 (quoting *In re Currency Conversion Fee Antitrust Litig.*, 209 F.R.D. at 309). Numerous courts have found predominance lacking in "form contract" cases when "individual

inquiries [are] required to determine whether a breach of the contract could be found." *Jim Ball Pontiac-Buick-GMC, Inc. v. DHL Express (USA), Inc.*, 2011 WL 815209, at *6 (W.D.N.Y. Mar. 2, 2011) (denying class certification); *Spagnola*, 264 F.R.D. at 98-99 (same); *Masokowitz v. La Suisse, Societe D'Assurances Sur La Vie*, 282 F.R.D. 54, 62 (S.D.N.Y. 2012) (same); *Rapp v. Green Tree Servicing,* LLC, 302 F.R.D. 505 (D. Minn. 2014) (same); *O'Gara v. Countrywide Home Loans, Inc.*, 282 F.R.D. 81, 90-91 (D. Del. 2012) (same).[8]

In *Spagnola v. Great Northern Ins. Co.*, for example, the Second Circuit reaffirmed that form contract cases can raise individual inquiries that destroy predominance. 531 F. Appx. 93, 93 (2d Cir. 2013). There, the plaintiffs alleged a breach of a form contract; the defendant allegedly failed to change coverage amounts to reflect "current costs and values." *Spagnola*, 264 F.R.D. at 83, 99. The Court ruled that liability could not be established by class-wide proof because determining whether the coverage changes reflected "current costs and values" required "analysis of the unique characteristics of each class member's home, whether each policyholder's coverage was actually increased using [the consumer price index] or some other guideline, the amount of the increase, whether the policy[holder] requested that the increase be waived or revalued, and [the] actual replacement cost of each policyholder's home." *Id.* at 99.

Similarly, in *Rapp*, the plaintiff claimed that the defendant breached a mortgage contract by charging him an amount in "force-placed insurance" that exceeded the actual cost of such insurance. 302 F.R.D. at 508. The Court found that "it is an oversimplification to say that because each class member's breach of contract claim turns on the meaning of the phrase 'cost of the insurance,' . . . each class member's claim will be factually similar." 302 F.R.D. at 508, 510.

---

[8]   *See also Pastor v. State Farm Mut. Auto Ins. Co.*, 2005 WL 2453900, at *7 (N.D. Ill. Sept. 30, 2005), *aff'd*, 487 F.3d 1042 (7th Cir. 2007) (denying class certification); *Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 226 F.R.D. 446, 451-54 (S.D.N.Y. 2005) (same); *Adams v. Kansas City Life Ins. Co.*, 192 F.R.D. 274, 282 (W.D. Mo. 2000) (same); *Sparano v. Southland Corp.*, 1996 WL 681273, at *1-2 (N.D. Ill. Nov. 21, 1996) (same).

In finding that "questions that would require individual adjudication would substantially predominate" over common questions, the Court stated:

> There is no reason to think that "the cost of insurance" for Rapp will be the same as "the cost of the insurance" for every other class member. A jury would need to determine the "true" cost to the amount actually charged by [defendant]. The "true" cost of the force-placed insurance in each case might depend on the location of the property, the personal characteristics of the borrower, the circumstances of the insurance market at the particular time and in the particular location, and countless other variables.

*Id.* at 510.

Moreover, "[n]umerous courts have recognized that predominance cannot be satisfied where a court must make a reasonableness determination of individual charges." *O'Gara*, 282 F.R.D. at 90 (collecting cases). In *O'Gara*, the plaintiffs alleged a breach of a standard form mortgage agreement. *Id.* The Court ruled that, while the contract may have been common and demonstrable on a class wide basis, "breach and damages cannot" because those issues required individualized analysis and "class-member-specific proof." *Id.*

The same result follows here. The AC alleges that (1) BA breached the EC Contract by charging a fuel surcharge that was not based on its fuel costs, and (2) that BA's "breach injured [them] because [they] paid a surcharge that was greater than one based on BA's actual fuel costs." (AC ¶ 76.) As an initial matter, BA disagrees with the formulation of the issue because it would be unreasonable to expect that BA could anticipate, 355 days before a flight, what its actual fuel costs will be on that flight. As Mr. Foran explains, BA's future fuel costs are unknowable and impacted by a number of variables. (Foran Decl. ¶¶10, 11.) For that reason, BA set its fuel surcharge at a global level, and it is undisputed that BA's fuel surcharge did not exceed its actual fuel costs during the putative class period. (Ex. 4, Sherman Rep. ¶¶ 71-73, Charts 9-10; Ex. 10, May 15, 2015 Dover Second Am. R&O to RFA, No. 114 at 41.)

