**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

---

RUSSEL DOVER, HENRY HORSEY, CODY
RANK, and SUZETTE PERRY, on behalf of
themselves and all others similarly situated,

          Plaintiffs,

          v.

BRITISH AIRWAYS, PLC (UK),

          Defendant.

---

Case No. 1:12-cv-05567-MKB-MDG

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

**DLA Piper LLP (US)**
Richard F. Hans
Keara M. Gordon
Colleen M. Carey
Timothy H. Birnbaum
richard.hans@dlapiper.com
keara.gordon@dlapiper.com
colleen.carey@dlapiper.com
timothy.birnbaum@dlapiper.com
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 335-4500
*Attorneys for Defendant British Airways PLC*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ...............................................................................................................4

    A.    The Plaintiffs Agreed to Pay a Fuel Surcharge ..................................................4

    B.    The Purpose of BA's Fuel Surcharge Was To Defray Fuel Costs........................5

ARGUMENT ....................................................................................................................9

I.     LEGAL STANDARD .................................................................................................9

II.    THE PLAINTIFFS' BREACH OF CONTRACT CLAIM MUST BE
      DISMISSED.........................................................................................................10

    A.    The Contracts Explicitly Permit BA to Impose a Fuel Surcharge And the
         Plaintiffs Agreed to Pay a Fuel Surcharge ......................................................10

    B.    A Fuel Surcharge is a Supplemental Charge Reasonably Related to or
         Based Upon the Price or Cost of Fuel To Defray Rising Fuel Costs...................11

    C.    BA's Fuel Surcharge is Reasonably Related to or Based on Its Fuel Costs .......12

         1.    The Purpose of BA's Fuel Surcharge Was to Defray Fuel Costs ...........12

         2.    BA Never Over-Recovered Its Fuel Costs.............................................14

         3.    BA's Fuel Surcharge Changes Reflected Its Fuel Costs ........................14

    D.    BA's Exercise of its Contractual Power Complied with English Law ...............18

         1.    The Plaintiffs Concede BA Acted in Good Faith...................................19

         2.    The Undisputed Evidence Demonstrates that BA's Actions
              Conformed to the Purpose of the Fuel Surcharge: Defraying Fuel
              Costs ..................................................................................................22

    E.    The ADA Preempts The Plaintiffs' Claim .......................................................23

III.   THE PLAINTIFFS LACK STANDING ....................................................................26

IV.  THE STATUTE OF LIMITATIONS BARS MR. DOVER'S CLAIM FOR PRE-
      NOVEMBER 2010 REWARD TRAVEL ..................................................................27

V.   THE VOLUNTARY PAYMENT DOCTRINE BARS MR. DOVER'S CLAIMS.........29

CONCLUSION................................................................................................................31

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Oil Serv. v. Hope Oil. Co.*,
    194 Cal. App. 2d 581 (2d Dist. Ca. 1961) .......................................................................30

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..........................................................................................................9

*Biglio v. Coca-Cola Co.*,
    675 F.3d 163 (2d Cir. 2012) .............................................................................................30

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..........................................................................................................9

*Credit Lyonnais S.A. v. Korea Asset Mgmt. Corp.*
    2003 WL 22241136 (S.D.N.Y. Sept. 30, 2003) ...............................................................18

*David v. United Cont'l Hold'gs, Inc.*,
    2015 WL 7573204 (D.N.J. Nov. 24, 2015) ......................................................................18

*Demery v. Extebank Deferred Comp. Plan (B)*,
    216 F.3d 283 (2d Cir. 2000) ...............................................................................................9

*Duse v. IBM*,
    252 F.3d 151 (2d Cir. 2010) ...............................................................................................9

*Ehrich v. Credit Prot. Ass'n, L.P.*,
    891 F. Supp. 2d 414 (E.D.N.Y. 2012)..............................................................................26

*Garofalo v. Empire Blue Cross and Blue Shield*
    67 F. Supp. 2d 343, 346-47 (S.D.N.Y. 1999) ..................................................................27

*Giannopoulos v. Iberia Lineas de Espana, S.A.*,
    17 F. Supp. 3d 743, 750..........................................................................................24, 25, 26

*Grocery Haulers, Inc. v. C&S Wholesale Grocers, Inc.*,
    2013 WL 342693 (S.D.N.Y. Jan. 29, 2013) .....................................................................12

*Hayes v. Willoughby*
    [2013] 1 WLR 935 .............................................................................................................21

*Holt v. KMI-Cont'l, Inc.*,
    95 F.3d 123 (2d Cir. 1996) .................................................................................................9

# TABLE OF CONTENTS
(continued)

**Page**

*In re IMAX Sec. Litig.*,
  272 F.R.D. 138 (S.D.N.Y. 2010) ........................................................................27

*In re PCH Assocs.*,
  949 F.2d 585 (2d Cir. 1991) ...............................................................................11

*Kearins v. Panalpina, Inc.*,
570 Fed. Appx. 9, 10-11 (2d Cir. 2014)................................................................28

*K.M.L. Labs. Ltd. v. Hopper*,
  830 F. Supp. 159 (E.D.N.Y. 1993) (Dearie, J.) ...................................................9

*Klaper v. Cypress Hills Cemetery*,
  2014 WL 1343449 (E.D.N.Y. Mar. 31, 2014)....................................................11

*Lazard Freres & Co. v. Protective Life Ins. Co.*,
  108 F.3d 1531 (2d Cir. 1997)..............................................................................30

*Licci v. Lebanese Canadian Bank, SAL*,
  672 F.3d 155 (2d Cir. 2012) ...............................................................................30

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................................................26

*Lyn-Lea Travel Corp. v. Am. Airlines*,
  1999 WL 777716 (N.D. Tex. Sept. 29, 1999) .....................................................24

*New York SMA Ltd. v. Town of Clarkstown*,
  612 F.3d 97 (2d Cir. 2010) .................................................................................24

*Nobel Ins. Co. v. City of New York*,
  2006 WL 2848121 (S.D.N.Y. Sept. 29, 2006).....................................................11

*Northwest, Inc. v. Ginsberg*,
  134 S.Ct. 1422 (2014) ...................................................................................24, 26

*Pagan v. Abbott Labs., Inc.*,
  287 F.R.D. 139 (E.D.N.Y. 2012) .......................................................................27

*R.G. Grp., Inc. v. Horn & Hardart Co.*,
  751 F.2d 69 (2d Cir. 1984) ...................................................................................9

*Ross v. Albany Med. Ctr.*,
  104 F.3d 351 (2d Cir. 1996) ...............................................................................27

# TABLE OF CONTENTS
(continued)

**Page**

*S.E.C. v. Tourre*,
2013 WL 2407172 (S.D.N.Y. June 4, 2013) ........................................................11

*Socimer v. Int'l Bank Ltd. (in liquidation) v. Standard Bank London Ltd.*
[2008] Bus. L.R. 1304 ........................................................................................20

*Spagnola v. Chubb Corp.*,
574 F.3d 64 (2d Cir. 2009) ................................................................................29

*Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*,
992 F. Supp. 2d 962 (C.D. Ca. 2014) ...............................................................27

*Thompson v. City of N.Y.*,
2 F. Supp. 3d 374, 376 (E.D.N.Y. 2014) (Dearie, J.) ........................................9

*Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*,
103 F. Supp. 2d 711 (S.D.N.Y. 2000) ...............................................................18

*Treiber v. Aspen Dental Mgmt.*,
94 F. Supp. 3d 352, 363 (N.D.N.Y. 2015) .........................................................27

*Viti v. Guardian Life Ins. Co. of Am.*,
2013 WL 6500515 (S.D.N.Y. Dec. 11, 2013) ...................................................11

STATUTES

49 U.S.C. § 41712 ..................................................................................................24

Airline Deregulation Act, 49 U.S.C. § 41713 ....................................................23, 24

Fed. R. Civ. P. 56(c) ................................................................................................9

## PRELIMINARY STATEMENT

This is a contract case.  British Airways PLC ("BA") told the plaintiffs that it would charge a fuel surcharge, and the plaintiffs agreed to pay it.

There is no dispute – of law or of fact – that BA had the contractual right to impose a fuel surcharge.  When the plaintiffs joined the Executive Club ("EC"), BA told them it would charge a fuel surcharge, and by entering the Executive Club Contract (the "EC Contract"), the plaintiffs agreed to pay it.  Then, when the plaintiffs booked their redemption flight, BA again told the plaintiffs, in the Conditions of Carriage ("CoC"), that BA would impose a fuel surcharge, and the plaintiffs again agreed to – and did – pay it.

In an attempt to knit together an argument that BA's fuel surcharge exceeds its contractual right to charge one, the plaintiffs ask this Court to rewrite one of the contracts and ignore the other.  Even though they paid the fuel surcharge pursuant to the CoC – not the EC Contract – the plaintiffs ask the Court to pretend that the CoC does not exist.  Why?  If the CoC is enforced, then the laws of potentially all 50 states apply (rather than English law), and the claims are preempted by the Airline Deregulation Act ("ADA"), limited by the CoC's two year statute of limitations, and in certain instances, barred by the voluntary payment doctrine.

