**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RUSSELL DOVER, HENRY HORSEY, CODY RANK, and SUZETTE PERRY, on behalf of themselves and all others similarly situated, | Case No. 1:12-cv-5567 |
| Plaintiffs | Judge: Raymond J. Dearie |
| -vs.- | Magistrate Judge:  Marilyn D. Go |
| BRITISH AIRWAYS, PLC (UK), | |
| Defendant. | |

**PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY
AND OPPOSITION TO BRITISH AIRWAYS' MOTION FOR SUMMARY JUDGMENT**

David S. Stellings
Nicholas Diamand
Jason L. Lichtman
Douglas I. Cuthbertson
**LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY  10013-1413
212.355.9500

Clive Zietman
Fiona Stewart
Daniel Loblowitz
**STEWARTS LAW, LLP**
5 New Street Square
London, UK EC4A 3BF
+44 (0)20.7822.8000

*Counsel for Plaintiffs*

*Additional Counsel Listed on Signature Page*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION AND SUMMARY OF THE ARGUMENT ........................... 1

II.    THE CONTRACT BETWEEN THE PARTIES IS INTERPRETED
UNDER ENGLISH LAW.................................................................................. 3

    A.    Under English law, a party is in breach of contract when it acts
outside the bounds of a contract's objective meaning. ............................. 4

    B.    This case does not involve a claim for breach of the duty of good
faith and fair dealing. .............................................................................. 4

III.   RELEVANT UNDISPUTED FACTS ................................................................ 5

    A.    BA contends that it set the YQ Charge based on the cost of fuel at
an undisclosed time in the past (2003-2004). ........................................... 6

    B.    The YQ Charge was simply part of the total price of a plane ticket.......... 6

        1.    BA frequently changed the YQ Charge for reasons that had
nothing to do with the price or cost of fuel.................................... 7

        2.    The YQ Charge was not meaningfully related to the cost of
fuel. ......................................................................................... 8

            a.    Dr. Jonathan Arnold has used BA's data to
demonstrate that the YQ Charge cannot be
considered a fuel surcharge............................................... 8

            b.    BA's flawed statistical analysis fails to show any
meaningful correlation between fuel prices and
BA's YQ Charges. ............................................................. 9

        3.    The YQ Charge could exceed BA's fuel costs. ........................... 10

        4.    The YQ Charge often exceeded BA's airfares. ........................... 10

        5.    BA could (and did) assess two YQ Charges for the same
seat. ......................................................................................... 11

IV.   PLAINTIFFS ASK THIS COURT TO GRANT SUMMARY
JUDGMENT IN THEIR FAVOR WITH RESPECT TO LIABILITY............... 11

    A.    Plaintiffs ask this Court to hold that BA breached its contract with
Plaintiffs because a "fuel surcharge" has only a single, reasonable
meaning.................................................................................................. 11

        1.    A fuel surcharge is a charge in addition to the regular price
of a ticket, not part of the regular price of a ticket...................... 12

        2.    BA's alternative definition of "fuel surcharge" is not
reasonable. ............................................................................... 13

# TABLE OF CONTENTS
## (continued)

Page

B.  Plaintiffs ask the Court to grant partial summary judgment with respect to BA's affirmative defenses. ....................................... 14

    1.  The Airline Deregulation Act does not preempt Plaintiffs' claims. ........................................................................ 14

    2.  The voluntary payment doctrine does not apply to this litigation. ...................................................................... 15

        a.  English law does not recognize the voluntary payment doctrine. ........................................... 16

        b.  Summary judgment should be granted against BA even if the voluntary payment doctrine applies. .............. 17

    3.  BA's affirmative defense based on the statute of limitations fails as a matter of law. ................................................ 17

    4.  BA's "affirmative defenses" that are not affirmative defenses fail as a matter of law. .................................................. 18

    5.  BA cannot produce admissible evidence to support its "catch-all" affirmative defenses. ................................................ 20

C.  Plaintiffs respectfully ask this Court to defer ruling on their motion for partial summary judgment until after ruling on class certification. ............................................................. 21

V.  BA'S MOTION FOR SUMMARY JUDGMENT IS WITHOUT MERIT. ........ 21

A.  BA does not meaningfully attempt to meet the governing legal standard, and instead focuses its motion on the duty of good faith and fair dealing, which is not at issue in this case. ................................. 22

    1.  BA's contention that it assessed a "fuel surcharge" is circular. ........................................................................ 22

    2.  The unsurprising fact that BA hired an English law expert who would rule in BA's favor does not compel summary judgment for BA. ...................................................... 23

B.  A reasonable jury could find that BA's YQ Charge was not based on or related to the cost of fuel even if that jury accepted BA's definition of a "fuel surcharge." ............................................. 24

C.  BA's tertiary arguments fail. ............................................... 25

    1.  The law of the case doctrine does not support BA. .................... 25

    2.  BA's standing argument is frivolous. ......................................... 25

**TABLE OF CONTENTS**
**(continued)**

Page

CONCLUSION ............................................................................................................... 27

CERTIFICATE OF SERVICE ...................................................................................... 28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abu Dhabi Nat'l Tanker Co v Prod. Star Shipping Ltd (No 2)* [1993],
   1 Lloyd's Rep 397, 404.............................................................................................. 5

*Am. Airlines v. Wolens,*
   513 U.S. 219 (1995)............................................................................................. 14, 15

*Aretakis v. Fed. Express Corp.,*
   No. 10 CIV. 1696, 2011 WL 1226278 (S.D.N.Y. Feb. 28, 2011) *adopted*, No. 10 CIV. 1696,
   2011 WL 1197596 (S.D.N.Y. Mar. 25, 2011) ...................................................... 15

*Arrowood Indem. Co. v. King,*
   699 F.3d 735 (2d Cir. 2012) ................................................................................. 13

*Cacchillo v. Insmed, Inc.,*
   638 F.3d 401 (2d Cir. 2011) ............................................................................. 26, 27

*Chukwu v. Bd. of Dirs. of Varig Airline,*
   880 F. Supp. 891 (D. Mass. 1995)......................................................................... 14

*Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC,*
   724 F. Supp. 2d 398 (S.D.N.Y. 2010) *aff'd,* 482 F. App'x 662 (2d Cir. 2012)...................... 11

*Devilla v. Schriver,*
   245 F.3d 192 (2d Cir. 2001) ................................................................................. 25

*Dorsett-Felicelli, Inc. v. Cty. of Clinton,*
   No. 1:04-cv-1141, 2013 WL 3897578 (N.D.N.Y. July 29, 2013)........................... 25

*Fed. Trade Comm'n v. Navestad,*
   No. 09-cv-6329, 2011 WL 939384 (W.D.N.Y. Mar. 14, 2011) ............................ 18

*Garcia v. Pinelo,*
   808 F.3d 1158 (7th Cir. 2015) ........................................................................... 3, 24

*Giannopoulos v. Iberia Lineas Aereas de Espana, S.A.,*
   17 F. Supp. 3d 743 (N.D. Ill. 2014) ..................................................................... 15

*Grasson v. Bd. of Educ. of Town of Orange,*
   24 F. Supp. 3d 136 (D. Conn. 2014)..................................................................... 22

*In re Cablevision Consumer Litig.,*
   No. 10-cv-4992, 2014 WL 1330546 (E.D.N.Y. Mar. 31, 2014) ................................ 15, 17, 21

*Kruger v. Virgin Atl. Airways, Ltd.,*
   976 F. Supp. 2d 290 (E.D.N.Y. 2013) .................................................................. 14

*Levy v. Delta Airlines,*
   2004 U.S. Dist. LEXIS 19894 (S.D.N.Y. Sept. 30, 2004)..................................... 15

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Medline Indus. Inc. v. Maersk Med. Ltd.*,
   230 F. Supp. 2d 857 (N.D. Ill. 2002) ........................................................ 5

*Musson Theatrical v. Fed. Express Corp.*,
   89 F.3d 1244 (6th Cir. 1996) ................................................................... 15

