UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
RUSSELL DOVER, HENRY HORSEY,
CODY RANK, and SUZETTE PERRY, on
behalf of themselves and all others similarly
situated,

                          Plaintiffs,

                  - against -

BRITISH AIRWAYS, PLC (UK)

                          Defendant.
------------------------------------------------------------ x

**MEMORANDUM & ORDER**

12 CV 5567 (RJD) (CLP)

DEARIE, District Judge

Plaintiffs, a class of members of the Executive Club, British Airways' frequent flyer program, allege that the airline breached its frequent flyer contract ("the Contract") by imposing impermissible fuel surcharges on frequent flyer reward flights. The parties have submitted cross-motions for summary judgment. See ECF No. 227 ("BA Mot."), ECF No. 229 (Pls.' Cross-Mot.), ECF No. 232 ("BA Reply"), ECF No. 234 ("Pls.' Reply"). Because triable issues remain, summary judgment is denied.

## BACKGROUND

Under the Contract, Executive Club members accumulate points called "Avios" for flying with British Airways, staying in certain hotels, or renting cars. These frequent flyer points may be redeemed for reward flights on British Airways.

The Contract provides that when a frequent flyer redeems his or her points for a reward flight, British Airways may impose certain additional charges, fees, and taxes. Among these are the fuel surcharges at issue in this lawsuit. The Contract states in relevant part:

> Members will be liable for all taxes and other charges associated
> with Reward travel on British Airways or a Service Partner airline,

> including without limitation, airport departure tax, custom fines, immigration fees, airport charges, customer user fees, <u>fuel surcharges</u>, agricultural inspection fees, security and insurance surcharge or other incidental fees or taxes charged by any person or relevant authority or body . . . .

See ECF No. 209-8 ("Contract"), at § 13.14 (emphasis added).

In May 2004, British Airways began imposing a fuel surcharge on reward flights. The decision to impose these surcharges, referred to internally as "YQ charges," was, according to the airline, based on a substantial anticipated increase in its fuel costs. Initially the charge was nominal, £2.50 for tickets booked in the United Kingdom and $4.00 for tickets booked elsewhere, and British Airways anticipated that these charges would enable it to recover approximately one-third of the expected increase in its fuel costs. Over time, however, the amount of the YQ charge grew substantially, and unlike the initial nominal charge, varied based on several factors including distance flown, class of service, or point of sale (e.g. the YQ charge could be substantially higher for a customer in New York buying a round trip ticket from New York to London than for a customer who purchased the same ticket in London).

The amount and structure of the YQ charge was set by British Airways' fuel surcharge committee. During the class period, November 2006 to April 2013, the committee met 47 times and changed the YQ charge 15 times (three of which were reductions). The committee did not meet on a regular schedule, instead convening when British Airways felt that circumstances warranted. In setting the YQ charge, the committee considered several factors such as the cost or price of fuel, British Airways' fuel hedging positions, competitor actions, consumer perceptions, and fluctuations in currency exchanges. The airline also used an additional factor—its cost of fuel in 2003-2004, the year prior to adopting the YQ charge—although the parties dispute precisely how and why that figure was used.

The parties agree that the Contract, which is governed by English law, permits British Airways to impose a fuel surcharge. The Contract does not, however, define the term "fuel surcharges." In denying British Airways' motion to dismiss, the Court held that "the plain meaning of the term 'fuel surcharge' is a supplemental charge that is reasonably related to or based upon the cost or price of fuel" and that "the typical consumer would consider a fuel surcharge to be an added charge imposed by an airline in order to defray rising fuel costs." ECF No. 52 ("MTD Order"), at 9.

Plaintiffs' theory is that the Contract required that the YQ charges genuinely compensate for fluctuations in the fuel market. Plaintiffs argue, however, that in setting the YQ charge throughout the class period, British Airways relied on a factor not substantively or temporally relevant to the actual cost or price of fuel: the airline's fuel costs in 2003-2004. According to Plaintiffs, British Airways used the YQ charge as a way to recover the difference between its then-present fuel costs and its fuel costs in 2003-2004. In Plaintiffs' view, setting the amount of the YQ charge in reference to the cost of fuel in an arbitrary year is irrelevant and contractually impermissible, and as a result of this inappropriate baseline, British Airways' breached the Contract.