Assuming, for the sake of argument only, that BA could be held to the plaintiffs' standard, the plaintiffs will have to establish that BA acted irrationally in setting its fuel surcharge, that each, separate fuel surcharge decision was not based on BA's fuel costs, and that each fuel surcharge imposed was greater than one based on BA's "actual fuel costs," which necessarily involves establishing what those actual fuel costs were.

Each decision regarding the fuel surcharge reflects unique facts and circumstances:

- Each surcharge decision made during the six year putative class period reflects the fuel prices and pricing trends at that particular moment in time. During the relevant period, there were dramatic variations in fuel prices. (Ex. 5, Kasper Rep. at 3 & ¶¶ 8-10, 19, 33.)

- BA's aggregate and incremental fuel costs at the time of each fuel surcharge decision varied based on an ever-changing landscape of factors, including hedging profiles, currency exchange rates, demand, weather, etc. (Foran Decl. ¶¶ 10-11.)

- The structure of the fuel surcharge varied and changed over time. (Foran Decl. ¶¶ 7-19; Daniels Decl. ¶¶ 6-11.)

Each resulting fuel surcharge imposed necessarily had its own distinct relationship to BA's fuel costs, which would need to be assessed to determine whether the amount paid was greater than BA's fuel costs. This analysis is individualized and complex, for example:

- The fuel surcharges assessed varied based on the route, the sector length, and the cabin class ticketed.

- Each named plaintiff bought his or her ticket at different points during the putative class period, for different routes, in different cabin classes, and paid different fuel surcharges, each of which were based on the unique factors, facts and circumstances at the time of ticketing. (Ex. 4, Sherman Rep. Chart 7; Foran Decl. ¶¶ 6-32; Daniels Decl. ¶¶ 4-32.)

- The fuel surcharge was applied at the time of ticketing, but Members may not have flown until up to 355 days later, a factor that needs to be considered in evaluating the reasonableness of the charge. (Ex. 4, Sherman Rep. ¶ 22; Ex. 3, May Arnold Rep. Figure 12; Foran 148:22-149:12.)

Even if the plaintiffs could establish liability through common evidence (which they cannot), the mere payment of a fuel surcharge is insufficient to establish injury because if the

fuel surcharge paid did not exceed BA's actual fuel costs, there is no injury. As a result, the Court must determine the appropriate fuel surcharge level for each putative class member's flight to assess whether the fuel surcharge paid exceeded that amount. Yet, the plaintiffs' damages expert did "not look[] to see on a ticket-by-ticket basis whether there was ever an occasion in which the YQ charge was the same as or was very close to the imputed fuel surcharge." (Arnold 117:6-21.) The need for individualized, ticket-by-ticket inquiries destroys predominance here. *See Chen-Oster v. Goldman, Sachs & Co.*, 2015 WL 1566722, at *18 (S.D.N.Y. Mar. 10, 2015); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252; *Vu v. Diversified Collection Serv., Inc.*, 293 F.R.D. 343, 356 (E.D.N.Y. 2013); *Enriquez v. Cherry Hill Mkt. Corp.*, 2013 WL 5437038, at *6 (E.D.N.Y. Sept. 30, 2013); *Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62, 68 (S.D.N.Y. 2013); *Pagan*, 287 F.R.D. at 151.

### 2. The Plaintiffs' Damages Models Are Inconsistent with Their Theory of Liability.

The plaintiffs' damages models suffer from a fundamental defect because they do not align with their theory of liability in two ways. *Comcast*, 133 S. Ct. at 1433 (holding that a model for determining class-wide damages must actually measure damages that result from the class's asserted theory of injury). First, their damages model assumes the only proper fuel surcharge level would be $0, thereby disregarding BA's undisputable contractual right to impose some level of fuel surcharge. (Ex. 23, July Sutcliffe Rep. ¶ 6.a.)