Seeking to avoid the CoC's restrictions, the plaintiffs focus exclusively on the EC Contract.  That attempt fails.  First, the plaintiffs admit that there are no express contractual limitations on BA's discretion to impose a fuel surcharge. Second, English law requires only that the contractual power "be exercised honestly and in good faith for the purpose for which it was conferred, and must not be exercised arbitrarily, capriciously or unreasonably (in the sense of irrationality)."  (Ex. 1, Report of Michael Crane QC ¶ 38 (quoting *Yam Seng Pte Ltd. V. Int'l Trade Grp., Ltd.* [2013] 1 C.L.C. 662)).  As BA's English law expert, Michael Crane QC, opines,

"[G]iven that [BA] acted rationally[,] provided BA acted honestly and in good faith in setting the fuel surcharge and in applying that fuel surcharge amongst its passengers, then under English law it lawfully exercised the contractual power in question."  (Ex. 1, Crane Rep. ¶ 51).

The plaintiffs *concede* that BA acted honestly, in good faith and not unreasonably. (Plaintiffs' Reply on Class Certification ("Cert. Reply") at 2 ("Plaintiffs did not bring a claim relating to good faith or the unreasonable exercise of contractual discretion."); 15 ("While English law provides that a party can breach its contract because it does not act in good faith or because it acts unreasonably, this case does not involve such a claim.")).  These concessions – that BA had the contractual power to charge a fuel surcharge and it did not exercise that power in bad faith or unreasonably – end this case and mandate summary judgment in BA's favor.

In a futile attempt to show otherwise, the plaintiffs misstate English law.  They claim that BA's "discretion is subject to three independent limitations; it must: (1)  be 'exercised for the purpose for which it was conferred;' (2) be 'exercised honestly and in good faith;' and (3) 'not be exercised arbitrarily, capriciously, or unreasonably.'"  (*Id*. at 2).   Because the plaintiffs concede they are not contesting BA's honesty, good faith and reasonableness (their prongs 2 and 3), they focus entirely on their supposed first prong: whether BA exercised its contractual power "for the purpose for which it was conferred."  (*Id*. at 2, 15-16).  As explained by BA's English law expert, however, the plaintiffs' construction violates English law: ascertaining the "purpose for which the power is conferred" is part of the process used to determine whether BA acted honestly, in good faith and not unreasonably – it is not a determinative test in and of itself.  And, even if it were a separate prong, the undisputed evidence demonstrates that the purpose of BA's fuel surcharge was to defray its fuel costs and that is precisely how BA used it.

2

Mr. Crane is an Oxford educated barrister and expert in English law, who submitted an expert report for the Court.  Mr. Crane has been a full time barrister since 1976, he was appointed to the Queen's Counsel in 1994, since 1998 has practiced from Fountain Court Chambers, one of London's leading sets of commercial chambers, was elected a Bencher of the Middle Temple, was authorized to sit as a Deputy Judge of the High Court (Commercial Court) in 2002, and is a leading silk in aviation and commercial litigation. (Ex. 1, Crane Rep. ¶¶ 2-3; Appendix 1).  Mr. Crane has reviewed the undisputed evidence and opined that:

- BA has the contractual right to charge a fuel surcharge (*id.* ¶ 10(i));

- There is "no express contractual provision that regulates BA's imposition of such a surcharge" (*id.*);

- The "purpose of the fuel surcharge was to enable BA to recover some of its increased or incremental costs of fuel" (*id.* at ¶ 57);

- The "factors to which BA had regard in setting or adjusting the fuel surcharge were . . . matters which could rationally be taken into account in setting" a fuel surcharge (*id.* at ¶58; *see also* ¶ 51);

- The limitations that the plaintiffs variously have urged (such as limiting the fuel surcharge to unforeseeable spikes in fuel costs) are not warranted (*id.* at ¶ 59);

- BA's fuel surcharge was reasonably related to or based upon the cost or price of fuel (Crane, 38:4-12); and

- "[P]rovided BA acted honestly and in good faith in setting the fuel surcharge and applying [it] amongst its passengers, then under English law it lawfully exercised the contractual power in question."  (Ex. 1, Crane Rep. at ¶ 51).

The plaintiffs' admissions and the material undisputed evidence discussed herein and in BA's accompanying 56.1 Statement require the Court to dismiss their claim because:

- The contracts explicitly permit BA to impose a fuel surcharge, and this Court has ruled that the "plain meaning" of the term "is a supplemental charge that is reasonably related to or based upon the cost or price of fuel," and that "the typical consumer would consider a fuel surcharge to be an added charge imposed by an airline in order to defray rising fuel costs." (MTD Order, dated November 8, 2013 (Dkt. No. 52) ("MTD Order") at 9). Because the material undisputed evidence demonstrates that BA's fuel surcharge was

reasonably related to or based upon the cost or price of fuel and imposed to defray its rising fuel costs, summary judgment for BA is mandated (*see* Section II(A)-(C));

- The plaintiffs have conceded that BA's exercise of its contractual discretion was honest, rational and in good faith, and as such, complied with English law (*see* Section II(D));

- Because the plaintiffs must establish that BA violated notions of good faith and fair dealing to succeed on their claim and because the Department of Transportation ("DOT") occupies the field, their claims are preempted under the ADA (*see* Section II(E));

- The plaintiffs lack standing because they have not demonstrated an injury-in-fact (*see* Section III); and

- Mr. Dover's pre-November 2010 claim must be dismissed because it is barred by the two-year statute of limitations and his claims are barred in their entirety by the voluntary payment doctrine. (*See* Sections IV and V).

## BACKGROUND

### A.    The Plaintiffs Agreed to Pay a Fuel Surcharge.

The EC is BA's frequent-flyer program.  It is free to join, and members ("Members") earn points ("Avios") in several ways, including flying, using a BA-branded credit card, buying wine, renting cars, or staying at participating hotels.  (Dover 103:17-19,[1] 146:7-150:8; Ex. 2, BA00168963).  To join the EC, one must enter into the EC Contract. (Ex. 3, Dover RFA No. 29; Ex. 4, Perry RFA No. 29; Ex. 5, Horsey RFA No. 29; Ex. 6, Rank RFA No. 29).

The EC Contract informed Members that they were "liable for all taxes and other charges associated with Reward travel . . . including without limitation . . . **fuel surcharges**."  (Ex. 7, EC Contract § 13.14).  The EC Contract is subject to the CoC.  (Ex. 8, CoC).  The CoC – which Members enter into when they redeem Avios for redemption travel ("Reward Travel") – makes plain that BA "may charge **any surcharge** to the fare for your ticket which applies under our tariff on the day you pay for your ticket, for example a **fuel** or insurance surcharge." (*Id.*, § 4a5).

BA informed the plaintiffs – before they booked their flights – that BA would impose a

---

[1] Citation to deposition transcripts are in the following form: Last name Page:line.  Excerpts of depositions cited herein or in the 56.1 Statement are provided for the Court's convenience in Appendix A.

fuel surcharge, and the plaintiffs agreed to pay it.  (Horsey 185:9-186:4 (EC Contract provides Members will be liable to pay fuel surcharges), 186:7-187:21 (the CoC states that BA can impose a fuel surcharge); Rank 192:4-13 (Mr. Rank does not contend that the EC Contract prohibits BA from imposing a fuel surcharge); Perry 139:20-25 (EC Contract permits fuel surcharge); *see also* Ex. 9, BA-PLTF-007254; 10, BA-PLTF-007278; Ex. 11, BA-PLTF-007286; Ex. 12, BA-PLTF-006479; Ex. 13, BA-PLTF-006586; Ex. 14, BA-PLTF-007307; Ex. 15, BA-PLTF-001284; Ex. 16, BA-PLTF-000271).   Despite agreeing to pay a fuel surcharge, the plaintiffs here assert that BA breached its contract by assessing one on their Reward Travel and claim, without support, that the fuel surcharge should have been $0.

### B.    The Purpose of BA's Fuel Surcharge Was To Defray Fuel Costs.

From 2003 through the end of the putative class period, the price of jet fuel tripled from "$1 per gallon in 2003 to over $3 per gallon in 2013" and became BA's largest single cost.  (Ex. 17, Supplemental Report of Daniel Kasper ("Kasper Report") dated September 4, 2015, II(A); Ex. 18, Foran Decl. ¶ 4).  By the end of BA's 2003/4 fiscal year (ending March 31, 2004), BA projected that its fuel bill for the next fiscal year would be £150 million higher than the year before.  (Ex. 19, BA's 2004 Annual Report, BA00003639; *see also* Ex. 18, Foran Decl. ¶ 4; Ex. 20, BA00123572).  "[J]et fuel prices hit then record highs in mid to late 2004."  (Ex. 17, Kasper Report ¶ 10).  At their depositions, BA executives explained that the purpose of the fuel surcharge was an attempt to defray BA's rising fuel costs.  (*See*; Ex. 20, BA00123572; Ex. 22, BA00123621; Ex. 23, BA00123607; Ex. 75, Chart of Testimony).

"When it was introduced, BA did not intend for the fuel surcharge to recoup 100 percent of BA's fuel costs, or even the incremental increase in BA's fuel costs, but BA hoped to offset some of the increased fuel costs."  (Ex. 18, Foran Decl. ¶ 5).  BA "never had any expectation of

being able to recover the total amount." (Foran, 39:6-15, Feb. 26, 2015; *see also* Pickard 62:4-13 ("[I]t was designed to mitigate the increased cost of increasing fuel … but it doesn't recover all of it."); Crawley 23:3-6 ("[W]e were doing it to recover the cost of fuel which was going through the roof and which we have never managed to recover the full costs of.")). Instead, BA initially set a fuel surcharge of £2.50 per sector regardless of the class of ticket or duration of the flight. (Ex. 23, BA00123607). At that time, BA expected the £2.50 charge only to recover a mere £50 million of the projected £150 million fuel bill increase. (Ex. 20, BA00123572). BA announced that it was introducing the fuel surcharge "as a result of the continuing rise in oil prices" (Ex. 22, BA00123621), and that explanation appeared on BA's website since before the beginning of the putative class period. (Ex. 24, BA00169555; Ex. 25, Lewis Declaration).