*Nat'l Oil Well Maint. Co. v. Fortune Oil & Gas, Inc.*,
   No. 02-cv-7666, 2004 WL 1886293 (S.D.N.Y. Aug. 24, 2004) ............... 3

*Northwest v. Ginsberg*,
   134 S. Ct. 1422 (2014) ............................................................................. 5

*ProCD, Inc. v. Zeidenberg*,
   86 F.3d 1447 (7th Cir. 1996) ................................................................... 14

*Saks v. Franklin Covey Co.*,
   316 F.3d 337 (2d Cir., 2003) ................................................................... 19

*Sexton v. Am. Golf Corp.*,
   No. 13-cv-873, 2015 WL 5884825 (E.D.N.Y. Oct. 8, 2015) ................... 11

*Spagnola v. Chubb Corp.*,
   574 F.3d 64 (2d Cir. 2009) ...................................................................... 17

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
   554 U.S. 269 (2008) ................................................................................ 26

*Vormittag v. Unity Elec. Co.*,
   No. 12-cv-4116, 2014 WL 4273303 (E.D.N.Y. Aug. 28, 2014) ............... 11

**Rules**

Fed. R. Civ. P. 44.1 .......................................................................................... 3

Fed. R. Civ. P. 56(a) ........................................................................................ 11

Fed. R. Civ. P. 56(c)(1)(B) .............................................................................. 20

## I.   <u>INTRODUCTION AND SUMMARY OF THE ARGUMENT</u>

British Airways' motion for summary judgment has very little to do with the case that Plaintiffs filed and even less to do with governing law.  BA spills pages of ink discussing the duty of good faith and fair dealing, but Plaintiffs did not file a lawsuit for breach of the duty of good faith and fair dealing.  BA raises something called the "voluntary payment doctrine," but English law, which governs this case, does not recognize it.  And BA (again) asserts that the Airline Deregulation Act preempts Plaintiffs' claims, but the primary case it cites for that proposition holds exactly the opposite.  The Court should dismiss such arguments summarily.

Plaintiffs, moreover, respectfully ask the Court to go further than simply denying BA's motion for summary judgment.  They ask the Court to grant partial summary judgment in their favor on the issue of liability, leaving only damages to be determined by a jury at trial.

\*        \*        \*

Plaintiffs entered into a contract to join BA's frequent flier program.  Under the contract, Plaintiffs earned miles that they could use to buy "free" plane tickets on BA flights.  Miles covered the regular ticket price (the "airfare"), but the contract also required Plaintiffs to pay any fuel surcharge.  That phrase is not defined by the contract, although this Court has held that the "plain meaning of the term 'fuel surcharge' is a supplemental charge that is reasonably related to or based upon the cost or price of fuel."  (Dkt. 52 at 9.)

Plaintiffs respectfully submit that the contract thus imposed two interrelated requirements.  First, the charge must be "supplemental."  In other words, a reasonable person reading the contract would expect BA's standard operating costs (paying staff, buying airplanes, purchasing fuel, etc.) to be included in its regular ticket price.  And they would therefore expect a "fuel surcharge" to be an additional charge above and beyond BA's regular fuel costs.  This

expectation is consistent with how one of BA's own testifying experts defined a surcharge: "a charge in addition to the regular price."  Ex. 1 (8/28/15 Sherman Rep.) ¶ 28.

Second, the charge must be "reasonably related to or based upon" the cost of fuel.  A surcharge that has a *reasonable* relationship with the cost of fuel is related to the recent cost of fuel.  Indeed, this is the definition of "fuel surcharge" that BA posted on its website for the majority of the class period:  "a charge based on the fluctuating price of worldwide oil."  Ex. 2 (RFA Resp.) at 6.

The charge BA assessed was not "supplemental," and it was not "reasonably related" to the cost of fuel.  BA instead used its "fuel surcharge" in an effort to recover as much of its *total* fuel bill as possible (instead of using it to protect itself from fluctuations in fuel pricing).  This resulted in a wildly improper "fuel surcharge" that vastly exceeded BA's regular fuel costs and even exceeded BA's *total* fuel costs on certain routes.  And this was not just a problem on certain routes.  BA charged its customers $█████████ in "fuel surcharges" in 2009.  But its fuel costs that year had *dropped* by $█████████  *See* Ex. 3 (7/15/15 Arnold Rep.) ¶¶ 31-32 & Fig. 5.

Confronted with this litigation, BA now contends that such a "fuel surcharge" was permissible because its annual fuel surcharges never exceeded the difference between BA's cost of fuel in 2003-2004 and the present year.  For example, assume BA paid $1 billion for fuel in 2003 and $2.5 billion in 2011.  BA now asserts that any "fuel surcharge" was contractually permissible so long as it did not collect more than $1.5 billion in total.  In other words, BA argues that it was allowed to charge a passenger flying between New York and London in 2011 a $1200 "fuel surcharge" even if BA's actual fuel cost for that passenger on that flight was $800 (so long as BA's total worldwide income from the "fuel surcharge" did not exceed the difference between its 2011 fuel costs and its 2003 fuel costs).  This contention strains credulity—even

BA's CEO admits there is no logic to it—when asked about the purported 2003-2004 baseline, he responded "Why not 1992?  Why not 1962?"  Ex. 4 (3/13/15 Williams Dep.) at 35:21.

To be sure, BA *did* consider complying with the contract and including its regular cost of fuel in the airfare.  But BA abandoned its plan after realizing that doing the right thing would have cost BA tens of millions of dollars a year in revenue from class members who pay for their airfares with miles, but pay cash for fuel surcharges.  Ex. 5 (9/5/08 e-mail) at BA00123694.

Plaintiffs respectfully ask the Court to reject BA's unreasonable contractual interpretation as a matter of law and grant partial summary judgment in Plaintiffs' favor, leaving only the issue of damages for jury trial.  In the alternative, Plaintiffs ask the Court to find that the meaning of the phrase "fuel surcharge" is susceptible to more than one reasonable interpretation, to deny BA's summary judgment motion, and to allow the jury to determine both liability and damages.

## II.   THE CONTRACT BETWEEN THE PARTIES IS INTERPRETED UNDER ENGLISH LAW.

This litigation involves a contract "governed by and construed in accordance with English law."  Ex. 6 (Contract) ¶ 30.1.  For this reason, the Court applies English substantive law and federal procedural law.  *See, e.g.*, *Nat'l Oil Well Maint. Co. v. Fortune Oil & Gas, Inc.*, No. 02-cv-7666 , 2004 WL 1886293, at *1 (S.D.N.Y. Aug. 24, 2004) (applying English substantive law and federal procedural law to a motion for summary judgment).

Both parties have offered testimony from barristers—Andrew Sutcliffe for Plaintiffs and Michael Crane for BA—to help the Court interpret English law.  *See* Fed. R. Civ. P. 44.1; *cf., e.g.*, *Garcia v. Pinelo*, 808 F.3d 1158, 1163 (7th Cir. 2015) (Wood, CJ.) (explaining that courts must still "research and analyze foreign law independently" (citation omitted)).  While Mr. Sutcliffe and Mr. Crane apply the law to the facts differently from each other, they ultimately agree on the key substantive legal principles that govern this case.

A.      **Under English law, a party is in breach of contract when it acts outside the bounds of a contract's objective meaning.**

To determine whether BA breached its contractual obligations, the "first step of any analysis is to determine the meaning of the phrase 'fuel surcharge.'"  Ex. 7 (7/15/15 Sutcliffe Rep.) ¶ 6(a); *see also* Ex. 8 (7/28/15 Crane Dep.) at 9:16-20 (same).  As BA's English law expert explained, the phrase "fuel surcharge" has an objective meaning.  *Id.* at 11:15-16 ("What the parties believed [fuel surcharge] meant is irrelevant to the question of construction.").  Thus, "while BA has discretion to impose and set a 'fuel surcharge,' BA does not have discretion to determine what the phrase 'fuel surcharge' means."  Ex. 7 (7/15/15 Sutcliffe Rep.) ¶ 26.