The Court granted Plaintiffs' motion for class certification, certifying the following class:

> All United States resident members of British Airways' Executive Club who redeemed frequent flier miles for an award ticket from November 9, 2006 through April 17, 2013 and who paid a BA-imposed 'fuel surcharge,' so long as that United States resident member provided British Airways with a valid United States address at the time of booking. This class excludes: (1) members who redeemed frequent flier miles exclusively using what British Airways terminated its "Cash + Avios" option; (2) any judge to whom this case is assigned, along with his or her staff; (3) British Airways Officers, directors, employees, as well as outside counsel in this litigation, and; (4) immediate family of any individual excluded by 2 or 3.

3

ECF No. 249 ("Class Cert. Order"), at 17. The Court also denied motions to exclude the testimony of all but one of the parties' proposed expert witnesses under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). See ECF No. 256 ("Daubert Order"), at 1. In so doing, the Court held that a hearing was warranted to consider more fully the admissibility of one of British Airways' experts, Dr. Andrew Hildreth, but that hearing became unnecessary when the airline advised that it no longer intended to rely on Hildreth's testimony at trial. See ECF No. 266.

The parties have cross-moved for summary judgment seeking to resolve some or all of these claims as a matter of law. In addition to arguing it is entitled to summary judgment because its actions did not breach the Contract, British Airways contends that Plaintiffs lack standing, their claims are preempted by the Airline Deregulation Act, 49 U.S.C. Section 41713, and that named Plaintiff Russell Dover's claims are barred by an affirmative defense, the voluntary payment doctrine. For their part, Plaintiffs move for partial summary judgment asserting that even though triable issues remain as to the amount of damages the class suffered, British Airways is liable for breach of contract as a matter of law.

## LEGAL STANDARD

Summary judgment is appropriate "only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 558 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). Courts are "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). In deciding whether summary judgment is warranted, the Court must "resolve all ambiguities and draw all reasonable inferences against the movant." Delaney v. Bank of Am. Corp., 766 F.3d

163, 167 (2d Cir. 2014) (quoting Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d 73, 79-80 (2d Cir. 2009)). Summary judgment is appropriate "where the facts and the law will reasonably support only one conclusion." O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 64 (2d Cir. 2002).

## DISCUSSION

As mentioned, the Court held in denying British Airways' motion to dismiss that the term "fuel surcharge" in the Contract has a plain meaning, namely "a supplemental charge that is reasonably related to or based upon the cost or price of fuel," and that "the typical consumer would consider a fuel surcharge to be an added charge imposed by an airline in order to defray rising fuel costs." MTD Order at 9. The central issue in these motions is whether a reasonable jury could conclude that the YQ charges British Airways levied fall inside or outside this definition. As explained below, because there are genuine disputes of material fact, summary judgment is denied. Additionally, because British Airways' remaining arguments[1]—that Plaintiffs' lack standing, or their claims are barred by preemption and the voluntary payment doctrine—are inapposite, the airline's motion for summary judgment as to those issues is denied as well.

A. Liability

The Contract is, as mentioned, governed by English law. As the Second Circuit has observed, "English law comports with New York law on contract interpretation." Sharma v. Skaarup Ship Mgmt. Co., 916 F.2d 820, 825 n.3 (2d Cir. 1990). "'Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having

---

[1] Initially, British Airways also argued that Plaintiffs' claims were barred by the statute of limitations. The airline later withdrew this argument. See ECF No. 236.

5

all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract,' and the 'meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean.'" Deutsche Bank Tr. Co. v. Am. Gen. Life Ins. Co., No. 15-cv-3869-GHW, 2016 WL 5719783, at *9 (S.D.N.Y. Sept. 30, 2016) (quoting Sigma Fin. Corp. (In Administration), Re, [2009] UKSC 2, [2010] B.C.C. 40 (S.C.) ¶ 10) (applying English law).

In ruling on British Airways' motion to dismiss, the Court held that the term "fuel surcharge" in the Contract means "a supplemental charge that is reasonably related to or based upon the cost or price of fuel" and that "the typical consumer would consider a fuel surcharge to be an added charge imposed by an airline in order to defray rising fuel costs." MTD Order at 9. The parties simultaneously embrace the Court's definition of "fuel surcharge" and try to develop it further, arguing that the undisputed facts, when coupled with their interpretive gloss, demonstrate that they prevail as a matter of law. As explained, further elaboration on this definition is unneeded.