Second, the plaintiffs' English law expert claims BA is liable if it imposed a fuel surcharge that did not "cover unanticipated increases in its fuel costs caused by fluctuations in the price of crude oil." (*Id.* ¶¶ 5.b., 6.a., 9, 16-17.) The plaintiffs' damages model, however, does not measure damages based on "unexpected fluctuations" in the price of oil. (Ex. 3, May Arnold Rep. ¶ 54 & App'x 5.) "[A] model purporting to serve as evidence of damages in this

22

class action must measure only those damages attributable to [the] theory [of liability]." *Comcast*, 133 S. Ct. at 1433.  Failing to align their damages model to their theory of liability eviscerates the plaintiffs ability to "establish damages [that] are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  *Id.*

### 3.    Individualized Issues Regarding the Term "Fuel Surcharge" Destroy Predominance.

The Court has held that the "plain meaning" of "fuel surcharge" is a charge "reasonably related to or based upon the cost or price of fuel" and a charge "to defray rising fuel costs." (MTD Order at 9.)  As such, the EC Contract is unambiguous and confers on BA the power to set a fuel surcharge in its discretion.  (Ex. 1, Crane Rep. ¶ 10.)  To the extent, however, that the plaintiffs are now advocating that the Court should ignore this prior ruling and consider other interpretations, those raise additional individualized inquiries, which defeat predominance.

Through their ever changing interpretations of the phrase "fuel surcharge," the plaintiffs try to inject ambiguity into the EC Contract.  If ambiguity exists (which it does not), the Court will look to the "factual matrix" to determine the intended meaning of the contractual language. (*Id.* ¶¶ 42-44, 46-48; Ex. 22, May Sutcliffe Rep. ¶ 33.)  That in turn creates individualized inquiries because the factual matrix is set at the time each individual putative class member joined the Executive Club and would necessarily be different for each of them.  (Ex. 22, May Sutcliffe Rep., ¶ 33; Ex. 1, Crane Rep., ¶ 10(xi).)  For example, "the fluctuating price of worldwide oil" language was not on BA's website until 32 months into the putative six-year class period and after more than 74% of the class became a member of the Executive Club.  (Ex. 7, Mar. 20, 2015 BA's R&O to Pls.' Second RFA, No. 4 at 6; Shade Decl. ¶ 7.)   Indeed, Mr. Dover joined the Executive Club in 1996, well before that BA.com statement.  (Ex. 10, May 15, 2015 Dover Second Am. R&O to BA's RFA, No. 2 at 5; Dover 104:7-108:9.)

The need to consider extrinsic evidence to resolve ambiguity weighs against class certification.  *See Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1030 (8th Cir. 2010) (certification denied where disputed language was ambiguous and extrinsic evidence was necessary); *Adams v. Kansas City Life Ins. Co.,* 192 F.R.D. 274, 281, 282 (W.D. Mo. 2000) (Rule 23(b)(3) not satisfied where contract claim was premised on language that likely "contain[ed] some degree of ambiguity.").

### 4.      Unique Defenses Preclude Predominance.

"[I]t is . . . well established that courts must consider potential defenses in assessing the predominance requirement."  *Myers*, 624 F.3d at 551.  The Second Circuit has expressly recognized that, "[w]hile [the defendant] ultimately bear[s] the burden of proving the merits of [a defense], plaintiffs must at this stage show that more 'substantial' aspects of this litigation will be susceptible to generalized proof for all class members than any individualized issues."  *Myers*, 624 F.3d at 551 (citation omitted).  Thus, the plaintiffs' claim that BA must establish at this stage that its defenses are "meritorious" (Pl. Br. 17) is wrong; even the case on which the plaintiffs rely did not impose a "meritorious" requirement.  *See Vincent v. Money Store*, 304 F.R.D. 446, 455-56 (S.D.N.Y. 2015).  Instead, the Court found that the defendant had not made a "plausible showing" that the defenses would apply.  *Id.*

Here, three unique defenses – the voluntary payment doctrine, the statute of limitations, and waiver – operate to bar certain of the putative class members' claims and require individualized inquiries that preclude predominance.