BA managed its fuel surcharge on a global basis, "meaning that the fuel surcharge was designed to recoup a portion of BA's increased fuel costs throughout BA's entire network. As such, the fuel surcharge was not set individually (on a specific route or flight basis) since BA was seeking to collect a portion of its aggregate increased costs, not necessarily the increased costs associated with that route and/or flight." (Ex. 18, Foran Decl. ¶ 9; *see also* Ex. 102, BA00086531 (rejecting a "per flight" fuel surcharge as "unmanageable").

BA's fuel surcharge committee ("FSC") reviewed the structure and level of the fuel surcharge. (Ex. 18, Foran Decl. ¶ 21). The FSC met 47 times during the putative class period, and convened when BA felt that circumstances warranted. (*Id*. ¶ 28; Boswell, 65:24-66:6; Crawley, 78:21-79:9; Daniels, 38:1-15; Foran (Feb. 26, 2015), 47:19-48:4; Howick, 29:22-30:9; Pickard, 41:9-42:20; Tuensmeyer, 25:3-25:11; Wells, 27:9-28:7). The FSC met more often during periods of dramatic oil price movement. (Ex. 26, Chart of FSC meetings).

At meetings, the FSC reviewed a "chart reflecting BA's weighted fuel price against BA's fuel surcharge levels" and the Treasury Department would describe "how BA's weighted fuel price had moved over time" as well as its "███████████████████████████ ██████████████." (Ex. 18, Foran Decl. ¶¶ 33-34; Ex. 147, BA00173639).

The FSC also considered "████████████████████████████████ ████████████████████████████████████████████████ ████████████████." (Ex. 18, Foran Decl. ¶ 35; Ex. 125, BA00173635). "█████ ████████████████████████████████████████████████ ███████████████████████████████████████," the FSC could "████ ████████████████████████" a fuel surcharge change. (*Id.* ¶ 36). In early 2011, for example, BA faced just such a situation when it projected increased fuel costs of £200-250 million more than anticipated in its 2011 financial plan. (Ex. 28, BA00134894).

BA hedged its fuel purchases, employing a range of derivative products and strategies designed to dampen the volatility of the oil markets. (Howick; 20:24-22:8, 22:15-24:10; Ex. 29, BA00062287). These strategies, however, could not eliminate the price volatility or offset the kinds of dramatic increases and decreases in fuel prices seen during the putative class period. The price of jet fuel could change by the minute and often swing $5 or more per barrel in a single day. (*See* Howick 43:10-44:5). Given the volume of jet fuel that BA consumed, this movement could have a substantial effect. In 2013, for example, BA bought 49,630,000 barrels of jet fuel. (Ex. 30, BA 2013 Annual Report, at 9). Even a $1 swing in fuel costs could have a £24 million impact on BA's bottom line. (Ex. 31, BA00063521 at BA00063523).

Because fuel prices change multiple times every day, changing the fuel surcharge continually would be impractical. (Ex. 32, Supplemental Report of Marc B. Sherman ("Sherman

7

Report"), supplemented Aug. 28, 2015, ¶ 45).  Instead, BA did so when there were significant price movements and an expectation that the trend would continue.  (*See* Foran 37:23-38:5 (FSC considered trends), 71:6-18 (FSC considered the spot price and trend of jet fuel); Howick 21:17-22:22 (FSC reviewed "the historical trend"); Tuensmeyer ("the trend was really important")).  During the putative class period, BA changed the global fuel surcharge 15 times – three of those changes were reductions.  (Ex. 18, Foran Decl. ¶ 30; ; Ex. 40, Chart of FSC Changes).

While it set its fuel surcharge prospectively, "BA also set up a safeguard to ensure that it did not recover more in fuel surcharge revenue than its increased fuel costs on a global level." (Ex. 33, Daniels Decl. ¶ 32).  BA "periodically measured its fuel surcharge revenue against the increased fuel costs incurred since the imposition of the fuel surcharge," its baseline.  (*Id*. ¶ 32).  This retrospective review measured BA's fuel surcharge recoveries against the baseline 2003/04 fiscal year (ending on March 31, 2004) to ensure that BA did not over-collect.  BA explained this, for example, in an Investor Day Presentation where it announced that its "fuel surcharge recoveries [we]re around 60-70%."  The percentage represented the "net fuel cost increase since 2003 recovered through [fuel] surcharges." (Ex. 34, BA00003247 at p. 47).  Mr. Crane opined that BA's baseline of "the end of the financial year immediately preceding the introduction of the fuel surcharge" was appropriate.  (Crane, 43:11-44:3; 59:17-60:1).

BA's fuel surcharge revenue never exceeded its increased fuel costs during the putative class period.  (Ex. 32, Sherman Rep. ¶¶ 71-73, Charts 9-10; Ex. 3, Dover RFA, Nos. 113-14; Ex. 4, Perry RFA, Nos. 112-13; Ex. 6,  Rank RFA, Nos. 112-13; Ex. 5, Horsey RFA, Nos. 113-14; Ex. 33, Daniels Decl. ¶ 32).  Over the putative class period, BA *defrayed less than half* of its aggregate fuel costs net of hedging through the passenger fuel surcharge and only approximately 70 percent of its incremental fuel costs.  (Ex. 32, Sherman Report ¶ 71, Chart 9).

8

<u>**ARGUMENT**</u>

As is described in more detail below and in BA's Rule 56.1 Statement, there is no genuine issue as to any material fact and BA is entitled to summary judgment as a matter of law.

**I.     LEGAL STANDARD.**

Summary judgment should be granted when there is no genuine issue of material fact, and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  To defeat summary judgment, the plaintiffs must put forth sufficient admissible evidence demonstrating material issues of fact for trial. *Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996) (affirming summary judgment).  They must come forward with "concrete particulars."  *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (affirming summary judgment).  And, they "must tender evidence demonstrating a genuine issue for trial … and must offer more than 'conclusory allegations or unsubstantiated speculation' to defeat summary judgment." *Thompson v. City of N.Y.*, 2 F. Supp. 3d 374, 376 (E.D.N.Y. 2014) (Dearie, J.) (granting summary judgment) (quoting *DeFabio v. E. Hampton Union Free Sch. Dist.*, 623 F.3d 71, 81 (2d Cir. 2010)).  The evidence proffered must be "significantly probative;" if the evidence is "merely colorable," summary judgment should be granted.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

The plaintiffs bear the burden of proof at trial. "'Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *K.M.L. Labs. Ltd. v. Hopper*, 830 F. Supp. 159, 162-63 (E.D.N.Y. 1993) (Dearie, J.) (granting summary judgment) (quoting *Celotex*, 477 U.S. at 322); *see also Duse v. IBM*, 252 F.3d 151, 158 (2d Cir. 2010) (affirming summary judgment); *Demery v.*

*Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 286 (2d Cir. 2000) (same).

## II.   THE PLAINTIFFS' BREACH OF CONTRACT CLAIM MUST BE DISMISSED.

### A.   The Contracts Explicitly Permit BA to Impose a Fuel Surcharge And the Plaintiffs Agreed to Pay a Fuel Surcharge.

Both the EC Contract and the CoC unequivocally give BA the right to impose a fuel surcharge on Reward Travel.  The following facts are undisputed:

- The plaintiffs voluntarily agreed to the terms and conditions of the EC Contract when they joined the Executive Club (*see, e.g.*, Ex. 3, Dover RFA No. 29; Ex. 4, Perry RFA No. 29; Ex. 6, Rank RFA No. 29; Ex. 5, Horsey RFA No. 29; Rank 69:24-70:12);

- The EC Contract explicitly permits BA to impose a fuel surcharge (Rank 182:2-13; Horsey 185:9-186:4, 186:7-187:21; Perry 139:20-25; Ex. 35, Sutcliffe Reply Rep. ¶8(b); Sutcliffe 94:5-8; *see also* Ex. 1, Crane Rep. ¶ 10(i)); Ex. 7, EC Contract § 13:14);

- Both parties' experts now agree that BA had the "power to impose a 'fuel surcharge'" (Ex. 35. Sutcliffe Reply Rep. ¶ 6(a)); [2] Ex. 1, Crane Rep. ¶ 10(iii));

- The plaintiffs' expert concedes that "British Airways had discretion when it c[ame] to determining the fuel surcharge," including "the level at which that fuel surcharge" was set (Ex. 36, Sutcliffe Rep. ¶ 32; Ex. 35, Sutcliffe Reply Rep. ¶ 6(b));

- BA told the plaintiffs the amount of fuel surcharge they would have to pay before they booked their Reward Travel and they agreed to purchase the Reward Travel with that knowledge  (Ex.4, Perry RFA Nos. 35-36; Ex. 5, Horsey RFA Nos. 35-36; Ex. 6 Rank RFA Nos. 35-36; Ex. 3, Dover RFA Nos. 35-36);

- The plaintiffs concede the EC Contract does not contain the language "reflecting the fluctuating price of worldwide oil" or a requirement that the fuel surcharge be "nominal" as alleged in their complaint (*compare* AC ¶6, 9, *with* Perry 188:19-189:12; Dover 301:21-302:7, 321:17-322:5; Rank 183:6-15, 198:25-200:17; Horsey 189:9-16, 208:3-8);

- The EC Contract did not establish a schedule by which BA had to change the fuel surcharge or require BA to use a formula  (Ex. 4, Perry RFA Nos. 54, 56; Ex. 5, Horsey RFA Nos. 55, 57; Ex. 6, Rank RFA Nos. 54, 56; Ex. 3, Dover RFA Nos. 55, 57);

- The EC Contract incorporates the CoC, which explicitly permits BA to impose a fuel surcharge (Sutcliffe. 95:2-5;  Ex. 3, Dover RFA Nos. 30, 39); and

---

[2]   The plaintiffs and their English law expert originally argued that a fuel surcharge must "be imposed on British Airways by a third party and directly passed along to ticket purchasers," but the Court rejected that argument. (MTD Order at 8 n.6 ("Nothing in the plain meaning or common usage of the term, however, requires such a restrictive definition.")).