BA thus breached its contract if it imposed a "fuel surcharge" that did not comport with the objective meaning of the phrase "fuel surcharge."  *Id.* ¶ 6(b); *see also* Ex. 8 (7/28/15 Crane Dep.) at 9:20-10:11, 13:15-14:7.  For example, if the Court were to determine that the objective meaning of the phrase "fuel surcharge" is a charge that protects BA against fluctuations in its cost of fuel, and the trier of fact were to determine that BA assessed a charge to maximize its revenues, BA would be in breach of contract.  *See* Ex. 7 (7/15/15 Sutcliffe Rep.) ¶ 32.  In English law this is known as determining whether a party exercised its discretion "for the purpose for which it was conferred."  *Id.* ¶ 22; *see also* Ex. 8 (7/28/15 Crane Dep.) at 14:8-16:14.

While English law also recognizes other limitations on contractual discretion, the requirement that a party act within the bounds of a contract's objective meaning is "independent" of those other limitations.  Ex. 7 (7/15/15 Sutcliffe Rep.) ¶ 22; *see also* Ex. 8 (7/28/15 Crane Dep.) at 14:8-16:14.

B.      **This case does not involve a claim for breach of the duty of good faith and fair dealing.**

BA ignores the above legal standard.  (*See* Mot. at 19-21.)  In particular, BA seems to claim an English court must only consider "good faith" when evaluating a claim for breach of

contract.  (*See* Mot. at 19-22.)  But one of the cases cited by BA holds the opposite.  *See, e.g.*, *Abu Dhabi Nat'l Tanker Co v Prod. Star Shipping Ltd (No 2)* ("*The Product Star*") [1993], 1 Lloyd's Rep 397, 404 ("[N]ot only must the discretion be exercised honestly and in good faith, but having regard to the provisions of the contract by which it was conferred, it must not be exercised arbitrarily, capriciously or unreasonably.").  Indeed, until very recently, it was "well established that English case law does not recognize *any* general implied duty of good faith and fair dealing."  *Medline Indus. Inc. v. Maersk Med. Ltd.*, 230 F. Supp. 2d 857, 864 (N.D. Ill. 2002) (collecting cases) (emphasis added) (dismissing a claim for breach of the covenant of good faith and fair dealing because English law did not recognize such a claim).

Given BA's focus on good faith and fair dealing, it also bears emphasis that Plaintiffs did not bring a claim for breach of the duty of good faith and fair dealing.  (*See* Dkt. 131 Am. Compl. ¶¶ 36-45, 60-67, 74-76); *cf. Northwest v. Ginsberg*, 134 S. Ct. 1422, 1426 (2014) (holding that parties may only bring claims for breach of contract and that claims for breach of the duty of good faith and fair dealing are preempted).  But the absence of a good faith and fair dealing claim does not mean that BA acted in good faith.  To the contrary, BA did <u>not</u> act in good faith (or reasonably) because it imposed a "fuel surcharge" that was not a fuel surcharge.

## III.   <u>RELEVANT UNDISPUTED FACTS</u>

BA's industry expert concedes that BA used the "fuel surcharge" to attempt to "maximize system revenues" and that it was simply a component of BA's overall ticket price. Ex. 9 (9/4/15 Kasper Rep.) ¶¶ 51, 62; *see also* Ex. 10 (5/4/15 Kokonis Rep.) ¶ 7 ("While British Airways termed the [charges] in this case fuel surcharges,' these charges were primarily used for revenue maximization, not cost recovery.").  In part for this reason, Plaintiffs refer to BA's "fuel surcharge" as the "YQ Charge," which was BA's internal code for the charge.

## A.   BA contends that it set the YQ Charge based on the cost of fuel at an undisclosed time in the past (2003-2004).

BA now states that it based the YQ Charge on its total cost of fuel in 2003-2004.  *See* Ex. 11 (8/28/15 Sherman Rep.) ¶¶ 74-83.  BA, however, has never meaningfully defended its (purported) use of a 2003-2004 reference point.  To the contrary, two of BA's experts cite an academic paper that "concludes that an appropriate baseline price for a fuel surcharge is a recent period's price, not that from a period years in the past."  Ex. 3 (7/15/15 Arnold Rep.) ¶ 27 (describing the paper).  And even BA's CEO considered basing a "fuel surcharge" on the price of fuel in 2003-2004 to be entirely arbitrary.  *See* Ex. 4 (3/13/15 Williams Dep.) at 35:21 ("Why not 1992? Why not 1962?").

BA's contract *could* have defined a "fuel surcharge" as a charge not to exceed BA's total cost of fuel compared to its fuel cost in 2003, but BA chose not to do this.  Rather, BA took precisely the opposite tack and hid its actions:  it even went so far as to designate the 2003 baseline a "trade secret."  *See, e.g.*, Dkt. 207-18 (Lichtman Decl.) ¶ 8 ("BA designated any reference to the 2003 baseline as confidential information under the Protective Order.").  To that end, it bears emphasis that BA's new assertion that it disclosed the 2003-2004 baseline (Mot. at 8) is absolutely false.  The only document BA cites for this proposition is a 188-page investor presentation that discloses no such thing.  (*See* BA Ex. 34.)  The page of the presentation cited by BA simply discusses the total revenue that BA had generated since introducing its "fuel surcharge" in 2003.  (*Id*. at 47.)

## B.   The YQ Charge was simply part of the total price of a plane ticket.

BA's industry expert implicitly acknowledged that the YQ Charge was "simply an element of the total price BA charges . . . [and] not necessarily related to [fuel] costs."  Ex. 3 (7/15/15 Arnold Rep.) ¶¶ 14-15 (citing Ex. 9 (9/4/15 Kasper Rep.) ¶ 51).  As BA's 30b6 witness

put it:  the "fare and the surcharge are a method of constructing the total price."  Ex. 12 (2/26/15

Foran Dep.) at 43:7-9.  In other words, the YQ Charge was not a fuel surcharge at all.

> **1.    BA frequently changed the YQ Charge for reasons that had nothing to do with the price or cost of fuel.**

It is undisputed that BA would change the YQ Charge based on many considerations

other than changes in the cost of fuel.  *See* Ex. 13 (3/11/15 Tuensmeyer Dep.) at 48:19-24 ("[The

YQ Charge] really depends on the competition and our strategy.").  The former chairman of

BA's board even stated that "[t]he competitive landscape" was the "most important" factor in

determining the amount of the YQ Charge.  Ex. 14 (12/4/12 Broughton Ltr.) at BA00156278.[1]

Needless to say, *there was no direct link at all between the YQ Charge and BA's cost of fuel*:

> Q: So British Airways' costs of fuel go up GBP10 a barrel.  How much does the
> fuel surcharge rise?
>
> A: There's no answer to that question.  The two aren't directly linked.

Ex. 15 (2/13/15 Howick Dep.) at 32:12-16.

Perhaps the best example of the lack of a relationship between the YQ Charge and BA's

cost of fuel is the simple fact that consumers who flew identical routes could pay a different YQ

Charge depending solely on where they purchased the tickets.  Ex. 10 (5/4/15 Kokonis Rep.) ¶

22.  For example, customers in New York purchasing a roundtrip ticket to London paid 30%

more for the YQ Charge than customers who purchased the same tickets in London.  *Id.*  In other

words, passengers who on the same day purchased the same ticket, for the same flights, would

each pay a *different* YQ Charge (even though they "consumed" the exact same amount of fuel).

---

[1] A BA executive testified that he later edited the letter to say that no one factor was most
important.  Ex. 12 (2/26/15 Foran Dep.) at 258:5-259:6.  Notably, however, even that executive
did not edit the letter to say that fuel costs were more important than competition.  *See id.*

That is not a surcharge that reflects the fluctuating cost of fuel; it is a surcharge that reflects fluctuating sales and marketing practices.