Plaintiffs contend that the Court's definition of "fuel surcharge" contains two related requirements. First, so the argument goes, the YQ charge must be "supplemental," that is, it must account for fuel costs above and beyond British Airways' standard operating costs. In Plaintiffs' view, the YQ charge was not supplemental because it was partly based on an the airline's 2003-2004 fuel costs, not its recent fuel costs, and was simply part of the overall ticket price it charged. Indeed, Plaintiffs point out that the YQ charge sometimes exceeded British Airways' base fare on certain routes. For example, the YQ charge could be almost 10 times higher than the fare for travel between New York and Amsterdam, and for a time, the YQ charge was at least as high as the base fare for travel between New York and London.

The second requirement that Plaintiffs derive from the Court's definition of "fuel surcharge" is that the YQ charge must have a "reasonable relationship" to the cost or price of fuel. Plaintiffs contend that in order to have such a reasonable relationship, the YQ charge must have a relationship to the airline's *recent* cost of fuel. That relationship was absent, according to Plaintiffs, because the YQ charge was partly based on the airline's 2003-2004 fuel costs, grew more rapidly than fuel prices over the relevant period, and often moved in the opposite direction from fuel prices or changed for reasons other than fluctuations in the fuel markets. Additionally, Plaintiffs point out that the YQ charge varied by point of sale, a factor they argue is wholly unrelated to fuel costs.

British Airways, for its part, contends that the Court's definition of "fuel surcharge" is the law of the case, and should not be revisited now. See In re PCH Assocs., 949 F.2d 585, 592 (2d Cir. 1991) ("Under the law of the case doctrine, a decision on an issue of law made at one stage of the case becomes binding precedent to be followed in subsequent stages of the same litigation."). Hewing to the Court's definition, the airline argues that the undisputed evidence demonstrates that the YQ charge was "a supplemental charge that is reasonably related to or based upon the cost or price of fuel." MTD Order at 9. As support for this assertion, the airline points to testimony from its executives that the purpose of the YQ charge was to defray rising fuel costs and documentary evidence that it argues show the charge did, in fact, reflect those costs. Moreover, British Airways asserts that Plaintiffs misunderstand the nature of the 2003-2004 fuel costs baseline it used, and point to the undisputed fact that over the class period, it never recovered more than the difference between its present fuel costs and its fuel costs in 2003-2004.

In addition to, and perhaps in tension with, its assertion that the Court should not revisit its interpretation of the term "fuel surcharge," British Airways argues that it did not breach the contract because it complied with a term, implied in the Contract by English law, limiting its exercise of discretion in setting the YQ charge. In British Airways' view, the Contract afforded them discretion to impose a fuel surcharge and to set the amount of that charge. Under English law, such a discretionary power is limited by an implied contractual term requiring that discretion "be exercised honestly and in good faith, but, having regard to the provisions of the contract by which it is conferred, it must not be exercised arbitrarily, capriciously, or unreasonably." Abu Dhabi Nat'l Tanker Co. v. Product Star Shipping Ltd., [1993] 1 Lloyd's Rep. 397, 404; see also Yam Seng Pte Ltd. v. Int'l Trade Grp., Ltd., [2013] EWHC (QB) 111 [145]. Because, in British Airways' view, it acted honestly and in good faith when it set the YQ charge, not arbitrarily, capriciously, or unreasonably, it cannot have breached the contract.

Taking this issue first, unlike New York law, English law does not recognize a general obligation of good faith and fair dealing implied in all contracts. See Yam Seng, [2013] EWHC (QB) 111 [121] ("The general view among commentators appears to be that in English contract law there is no legal principle of good faith of general application" (citation omitted)); but see Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995) ("Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." (citation omitted)). English courts have, however, "'developed piecemeal solutions in response to demonstrated problems of unfairness.'" Yam Seng, [2013] EWHC (QB) 111 [121] (quoting Interfoto Picture Library Ltd. v. Stiletto Visual Programmes Ltd., [1989] 1 QB 433 at 439 (Eng.)).