### a.      The Voluntary Payment Doctrine

"The voluntary payment doctrine precludes a plaintiff from recovering payments 'made with full knowledge of the facts' and with a lack of diligence in determining his contractual rights and obligations."  *Spagnola,* 574 F.3d at 72 (quoting *Dillon v. U-A Columbia Cablevision*

*of Westchester, Inc.*, 292 A.D.2d 25, 27 (2d Dep't 2002)); *Vaccariello*, 295 F.R.D. at 68 (class

not be certified); *Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529, 549 (C.D. Cal.

2013) (predominance not met).

The doctrine is a state-specific defense that applies by operation of the CoC, which is the

contract each Member entered into when buying a reward ticket and paying the fuel surcharge.

Unlike the EC Contract, the CoC does not contain a choice-of-law provision, and although the

plaintiffs have argued that English law would apply to the CoC, their English law expert has

opined that the choice of law provision "would not affect the governing law of the [CoC]."

(*Compare* Pls.' Opp. to BA's MTD (Dkt. No. 27) at 7, *with* Ex. 22, May Sutcliffe Rep. ¶ 13 n.6.)

A federal court sitting in diversity applies the choice-of-law rules of the state in which it

sits. *Biglio v. Coca-Cola Co.*, 675 F.3d 163, 169 (2d Cir. 2012). Under New York's choice-of-

law rules, "[t]he first step in any case presenting a potential choice of law issue is to determine

whether there is an actual conflict between the laws of the jurisdictions involved." *Licci v.*

*Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012). A conflict exists here because

neither English law expert has opined that the voluntary payment doctrine is available under

English law. Conversely, New York and the states where the plaintiffs purchased their reward

travel recognize the doctrine. *See Parino v. BidRack, Inc.*, 838 F. Supp. 2d 900, 908-09 (N.D.

Cal. 2011); *Shaw v. Marriott Int'l, Inc.*, 474 F. Supp. 2d 141, 150-51 (D.D.C. 2007); *Hawkinson*

*v. Conniff*, 53 Wash. 2d 454, 460 (1959); *Spagnola*, 574 F.3d at 72.

In determining which law applies – and, thus, what defenses are available – New York

courts apply the "center of gravity" or "grouping of contacts" approach. *Lazard Freres & Co. v.*

*Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997). Under this approach, the places of

contracting and performance "are given the heaviest weight in this analysis." *Id.* Given that

each named plaintiff purchased reward travel in his or her home state, agreed to the CoC, and partially performed in his or her home state by taking a flight from that location, the laws of the states of the named plaintiffs' residences have the strongest connection to the CoC.

The voluntary payment doctrine requires an analysis of the putative class members' payment history and the circumstances under which each learned of the fuel surcharge and paid it with or without protest.  Illustrating the individualized analysis are the circumstances under which the named plaintiffs purchased their travel.  For example, Mr. Dover is a seasoned traveler who paid the fuel surcharge repeatedly with full knowledge and without objection.  (Dover 115:11-123:9, 127:145:23; 166:15-168:6, 172:10-23.)  After purchasing the travel at issue, he later booked another seat for his daughter on the same flight.  (*Id.* 215:21-216:16-18; AC ¶ 19.) Mr. Horsey paid a fuel surcharge on at least three separate occasions, including after he had contacted LC about joining this suit.  (Horsey 56:3-23, 111:3-10, 148:2-12, 150:4-7.)

Finally, the plaintiffs cannot argue that the voluntary payment doctrine is applicable to all putative class members because such a justification "is simply too weak to overcome the clearly numerous individual issues that are likely to become the focus of this litigation."  *Spagnola*, 264 F.R.D. at 99 n.25.[9]  Here, there is significant disparity among the number of times putative class members repeatedly paid the fuel surcharge.  Over 55 percent only paid one fuel surcharge in the putative class period, 20.67 percent paid two, 16.21 percent paid three to five, 4.91 percent paid six to ten, 1.71 percent paid ten to twenty, 0.47 percent paid 21 to 40, and 0.11 paid more than 40. (Ex. 35, SHERMAN-00002741.)  These statistics belie any claim that the voluntary payment doctrine applies to all putative class members in the same way.