- The plaintiffs concede that they entered into the CoC when booking their Reward Travel. (Ex. 4, Perry RFA Nos. 32; 38; Ex. 5, Horsey RFA Nos. 32; 39; Ex. 6, Rank RFA Nos. 32; 38; Ex. 3, Dover RFA Nos. 32; 39).

**B.      A Fuel Surcharge is a Supplemental Charge Reasonably Related to or Based Upon the Price or Cost of Fuel To Defray Rising Fuel Costs.**

The parties agree that the EC Contract is governed by English law.  (MTD Order at 8). Under English law, a court is compelled to apply unambiguous contractual language.  (Ex. 1, Crane Rep. ¶ 21).  This Court ruled previously that the term fuel surcharge is unambiguous, defined the term, and set forth its purpose when it held:

> The plain meaning of the term 'fuel surcharge' is a supplemental charge that is reasonably related to or based upon the cost or price of fuel.  This understanding comports with conventional usage.  Most-if not all-commercial airplane passengers are aware that the price of jet fuel rises and falls.  Against this backdrop, the typical consumer would consider a fuel surcharge to be an added charge imposed by an airline in order to defray rising fuel costs.

(MTD Order at 9).[3]

"Under the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation."  *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991).  Typically, a court will not reconsider "legal conclusions [made during a motion to dismiss] which are not in any way altered by discovery" during summary judgment.  *Nobel Ins. Co. v. City of New York*, 2006 WL 2848121, at *4 (S.D.N.Y. Sept. 29, 2006); *see also Klaper v. Cypress Hills Cemetery*, 2014 WL 1343449, at *4 (E.D.N.Y. Mar. 31, 2014); *Viti v. Guardian Life Ins. Co. of Am.*, 2013 WL 6500515, at *3-4 (S.D.N.Y. Dec. 11, 2013) (applying prior ruling on summary judgment). The Court's determination is law of the case and applies for purposes of summary judgment.  *See, e.g., S.E.C.*

---

[3] The plaintiffs sought to subvert this ruling by arguing that "fuel surcharge" is "an extra charge on top of the fare for recent changes in the cost of fuel'" (Class Cert Reply at 2) or "the [fuel] surcharge will reflect the portion of cost that is transitory or unanticipated."  (Arnold Opp. at 4 (citing Arnold Rep. ¶ 13)).  They made that argument in their opposition to the motion to dismiss and this Court rejected it.  (*See* P's Opp to MTD at 18; MTD Order at 9).

*v. Tourre*, 2013 WL 2407172, at *9 n.11 (S.D.N.Y. June 4, 2013) (applying doctrine); *Grocery Haulers, Inc. v. C&S Wholesale Grocers, Inc.*, 2013 WL 342693,  at *2 (S.D.N.Y. Jan. 29, 2013) (unambiguous contract interpretations entitled to deference).

### C.    BA's Fuel Surcharge is Reasonably Related to or Based on Its Fuel Costs.

The undisputed evidence overwhelmingly demonstrates that BA's fuel surcharge was a supplemental charge reasonably related to or based upon the price or cost of fuel to defray fuel costs, as explained in more detail below.

### 1.    The Purpose of BA's Fuel Surcharge Was to Defray Fuel Costs.

BA instituted the fuel surcharge in May of 2004.   (Foran 19:12-20:2; Ex. 37, BA00123601; Ex. 23, BA00123607; Ex. 22, BA00123621; Ex. 38, BA00123627). At their depositions, BA executives explained that the purpose of the fuel surcharge was to attempt to defray BA's rising fuel costs; for example:

- Andrew Crawley, the Chief Commercial Officer, testified that the fuel surcharge was "a recovery device for recovering . . . the incremental costs of our fuel," which BA put in "to recover the cost of fuel which was going through the roof and which we have never managed to recover the full costs of"  (Crawley, 23:3-6; 84:15-16);

- Jerry Foran, the Head of Product Delivery for Revenue Management, testified that the fuel surcharge was introduced "as a result of an unexpected rise in [BA's] fuel costs which we attempted to partially recover," that because BA "had a spike in the cost of fuel . . . we needed to attempt to recover that increase in our costs," and the purpose of the fuel surcharge was "to recover the additional cost of fuel that we had incurred" (Foran 17:17-18, 19:16-21, 173:9-17, Feb. 26, 2015; *see also*  Ex. 18, Foran Decl. at ¶ 4);

- Jo Boswell, the former Head of Revenue and Customer Analysis, testified that the "fuel surcharge [helped] to offset the massive increase in cost" (Boswell 120:2-13);

- Richard Goodfellow, the former Head of News, testified that the fuel surcharge "was a way of passing off some of the increased fuel bill we [we]re facing" (Goodfellow 108:25-109:22);

- Gavin Halliday, a former Area Commercial Manager, testified that "[t]he fuel surcharge [wa]s a surcharge to try and recover a proportion of the increased cost that the company [wa]s enduring due to the increase in fuel price" (Halliday, 25:10-19);

12

- Ian Howick, the former Head of Treasury, testified that the fuel surcharge was in place "to try and offset what we could" of the fuel price (Howick, 86:2-8);

- Mark Pickard, Revenue Manager for Europe, testified that the fuel surcharge "was designed to mitigate the increased cost of increasing fuel. So it's there to recover that, but it doesn't recover it all" (Pickard 40:15-41:1);

- Nick Swift, the Chief Financial Officer from 2011 forward, testified that "the fuel surcharge [wa]s designed to try to recover as much of the increase in our fuel costs through that revenue line" (Swift, 25:11-26:13); and

- Jack Walker, the former Revenue Manager for the Americas, testified that the fuel surcharge "[wa]s added to the base fare in an attempt to offset the cost of fuel." (Walker 33:23-34:1; *see also* Ex. 75, Chart of Testimony).

BA explained that the fuel surcharge was "introduced as a result of the continuing rise in oil prices" and that it was used instead of increasing the fare because it "allow[ed] greater flexibility in response to changing oil prices and provide[d] greater transparency to our customers." (Ex. 22, BA00123621). BA selected £2.50 as the initial amount because "[i]t was a number which was acceptably small for everyone to have agreed to get the concept into the marketplace, and nowhere near the number it needed to be." (Crawley, 23:9-20).

BA never expected the fuel surcharge fully to recoup its incremental increase in fuel costs. (Boswell 214:9-19 (fuel surcharge collected less than half of BA's increased fuel costs); Crawley 78:21-79:9 ("the incremental cost of fuel has never been fully recovered through the fuel surcharge"); Daniels 38:1-15 ("[W]e have never over-collected the additional cost of fuel or the total cost of fuel in the fuel surcharge."); Foran 252:13-253:18 (BA never intended and never did collect its fuel costs or incremental fuel costs); Pickard 62:4-13 (the fuel surcharge is not high enough to recoup BA's fuel costs)). Within a few months, BA realized that its fuel costs were rising faster than expected – BA then anticipated them to be £225 million more than the prior year (versus the £150 million more previously expected). (Ex. 20, BA00123572). As a result, in August of 2004, BA raised the fuel surcharge to £6 per sector. *Id.*

### 2.   BA Never Over-Recovered Its Fuel Costs.

Discovery established – and the plaintiffs concede – that during the putative class period, BA's fuel surcharge revenue never fully recovered its fuel costs.  (Ex. 3, Dover RFA Nos. 113-14; Ex. 5, Horsey RFA Nos. 113-14; Ex. 4, Perry RFA Nos. 112-13; Ex. 6, Rank RFA Nos. 1123-13; Arnold 208:13-23). Indeed:

- Over the putative class period, BA collected **only 46 percent** of its aggregate fuel costs net of hedging through the passenger fuel surcharge.  (Ex. 32, Sherman Report ¶ 71, Chart 9).

- BA never collected in fuel surcharges its incremental fuel costs, and in general only recovered approximately 70 percent of them (measured from the inception of the fuel surcharge).  (Ex. 3, Dover RFA No. 41; Ex. 5, Horsey RFA No. 41; Ex. 4, Perry RFA No. 41; Ex. 6, Rank RFA No. 41; Ex. 32, Sherman Report, Chart 10, pg. 36).