Indeed, BA executives often changed YQ Charges after discussing only pricing and other competitive issues. *See Id.* ¶¶ 18-19 & Appx. D.[2]  In one set of representative documents, for example, BA "increased its YQ Charges when certain competitors increased their YQ Charges, immediately rescinded the increase due to the failure of another competitor to match BA's increase, and then reinstated the increase when that competitor ultimately decided to raise its YQ Charges." *Id.* ¶ 18; *cf.* Ex. 15 (2/13/15 Howick Dep.) at 13:12-15 ("[Fuel Surcharge Committee Meetings were] ad hoc.  Sometimes they were scheduled in advance.  It depended on the timeframe.  It varied.  There was no sort of single process across the time period.").

### 2. The YQ Charge was not meaningfully related to the cost of fuel.

#### a. Dr. Jonathan Arnold has used BA's data to demonstrate that the YQ Charge cannot be considered a fuel surcharge.

Plaintiffs' primary expert witness is Dr. Jonathan Arnold, former Chief Economist to the New York Attorney General who has taught economics at the University of Chicago School of Business.  *See* Ex. 16 (5/4/15 Arnold Rep.) ¶ 2 & Appx. 1.  He applied well-accepted economic methods to demonstrate that what BA called a fuel surcharge cannot be considered a fuel surcharge from an economic perspective.  Among other things, he demonstrated that BA's data shows:

- BA's YQ Charges frequently did not change in reaction to changes in jet fuel prices.  *See id.* ¶ 34 & Fig. 3.

---

[2] BA executives, moreover, provided no single, consistent definition of the YQ Charge.  *See* Ex. 10 (5/4/15 Kokonis Rep.) ¶¶ 23-25 & Appx. E.  These inconsistencies included varying accounts of which factors affected the YQ Charges, differing explanations of the charges themselves, changing explanations of authority over the charges, and varying statements contradicting that the YQ Charges were designed to recover fuel costs.  *See id.* ¶ 25 & Appx. E.

- BA's YQ Charges moved in the opposite direction of jet fuel prices or did not move at all when jet fuel prices changed 39 to 65 percent of the time.  *See id.* ¶ 35 & Fig. 4.

- BA's YQ Charges grew much more rapidly than fuel prices.  For example, from May 13, 2004 to July 17, 2008, BA's YQ Charge increased 3000% while BA's fuel costs increased a fraction of that amount.  *See id.* ¶ 36 & Fig. 5.

- BA's YQ Charges massively exceeded BA's annual change in its fuel costs.  *See* Ex. 3 (7/15/15 Arnold Rep.) ¶¶ 31-32 & Fig. 5.

BA did not meaningfully dispute Dr. Arnold's analysis, *see* Ex. 3 (7/15/15 Arnold Rep.) ¶¶ 18-25, arguing instead that its YQ Charges were permissible because BA did not recover more revenue from its YQ Charges than its incremental increase in fuel costs from the undisclosed 2003-2004 baseline.  *See, e.g.*, Ex. 9 (9/4/15 Kasper Rep.) ¶¶ 59, 68-69, 77-78, 145.

       **b.**      <u>**BA's flawed statistical analysis fails to show any meaningful correlation between fuel prices and BA's YQ Charges.**</u>

Although "statistical analyses cannot provide definitive answers to most economic questions," *see* Ex. 17 (9/14/15 Arnold Rep. ¶ 8), BA attempted to introduce the testimony of a "surprise" sur-reply witness, Dr. Andrew K.G. Hildreth, who did not disagree with any of the above analysis, but stated that there was a statistical correlation between BA's YQ Charges and the price of fuel.  That testimony is meaningless because Dr. Hildreth conducted his analysis in such a way that even random numbers would appear correlated 75% of the time.  *See* Ex. 17 (9/14/15 Arnold Rep.)  ¶¶ 6-20.  A coin flip would have been better.  (*See* Dkt. 178 (asking the Court to exclude Dr. Hildreth's testimony).)

Dr. Hildreth later submitted an entirely new expert report (a sur-sur-sur reply report) claiming that his previous conclusions were valid because he had analyzed the underlying data using "the standard method as described by Engle and Granger[]."  (*See id*. at 2 (citing 10/29/15 Hildreth Decl.) ¶ 21).)  Nobel Laureate Robert Engle himself, however, explained in an affidavit

Plaintiffs submitted to the Court that Dr. Hildreth's results were wholly invalid and could not be used to demonstrate a relationship between fuel prices and YQ Charges.  (*See id.* at 1, 3, 6.)[3]

BA appears now to have abandoned Dr. Hildreth's testimony, relegating it to a footnote and stating that it is "not necessary or material" to BA's summary judgment motion.  (Mot. at 18 n.5.)

### 3.      The YQ Charge could exceed BA's fuel costs.

The most straightforward indication that the YQ Charge was not truly a fuel surcharge is the simple fact that it exceeded BA's actual fuel costs on a number of routes.  *See* Ex. 18 (7/15/15 Kokonis Rep.) ¶¶ 32, 45-46; Ex. 19 (9/14/15 Kokonis Rep.) ¶ 19.  This is so both in the sense that the YQ Charge could recover more than the difference between BA's cost of fuel in the present year and 2003, and in the sense that the YQ Charge exceeded BA's *total* cost of fuel on at least one route.  *See id.*; *cf.* Ex. 3 (7/15/15 Arnold Rep.) ¶¶ 31-32 & Fig. 5 (demonstrating that the YQ Charge "over-recovered" in certain years even using BA's 2003-2004 baseline).

### 4.      The YQ Charge often exceeded BA's airfares.

Perhaps unsurprisingly in light of the above, BA's YQ Charge often exceeded what BA designated as "airfare."  *See* Ex. 16 (5/4/15 Arnold Rep.) ¶¶ 37-39.  Between New York and Amsterdam, for example, the YQ Charge could be almost ten times higher than the fare.  *Id.* ¶ 25. For travel between New York and London, BA's YQ Charge was at least as large as the base fare for 12 of 17 months during which BA tracked the relationship between the charges.  *Id.* ¶¶ 37-38 & Fig. 6.  The same was true for flights between London and Los Angeles International Airport for 9 of 17 months.  *Id.* ¶ 38.  Indeed, BA's YQ Charge exceeded the fare for a wide

---

[3] BA initially doubled-down on Dr. Hildreth's deception by taking a quote out of context from one of Professor Engle's articles.  (Dkt. 205-2.)  In particular, BA claimed that the article endorses Dr. Hildreth's methodology, when it did exactly the opposite.  (*See* Dkt. 213 at 15 n. 11 (discussing this in more depth).)

variety of routes and time periods.  *Id.* ¶ 39 & Fig. 7 (analyzing coach fares and YQ Charges during the entire class period and finding that BA's YQ Charge exceeded the fare for at least 25% of route and time period combinations).

### 5. BA could (and did) assess two YQ Charges for the same seat.

For most plane tickets, BA refused to refund the YQ Charge after a customer cancelled a flight.  *See* Ex. 10 (5/4/15 Kokonis Rep.) ¶¶ 20-21; Ex. 18 (7/15/15 Kokonis Rep.) ¶¶ 9, 36.  This was true even if BA re-sold the seat and a second flier paid the YQ Charge for the same seat.  *Id.* In other words, BA would collect two YQ Charges for one seat occupied by one passenger— *Plaintiffs could pay a "fuel surcharge" that someone else had already paid.*

## IV. PLAINTIFFS ASK THIS COURT TO GRANT SUMMARY JUDGMENT IN THEIR FAVOR WITH RESPECT TO LIABILITY.

Plaintiffs respectfully ask this Court to grant partial summary judgment on all issues relating to liability.  *See* Fed. R. Civ. P. 56(a); *see also Sexton v. Am. Golf Corp.*, No. 13-cv-873, 2015 WL 5884825, at *2 (E.D.N.Y. Oct. 8, 2015) (Dearie, J.) (articulating the standards governing summary judgment); *Vormittag v. Unity Elec. Co.*, No. 12-cv-4116, 2014 WL 4273303, at *3 (E.D.N.Y. Aug. 28, 2014) (Dearie, J.) (same).

### A. Plaintiffs ask this Court to hold that BA breached its contract with Plaintiffs because a "fuel surcharge" has only a single, reasonable meaning.