8

One such problem arises when a contract confers discretion on one of the parties to that contract without express limitations. See Product Star, 1 Lloyd's Rep. at 404 ("Where A and B contract with each other to confer discretion on A, that does not render B subject to A's uninhibited whim."). In such circumstances, English courts have applied "the established methodology of English law for the implication of terms in fact," and implied a term requiring that "contractual discretion . . . be exercised in good faith and not arbitrarily or capriciously."[2] Yam Seng, [2013] EWHC (QB) 111 [131]; British Telecomm. Plc v. Telefónica O2 UK Ltd., [2014] UKSC 42 [37] (citations omitted). The precise contours of this implied term have not been fully sketched by English courts, and the limitations it imposes "may vary according to the terms of the contract and the context in which the decision-making power is given." Braganza v. BP Shipping Ltd., [2015] UKSC 17 [18]; see also id. at [20]-[32]; (suggesting that the implied limitations on contractual discretion require a discretionary contractual decision be reasonable in the sense expressed in Associated Provincial Pictures Houses Ltd. v. Wednesbury Corp., [1948] 1 KB 223, 233-34, before concluding that resolving the question was unnecessary); V.K. Sims & R.J. Goddard, Comment, Controlling Contractual Discretion, 61 Cambridge L.J. 268, 271 (2002) (discussing similar cases and noting that "[t]he scope of this restriction [on contractual

---

[2] As discussed more fully below in Part B.2, Plaintiffs' claims in this case are not preempted by the Airline Deregulation Act, 49 U.S.C. § 41713(1)(b). It bears pointing out now, however, that a claim for breach of this implied term would not be preempted either despite its apparent similarities to a claim for breach of the implied covenant of good faith and fair dealing. In Northwest, Inc. v. Ginsberg, 134 S. Ct. 1422, 1432 (2014) the Supreme Court held that "[w]hen the law of a State does not authorize parties to free themselves from the [implied] covenant [of good faith and fair dealing], a breach of covenant claim is pre-empted . . . ." Because English law authorizes parties to modify or exclude the implied limitations on contractual discretion by the express terms of their contract, such a claim is not preempted. See Yam Seng, [2013] EWHC (QB) 111 [149] ("[A] further consequence of the fact that the duty is based on the parties' presumed intentions is that it is open to the parties to modify the scope of the duty by the express terms of their contract and, in principal at least, to exclude it altogether.").

9

discretion] and its future development remain, however, unclear."). Nevertheless, it is clear that "no legal discretion, however widely worded . . . can be exercised for purposes contrary to those of the instrument by which it is conferred." Equitable Life Assurance Soc'y v. Hyman, [2000] UKHL 39; see also British Telecomm., [2014] UKSC 42 [37] (noting that the implied term "will normally mean that [discretion] must be exercised consistently with its contractual purpose." (citations omitted)); Sims & Goddard, Discretion, 61 Cambridge L.J. at 270 (noting that the "central issue" is "whether the discretion has been exercised for the purposes for which it was conferred.").

The necessary limitations on the exercise of British Airways' discretion are already implicit in the Court's construction of the Contract, and the Court sees no reason to revisit its definition of "fuel surcharge" at this point. See Yam Seng, [2013] EWHC (QB) 111 at [132]-[134] (noting that the question of whether to imply terms into a contract is "ultimately always a question of construction: what would the contract, read as a whole against the relevant background, reasonably be understood to mean?" (citing Atty. Gen. for Belize v. Belize Telecom Ltd., [2009] UKPC 10 [19] (appeal taken from Belize)). Answering whether the YQ charge was "reasonably related to the cost or price of fuel" is the same as determining whether British Airways exercised its contractual authority "for the purposes for which it was conferred." After all, the purpose of British Airways' contractual power to set a fuel surcharge was to enable it to defray rising fuel costs; the airline says as much. See BA Mot. at 22 (stating that the purpose of the fuel surcharge "was to defray a portion of [British Airways'] rising fuel costs" (citations omitted)). And if the airline's YQ charges were, as Plaintiffs contend, unrelated to the airline's rising fuel costs, then by imposing them, British Airways necessarily "exercised [its power under the Contract] for purposes contrary to those of the instrument by which it is conferred." Hyman,

[2000] UKHL 39. Although British Airways argues, based on a formalistic reading of certain English cases discussed above, that it is improper to focus on the purpose for which the Contract conferred discretion, that argument is belied both by those very cases and the fact that the limitations on contractual discretion implied by English law "may vary according to the terms of the contract and the context in which the decision-making power is given." See Braganza, [2015] UKSC 17 at [18].