---

[9]     Where the voluntary payment doctrine has not precluded a predominance finding, the courts addressed whether the doctrine applied to the putative class as a whole, not whether the doctrine barred individual putative class members' claims.  *In re Cablevision Consumer Litig.*, 2014 WL 1330546, at *11 (E.D.N.Y. Mar. 31, 2014) (defendant "contracted around the voluntary payment doctrine"); *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 39 (E.D.N.Y. 2008) (named plaintiff made factual denials).

### b.      Statute of Limitations

The statute of limitations operates to bar certain putative class members' claims and thus undermines predominance.  *O'Gara*, 282 F.R.D. at 91.  Here, the EC Contract states that the "limitations and exclusions of liability referred to in the [CoC] will . . . apply in relation to travel on the services of British Airways including Reward travel."  (*See* Ex. 8, EC Contract § 13.1; Ex. 22, May Sutcliffe Rep. ¶ 15 (EC Contract is subject to CoC).)  According to the CoC, "[a]ctions for damages must be brought within two years."  (Ex. 9, CoC Article 17.)

Despite the two year limitations period, the plaintiffs' proposed class attempts to reach back to November 9, 2006, which is more than two years before the Complaint was filed.  (Pl. Br. 4.)   Under English law, the enforceability of the limitation provision depends on a "reasonableness" inquiry that involves "consideration of the particular circumstances in which individual contracts were concluded."  (Ex. 1, Crane Rep. ¶ 60.)  Accordingly, individualized inquiries are necessary to determine whether certain claims are barred by the applicable statute of limitations.  (Ex. 1, Crane Rep., ¶¶ 81-82, Ex. 23, July Sutcliffe Rep. ¶¶ 49-50).

### c.      Waiver

Certain putative class members, including potentially Mr. Dover, have released their claims against BA pursuant to a settlement entered in a previous class action lawsuit filed against BA in California.  (Ex. 36, Settlement Agreement Between Plaintiffs and British Airways PLC, *In re Int'l Air Trans. Surcharge Antitrust Litig*., Case No. 06-md-01793-CRB (N.D. Cal. Feb. 15, 2008) ("Settlement Agreement"); Dover 68:20-96:15, 221:14-23; Ex. 37; Ex. 38; Ex. 39; Ex. 40).  In the Settlement Agreement, class members who purchased a ticket on BA from August 11, 2004 through March 23, 2006, "forever released, relinquished, and discharged"

> any and all claims, demands, actions, suits, and causes of action, whether class, individual, or otherwise in nature, that the Releasing Parties, or any one of them, ever had, now has, or hereafter can, shall or may have, directly, representatively,

> derivatively, or in any other capacity, against [BA], on account of, arising from, or in any way related to, the pricing of passenger air transportation by British Airways . . . *including, without limitation, with respect to fuel surcharges* . . . .

*Id.* ¶¶ 2.1(a), 8.1.  The release covers all claims through November 1, 2008.  *Id.* ¶¶ 8.1, 1.16.

Determining whether putative class members released their claims against BA requires an individualized inquiry into the circumstances surrounding the putative class members' notice of and participation in the settlement.  *Spann v. AOL Time Warner, Inc.*, 219 F.R.D. 307, 323 (S.D.N.Y. 2003).  Mr. Dover, for example, filled out a claim form in connection with the settlement in which he attested that he was a member of the class, and that he agreed to "fully, finally, and forever release, relinquish, and discharge" BA.  (Ex. 38).  A case-by-case factual inquiry will be necessary to determine whether he, and 66,942 other absent class members, released their claims, destroying predominance.  (Ex. 4, Sherman Rep. ¶ 98 & Chart 11.)