- On each of the named plaintiffs' flights, BA did not collect more in fuel surcharge than its fuel cost or incremental increase in fuel costs.  (Ex. 17, Kasper Report ¶ 156).

As such, the facts disprove the plaintiffs' counsel's unfounded speculation at the Motion to Dismiss hearing that, "I think discovery will reveal, Your Honor, that . . . the fuel surcharge that [BA] collects is always more than high enough to more than cover the fluctuation in fuel prices."  (Ex. 39, Mar. 5, 2013 Court Conference Tr., 14:7-11).

### 3.   BA's Fuel Surcharge Changes Reflected Its Fuel Costs.

During the putative class period, BA's fuel costs largely continued their upward trend – ultimately tripling and becoming its largest cost. (Ex. 17, Kasper Supp. II(A); Ex. 18, Foran Decl. ¶ 4).  BA monitored its fuel costs and adjusted the fuel surcharge when warranted.  (Ex. 18, Foran Decl. ¶ 30).   During that time, BA's FSC met 47 times and BA adjusted the global fuel surcharge 15 times, three of which were reductions.  (Ex. 40, Chart of FSC Changes).  Each of these fifteen global fuel surcharge changes were undisputedly and reasonably related to BA's fuel costs, as discussed below, in contemporary documents, and in BA's 56.1 Statement.

- On January 12, 2007, BA decreased the fuel surcharge on certain longhaul[4] flights "as a result of the fall in the price of oil." (Ex. 41, BA00101307). The price of jet fuel had decreased more than nine percent during the prior six weeks. (Ex. 103, EIA Data). BA also introduced a differentiated level of surcharge for flights less or more than nine hours. (Ex. 43, BA00173755). BA decreased the fuel surcharge even though "fuel costs remain[ed] a real burden" because "the cost of oil ha[d] reduced in recent weeks." (Ex. 41, BA00101307). BA expected its fiscal year fuel bill to be "around £400 million higher" versus the prior year. (Ex. 44, BA00155876).

- On May 2, 2007, BA increased the fuel surcharge on all longhaul flights after "[t]he cost of fuel ha[d] risen significantly in recent weeks." (Ex. 42, BA00004282). The price rose more than thirty percent over the prior three months. (Ex. 103, EIA Data). The increase was recommended "subject to the spot price remaining where it [wa]s." (Ex. 45, BA00174635). By that time, fuel costs for the fiscal year 2007/2008 were expected "to be more than £2 billion." (Ex. 42, BA00004282).

- On June 13, 2007, BA increased the fuel surcharge on all longhaul flights "as a result of further rises in the price of oil, which [wa]s now more than US$70 per barrel." (Ex. 46, BA00075609). "The cost of fuel ha[d] risen significantly in recent weeks" and BA had "little choice but to pass on some of this extra cost to [its] customers." (*Id.*)

- On November 15, 2007, BA increased the fuel surcharge on all flights. (Ex. 47, BA00093645). "[T]he decision reflect[ed] new record oil prices and t[ook] into account rising fuel costs." (*Id.*) "The cost of oil ha[d] reached record levels, rising by more than $20 per barrel" since the last fuel surcharge change. (*Id.*) Just in the second half of that fiscal year, BA expected a £136 million increase in fuel costs, with the overall fuel bill for the year exceeding £2 billion for the "first time." (Ex. 48, BA00173777).

- On February 25, 2008, BA increased the fuel surcharge on longhaul flights due to "continuing high oil prices." (Ex. 49, BA00173794). BA's fuel costs "ha[d] soared by £72 million in the last three months," "ha[d] almost doubled in the last three years and now represent[ed] 25 percent of [its] costs." (*Id.*)

- On May 2, 2008, BA increased the fuel surcharge on all flights due to "continuing high oil prices." (Ex. 50, BA00101318). Jet fuel prices increased over 28 percent between mid-February and the end of April. (Ex. 103, EIA Data). BA's "fuel costs were up £72 million … the highest ever increase in a quarter." (Ex. 51, BA00075674). As a result, BA expected its fuel costs "to be up £100 million" versus last year. (*Id.*)

- On June 3, 2008, after determining that BA's "fuel bill [wa]s set to rise by £1 billion in the next year … to £3 billion," BA increased the fuel surcharge further on all flights. (Ex. 52, BA00101324; *see also* Ex. 53, BA00093651). Fuel prices had once again "reached new record levels" (increasing twelve percent in a month) and fuel costs were

---

[4] Longhaul flights refer generally to flights more than six hours in duration. (Swift 66:5-22; Ex. 33, Daniels Decl. ¶ 8). In some instances, BA made adjustments to only its longhaul fuel surcharge, not the one applied to short haul. (Ex. 18, Foran Decl. ¶ 32; Ex. 42, BA00004282).

now BA's "single biggest cost."  (Ex. 54, BA00173818; Ex. 103, EIA Data).  Despite the fuel surcharge increases, BA's fuel surcharge revenue "only recover[ed] part of [its] fuel costs" as "fuel costs per passenger ha[d] more than doubled" over the past year.  (*Id.*)

- On June 19, 2008, BA differentiated the fuel surcharge by the class of the ticket to "reflect some of the additional costs per passenger associated with carrying customers in premium cabins."  (Ex. 55, BA00092784).  BA's decision "reflect[ed] the significant rise in [fuel] price in recent months" having increased from $95 a barrel to in excess of $130 a barrel.  (Ex. 56, BA00075715).  BA explained that "[r]ecent unprecedented oil price rises [we]re putting the pressure on the whole aviation industry" and it was "considered to be the worst crisis the aviation industry ha[d] faced since 9/11."  (*Id.*)

- On October 16, 2008, BA decreased the fuel surcharge for economy and premium economy classes on all longhaul flights due to "the recent falls in the price of oil" (Ex. 57, BA00004278), despite the fact that its "fuel bill [wa]s still expected to rise 50 percent th[at] year."  (Ex. 58, BA00173823).  Jet fuel prices had fallen over thirty-five percent in four months.  (Ex. 103, EIA Data).  BA's daily fuel bill was "about £8 million" (Ex. 58, BA00173823) and had not decreased even though the market price of oil was dropping because "the pound ha[d] weakened against the US dollar."  (Ex. 60, BA00101328).

- On December 18, 2008, BA decreased the fuel surcharge for all flights because of "the reduction in the price of oil and [its] fuel hedging policy for 2009/10."  (Ex. 61, BA00004277).  While fuel prices fell more than 42 percent in two months, BA reiterated that "[BA's] costs ha[d] not."  (Ex. 62, BA00101951; Ex. 103; EIA Data).  BA decreased the fuel surcharge despite experiencing a loss of £401 million for the fiscal year ending March 31, 2009.  (Ex. 63, BA00003107 at BA000003111).

- Over the next two years, BA's fuel surcharge remained constant despite increasing fuel costs of more than 62 percent.  (Ex. 32, Sherman Rep. Chart 4; Ex. 103, EIA Data).  Then, on December 16, 2010, BA increased the fuel surcharge on all longhaul flights due to a "substantial recent increase in the price of oil and the airline's fuel hedging policy" for the fiscal year.  (Ex. 64, BA00173810).  BA acknowledged that "[p]etrol prices ha[d] also hit a record high as the price of oil continue[d] to rise."  (Ex. 65, BA00076199).

- On February 8, 2011, BA increased the fuel surcharge on longhaul flights because of "the continuing substantial increase in the price of oil and a 14 percent rise in the spot price of jet fuel since [its] last fuel surcharge increase."  (Ex. 66, BA00017362).  The spot price of jet fuel had risen from $825 to over $940 per tonne in six weeks.  (Ex. 67, BA00173826).

- On April 8, 2011, BA increased longhaul fuel surcharges "[d]ue to the continuous increase in the price of oil reaching over $120 a barrel th[at] week."  By then, BA's fuel costs were "over one third" of its overall costs (Ex. 68, BA00079871), and BA was spending "in excess of £9 m[illion] a day" on fuel.  (Ex. 69, BA00079875).

- On December 19, 2011, BA increased the fuel surcharge on all flights because its fuel costs "ha[d] increased substantially as [its] hedging position worsen[ed]."  (Ex. 70, BA00119087).  Over the first three quarters of the fiscal year, the fuel bill for

International Airlines Group, S.A. (BA's parent company), had increased "by 28.5 percent." (Ex. 71, BA00173790).

- Finally, on March 6, 2012, BA increased the fuel surcharge on certain flights "due to recent increases in fuel costs" as BA expected its fuel costs to increase "by more than €1 billion in 2012." (Ex. 72, BA00173763).  Jet fuel prices increased almost eighteen percent in a ten-week period.  (Ex. 103, EIA Data).

As this undisputed evidence overwhelmingly demonstrates, each one of BA's global fuel surcharge changes during the putative class period was reasonably related to or based upon its fuel costs and done for the purpose of defraying fuel costs.

Even a cursory look at a graphical representation plotting BA's fuel surcharge against the weighted spot price of jet fuel confirms the reasonable relationship between the two:



(Ex. 32, Sherman at Chart 4).  In an attempt to quibble with this conclusion, the plaintiffs' expert, Dr. Arnold, adjusted the scaling of Mr. Sherman's chart, but even with the scaling adjusted, it is plain that a reasonable relationship exists.  (Ex. 74, Arnold Reply Rep. at Fig. 2).