When a party brings a claim for breach of contract, summary judgment is appropriate when the facts are not in dispute, "the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning[.]"  *Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC*, 724 F. Supp. 2d 398, 404 (S.D.N.Y. 2010) (citation omitted) *aff'd*, 482 F. App'x 662 (2d Cir. 2012).

1.  **A fuel surcharge is a charge in addition to the regular price of a ticket, not part of the regular price of a ticket.**

The Court already has explained that "[t]he plain meaning of the term 'fuel surcharge' is a *supplemental* charge that is *reasonably related* to or based upon the cost or price of fuel." (Dkt. 52 at 9 (emphasis added).)  Plaintiffs respectfully submit that this can mean only one thing: a charge in addition to the regular price of a ticket (related to BA's regular fuel costs)—not a charge that is part of the regular price of the ticket (purportedly related to the cost of fuel at an undisclosed time in the distant past).  Indeed, even one of BA's own experts readily conceded that a "surcharge" is not part of the regular price, but rather "an amount of money that must be paid in addition to the regular price."  Ex. 1 (8/28/15 Sherman Rep.) ¶ 28; *see also* Ex. 16 (5/4/15 Arnold Rep.) ¶ 13 ("[A] charge will reflect the underlying cost of the fuel, and thus will be included in the base price; the surcharge will reflect the portion of cost that is transitory or unanticipated.").

If that is what a "fuel surcharge" is, there is no question that BA breached its contract with Plaintiffs.  As explained in more detail above:

- Assuming the 2003-2004 baseline existed, it was entirely arbitrary.  *See, e.g.*, Ex. 3 (7/15/15 Arnold Rep.) ¶ 27 (explaining that two of BA's experts cite an academic paper concluding that "an appropriate baseline price for a fuel surcharge is a recent period's price, not that from a period years in the past").

- BA frequently changed the YQ Charge for reasons that had nothing to do with the cost of fuel.  *See, e.g.* Ex. 15 (2/13/15 Howick Dep.) at 32:12-16 ("Q: So British Airways' costs of fuel go up GBP10 a barrel.  How much does the fuel surcharge rise? A: There's no answer to that question.  The two aren't directly linked.").

- The total amount of the YQ Charge was not meaningfully related to the cost of fuel. *See, e.g.*, Ex. 16 (5/4/15 Arnold Rep.) ¶ 35 & Fig. 4 (demonstrating that BA's YQ Charges moved in the opposite direction of jet fuel prices or did not move at all when jet fuel prices changed 39 to 65 percent of the time).

- BA's YQ Charges massively exceeded BA's annual change in its fuel costs.  *See* Ex. 3 (7/15/15 Arnold Rep.) ¶¶ 31-32 & Fig. 5.

- The YQ Charge exceeded BA's fuel costs on certain routes. *See, e.g.*, Ex.18 (7/15/15 Kokonis Rep.) ¶¶ 32.

- The YQ Charge often exceeded BA's airfare. *See* Ex. 16 (5/4/15 Arnold Rep.) ¶¶ 37-39 (demonstrating that the YQ Charge could be almost ten times higher than the fare).

- BA could collect the YQ Charge twice for a single seat. *See* Ex. 10 (5/4/15 Kokonis Rep.) ¶¶ 20-21; Ex. 18 (7/15/15 Kokonis Rep.) ¶¶ 9, 36.

Put simply, the YQ Charge was not a fuel surcharge.

## 2.   <u>BA's alternative definition of "fuel surcharge" is not reasonable.</u>

BA argues that a "fuel surcharge" is a charge that takes into account competitive factors and attempts to recover BA's entire increased fuel cost between 2003-2004 and the present year. *See, e.g.*, Ex. 1 (8/28/15 Sherman Rep.) ¶¶ 25, 31, 39-40, 43, 57, 63, 70, 71-83; Ex. 12 (2/26/15 Foran Dep.) at 22:4-23:2; Ex. 4 (3/13/15 Williams Dep.) at 28:3-13.   But while BA surely could have written a contract that allowed it to assess a charge for its total cost of fuel relative to 2003-2004, BA did not do that.   *Cf. Arrowood Indem. Co. v. King*, 699 F.3d 735, 739 (2d Cir. 2012) ("[A] court will not torture words to import ambiguity." (citation omitted)).

It bears emphasis that even BA's own experts do not meaningfully defend BA's proposed definition of a "fuel surcharge."   Instead, they make the circular argument that BA was justified in assessing a "fuel surcharge" using 2003-2004 as an undisclosed baseline because BA assessed a fuel surcharge using 2003-2004 as an undisclosed baseline.   *See, e.g.*, Ex. 16 (5/4/15 Arnold Rep.) ¶ 28 (collecting testimony).   Dr. Arnold, however, refutes BA's contention that a fuel surcharge is a charge that attempts to recover a particular year's fuel costs compared to 2003-2004:

> [I]t is not reasonable to assess a fuel surcharge based on a benchmark that is several years old. To see why this is so, consider that most of the changes in fuel prices that had occurred (or were to occur) between 2003 and 2008 were already

known in 2007. Thus, using 2003 prices as a benchmark instead of some more recent price will inappropriately ignore a great deal of information known to BA.

*Id*. ¶ 45.

**B.      Plaintiffs ask the Court to grant partial summary judgment with respect to BA's affirmative defenses.**

**1.      The Airline Deregulation Act does not preempt Plaintiffs' claims.**

Plaintiffs respectfully ask this Court to reaffirm its two prior rulings rejecting BA's affirmative defense based on the Airline Deregulation Act (ADA).  (*See* Dkt. 133, Ans. at 19 ¶ 3.)  In particular, Plaintiffs ask the Court to again hold that the ADA does not preempt claims for breach of contract.  (Dkt. 52 at 4-8; Dkt. 66 at 1-2.)

*American Airlines, Inc. v. Wolens* is directly on point.  513 U.S. 219, 228-29 (1995).  In *Wolens*, the Supreme Court considered a claim that American Airlines had not upheld its contractual obligation to its frequent flier customers with respect to its pricing.  *See id*.  The Court held that this claim was not preempted because "[a] remedy confined to a contract's terms simply holds parties to their agreements—in this instance, to business judgments an airline made public *about its rates and services*."  *Id*. (emphasis added); *see also, e.g.*, *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1454-55 (7th Cir. 1996) (Easterbrook, J.) (explaining that the ADA does not preempt claims for breach of contract even when those claims relate to "price or a contract to reduce the price by the value of frequent flyer miles" (internal citation omitted)).

The law is not ambiguous: a plaintiff may "bring a claim related to *anything* that Defendant explicitly incorporates into its contract."  *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 299 (E.D.N.Y. 2013) ((Garaufis, J.) (explaining *Wolens*, 513 U.S. at 228-29).  No authority is to the contrary.  *See, e.g.*, *Chukwu v. Bd. of Dirs. of Varig Airline*, 880 F. Supp. 891, 898 (D. Mass. 1995) ("[M]any claims that would otherwise fall within the preemption provision

because they relate to 'rates, routes, or services' may nevertheless not be preempted since they do not purport to enact or enforce any law." (explaining *Wolens*, 513 U.S. at 228-29)).[4]

*     *     *

One final point with respect to the ADA.  BA's summary judgment motion includes a lengthy discussion of *Giannopoulos v. Iberia Lineas Aereas de Espana, S.A.*, 17 F. Supp. 3d 743, 748 (N.D. Ill. 2014).  This case means precisely the opposite of what BA asserts.  The *Giannopoulos* court held that the ADA preempted a claim for breach of an EU regulation.  *See id*.  The plaintiffs in *Giannopoulos*, however, also brought a breach of contract claim, and *the breach of contract claim was not preempted*.  *See id*.  Indeed, the court expressly distinguished its preemption ruling from cases involving claims for breach of contract.  *See id*.  BA's own citation demonstrates that Plaintiffs' claim is not preempted.