Given the Court's construction of the Contract, both parties point to evidence that could lead a reasonable jury to find in their favor. Certain facts, like the amount of YQ charge on a given date and the corresponding fuel price or cost, are undisputed. The parties, however, draw competing reasonable inferences from these data about the relationship between the YQ charge and the cost or price of fuel. See Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (noting that where the parties file cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." (citation omitted)). Other material facts are genuinely disputed. Most centrally, the parties hotly dispute the way in which British Airways used its 2003-2004 baseline figure and what relevance, if any, using this figure had on the relationship between the YQ charge and the cost or price of fuel. Likewise, both sides point to competing testimony about the primary factors British Airways used in setting the YQ charge and what the airline's intended purpose was for the charges. Finally, expert witnesses for both parties have provided competing analyses of the relationship between the YQ charge and fuel prices or costs, as well as the amount, if any, of damages suffered by Plaintiffs.

Given the existence of competing evidence and genuine disputes of material fact, a jury, not the Court, must resolve whether or not British Airways' YQ charge constituted a "fuel surcharge" within the meaning of the Contract.

B. British Airways' Remaining Arguments

Setting aside the question of whether British Airways breached the Contract, the airline argues that three remaining issues—standing, preemption, and the voluntary payment doctrine—bar Plaintiffs' claims.

1. Standing

"[T]he irreducible constitutional minimum of standing contains three elements:" "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.' Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be 'likely' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal citations and quotation marks omitted).

British Airways argues that Plaintiffs cannot satisfy the first requirement, injury in fact, because they have not demonstrated that they were injured by the imposition of the YQ charges. In the airline's view, "[t]he fact that the plaintiffs paid a fuel surcharge is insufficient to establish injury because it is undisputed that BA can impose a fuel surcharge." BA Mot. at 27.

The problem with this argument is it "put[s] the merits cart before the standing horse . . . ." Hillside Metro Assocs., LLC v. JP Morgan Chase Bank, Nat'l Ass'n, 747 F.3d 44, 50 n.5 (2d Cir. 2014). As the Supreme Court has explained "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues,"

not whether the plaintiff will, in fact, prevail on the merits. See Warth v. Seldin, 422 U.S. 490, 498 (1975); see also Parker v. District of Columbia, 478 F.3d 370, 377 (D.C. Cir. 2007) ("The Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume [for the sake of argument] the merits of his or her legal claim."), aff'd sub nom. District of Columbia v. Heller, 554 U.S. 570 (2008). Plaintiffs allege that even though the Contract authorized British Airways to impose a fuel surcharge, its YQ charge was not a fuel surcharge at all. By paying that charge, Plaintiffs allege that they were injured by the airline's breach of the Contract. This is all that is needed to establish Plaintiffs' Article III standing.

### 2. Preemption

The airline next argues that Plaintiffs claims are barred by the preemption provision of the Airline Deregulation Act, 49 U.S.C. § 41713 ("ADA"). The ADA provides that "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route or service of an air carrier . . . ." Id. at (b)(1). In British Airways' view, Plaintiffs' claims are either expressly preempted by this provision or impliedly preempted on account of Congress's intent to "occupy the entire legislative field" of airline regulation. See Giannopoulos v. Iberia Lineas Aereas de España, S.A., 17 F. Supp. 3d 743, 750 (N.D. Ill. 2014).

In two cases, the Supreme Court has addressed the effect of the ADA's preemption provision on claims for breach of contract and breach of the implied covenant of good faith and fair dealing. The first, American Airlines, Inc. v. Wolens, 513 U.S. 219 (1995), held that common law breach of contract claims are not preempted by the ADA because they relate to "privately ordered obligations, [which] do not amount to a State's enactment or enforcement of

13

any law, rule, regulation, standard, or other provision having the force and effect of law" as defined in 49 U.S.C. Section 41713(b)(1). Wolens, 513 U.S. at 228-29. The second, Northwest, Inc. v. Ginsberg, 134 S. Ct. 1422 (2014), addressed whether a claim for breach of the implied covenant of good faith and fair dealing was preempted by the ADA. The Supreme Court held, reaffirming the "privately ordered obligations" theory in Wolens, that "[w]hen the law of a State does not authorize parties to free themselves from the covenant, a breach of covenant claim is pre-empted . . . ." Id. at 1432.