## B.   A Class Action Is Not Superior to Other Methods of Adjudication.

The superiority analysis "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).  Courts should consider, among other things, "the difficulties likely to be encountered in the management of a class action."  *Calabrese v. CSC Holdings, Inc.*, 2009 WL 425879, at *27-28 (E.D.N.Y. Feb. 19, 2009).  Indeed, "[t]he greater the number of individual issues, the less likely superiority can be established."  *Cohn v. Mass Mut. Life. Co.*, 189 F.R.D. 209, 219 (D. Conn. 1999).  It has long been recognized that "the need for mini trials on the resolution of each class member's claims and the applicability of affirmative defenses detracts from the superiority of the class action device."  *Spagnola*, 264 F.R.D. at 50; *Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 142 (S.D.N.Y. 2003) (need for mini-trials defeats superiority).  "Because liability for a significant bloc of the class members and damages for the entire class must be decided on an individual basis, . . . a class action is not a superior method of

litigating the case." *Johnson*, 780 F.3d at 148.  Given the multitude of individualized inquiries relating to liability, the class action device here is not superior.

## IV.    THE PROPOSED CLASS IS NOT ASCERTAINABLE.

Denial of class certification is warranted for the independent reason that the class is not ascertainable. "The touchstone of ascertainability is whether the class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *Brecher*, 2015 WL 5438797, at *2.

In *Brecher*, the Court rejected the proposed class defined solely by objective criteria, i.e., those holding Argentinian bonds.  The Court ruled that the class was not ascertainable because the trading on the secondary market made it impossible to determine which bonds had opted in or out of earlier settlements or which had suffered any harm.  As the Court opined, defining a class to include "'those wearing blue shirts,' while objective, could hardly be called sufficiently definite and readily ascertainable." *Id.* at *2.  Class membership must be readily identifiable such that a court can determine who is in the class without resort to a "mini-hearing on the merits of each case." *Id.*; *see also Bakalar v. Vavra*, 237 F.R.D. 59, 65-66 (S.D.N.Y. 2006).

Here, the putative class may only be determined through a burdensome mix of mini-trials on both the merits and on damages. The plaintiffs' proposed class definition in their brief has morphed from that in the AC (which was limited to U.S. residents), to purportedly include: "All" Members "who redeemed frequent flier miles for an award ticket from November 9, 2006 through April 17, 2013 and who paid a BA-imposed 'fuel surcharge,' so long as that member provided British Airways with a valid United States address at the time of booking." (Pl. Br. 4.)

The proposed definition fails in four ways.  First, it is impossible to ascertain the size, scope and geographic reach of this class.  How will one establish that a Member provided BA a "valid United States" address?  Is this a home address, business address or a holiday address?

Second, surely the plaintiffs do not intend to suggest that the class includes foreign citizens. If they did, then presumably they would have attempted to meet their burden to demonstrate that the existing law of the countries in which those individuals reside would enforce the judgment of a U.S. court. *In re IPO*, 471 F.3d at 41. Here, were the class to extend past U.S. citizens, the proposed class would include individuals from 174 different countries, ranging from Eritrea to Uzbekistan. (Ex. 4, Sherman Rep. Ex. 6.) In such an event, the Court would be obligated to conduct an investigation of the laws of each of those countries, which would destroy the superiority of the class action mechanism. *In re Vivendi Univ., S.A. Sec. Litig.*, 2009 WL 855799, at *3 (S.D.N.Y. Mar. 31, 2009); *St. Stephen's School v. PricewaterhouseCoopers Accountants N.V.*, 570 F. Appx. 37, 39 (2d Cir. 2014).

Third, the plaintiffs' damages cannot be established without resort to individual inquiries to determine whether class members paid a fuel surcharge that was greater than BA's fuel costs. *See, e.g.*, *Alix v. Wal-Mart Stores, Inc.*, 16 Misc. 3d 844, 848, 850 (N.Y. Sup. Ct. Albany County 2007) (class not ascertainable), *aff'd*, 57 A.D.3d 1044 (3rd Dep't 2008); *Van West v. Midland Nat. Life. Ins. Co.*, 199 F.R.D. 448 (D.R.I. 2001).

Finally, individual inquiries are necessary to determine which Members' claims are barred by the voluntary payment doctrine, statute of limitations, or waiver and estoppel. *Jim Ball Pontiac-Buick-GMC,* 2011 WL 815209, at *4.

## CONCLUSION

For all these reasons, BA respectfully requests that the Court deny class certification.

 s/s Keara M. Gordon
Richard F. Hans
Keara M. Gordon
Colleen M. Carey

*Attorneys for Defendant*
*British Airways PLC*