Given this evidence, it cannot be disputed that BA's fuel surcharge was reasonably related to or based upon its fuel costs.[5]  When a party acts in accordance with its explicit rights under an agreement, it has not breached the agreement.  For example, in *Credit Lyonnais S.A. v. Korea Asset Mgmt. Corp.*, the contract granted the defendant discretion to reject debt and its "actions fell within its rights under the unambiguous [contract] language."  2003 WL 22241136, at *3 (S.D.N.Y. Sept. 30, 2003).  As a result, the Court granted defendant's motion for summary judgment.  *Id.* at *7; *see also Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 103 F. Supp. 2d 711, 735 (S.D.N.Y. 2000) (granting summary judgment; the "alleged breaches were not breaches at all, for the conduct complained of is explicitly permitted by the language of the agreements"); *David v. United Cont'l Hold'gs, Inc.*, 2015 WL 7573204, at *4 (D.N.J. Nov. 24, 2015) (granting dismissal of contract claim where defendant acted "precisely as it promise[d]").  BA has not breached the EC Contract and the claim must be dismissed.

## D.    BA's Exercise of its Contractual Power Complied with English Law.

Although there are no express contractual limitations to BA's discretion to impose a fuel surcharge, English law implies certain limitations onto the exercise of a contractual power.  (Ex. 1, Crane Rep. ¶ 33; Ex. 35, Sutcliffe Reply Rep. ¶ 21).  Specifically, a contractual power "must be exercised honestly and in good faith for the purpose for which it was conferred, and must not

---

[5] The plaintiffs' industry expert did not review every fuel surcharge change (Kokonis, 114:4-7).  He testified that he is not offering an opinion as to the reasons underlying the changes (114:4-7), conceded that it was "possibl[e]" that there were changes that related to the cost of fuel (*Id.*, 114:8-11) and acknowledged that "there was testimony that BA did consider the cost of fuel in its setting its [fuel surcharge] in certain circumstances."  (*Id.*, 115:8-15).

While not necessary or material to the resolution of this motion, it is telling that, notwithstanding this Court's statement that a "statistical analysis," which demonstrates a lack of correlation between BA's fuel surcharge and fuel prices, "is what the plaintiffs must demonstrate to prevail on the merits," and the inclusion of a regression analysis in the plaintiffs' complaints that they claimed did that, the plaintiffs' experts have not offered a regression analysis. (Nov. 7, 2013 Mem. at 9; Compl ¶¶ 50-55; Am. Compl. ¶¶ 50-55).  BA's econometrician, Dr. Andrew Hildreth, performed a regression analysis and concluded that BA's fuel surcharge was "not only reasonably related to the price (or cost) of jet fuel kerosene, it [was] highly correlated."  (Ex. 73, Hildreth Rep. ¶ 41).

be exercised arbitrarily, capriciously or unreasonably (in the sense of irrationally)."   (Ex. 1, Crane Rep. ¶ 38 (quoting *Yam Seng Pte Ltd. v. Int'l Trade Grp., Ltd.* [2013] 1 C.L.C. 662)). These limitations are similar to those imposed by the implied duty of good faith and fair dealing under U.S. law.[6]  The undisputed evidence and the plaintiffs' concessions clearly demonstrate that BA exercised its discretion honestly and in good faith for the purpose for which it was conferred and did not act arbitrarily, capriciously or unreasonably.

### 1.   The Plaintiffs Concede BA Acted Honestly, Reasonably and In Good Faith, Which Ends the Inquiry.

In their reply brief on class certification, the plaintiffs make concessions that doom their breach of contract claim: they concede that BA acted honestly, reasonably and in good faith in exercising its discretion to impose the fuel surcharge.  (Cert. Reply at 2 ("Plaintiffs did not bring a claim relating to good faith or the unreasonable exercise of contractual discretion"), 15 ("While English law provides that a party can breach its contract because it does not act in good faith or because it acts unreasonably, this case does not involve such a claim.") *see also* Arnold 134:22-135:7; Sutcliffe 196:3-13). They then seek to avoid the result of those admissions by claiming that BA's "discretion is subject to three independent limitations; it must: (1) be 'exercised for the purpose for which it was conferred;' (2) be 'exercised honestly and in good faith;' and (3) 'not be exercised arbitrarily, capriciously, or unreasonably'" and, while they concede their prongs 2 and 3, the plaintiffs claim that "the *sole question"* for the fact-finder is whether BA was charging an actual fuel surcharge (i.e., exercised its discretion for the purpose for which it was conferred"), suggesting that ends the analysis.  (Cert. Reply at 2 (emphasis added)).

The plaintiffs are wrong.  Under English law, a contractual power must "be exercised honestly and in good faith, but having regard to the provisions of the contract by which it must

---

[6] As explained in Section II(E), the claim is preempted.

be conferred, it must not be exercised arbitrarily, capriciously, or unreasonably." *Socimer v. Int'l Bank Ltd. (in liquidation) v. Standard Bank London Ltd.* [2008] Bus. L.R. 1304; *see also* Crane Reply Rep. ¶ 31 (quoting *Abu Dhabi Nat'l Tanker Co. v. Product Star Shipping Ltd (No 2)* [1993] 1 Lloyd's Rep 397) ("the authorities show that not only must the discretion be exercised honestly and in good faith, but having regard to the provisions of the contract by which it was conferred, it must not be exercised arbitrarily, capriciously or unreasonably").

This English law test of good faith is not three independent inquiries (as the plaintiffs assert)[7] but rather an integrated analysis. English law does not permit a Court to isolate the dependent clause "but having regard to the provisions of the contract by which it must be conferred," determine that purpose in a vacuum, and impose liability based solely on that piece of the analysis. Quite the contrary, upon determining the purpose (which, here, was to offset or defray BA's fuel costs), the Court uses the purpose to determine whether BA acted arbitrarily, capriciously or unreasonably *in light of (or having regard to)* that purpose. Under English law, one cannot concede that BA acted honestly, in good faith and reasonably in setting the fuel surcharge and simultaneously maintain that it was not applied for a proper purpose.

The fact the plaintiffs have misinterpreted English law is confirmed by *Socimer* and the other English law cases cited by both experts, which clearly hold that the "purpose of the power" inquiry is used to determine whether a party acted arbitrarily, capriciously, or unreasonably and is not a seperable or severable prong. *Socimer* at 1304. Indeed, neither English law expert cites a

---

[7] The plaintiffs have argued that BA did not exercise its power for the purpose for which it was conferred because "the [fuel surcharge] was *not* primarily used to recover fuel costs, but rather was a revenue enhancement mechanism." (Opp. to Kokonis Daubert at 6). For all of the reasons set forth in BA's Daubert motions, this Court should exclude Mr. Kokonis' opinion and not consider it or the opinion of Dr. Arnold. (*See generally* Mot. to Exclude Testimony of Jonathan Arnold, dated Oct. 1, 2015; Mot. to Exclude Testimony of Robert Kokonis, dated Oct. 1, 2015). In any event, such an argument is contrary to the undisputed evidence as well as preposterous – the plaintiffs' expert concedes that "from a revenue standpoint," there is no way to offset incurred fuel costs other than by generating revenue. (Kokonis, 124:21-125:5).

20

case that separates out "the purpose for which it is conferred" phrase and holds that a party exceeded its contractual discretion based solely on such an analysis.  Instead, as explained by Mr. Crane, "the sole question is whether BA acted honestly and in good faith in setting the criteria and whether they were factors which could rationally be taken into account having regard to the purpose of the fuel surcharge."  (Ex. 1, Crane Rep. ¶ 56).

"Unreasonableness" under English law is very different from the U.S. concept; under English law, "unreasonableness … indicate[s] a decision **to which no reasonable person could have come** had he or she had regard only to considerations consistent with the purpose for which the discretion had been conferred." (Ex. 1, Crane Rep. ¶ 35 (emphasis added)). The plaintiffs' English law expert, Andrew Sutcliffe, "agree[s] with Mr. Crane that a private individual behaves unreasonably (and thus in breach of contract) when he takes '**a decision to which no reasonable person could have come** had he or she had regard only to considerations consistent with the purpose for which [contractual] discretion has been conferred.'" (Ex. 35, Sutcliffe Reply Report ¶ 43 (emphasis added)).  Rationality (or reasonableness) requires a showing "that there should be some logical connection between the evidence and the ostensible reasons for the decision, and (which will usually amount to the same thing) an absence of arbitrariness, of capriciousness or of reasoning so outrageous in its defiance of logic as to be perverse."  *Hayes v. Willoughby* [2013] 1 WLR 935. In exercising its discretion, BA was entitled to act in its own commercial interests. (Ex. 1, Crane Rep. ¶ 88; *see also* Ex. 35, Sutcliffe Reply Rep. ¶ 36(c)).

As such, if BA acted honestly, rationally and in good faith in exercising a contractual power, it necessarily had to act in light of the purpose for which the power was granted.  Since the plaintiffs concede that BA acted honestly, rationally and in good faith (Cert Reply at 2, 15),

they have necessarily conceded that BA exercised its discretion "having regard to the purpose of the power" and their claim must be dismissed.  (*See* Ex. 1, Crane Rep. ¶ 41).