### 2.    The voluntary payment doctrine does not apply to this litigation.

BA's eleventh affirmative defense is based on the voluntary payment doctrine.  (*See* Ans. at 21 ¶ 11; *see also* Mot. at 29-30.)  This is a common law rule in some states that "bars recovery of payments voluntarily made with full knowledge of the facts, and in absence of fraud or mistake of material fact or law." *In re Cablevision Consumer Litig.*, No. 10-cv-4992, 2014 WL 1330546, at *11 (E.D.N.Y. Mar. 31, 2014) (Seybert, J.).  Plaintiffs respectfully ask this Court to find that the doctrine does not apply as a matter of law for the independently sufficient reasons that English law does not recognize the doctrine and because no plaintiff could have had "full knowledge of the facts."

---

[4] *See also, e.g.*, *Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1251 (6th Cir. 1996); *Aretakis v. Fed. Express Corp.*, No. 10 CIV. 1696, 2011 WL 1226278, at *4 (S.D.N.Y. Feb. 28, 2011) *adopted*, No. 10 CIV. 1696, 2011 WL 1197596 (S.D.N.Y. Mar. 25, 2011); *Levy v. Delta Airlines*, 2004 U.S. Dist. LEXIS 19894, at *8-10, 12-14 (S.D.N.Y. Sept. 30, 2004).

### a.    English law does not recognize the voluntary payment doctrine.

BA's attempt to raise the voluntary payment doctrine should fail for the simple reason that BA admits that there is no such doctrine under English law.  BA contends, however, that this defense is implicated because Plaintiffs and BA are also party to an additional contract that may not be governed by English law, known as the "Conditions of Carriage."  (*See* Mot. at 29-30.)  But Plaintiffs do not contend that BA violated the Conditions of Carriage: this litigation involves the Executive Club agreement (the "Contract"), which governs the earning and redemption of frequent flier miles.  *See* Ex. 6 (Contract).

The Contract does make clear that when a customer travels on a BA flight, he or she is subject to the Conditions of Carriage, but that does not implicate this case, much less bring the voluntary payment doctrine into play.  *See* Ex. 6 (Contract) §§13.1; 27.3.  In particular, the Contract provides:

> Rewards for travel on British Airways flights are subject to the General Conditions of Carriage for Passengers and Baggage. . . .  The limitations and exclusions of liability referred to in the General Conditions of Carriage for Passengers and Baggage will apply in relation to travel on the Services of British Airways including Reward travel.

*Id*.

Two points about that language are relevant here.  First, the "limitations and exclusions of liability" in the Conditions of Carriage apply only "in relation to travel;" i.e., while traveling on a BA flight.  *Id*.  Such limitations do not apply to this case at all, which concerns events that transpired before travel.  *See* Ex. 7 (7/15/15 Sutcliffe Rep.) ¶¶ 49-55 (containing Mr. Sutcliffe's full analysis on this point).[5]  Second, even if the "limitations and exclusions" in the Conditions of Carriage applied to this case, that could not somehow bring the voluntary payment doctrine into

_____

[5] This is particularly clear because the Conditions of Carriage themselves have nothing to do with the earning or redemption of frequent flier miles.  *See* Ex. 20 (Conditions of Carriage).

play—the voluntary payment doctrine is not one of the "limitations and exclusions" in the Conditions of Carriage, it is a state law rule that applies to breach of a contract that is interpreted under that state's law. *See, e.g.*, *Cablevision*, 2014 WL 1330546, at *11 (explaining the doctrine).

### b. Summary judgment should be granted against BA even if the voluntary payment doctrine applies.

Plaintiffs stress that summary judgment would be appropriate even if English law recognized the voluntary payment doctrine. This is so because the doctrine applies only where a plaintiff has "full knowledge of the facts, and in absence of fraud or mistake of material fact or law." *Cablevision*, 2014 WL 1330546, at *11. It thus could not possibly apply here: even under BA's theory of this litigation, BA designated the baseline year to which it linked its fuel costs (2003-2004) a trade secret and only removed that designation a few months ago. No proposed class member could have had "full knowledge" of the YQ Charge. BA's argument that proposed class members knew that they were paying something BA termed a "fuel surcharge" is irrelevant—what matters is that no class member could have understood that this charge was (according to BA) related to the cost of fuel in 2003-2004. *See Spagnola v. Chubb Corp.*, 574 F.3d 64, 72 (2d Cir. 2009) (explaining that the voluntary payment doctrine does not apply "when [a] claim [is] predicated on lack of full disclosure" (citation omitted)).

### 3. BA's affirmative defense based on the statute of limitations fails as a matter of law.

BA's twelfth affirmative defense is based on the statute of limitations. (*See* Ans. at 21 12; *see also* Mot. at 27-28.) But the statute of limitations for a breach of contract claim is six years, and the class does not include any members whose claims arose more than six years before this lawsuit was filed. *See, e.g.*, Ex. 7 (7/15/15 Sutcliffe Rep.) ¶ 47 (explaining that the statute of limitations is six years).

-17-

BA attempts to raise a defense based on the statute of limitations because certain types of claims made regarding a breach of the Conditions of Carriage are restricted to two years as opposed to the standard six-year statute of limitations.  Ex. 7 (7/15/15 Sutcliffe Rep.) ¶¶ 47-66.  As indicated above, however, Plaintiffs are not suing BA for breaching the Conditions of Carriage, and those limitations do not apply to this case.  It is presumably for this reason that BA's first English law expert—*an attorney at DLA Piper*—did not attempt to contend that a two-year statute of limitations would apply.  *See, e.g.*, Ex. 21 (Stone Rep.).

Even if the Conditions of Carriage somehow applied to this case, however, its two-year statute of limitations still would not apply.  The Conditions of Carriage limit only "[l]iability for damage," where "damage" is a defined term.  Ex. 7 (7/15/15 Sutcliffe Rep.) ¶ 59 (quoting the Conditions of Carriage).  In particular, the Conditions of Carriage defines "damage" as:

> death of, wounding of, or bodily injury to a passenger. It also includes loss, partial loss, theft of, or other damage to baggage arising out of, or in connection with, either carriage on flights we operate or other services we provide.

*Id*.  In other words, the type of "damage" that is limited by the two-year statute of limitations in the Conditions of Carriage has absolutely nothing to do with the claim that BA assessed a "fuel surcharge" that was not a real fuel surcharge long before the date of travel.  *See* Ex. 7 (7/15/15 Sutcliffe Rep.) ¶¶ 56-61 (containing Mr. Sutcliffe's full analysis on this point).

### 4.  BA's "affirmative defenses" that are not affirmative defenses fail as a matter of law.

Plaintiffs respectfully ask this Court to grant partial summary judgment on (or strike) a number of BA's "affirmative defenses" that simply are not affirmative defenses.  *See, e.g.*, *Fed. Trade Comm'n v. Navestad*, No. 09-cv-6329, 2011 WL 939384, at *2 (W.D.N.Y. Mar. 14, 2011) ("An affirmative defense is defined as '[a] defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all allegations in the

-18-

complaint are true.'" (quoting *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir., 2003)). In particular:

- BA contends that Plaintiffs do not state a claim upon which relief can be granted. (Ans. at 19, ¶ 1.) That is not an affirmative defense because it would not allow BA to prevail even if all of Plaintiffs' claims are true. In any event, this Court has twice ruled that Plaintiffs *do* state a claim. (Dkt. 52 at 4-8; Dkt. 66 at 1-2.)

- BA states that this action "may be governed in whole or in part by foreign law." (Ans. at 19, ¶ 2.) It also asserts that Plaintiffs' claims are governed by "the Conditions of Carriage, the Executive Club Contract and applicable tariffs." (*Id.* at 20, ¶ 7.) These are not affirmative defenses—they are essentially just random statements.

- Five of BA's "affirmative defenses" are varying formulations of BA's contention that it did not breach its contract with Plaintiffs. (*See* Ans. at 19-21, ¶¶ 4; 5; 14; 15; 21.) Similarly, five of BA's "affirmative defenses" are varying general and specific arguments that this case should not be certified as a class action. (*See id.* at 23, ¶¶ 23-27.) These are not affirmative defenses because they are not arguments that would enable BA to prevail even if Plaintiffs' allegations (e.g., that BA *did* breach its contract, that a class *should* be certified) are true.