The Court held in ruling on British Airways' motion to dismiss that "[l]ike the plaintiffs in Wolens, the plaintiffs here ask the Court to consider only 'the parties' bargain' as expressed in" the Contract. MTD Order at 7. Thus, the Court held, Plaintiffs' claims were not expressly preempted by the ADA. Id. Although the Supreme Court's decision in Northwest postdates the Court's ruling on the motion to dismiss, it does not alter this conclusion. Despite the airline's assertion to the contrary, Plaintiffs' claim rise or fall on the terms of the Contract as interpreted by the Court. Such a claim is not preempted.

Nor are Plaintiffs' claims impliedly preempted. True, as British Airways points out, "Congress intended to occupy the entire field [of airline regulation] and thereby preempt state regulation of air safety." Air Transp. Ass'n of Am., Inc. v. Cuomo, 520 F.3d 218, 225 (2d Cir. 2008). But Plaintiffs claims do not rely on any state regulation. Rather, they rely on the terms of the Contract. As other courts have held, such claims are not impliedly preempted. See Kruger v. Virgin Atl. Airways, Ltd., 976 F. Supp. 2d 290, 299 (E.D.N.Y. 2013) (stating that the ADA does not preempt "a claim related to anything that Defendant explicitly incorporated into its contract." (citing Wolens, 513 U.S. at 228-29)); see also Giannopoulos, 17 F. Supp. 3d at 748 (noting that

claims based on a contract were not preempted even though the contract incorporated a European Union regulation).

### 3. Voluntary Payment Doctrine

British Airways' final salvo is based on the voluntary payment doctrine. The voluntary payment doctrine is a state law rule that "precludes a plaintiff from recovering payments 'made with full knowledge of the facts' and with a 'lack of diligence' in determining his contractual rights and obligations." Spagnola v. Chubb Corp., 574 F.3d 64, 72 (2d Cir. 2009 (quoting Dillon v. U-A Columbia Cablevision of Westchester, Inc., 740 N.Y.S. 396, 397 (App. Div. 2002)).

The parties agree that the voluntary payment doctrine does not exist in English law. British Airways nevertheless argues that it applies to the claims of one of the named Plaintiffs, Russell Dover, through the contract of carriage—another contract he entered into with British Airways when he bought reward travel. The contract of carriage, unlike the Contract, does not contain a choice of law clause. Citing New York's choice of law rules, which apply to this diversity action, see Licci v. Lebanese Canadian Bank, SAL, 672 F.3d 155, 157 (2d Cir. 2012), British Airways concludes that the law of California, Dover's home state, applies. California recognizes the voluntary payment doctrine. See Ellsworth v. U.S. Bank, N.A., 908 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012).

Even assuming that California law applies to Dover's claims through operation of the contract of carriage, the voluntary payment doctrine does not bar his claims because "it is elementary that an excessive payment made in ignorance of the fact that it is excessive is recoverable." Am. Oil Serv. v. Hope Oil Co., 194 Cal. App. 2d 581, 586 (1961). "Whether a plaintiff knew her payment to be excessive at the time of the payment is 'to be judged in light of the facts that were known to plaintiff' and not whether plaintiff has the 'means of knowledge' by

which they could have discovered the payment to be excessive." Rodman v. Safeway, Inc., 125 F. Supp. 3d 922, 941 (N.D. Cal. 2015) (quoting Am. Oil Serv., 194 Cal. App. 2d at 586). In this case, there is no evidence that, at the time Dover paid the YQ charge, he knew how the YQ charge was calculated, the factors on which it was based, or that it was (as Plaintiffs allege) not reasonably related to British Airways' cost or price of fuel. Under these circumstances, the Court cannot hold as a matter of law that the voluntary payment doctrine bars Dover's claims. See Rodman, 125 F. Supp. 3d at 941 (denying summary judgment as to the voluntary payment doctrine in a breach of contract action where there was no evidence that class members were aware of the conduct that allegedly breached the contract).

## CONCLUSION

As explained, the parties' cross-motions for summary judgment are denied.

SO ORDERED: /

s/Raymond J. Dearie

Dated: September 28, 2017

Raymond J. Dearie
United States District Judge