> **2.      The Undisputed Evidence Demonstrates that BA's Actions Conformed to the Purpose of the Fuel Surcharge: Defraying Fuel Costs.**

Even if the question whether BA exercised its contractual power "for the purpose for which it was conferred" were a severable inquiry (which it is not), the purpose of the fuel surcharge was to defray fuel costs and the undisputed evidence demonstrates that is precisely the purpose for which BA used the fuel surcharge.  (MTD Order at 9; *see* Ex. 75, Chart of Testimony; Ex. 1, Crane Rep. ¶ 10(vi) (a "fuel surcharge [is] a charge imposed by BA to enable it to recoup at least a proportion of its increased fuel costs"; ¶ 52 (the "purpose of the fuel surcharge was to enable BA to recover, or partially recover, its increased costs of fuel"); Sutcliffe 60:24-61:19 (admitting that he did not have an understanding of BA's purpose in imposing the fuel surcharge when writing his first or second reports). It is undisputed that:

- BA instituted the fuel surcharge in May of 2004 to help it recover a portion of its rising fuel costs (*see, e.g.*, Foran 19:12-20:2);

- BA announced that the fuel surcharge had been "introduced as a result of the continuing rise in oil prices" (Ex. 22, BA00123621);

- BA imposed a £2.50 per sector fuel surcharge that was expected to recover £50 million of the £150 million (or one-third) fuel increase for the year (Ex. 20, BA00123572; Ex. 19, BA's 2004 Annual Report, BA00003639); and

- BA did not expect the fuel surcharge to recoup all of its fuel costs. (Ex. 20, BA00123572; *see also* Ex. 1, Crane ¶ 52).

Afterwards, BA changed global fuel surcharge levels when it felt it was "██████████████ ████████████████████████████████████████████████████████."[8]  (Ex. 18,

---

[8]  "There was no obligation on BA to confine application of the fuel surcharge to sudden and unexpected fluctuations in the price of oil or aviation fuel or to ensure that there was a direct correlation between the level of fuel surcharge at any given time and the contemporary price of oil or jet fuel."  (Ex. 1, Crane Rep., ¶ 10(viii); ¶ 59

Foran Decl. ¶ 30).  The contemporaneous documentation demonstrates that, for every one of the fifteen global fuel surcharge changes made during the putative class period, BA considered its fuel costs and attempted to defray a portion of its fuel costs.  (*See* Section II(C)).

Mr. Crane reviewed the record evidence regarding "how the fuel surcharge was set and the factors" BA considered.  (Ex. 1, Crane Rep. ¶ 51). The factors that Mr. Crane reviewed, and which were appropriately considered under English law, include: BA's hedging position, the cost of fuel, currency exchange rates, and the competitive position in the aviation market.  (*Id.* ¶¶ 51-59). Mr. Crane concludes, as a matter of English law, that:

> the factors to which BA had regard in setting or adjusting the fuel surcharge were … matters which could rationally be taken into account in setting a surcharge of this nature.  Having regard to such matters does not indicate perverse, capricious or arbitrary conduct and is consistent with the purpose for which the fuel surcharge was applied.

(Ex. 1, Crane Rep. ¶ 58; see also ¶ 51 ("[T]he factors to which BA's witnesses claim to have had regard in setting the fuel surcharge are all factors which could rationally be taken into account in setting a fuel surcharge applied for the purpose of defraying increasing fuel costs.")).

**E.    The ADA Preempts The Plaintiffs' Claim.**

The ADA, 49 U.S.C. § 41713 preempts the plaintiffs' claim.  The ADA provides, in pertinent part, that "a State … may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route or service of an air carrier."  49 U.S.C. § 41713.  Since this Court's ruling on BA's motion to dismiss, the Supreme Court held that a breach of a state law's implied covenant of good faith and fair dealing "is pre-empted if it seeks

---

("Mr. Sutcliffe's contention that application of the fuel surcharge was confined to unexpected and sudden changes to the price of fuel made by third parties in my opinion involves placing an unjustified gloss on the contractual power in question and is not a limitation warranted by recourse to obligations of honesty and good faith.").

23

to enlarge the contractual obligations that the parties voluntarily adopt."[9]  *Northwest, Inc. v. Ginsberg,* 134 S.Ct. 1422, 1426 (2014).  "When the law of a State does not authorize parties to free themselves from the covenant, a breach of covenant claim is pre-empted under the reasoning of *Wolens* [513 U.S. 219 (1995)]."  *Id.* at 1432.

BA's fuel surcharge – a component of its price to the customer – undeniably relates to its prices, which the plaintiffs apparently concede. (*See, e.g.*, Class Cert. Rep. 3 (BA "used the fuel surcharge as a substitute for its airfare"); Ex. 79, Arnold Rep. ¶ 9 (fuel surcharges "an element of the total price that BA charged its customers"); Ex. 80, Arnold Supp. Rep. ¶ 3 (same)).

"Even where a federal law contains an express preemption clause, the court still may be required to consider implied preemption." *See, e.g.*, *New York SMA Ltd. v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010); *Giannopoulos v. Iberia Lineas de Espana, S.A.*, 17 F. Supp. 3d 743, 750 n.5 (N.D. Ill. 2014) (finding implied preemption under the ADA).  Implied preemption occurs when federal law so thoroughly occupies the field as reasonably to infer that Congress left no room for it to be supplemented.  *Giannopoulos*, 17 F. Supp. 3d at 750.

Here, "there can be no question that 'the federal regulatory scheme is so pervasive … that it may be inferred that Congress intended to occupy the entire legislative field,'…the federal regulatory scheme here is not merely pervasive but preempts *all* state and local regulation."  *Id.* at 751.  The DOT retains unfettered authority "to prohibit unfair or deceptive trade practice[s] … in air transportation or the sale of air transportation."  49 U.S.C. § 41712.  Where the regulator occupies the field, any attempt to impose a different standard must be impliedly preempted.  *See Lyn-Lea Travel Corp. v. Am. Airlines,* 1999 WL 777716 (N.D. Tex. Sept. 29, 1999).

---

[9] As this Court will recall, the Court rejected BA's preemption argument during the motion to dismiss phase based on the plaintiffs' contention that they "rely on explicit contractual terms and do not invoke any common law implied covenant of good faith or fair dealing."  (MTD Order at 8 n. 5).  No more.  To prevail on their claim, the plaintiffs must prove a breach of the covenant of good faith and fair dealing and are seeking to impose upon BA contractual terms to which it never agreed and which do not exist.

Specifically, the DOT has issued extensive regulations and guidance to airlines regarding airline pricing and disclosure – including fuel surcharges  (*See, e.g.*, Ex. 88, *Additional Guidance on Airfare/Air Tour Price Advertisements*, February 21, 2012).   In addition, "Congress has specifically authorized the DOT to investigate complaints relating to frequent flyer programs … and the DOT regularly entertains and acts on such complaints." *Ginsberg*, 134 S.Ct. at 1433 (citing FAA Modernization and Reform Act of 2012, sec. 408(6), 126 Stat. 87).   In fact, the DOT has already addressed and rejected a complaint against BA based on allegations similar to those raised here. *Edelman v. British Airways Plc*, OST 2013-0025. There, Mr. Edelman asserted that BA's fuel surcharges "appear[ed] to exceed the carrier's actual cost of fuel."  (Ex. 87, Edelman DOT Consent Order at 2).  The DOT, after briefing and the submission of evidence, rejected Mr. Edelman's claim; it concluded that "the evidence d[id] not support a finding that [BA] … misrepresent[ed] its actual fuel costs."  (*Id.* at 5).  Thus, it is clear that the DOT has occupied the field of airline pricing, disclosure and frequent flyer programs.

In *Giannopoulos*, the Court held that the ADA impliedly preempted a claim for delay compensation under a European regulation for "flight itineraries that began or ended" in the U.S. 17 F. Supp. 3d at 752.  The Court found that "Congress expressly intended for the ADA to apply to 'foreign air carriers' and flights that travel between the U.S. and a foreign country" and that the ADA and the European regulation "overlap[ped] in both substance and territorial application."  *Id.*  The Court also explained that since the European regulation only applied to European carriers' U.S. flights, the claims should be preempted because such discrimination "is contrary to the ADA's goals, and creates a regulatory environment analogous to the patchwork regulation that preemption doctrine is intended to avoid."  *Id.*

So too here.  Here, as in *Giannopoulous*, the plaintiffs' claims are preempted since (1) their flights began in the U.S., (2) the ADA and the implied covenant of good faith under English law both regulate BA's imposition of a fuel surcharge and thus overlap in substance and (3) they overlap in territorial application.

Finally, under *Ginsberg*, if the plaintiffs brought their claims for good faith and fair dealing under the CoC, and thus under U.S. state law, they would be pre-empted.  134 S.Ct. at 1432.  It would be fundamentally unfair to allow the plaintiffs to pretend that the CoC does not apply here to avoid that result.  Moreover, permitting claims for breaches of good faith and fair dealing against foreign carriers only, while preempting them for domestic carriers, would be discriminatory and create differing requirements for airlines based on their nationality.  The implied covenant of good faith and fair dealing claim is preempted by the ADA.

## III.    THE PLAINTIFFS LACK STANDING.

The plaintiffs lack standing because they have not demonstrated they were injured.  "[T]o meet the constitutional requirements for standing, 'the plaintiff must still allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants.'"  *Ehrich v. Credit Prot. Ass'n, L.P.*, 891 F. Supp. 2d 414, 416 (E.D.N.Y. 2012).  "To demonstrate injury in fact, the plaintiff must show that he has suffered a harm that is 'concrete' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 415.  "In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal citations omitted). "It is axiomatic that a putative class representative must be able to individually state a claim against defendants, even though he

or she purports to act on behalf of a class." *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 147 (S.D.N.Y. 2010) (internal citations omitted).