- BA contends that it exercised its contractual discretion in good faith. (*See id.* at 20, ¶ 10.) Similarly, it contends that its actions were not "unfair" under a particular English regulation. (*See id.* ¶ 17.) These statements are not affirmative defenses: (1) Plaintiffs do not bring a claim for breach of the duty of good faith and fair dealing; (2) Plaintiffs do not bring a claim for breach of any English regulations. To the extent that good faith or unfairness is relevant to Plaintiffs' claim for breach of contract, these are not arguments that would enable BA to prevail even if Plaintiffs' allegations are true.

- BA states that a plaintiff who did not pay a fuel surcharge cannot bring a claim because such a person would lack standing.  (*Id.* at 21, ¶ 16.)  This is not an affirmative defense because the class is defined to include only people who *did* pay a fuel surcharge.  (Dkt. 207 at 4.)

- BA contends that Plaintiffs' claims are barred because they did not give BA an opportunity to cure any alleged breach of contract.  (Ans. at 23, ¶ 22.)  This is not a defense at all, much less an affirmative one:  neither of BA's English law experts references any such requirement to sue for breach of contract.  (*See id.*)

- BA's twenty-ninth "affirmative defense" purportedly "reserves and asserts all affirmative and other defenses." (*See id.* at 24, ¶ 29.)  This is not an affirmative defense.  In the alternative, it does not comply with Federal Rule 8(c)(1), which requires a statement of any affirmative defense.  In the alternative, BA cannot produce any evidence to support whatever this "affirmative defense" might be.  *See* Fed. R. Civ. P. 56(c)(1)(B).

### 5.   BA cannot produce admissible evidence to support its "catch-all" affirmative defenses.

Plaintiffs also ask this Court to grant summary judgment with respect to a number of "catch-all" affirmative defenses for which BA has no admissible evidence.  *See* Fed. R. Civ. P. 56(c)(1)(B).  In particular:

- BA contends that Plaintiffs failed to take reasonable actions to prevent their alleged injury and damages.  (Ans. at 20, ¶ 6.)  Similarly, BA raises "waiver, estoppel, or ratification" (*id.* ¶ 8), laches (*id* ¶ 9), and unclean hands (*id* ¶ 18).  Plaintiffs move for summary judgment on these claims because BA cannot show that there is any reasonable step that Plaintiffs could have taken to prevent their injuries and damages, that Plaintiffs lacked diligence in pursuing their claims, that Plaintiffs somehow waived their claims, or that Plaintiffs acted in bad faith

with respect to the subject of the Complaint.  Among other things, BA actively hid the fact that the YQ Charge was not a true fuel surcharge.

- BA contends that some claims are barred by the doctrine of accord and satisfaction.  (Ans. at 21 ¶ 13.)  BA has no evidence with which to support this defense; i.e., evidence that any class member has settled his or her claim with BA.

- BA contends that Plaintiffs' claims are barred because Plaintiffs did not join an indispensable party.  (Ans. at 22 ¶ 19.)  Similarly, BA states that the acts or omissions of third parties were an intervening cause of Plaintiffs' injuries.  (*Id*. at 22 ¶ 20.)  BA has no evidence that any other party should be joined in this action or is somehow the cause of Plaintiffs' injuries.

    C.    **Plaintiffs respectfully ask this Court to defer ruling on their motion for partial summary judgment until after ruling on class certification.**

While there does not appear to be an absolute bar to entertaining a plaintiff's motion for summary judgment prior to class certification, courts generally allow time for class members to opt out of litigation before ruling on a plaintiff's summary judgment motion.  *See, e.g.*, *In re Cablevision*, 2014 WL 1330546, at *15-16 (collecting cases).  This guards against the theoretical possibility that some individuals would choose to remain in the class only because judgment had already been entered in their favor.  *See id*.

**V.    BA'S MOTION FOR SUMMARY JUDGMENT IS WITHOUT MERIT.**

Plaintiffs respectfully suggest that BA's motion for summary judgment does not present a close call.  Plaintiffs have, of course, asked the Court to hold that the unambiguous meaning of the phrase "fuel surcharge" is a charge in addition to the regular price of a ticket that reflects the fluctuating cost of fuel.  But even assuming that this is not the *only* reasonable understanding of a "fuel surcharge," it certainly is *one* reasonable understanding of that phrase—it is exactly what BA claimed on its website.  Ex. 2 (RFA Resp.) at 6 (admitting that BA's website said that its fuel

surcharge was based on the "fluctuating price of worldwide oil").  Accordingly, BA's motion for summary judgment must be denied.  *Grasson v. Bd. of Educ. of Town of Orange*, 24 F. Supp. 3d 136, 145 (D. Conn. 2014) ("[I]f the moving party cannot establish unambiguous contract language, 'a material issue exists concerning the parties' intent,' which is a question of fact. . . ").

Out of an abundance of caution, however, Plaintiffs note two additional, independently sufficient problems with BA's motion:  it is based on the wrong legal standard, and it ignores disputed issues of fact.

### A.   BA does not meaningfully attempt to meet the governing legal standard, and instead focuses its motion on the duty of good faith and fair dealing, which is not at issue in this case.

BA's motion is overwhelmingly focused on the duty of good faith and fair dealing.  (*See* Mot. at 1-4; 18-22.)  But this is a case for breach of contract only:  Plaintiffs did not bring a claim for breach of the duty of good faith and fair dealing.  (*See* Am. Compl. ¶¶ 36-45, 60-67, 74-76).  And while BA half-heartedly attempts to argue that summary judgment is appropriate even without reference to the duty good faith and fair dealing (*see* Mot. at 22-23), those arguments are equally meritless.

### 1.   BA's contention that it assessed a "fuel surcharge" is circular.

BA asserts without explanation that a "fuel surcharge" is any charge that helps defray fuel costs.  But *any* charge levied by an airline "helps defray fuel costs."  BA's definition of a "fuel surcharge" is meaningless, particularly given that BA used the YQ Charge as part of a broad revenue maximization scheme.  *See, e.g.*, Ex. 10 (5/4/15 Kokonis Rep.) ¶ 7 ("While British Airways termed the [charges] in this case fuel surcharges,' these charges were primarily used for revenue maximization, not cost recovery."); Ex. 3 (7/15/15 Arnold Rep.) ¶ 14 (noting that BA's industry expert agrees that the YQ Charge was "simply an element of the total price BA charges . . . [and] not necessarily related to [fuel] costs").

This section of BA's brief, moreover, implies that what matters is BA's *subjective* understanding of the phrase "fuel surcharge."  (*See* Mot. at 22-23.)  But BA's own English law expert admitted that BA's subjective understanding is irrelevant to the question of contract interpretation.  Ex. 8 (7/28/15 Crane Dep.) at 11:15-16 ("What the parties believed [fuel surcharge] meant is irrelevant to the question of construction."); *accord* Ex. 7 (7/15/15 Sutcliffe Rep.) ¶ 26 ("[W]hile BA has discretion to impose and set a 'fuel surcharge,' BA does not have discretion to determine what the phrase 'fuel surcharge' means.").

### 2.      The unsurprising fact that BA hired an English law expert who would rule in BA's favor does not compel summary judgment for BA.

BA's summary judgment argument relies overwhelmingly on testimony from its English law expert (Michael Crane), who states that he would rule in BA's favor under English law. (Mot. at 3-4, 22-23.)  This type of argument should be rejected out of hand for three interrelated reasons.

First, while both parties' English law experts can help the Court understand English law, neither expert's articulation of how he would apply that law in this case is anything more than a helpful illustration of the principles that an English law judge could apply.  *See, e.g.*, *Garcia*, 808 F.3d at 1158 ("[B]oth trial and appellate courts are urged to research and analyze foreign law independently" (citation omitted)).  Applying the law to the facts of this case are the responsibility of this Court or a jury; Mr. Crane cannot usurp that authority.