"There can be no serious dispute that a purchaser of a product who receives the benefit of his bargain has not suffered Article III injury-in-fact." *Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962, 972 (C.D. Ca. 2014); *see also Ross v. Albany Med. Ctr.*, 104 F.3d 351 (2d Cir. 1996) (unpublished) (affirming dismissal of claim for lack of standing because the plaintiff had not been overcharged and thus his "injury [w]as hypothetical"); *Treiber v. Aspen Dental Mgmt.*, 94 F. Supp. 3d 352, 363 (N.D.N.Y. 2015) (dismissing claim for lack of standing); *Pagan v. Abbott Labs., Inc.*, 287 F.R.D. 139, 149 (E.D.N.Y. 2012). In *Pagan*, for example, the Court held that the plaintiffs had not demonstrated injury "merely" by purchasing infant formula. They needed to offer evidence that the formula "actually contained beetle parts"; otherwise, they "received exactly what they paid to receive" and were not injured. 287 F.R.D. at 149. In *Garofalo v. Empire Blue Cross and Blue Shield*, the Court granted summary judgment on the defendant's breach of contract claim for an alleged overcharge of hospital charges because the evidence demonstrated that they were not overcharged. 67 F. Supp. 2d 343, 346-47 (S.D.N.Y. 1999).

The same result follows here. The fact that the plaintiffs paid a fuel surcharge is insufficient to establish injury because it is undisputed that BA can impose a fuel surcharge. (Ex. 35, Sutcliffe Reply Rep. ¶8(b); Sutcliffe 94:5-8; 95:2-5). They have not offered any evidence demonstrating that the amount of fuel surcharge paid exceeded by some specific amount that which they claim would have been permissible. The plaintiffs' claim must be dismissed.

## IV.   THE STATUTE OF LIMITATIONS BARS MR. DOVER'S CLAIM FOR PRE-NOVEMBER 2010 REWARD TRAVEL.

Mr. Dover's breach of contract claim for Reward Travel that took place more than two

years before the filing of the complaint must be dismissed as barred by the statute of limitations. The EC Contract states that "Rewards for travel on British Airways flights are subject to the [CoC]" and further provides "the limitations and exclusions of liability referred to in the [CoC] will apply in relation to travel on the Services of British Airways including Reward travel." (Ex. 7, EC Contract § 13.1, 27.3; Ex. 1, Crane Rep. ¶¶ 70-71). It is undisputed that the EC Contract incorporates the CoC. (*See, e.g.*, Ex. 3, Dover RFA No. 30; Ex. 1, Crane Rep. ¶ 12).[10]

The CoC explicitly states that "[a]ctions for damages must be brought within two years." (Ex. 8, CoC § 17; Ex. 1, Crane Rep. ¶ 62). The fact that the plaintiffs purposefully attempt to avoid the statute of limitations by asserting that they are bringing a claim under the EC Contract only (*see, e.g.*, Cert. Reply at 18), does not erase its legal effect as it was explicitly incorporated into the EC Contract and unequivocally applies to Reward Travel. (Ex. 1, Crane Rep. ¶¶ 60-71 ("An EC member enjoys the same rights against BA in relation to a Reward Flight as that same EC member, or any other passenger, enjoys in relation to any other flight")).

English law enforces such contractual provisions provided that the clause satisfies the "statutory requirement of reasonableness" in the Unfair Contracts Terms Act 1977 ("UCTA"). (Ex. 1, Crane Rep. ¶¶ 72, 74). UCTA provides "guidelines" to consider, including: (1) "the strength of the bargaining positions of the parties to each other"; (2) "whether the customer received an inducement to agree to the term"; (3) "whether the customer knew or ought reasonably to have known of the existence and the extent of the term"; and (4) "whether it was reasonable at the time of the contract to expect that compliance with that condition would be practicable." (Ex. 1, Crane Rep. ¶ 77 (quoting UCTA, Schedule 2)). A form contract does not

---

[10]   Courts routinely deny claims that are barred by a limitation period from an incorporated contract. *See, e.g.*, *Kearins v. Panalpina, Inc.*, 570 Fed. Appx. 9, 10-11 (2d Cir. 2014) (affirming grant of summary judgment based on incorporated limitations period; "Under New York law, a person who signs an agreement is conclusively bound by … the terms of a document clearly incorporated by reference into the signed agreement.").

preclude a finding of reasonableness.  (*See id.*).

 Here, it is fair for the two year statute of limitations to apply to Mr. Dover:

- Mr. Dover is a frequent flyer, who joined the EC in March of 1996 and achieved BA's highest status after flying multiple times a week on BA for several years.  (Ex. 3, Dover RFA Nos. 1-2 at 4-5; Dover 115:15-116:9; 117:19-121:20; 128:7-145:17).  In addition to the EC, he is a member of the frequent flyer programs of United Airlines and Alaska Airlines.  (Ex. 82, Dover. Int. Resp. No. 7 at 9).

- The EC is free to join and enabled Mr. Dover to accumulate Avios towards the purchase of future airfare or other items.  (Ex. 3, Dover RFA No. 1; *see also* Ex. 1, Crane Rep. ¶ 77).

- During the putative class period alone, Mr. Dover flew eight times on BA.  (Ex. 83, Def's Ex. 35).  He continued to fly with BA after he filed suit in this action.  (Ex. 3, Dover RFA No. 38 at 14-15). When he purchased his flights, BA notified Mr. Dover that the CoC was applicable and sent him a link to the CoC, which he easily could have clicked to review the CoC.  (Ex. 3, Dover RFA No. 40 at 15, Nos. 41-42 at 11).

- Mr. Dover regularly visits and posts on blogs for frequent flyers.  (Dover 113:18-114:12; 182:2-22; 238:11-239:9; 264:10-19; Ex. 84, Dover Depo. Ex. 34; Ex. 85, Dover Depo. Ex. 45; Ex. 86, Dover Depo. Ex. 49).

- As a seasoned traveler, it is reasonable to expect him to be familiar with the fact that "two year limitation periods are the norm in claims against airlines."  (Ex. 1, Crane Rep. ¶ 77).

- Finally, there is no reason to believe that Mr. Dover would have been unable to bring a claim within the two-year statute of limitations.  (*See id.*).

As a result, Mr. Dover's claim based on the fuel surcharge he paid on November 25, 2008 (Ex. 14, BA-PLTF-007307; Dover 456:18-459:21) is barred by the statute of limitations.

## V. THE VOLUNTARY PAYMENT DOCTRINE BARS MR. DOVER'S CLAIMS.

 "The voluntary payment doctrine precludes a plaintiff from recovering payments 'made with full knowledge of the facts' and with a lack of diligence in determining his contractual rights and obligations." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 72 (2d Cir. 2009) (quoting *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 292 A.D.2d 25, 27 (2d Dep't 2002)). This defense is available to BA under state law by operation of the CoC – a contract BA made with Mr. Dover when he bought Reward Travel and paid the fuel surcharge – which does not

contain a choice-of-law provision, and the choice of law provision in the EC Contract "would not affect the governing law of the [CoC]."  (Ex. 36, May Sutcliffe Rep. ¶ 13 n.6).

A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits.  *Biglio v. Coca-Cola Co.*, 675 F.3d 163, 169 (2d Cir. 2012).  In New York, "[t]he first step … is to determine whether there is an actual conflict between the laws of the jurisdictions involved."  *Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012).  A conflict exists here because no expert has opined that the voluntary payment doctrine exists under English law, but it does in California, where Mr. Dover resides. (Dover 9:7-9).  *See, e.g. Am. Oil Serv. v. Hope Oil. Co.*, 194 Cal. App. 2d 581, 586 (2d Dist. Ca. 1961) ("[A] payment voluntarily made with knowledge of the facts affords no ground for an action to recover it back.").

In determining which law applies – and, thus, what defenses are available – New York courts apply the "center of gravity" or "grouping of contacts" approach.  *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997).  Under this approach, the places of contracting and performance "are given the heaviest weight in this analysis."  *Id.*  Given that Mr. Dover purchased Reward Travel in California, agreed to the CoC in California, and partially performed in California by boarding the flight there, California's laws apply.

Mr. Dover is a seasoned traveler who paid the fuel surcharge repeatedly since its inception with full knowledge and without objection.  (Dover 115:11-123:9, 127:145:23; 166:15-168:6, 172:10-23).  During the putative class period alone, he flew on BA eight times and paid a fuel surcharge each time.  (*See* Ex. 83).  After purchasing the flight he referenced in the Complaint, he booked another seat for his daughter on the same flight.  (Dover 215:21-216:18; AC ¶ 19).  Mr. Dover's claim for breach of contract must be dismissed.

## <u>CONCLUSION</u>

For all of the foregoing reasons, BA respectfully submits that the Court should grant its motion for summary judgment in its entirety.

Dated: New York, New York
      December 17, 2015

/s/ Keara M. Gordon
Keara M. Gordon
Richard F. Hans
Colleen M. Carey
Timothy H. Birnbaum
**DLA Piper LLP (US)**
1251 Avenue of the Americas
New York, New York  10020
Tel:  (212) 335-4618
Fax:  (917) 778-8618

*Attorneys for Defendant British Airways PLC*