Second, Mr. Crane simply ignored facts that do not support BA.  Of particular relevance, he did not discuss or address testimony from Plaintiffs' testifying experts, even when that testimony directly contradicted statements on which Mr. Crane relied.  *See, e.g.*, Ex. 7 (7/15/15 Sutcliffe Rep.) ¶ 15 ("I do not know what evidence both parties will present to the Court, so I do not purport to apply the law to all of the relevant facts of the case.  I note only that I have briefly

reviewed *evidence that directly contradicts the testimony relied upon by Mr. Crane*, including evidence from Mr. Kokonis . . . and evidence from Dr. Arnold . . . . These contradict the statements relied upon by Mr Crane." (emphasis added)).

Finally, Plaintiffs respectfully suggest that their English law expert (Andrew Sutcliffe) articulated English law more persuasively than Mr. Crane, in part because Mr. Crane neglected to cite cases (or portions of cases) that were unhelpful to BA.  *See, e.g.*, Ex. 7 (7/15/15 Sutcliffe Rep.) ¶¶ 23, 27(c), 28-32.

**B.      A reasonable jury could find that BA's YQ Charge was not based on or related to the cost of fuel even if that jury accepted BA's definition of a "fuel surcharge."**

Even if BA were correct about the legal standard and the meaning of the phrase "fuel surcharge," BA's motion for summary judgment would still need to be denied.  This is so because there is ample evidence that would allow a jury to conclude that BA was simply assessing a revenue maximization charge.  Of particular relevance, Plaintiffs' testifying economist has shown that BA's YQ Charge was not reasonably based on or related to the cost of fuel *even using BA's unreasonable definition of a fuel surcharge*.  *See* Ex. 16 (5/4/15 Arnold Rep.) ¶¶ 33-42; Ex. 3 (7/15/15 Arnold Rep.) ¶¶ 18-25; *cf.*  Ex. 16 (5/4/15 Arnold Rep.) ¶ 33 ("Q: So British Airways' costs of fuel go up GBP10 a barrel.  How much does the fuel surcharge rise? A: *There's no answer to that question.  The two aren't directly linked*." (emphasis added) (quoting former BA Head of Treasury Ian Howick)); *id*. ¶ 22 ("According to Mr. Joerg Tuensmeyer, BA's Revenue Manager Americas, neither the price nor the cost of fuel was the predominant factor in setting YQ Charges.").

### C.   BA's tertiary arguments fail.

#### 1.   The law of the case doctrine does not support BA.

BA devotes a portion of its brief to the law of the case doctrine and seems to argue that the Court's articulation of a fuel surcharge as "a supplemental charge that is reasonably related to or based upon the cost or price of fuel" (Dkt. 52 at 9) somehow supports BA.  (Mot. at 11-12.)  It does not.  To the contrary, the Court's ruling demonstrates two independently fatal flaws with BA's argument.  First, the Court made clear that a fuel surcharge is a *supplemental* charge; i.e., it is in addition to the regular price, not part of the regular price.  Second, the Court made clear that a fuel surcharge must be "*reasonably* related to or based upon" the cost of fuel.  Even assuming BA could demonstrate a relationship between its cost of fuel and an undisclosed, arbitrary time in the past (2003-2004), that would not demonstrate a *reasonable* relationship.

In any event, the Court's articulation of the meaning of the phrase "fuel surcharge" predated discovery.  Now that discovery has closed, the Court can choose to modify or expand on that definition if it desires to do so: "courts have long recognized the distinction between pre-discovery motions, based on an undeveloped record, and post-discovery motions for summary judgment." *Dorsett-Felicelli, Inc. v. Cty. of Clinton*, No. 1:04-cv-1141, 2013 WL 3897578, at *3 (N.D.N.Y. July 29, 2013) (collecting cases); *cf. Devilla v. Schriver*, 245 F.3d 192, 197 (2d Cir. 2001) (holding that the law of the case doctrine "is, at best, a discretionary doctrine which does not constitute a limitation on the court's power").

#### 2.   BA's standing argument is frivolous.

BA's summary judgment motion includes an argument that Plaintiffs lack standing.  (Mot. at 26-27.)  It is frivolous—BA simply states its opinion that there was no breach of contract.  Setting aside that BA is wrong, that argument has nothing to do with standing at all.  *See, e.g.*,

*Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (articulating the "three familiar elements of standing," none of which is whether a plaintiff will ultimately win or lose).

To demonstrate standing, Plaintiffs must demonstrate "injury in fact, causation, and redressability." *Id.*; *see also, e.g.*, *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273-74 (2008). In this case, the injury in fact is the payment of a "fuel surcharge" that was hundreds (or thousands) of dollars higher than a true fuel surcharge, the cause of the injury is BA's breach of a contract, and the injury can be fully redressed by money damages in the amount of the overcharge. Article III requires no more. *See id.* In particular, Mr. Dover seeks ~$2235, Mr. Horsey ~$2650, Mr. Rank ~$975, and Ms. Perry ~$2135, and Dr. Arnold has provided a formula to calculate damages for every proposed class member using one of BA's databases. *See* Ex. 16 (5/4/15 Arnold Rep.) ¶¶ 53-54; Ex. 3 (7/15/15 Arnold Rep.) ¶¶ 38-40.[6]

None of BA's cases is to the contrary. In those cases, the Plaintiffs lacked standing because they could not demonstrate that they had a right to receive damages *even if they prevailed on all aspects of their lawsuit*. (*See* Mot. at 26-27.) BA's argument that Plaintiffs should lose has nothing to do with standing at all—i.e., BA does not and cannot contend that

---

[6] Dr. Arnold's report did not include individual damages numbers because BA had refused to identify its customers' names within the database used to calculate damages. But BA ultimately provided one of its experts some of the information it had refused to provide Plaintiffs—the above numbers are generated from that information. *See* Ex. 1 (8/28/15 Sherman Rep.) Ex. 1; *see also* BA174616-BA174621; BA174625; BA174626. As part of this litigation, British Airways produced to Plaintiffs an extract from what is known as the ICW Database. BA (through its designated Rule 30(b)(6) witness) testified that this extract "contain[s] all the address records for any Executive Club member that made a booking during the Class Period that had a U.S. address that was active at the time of booking." Plaintiffs did not attach the extract to this memorandum because it is voluminous, however, Plaintiffs will produce this database (in printed or electronic form) if the Court requests it. Because this database extract was produced by British Airways as part of this litigation, moreover, Plaintiffs are informed that British Airways is in possession, custody, or control of a copy of this extract.

Plaintiffs will not receive damages if the Court or a jury finds in their favor.  This renders BA's

standing argument entirely frivolous.  *See, e.g.*, *Cacchillo*, 638 F.3d at 404.

## **CONCLUSION**

For the above reasons, Plaintiffs respectfully ask the Court to grant their motion for

partial summary judgment with respect to liability and to deny BA's motion for summary

judgment.

Dated:  January 21, 2016            Respectfully submitted,


                                    */s/ David S. Stellings*
                                      David S. Stellings

                                    David S. Stellings (dstellings@lchb.com)
                                    Nicholas Diamand (ndiamand@lchb.com)
                                    Jason L. Lichtman (jlichtman@lchb.com)
                                    Douglas I. Cuthbertson (dcuthbertson@lchb.com)
                                    **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
                                    250 Hudson Street, 8th Floor
                                    New York, NY  10013-1413
                                    212.355.9500

                                    Clive Zietman (czietman@stewartslaw.com)
                                    Fiona Stewart (fstewart@stewartslaw.com)
                                    Daniel Loblowitz (dloblowitz@stewartslaw.com)
                                    **STEWARTS LAW, LLP**
                                    5 New Street Square
                                    London, UK EC4A 3BF
                                    Telephone: +44 (0)20.7822.8000

                                    Mark Schlachet (mschlachet@gmail.com)
                                    3515 Severn Road
                                    Cleveland, Ohio 44118
                                    (216) 896-0714

                                    *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 21, 2016, service of this document was accomplished via

e-mail and hand-delivery.


Jason L. Lichtman